**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>and<br><br>STATE OF ILLINOIS<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCATE HEALTH CARE NETWORK,<br><br>ADVOCATE HEALTH AND HOSPITALS CORPORATION,<br><br>and<br><br>NORTHSHORE UNIVERSITY HEALTHSYSTEM<br><br>Defendants. | No. 15-cv-11473<br><br><br>**PROVISIONALLY REDACTED VERSION** |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION PURSUANT TO**
**SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT**

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission") and the State of

Illinois, petition the Court, pursuant to Section 13(b) of the Federal Trade Commission Act

("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, for a

temporary restraining order and preliminary injunction enjoining Defendant Advocate Health

Care Network ("AHCN"), Defendant Advocate Health and Hospitals Corporation ("AHHC," and

together with AHCN, "Advocate"), and Defendant NorthShore University HealthSystem

1

("NorthShore," and together with Advocate, "Defendants"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating an acquisition or consolidation. The proposed acquisition or consolidation is pursuant to an Affiliation Agreement, dated September 11, 2014 ("Affiliation Agreement"), whereby AHCN will change its name to Advocate NorthShore Health Partners ("ANHP") and subsequently acquire and become the sole corporate member of NorthShore (proposed acquisition herein referred to as the "Transaction"). Absent this Court's action, Defendants will be free to complete the Transaction after 11:59 pm EST on December 23, 2015.

Plaintiffs require the aid of this Court to temporarily delay the closing of the Transaction in order to prevent competitive harm and maintain the *status quo* during the pendency of an administrative proceeding on the merits. The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, Section 5 of the FTC Act, 15 U.S.C. § 45, and the Commission's Rules of Practice. The administrative proceeding, which is scheduled to begin on May 24, 2016, will determine the legality of the Transaction and any appropriate remedies, subject to judicial review by a federal Court of Appeals. All parties will have a full opportunity to conduct discovery and present evidence regarding the likely competitive effects of the Transaction.

## I.

### NATURE OF THE CASE

1.      Advocate and NorthShore are the two leading providers of general acute care ("GAC") inpatient hospital services in the northern suburbs of Chicago, Illinois. The proposed Transaction would join these two hospital systems to create by far the largest hospital system in northern Cook County and southern Lake County.

2. The proposed Transaction will substantially lessen competition and cause significant harm to consumers. If Defendants consummate the Transaction, healthcare costs will rise, and the incentive to increase service offerings and improve the quality of healthcare will diminish.

3. Advocate and NorthShore are close, if not each other's closest, competitors in the North Shore area. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Moreover, both Advocate and NorthShore have a history of upgrading medical facilities, investing in new technologies, and adjusting their approach to managed care contracting because of competition from each other.

4. The Transaction will substantially lessen competition in the market for GAC inpatient hospital services sold and provided to commercial payers (*i.e.*, health plans) and their insured members, respectively ("GAC inpatient hospital services"). The relevant geographic market in which to analyze the effects of the Transaction is the area in northern Cook County and southern Lake County, defined as the "North Shore Area." The North Shore Area is bounded by six hospitals—NorthShore Evanston Hospital, Swedish Covenant Hospital, Presence Resurrection Medical Center, Northwest Community Hospital, Advocate Condell Medical Center, and Vista Medical Center East—and contains five additional hospitals—NorthShore Glenbrook Hospital, NorthShore Highland Park Hospital, NorthShore Skokie Hospital, Advocate Lutheran General Hospital, and Northwestern Lake Forest Hospital. Collectively, Defendants own and operate more than half the GAC hospitals located within the North Shore Area.

3

5.      Defendants are already the two largest providers, by admissions, of GAC inpatient hospital services in the North Shore Area. Defendants employ and are affiliated with large networks of physicians, offer a vast suite of GAC inpatient hospital services, and operate with additional competitive advantages over other hospitals in the North Shore Area. Post-Transaction, Defendants would control 55% of the GAC inpatient hospital services market, by admissions, in the North Shore Area, while the next largest hospital would have only 15% of this market. The Transaction would significantly increase market concentration and result in such a highly concentrated market that the Transaction is presumptively unlawful under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines").

6.      Today, Advocate and NorthShore compete for inclusion in commercial payers' hospital networks. Without either of these hospital systems, it would be very difficult for commercial payers to market a health plan provider network to employers with employees living or working in the North Shore Area. Competition between Advocate and NorthShore results in lower prices, higher quality, and greater service offerings.

7.      By eliminating competition between the parties, the Transaction is likely to increase Defendants' bargaining leverage with commercial payers, and enhance Defendants' ability to negotiate more favorable reimbursement terms, including reimbursement rates (*i.e.*, prices). Faced with higher rates and other less favorable terms, commercial payers will be forced to pass on those higher healthcare costs to employers and their employees in the form of increased premiums, co-pays, deductibles, and other out-of-pocket expenses. The merged firm will also have a diminished incentive to improve its quality of care or increase its service offerings to patients in the North Shore Area.

4

8.    Entry or expansion by other hospitals will not be likely, timely, or sufficient to counteract the adverse competitive effects that likely will result from the Transaction. Illinois's Certificate of Need regulatory framework makes it difficult for health systems to receive approval to build new hospitals or expand existing facilities. Additionally, potential entrants would need to devote significant time and resources to conduct studies, develop plans, acquire land, and construct and open a competitive hospital. Defendants' combined size and the breadth and depth of the GAC inpatient hospital services they provide make it unlikely that there will be entry on a sufficient scale to counteract or constrain post-Transaction price increases.

9.    The Defendants' principal efficiency claim—that the merger will enable Defendants to lower costs and participate in a low-price, ultra-narrow network insurance product offered to commercial payers—is neither substantiated nor merger-specific, and ultimately not cognizable. Defendants' other efficiency claims, including their purported claims for improved quality, are likewise not substantiated, not merger-specific, and not cognizable. Even assuming Defendants' purported efficiencies were cognizable, they are insufficient to justify the Transaction in light of its potential to harm competition.

10.    A temporary restraining order enjoining the Transaction is necessary to preserve the *status quo* and allow the Court to grant full and effective relief after considering the Commission's application for a preliminary injunction. Preliminary injunctive relief restraining Defendants from proceeding with their Transaction is necessary to prevent interim harm to competition pending final determination by the Commission of the merits in this case. Absent preliminary relief, Defendants can close the Transaction, and the Commission's ability to fashion effective relief is significantly impaired, or perhaps even precluded, if the Transaction is found to be unlawful after a full administrative proceeding and any subsequent appeals.

5

## II.

## BACKGROUND

## A.

### Jurisdiction and Venue

11.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345.

This is a civil action arising under Acts of Congress protecting trade and commerce against

restraints and monopolies, and is brought by an agency of the United States authorized by an Act

of Congress to bring this action.  Advocate and NorthShore, and their relevant operating entities

and subsidiaries, are, and at all relevant times have been, engaged in activities in or affecting

"commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the

Clayton Act, 15 U.S.C. § 12.

12.     Advocate and NorthShore transact business in the Northern District of Illinois and

are subject to personal jurisdiction therein.  Venue, therefore, is proper in this district under 28

U.S.C. § 1391 (b) and (c) and 15 U.S.C. § 53(b).

13.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

(b)     Whenever the Commission has reason to believe –

> (1) that any person, partnership, or corporation is violating,
> or is about to violate, any provision of law enforced by the
> Federal Trade Commission, and
> (2) that the enjoining thereof pending the issuance of a
> complaint by the Commission and until such complaint is
> dismissed by the Commission or set aside by the court on
> review, or until the order of the Commission made thereon
> has become final, would be in the interest of the public –
> the Commission by any of its attorneys designated by it for
> such purpose may bring suit in a district court of the United
> States to enjoin any such act or practice.  Upon a proper

6

> showing that, weighing the equities and considering the
> Commission's likelihood of ultimate success, such action
> would be in the public interest, and after notice to the
> defendant, a temporary restraining order or a preliminary
> injunction may be granted without bond . . . .

14.     In conjunction with the Commission, the State of Illinois brings this action for a

preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and

restrain Advocate and NorthShore from violating Section 7 of the Clayton Act, 15 U.S.C. § 18,

pending the Commission's administrative proceeding. The State of Illinois has the requisite

standing to bring this action because the Transaction would cause antitrust injury in Illinois for

GAC inpatient hospital services.

## B.

### The Parties

15.     Plaintiff, the Commission, is an administrative agency of the United States

government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et*

*seq.,* with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, District of

Columbia 20580. The Commission is vested with authority and responsibility for enforcing,

*inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C.

§ 45.

16.     Plaintiff, the State of Illinois, is a sovereign state of the United States. This action

is brought by and through its Attorney General, who is the chief law enforcement officer of the

State, with the authority to bring this action on behalf of her state pursuant to Section 16 of the

Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Illinois has its

principal offices at 100 West Randolph Street, Chicago, Illinois 60601.

7

17.     Defendants AHCN and AHHC are Illinois not-for-profit corporations, with AHCN acting as the sole corporate member of AHHC.  Together and with other controlled corporations, they constitute and operate Advocate, a not-for-profit health system affiliated with the Evangelical Lutheran Church in America and the United Church of Christ.  Headquartered in Downers Grove, Illinois, Advocate operates 11 GAC hospitals and a two-campus Children's Hospital, all in Illinois.  Five of Advocate's GAC hospitals—Christ Medical Center, Illinois Masonic Medical Center, Lutheran General Hospital, South Suburban Hospital, and Trinity Hospital—are located in Cook County, and two—Condell Medical Center and Good Shepherd Hospital—are located in Lake County.  For the fiscal year ending on December 31, 2014, Advocate generated $5.2 billion in revenue.

18.     Advocate is the largest hospital system in the Chicago metropolitan area. Including its 12 hospitals, Advocate has more than 250 healthcare practice sites at which physicians and other clinicians provide clinical health services, with 37 outpatient service locations, 25 imaging facilities, and five outpatient surgical centers.  Two of Advocate's hospitals, Advocate Lutheran General Hospital ("Advocate Lutheran General") and Advocate Condell Medical Center ("Advocate Condell"), are in the North Shore Area.  Advocate Lutheran General, Advocate's second largest hospital with 638 licensed beds, is in Park Ridge, Illinois, a town in northern Cook County, and offers a range of GAC inpatient hospital services.  Advocate Lutheran General generated more than $490 million in inpatient revenue in 2014.  Advocate Condell is in Libertyville, Illinois, in southern Lake County.  Advocate Condell has 273 licensed beds, and provides a wide range of GAC inpatient hospital services.  Advocate Condell's inpatient revenue in 2014 exceeded $173 million.  Both Advocate Lutheran General and Advocate Condell are Licensed Level I Adult Trauma Centers.

8

19.     Advocate employs approximately 1,375 physicians as part of its employed physician group, the Advocate Medical Group, and clinically integrates with an additional 3,825 non-employed physicians. Advocate Physician Partners ("APP"), a joint venture in which Advocate holds a 50% interest, contracts with commercial payers on behalf of Advocate's hospitals as well as its employed and clinically integrated non-employed physicians.

20.     Defendant NorthShore is an Illinois not-for-profit corporation and health system. Headquartered in Evanston, Illinois, NorthShore owns and operates four GAC hospitals. Three of these GAC hospitals—Evanston Hospital ("NS Evanston"), Glenbrook Hospital ("NS Glenbrook"), and Skokie Hospital ("NS Skokie")—are in northern Cook County, while the fourth—Highland Park Hospital ("NS Highland Park")—is in southern Lake County. For the fiscal year ending on September 30, 2014, NorthShore generated $1.9 billion in revenue.

21.     NorthShore's four hospitals compete with Advocate's hospitals, particularly Advocate Condell and Advocate Lutheran General, across a wide range of GAC inpatient hospital services. NS Evanston, located in Evanston, Illinois, is NorthShore's largest hospital, with 354 licensed beds. NS Evanston is a Licensed Level I Adult Trauma Center. NS Evanston's inpatient revenue for its fiscal year ending in September 2014 surpassed $243 million. NS Glenbrook is in Glenview, Illinois, and has 173 licensed beds. NS Highland Park, located in Highland Park, Illinois, has 149 licensed beds. NS Skokie is in Skokie, Illinois, and has 125 licensed beds. NS Glenbrook, NS Highland Park, and NS Skokie are Licensed Level II Adult Trauma Centers. The inpatient revenues for NS Glenbrook, NS Highland Park, and NS Skokie in the fiscal year ending in September 2014 were approximately $106 million, $85 million, and $91 million, respectively.

9

22.     NorthShore's employed physician group, NorthShore Medical Group, employs
approximately 900 physicians and clinically integrates with an additional 1,200 non-employed
physicians who are on staff and have admitting privileges at one or more of NorthShore's
hospitals. Of these 1,200 non-employed physicians, approximately 520 participate in
NorthShore Physician Associates, an independent physician association ("IPA") whose
membership also includes employed physicians within NorthShore Medical Group.
NorthShore's IPA negotiates contracts with commercial payers on behalf of NorthShore's
employed physicians and participating non-employed physicians.

## C.

### The Transaction and the Commission's Response

23.     In early 2014, NorthShore initiated discussions with Advocate regarding a
potential affiliation. On September 11, 2014, Defendants entered into the Affiliation Agreement,
according to which AHCN will change its name to ANHP and become the sole corporate
member of NorthShore, thereby acquiring NorthShore in a transaction valued at $2.2 billion.
The combined entity would operate 15 GAC hospitals in Illinois, 11 of which are located in
Cook and Lake Counties. ANHP would be the 11th largest non-profit hospital system in the
United States. Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a,
and a timing agreement entered into between the Defendants and Commission staff, absent this
Court's action, Defendants would be free to close the Transaction after 11:59 p.m. EST on
December 23, 2015.

24.     Following an investigation that lasted more than one year, the Commission, on
December 17, 2015, and by a unanimous vote, found reason to believe that the Transaction
would violate Section 7 of the Clayton Act by substantially lessening competition. That same

10

day, the Commission initiated an administrative proceeding on the antitrust merits of the Transaction before an Administrative Law Judge, and a merits trial will begin on May 24, 2016. The administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony. The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

25. On December 17, 2015, the Commission also authorized its staff to pursue this federal court proceeding to obtain preliminary injunctive relief under Section 13(b) of the FTC Act. In doing so, the Commission has determined that it has reason to believe the Transaction would violate the Clayton Act and the FTC Act by substantially lessening competition.

## III.

## THE RELEVANT SERVICE MARKET

26. The relevant service market is GAC inpatient hospital services sold and provided to commercial payers and their insured members, respectively. This service market encompasses a broad cluster of medical and surgical diagnostic and treatment services offered by both Advocate and NorthShore that typically require an overnight hospital stay. GAC inpatient hospital services include, but are not limited to, many emergency services, internal medicine services, and surgical procedures offered by both Defendants. Although the Transaction's likely effect on competition could be analyzed separately for each individual inpatient service, it is appropriate to evaluate the Transaction's likely effects across this cluster of GAC inpatient hospital services because these services are offered to residents of the North Shore Area under similar competitive conditions. Thus, grouping the hundreds of individual GAC inpatient

11

hospital services into a cluster for analytical convenience enables the efficient evaluation of competitive effects with "no loss of analytic power."

27.     Outpatient services are not included in the GAC inpatient hospital services market because commercial payers and patients cannot substitute outpatient services for inpatient care in response to a price increase on GAC inpatient hospital services. Additionally, outpatient services are offered by a different set of competitors under different competitive conditions than GAC inpatient hospital services.

28.     Similarly, the GAC inpatient hospital services market also excludes the most complex and specialized tertiary and quaternary services, such as some major surgeries and organ transplants. These services are offered by a different set of competitors under different competitive conditions than, and are not substitutes for, GAC inpatient hospital services.

29.     Finally, the GAC inpatient hospital services market excludes services related to psychiatric care, substance abuse, and rehabilitation services. These services are also offered by a different set of competitors under different competitive conditions than, and are not substitutes for, GAC inpatient hospital services.

## IV.

## THE RELEVANT GEOGRAPHIC MARKET

30.     The relevant geographic market in which to analyze the effects of the Transaction is no broader than the North Shore Area. The North Shore Area is defined as the area bounded by six GAC inpatient hospitals: NS Evanston, Swedish Covenant Hospital, Presence Resurrection Medical Center, Northwest Community Healthcare Hospital, Advocate Condell, and Vista Medical Center East.

12

31.     The North Shore Area is the main area of competition between NorthShore's four hospitals and the two Advocate hospitals with which NorthShore most directly competes— Advocate Lutheran General and Advocate Condell.  It also comprises the population center from where these six hospitals draw a significant portion of their patients.

32.     The North Shore Area substantially overlaps with NorthShore's primary service area, which NorthShore's ordinary course documents identify as the 51 zip codes that surround the NorthShore hospital system.  Approximately 73% of patients residing within the North Shore Area stay there to receive GAC inpatient hospital services.

33.     The appropriate geographic market to analyze the Transaction is the area where a hypothetical monopolist of the relevant services could profitably impose a small but significant and non-transitory increase in price ("SSNIP").  If a hypothetical monopolist could impose a SSNIP, the boundaries of that geographic area are an appropriate geographic market.

34.     North Shore Area residents strongly prefer to obtain GAC inpatient hospital services close to where they live or work.  Indeed, it would be very difficult for a commercial payer to market successfully to patients in the North Shore Area a health plan provider network that excluded all hospitals located within the North Shore Area.  Since a significant number of patients within the North Shore Area would not view hospitals outside of that area as practical alternatives, a hypothetical monopolist of all North Shore Area hospitals could profitably impose a SSNIP.

## V.

## MARKET STRUCTURE AND THE TRANSACTION'S PRESUMPTIVE ILLEGALITY

35.     Advocate and NorthShore are the two largest providers, by admissions, of GAC inpatient hospital services in the North Shore Area.

36. The Transaction will create a highly concentrated market that is presumptively illegal under the Merger Guidelines and the relevant case law. Based on commercial GAC inpatient admissions of patients residing within the six-county Chicagoland metropolitan area[1] and seeking care in the North Shore Area, NorthShore's share of GAC inpatient hospital services in the North Shore Area market is 35%, and Advocate's share is 20%. Post-Transaction, Defendants will control 55% of this market. Northwest Community, the third largest competitor in the North Shore Area, has a 15% share of the GAC inpatient hospital services market. No other competitor has more than a 9% share.

37. The Herfindahl-Hirschman Index ("HHI") is commonly used by courts and antitrust agencies to measure market concentration. The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market. A merger or acquisition is presumed likely to create or enhance market power—and is presumptively illegal—when the post-acquisition HHI exceeds 2,500 points and the merger or acquisition increases the HHI by more than 200 points. Here, the market concentration levels far exceed these thresholds. As measured by commercial inpatient admissions from patients residing within the six-county Chicagoland metropolitan area and seeking inpatient care at a hospital within the North Shore Area, the post-Transaction HHI for commercial GAC inpatient hospital services will be 3,517—an increase of 1,423 points. The market shares and HHI figures for commercial GAC inpatient admissions for hospitals in the North Shore Area are summarized in the table below.

---

[1] The six-county Chicagoland metropolitan area includes Cook, DuPage, Kane, Lake, McHenry, and Will Counties.

14

| GAC INPATIENT HOSPITAL SERVICES Share of Commercial GAC Inpatient Admissions for Hospitals Within North Shore Area Limited to commercial patients residing in the 6-county Chicagoland metropolitan area | | |
|---|---|---|
| **Hospital** | **Share of Admissions** | |
| | **Pre-Transaction** | **Post-Transaction** |
| **NorthShore Evanston Hospital** **NorthShore Glenbrook Hospital** **NorthShore Highland Park Hospital** **NorthShore Skokie Hospital** | **35%** | **55%** |
| **Advocate Condell Medical Center** **Advocate Lutheran General Hospital** | **20%** | |
| Northwest Community Healthcare Hospital | 15% | 15% |
| Swedish Covenant Hospital | 9% | 9% |
| Northwestern Lake Forest Hospital | 8% | 8% |
| Presence Resurrection Medical Center | 7% | 7% |
| Vista Medical Center East | 6% | 6% |
| **HHI** | **2,094** | **3,517** |
| **Change in HHI** | **1,423** | |

# VI.

# ANTICOMPETITIVE EFFECTS

## A.

## Competition Among Hospitals Benefits Consumers

38.     Competition between hospitals occurs in two distinct but related stages.  First,

hospitals compete for inclusion in commercial payers' health plan provider networks.  Second,

in-network hospitals compete to attract patients, including commercial payers' health plan

members.

15

39.     In the first stage of hospital competition, hospitals compete to be included in commercial payers' health plan provider networks. To become an in-network provider, a hospital negotiates with a commercial payer and, if mutually agreeable terms can be reached, enters into a contract. The financial terms under which a hospital is reimbursed for services rendered to a health plan's members are a central component of those negotiations, regardless of the payment method.

40.     In-network status benefits a hospital by giving it preferential access to the health plan's members. Health plan members typically pay far less to access in-network hospitals than those that are out-of-network. Thus, all else being equal, an in-network hospital will attract more patients from a particular health plan than an out-of-network one. This dynamic motivates hospitals to offer lower rates and other more favorable terms to commercial payers to win inclusion in their networks.

41.     From the payers' perspective, having hospitals in-network is beneficial because it enables the payer to create a health plan provider network in a particular geographic area that is attractive to current and prospective members, typically local employers and their employees.

42.     Under a fee-for-service payment model, a hospital receives payment (*i.e.*, reimbursement) for the services it provides to a commercial payer's health plan members. Such payment is typically on a per-service, per-diem, or discount-off-charges method. Under a risk-based payment model, a hospital is reimbursed a fixed payment for all services provided to a particular member. As a result, the hospital has an incentive to lower overall utilization of services by patients. Regardless of whether a contract's reimbursement method is based on fee-for-service terms, risk-based terms, or some combination of both, relative bargaining leverage plays a key role in negotiations between commercial payers and hospitals.

16

43.     A critical determinant of the relative bargaining positions of a hospital and a commercial payer during contract negotiations is whether other, nearby comparable hospitals are available to the commercial payer and its health plan members as alternatives in the event of a negotiating impasse.  The presence of alternative hospitals limits a hospital's bargaining leverage and thus constrains its ability to obtain more favorable reimbursement terms from commercial payers.  The more attractive these alternative hospitals are to a commercial payers' health plan members in a local area, the greater the constraint on that hospital's bargaining leverage.  Where there are few or no meaningful alternatives, a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates and other more favorable reimbursement terms.

44.     A merger between hospitals that are close substitutes in the eyes of commercial payers and their health plan members therefore tends to lead to increased bargaining leverage for the merged entity and, as a result, more favorable reimbursement terms, because it eliminates an available alternative for commercial payers.  This increase in leverage is greater when the merging hospitals are closer substitutes for (and competitors to) each other.

45.     Changes in the reimbursement terms negotiated between a hospital and a commercial payer, including increases in reimbursement rates, significantly impact the commercial payer's health plan members.  "Self-insured" employers rely on a commercial payer for access to its health plan provider network and negotiated rates, but these employers pay the cost of their employees' healthcare claims directly and thus bear the full and immediate burden of any rate increases in the healthcare services used by their employees.  "Fully insured" employers pay premiums to commercial payers—and employees pay premiums, co-pays, and deductibles—in exchange for the commercial payer assuming financial responsibility for paying hospital costs generated by the employees' use of hospital services.  When hospital rates

17

increase, commercial payers pass on these increases to their fully insured customers in the form of higher premiums, co-pays, and deductibles.

46.     In the second stage of hospital competition, hospitals compete to attract patients to their facilities. Because health plan members often face similar out-of-pocket cost for in-network hospitals, hospitals in the same network compete to attract patients on non-price features—that is, by offering better quality of care, amenities, convenience, and patient satisfaction than their competitors. Hospitals also compete on these non-price dimensions to attract patients covered by Medicare and Medicaid, and other patients without commercial insurance. A merger of competing hospitals eliminates that non-price competition and reduces the merged entity's incentive to improve and maintain quality.

**B.**

**The Transaction Would Eliminate Beneficial Price Competition**

47.     Advocate and NorthShore are close—if not each other's closest—competitors in the North Shore Area. NorthShore has significantly altered its managed care contracting strategy in response to competition from Advocate. NorthShore's ordinary course documents similarly identify Advocate's "approach to risk" and "ACO strategy" as significant competitive threats. Because Advocate and NorthShore are close

18

substitutes, the Transaction would eliminate a significant incentive for the Defendants to compete on price and other reimbursement terms post-merger.

48.     Diversion analysis, a standard economic tool that uses data on where patients receive hospital services to determine the extent to which hospitals are substitutes, confirms that Advocate and NorthShore are close competitors. Diversion analysis shows that if NorthShore's four hospitals were not available to Chicago-area patients, approximately 20% of NorthShore's patients would seek care within the Advocate system. Diversion analysis similarly shows that if Advocate Lutheran General and Advocate Condell were not available to Chicago-area patients, approximately 20% and 25% of their patients, respectively, would seek care at a NorthShore hospital.

49.     Offering hospital coverage in the North Shore Area is essential for a commercial payer to market successfully a health plan provider network to employers in the North Shore Area. At present, Advocate and NorthShore serve as key alternate providers of GAC inpatient hospital services for healthcare consumers living in the North Shore Area. Other hospitals in Chicago, including those located downtown and in the outlying suburbs, are not adequate substitutes for Advocate and NorthShore. Similarly, commercial payers do not view the five non-Defendant hospitals in the North Shore Area as comparable alternatives to the Defendants due to differences in their size, scope of services, and location.

50.     Healthcare consumers in the North Shore Area strongly prefer that their networks include at least one of the Defendants. For example, in 2013, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ health plan provider network included ▮▮▮▮▮▮ but excluded ▮▮▮▮▮. When ▮▮▮▮▮ subsequently dropped out of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ immediately deemed the new network—which now excluded both

19

NorthShore and Advocate—inadequate for its area employees. As a result, ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ As this

example demonstrates, commercial payers will have little choice but to accept the reimbursement

terms demanded by the merged system or exclude the merged system at the risk of having its

network fail.

51.     The Transaction would increase the Defendants' bargaining leverage in contract

negotiations with commercial payers. This increase in bargaining leverage would enhance

Defendants' ability to negotiate higher reimbursement rates and more favorable reimbursement

terms relating to risk-based contracting.

52.     The growth of "narrow network" health insurance products—which, in contrast to

"broad networks," include less than all of the hospitals in a geographic market—will further

increase the merged system's bargaining leverage with commercial payers. Such networks offer

a tradeoff to consumers by including fewer participating hospitals, but at often significantly

discounted prices relative to other available provider networks. Hospitals are willing to accept

the lower reimbursement terms required to participate in narrow networks with the expectation

that fewer providers will ensure that each hospital will gain increased volumes of patients and

procedures. Today, commercial payers treat the merging parties as substitutes—typically

including one Defendant while excluding the other—when constructing narrow network products

for North Shore Area employers. As such, virtually every narrow network marketed to

consumers across the North Shore Area will need to include the combined system post-merger.

20

53.     By eliminating competition between Advocate and NorthShore, the Proposed
Transaction will give the Defendants leverage to negotiate more favorable terms to participate in
narrow networks, including securing higher reimbursement rates.  For example, ▓▓▓▓▓▓▓▓
▓▓ narrow network product includes ▓▓▓▓▓▓ but excludes ▓▓▓▓▓▓  Competition between
Advocate and NorthShore allowed ▓▓▓ to obtain lower rates.▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓

## C.

### The Transaction Would Eliminate Vital Quality and Service Competition

54.     Competition drives hospitals to invest in quality initiatives and new technologies
to further differentiate themselves from competitors.  Advocate and NorthShore compete with
one another across other various non-price dimensions.  The Transaction would eliminate this
competition, which has provided patients in the North Shore Area with higher quality care and
more extensive healthcare service offerings.  Advocate and NorthShore closely track each
other's quality and brand recognition, and Defendants have substantially invested in improving
and expanding their services and facilities to compete against one another.

55.     For example, NorthShore responded to its strategic advisor's analysis of
healthcare competition—which identified Advocate's move to risk-based contracting as a
competitive threat to NorthShore—by forming a "Care Transformation Team."  The Care
Transformation Team has undertaken significant investments to improve NorthShore's health
outcomes and quality of care.  These investments include enhancements to NorthShore's already
well-regarded health information technology and data analytics, advancements in disease
management, and strengthening the clinical integration between NorthShore and its physicians.

21

56.     NorthShore also created the NorthShore Orthopedic Institute in 2013 in response to a significant loss of volume of orthopedic cases to Advocate Lutheran General.  NorthShore also opened six new integrated delivery rooms at NS Highland Park to stem losses in obstetric admissions market share to Advocate Condell.  Similarly, NorthShore has heavily invested in upgrading and modernizing NS Skokie, which it acquired in 2009, to attract patients from Advocate Lutheran General.

57.     Patients benefit from this direct competition in the quality of care and services offered to them by Defendants.  The Transaction will dampen the merged firm's incentive to compete on quality of care and service offerings, to the detriment of all patients who use these hospitals, including commercially insured, Medicare, Medicaid, and self-pay patients.

## VII.

## ENTRY BARRIERS

58.     Neither entry by new market participants nor expansion by current market participants would deter or counteract the Transaction's likely harm to competition for GAC inpatient hospital services in the North Shore Area.

59.     New hospital entry or expansion in the North Shore Area would not be likely, timely, or sufficient to offset the Transaction's likely harmful competitive effects.  Construction of a new GAC hospital or substantial expansion of an existing one involves high costs and serious financial risk, including the time and resources it would take to conduct studies, develop plans, acquire land, obtain regulatory approvals, and construct and open a competitive facility.

60.     Even if hospital construction or expansion were likely, such entry would not be timely.  Illinois's Certificate of Need ("CON") regulations pose an additional barrier to entry.  The CON regulations require hospitals seeking to build new hospitals, add licensed beds or new

22

clinical services to existing hospitals, or purchase medical equipment above a capital threshold to undergo an extensive application process and justify the need for additional hospital beds or an expansion of current facilities. Obtaining CON approval is a time-consuming process. Moreover, construction of a new hospital would take substantially longer than two years from initial planning stages to opening.

61.     Potential entry or expansion would also be insufficient to counteract the anticompetitive effects of the Transaction. Entrants would face significant challenges in replicating the competitiveness and reputation of either Advocate or NorthShore, both of whom offer a broad cluster of GAC inpatient hospital services, have multiple hospitals in the relevant market, generate billions of dollars in annual revenue, and provide healthcare services to tens of thousands of inpatients per year.

## VIII.

### EFFICIENCIES

62.     Defendants' claimed efficiencies are not sufficient to outweigh the Transaction's likely harm to competition. The purported benefits would not enhance competition for GAC inpatient hospital services and fall far short of the cognizable efficiencies needed to outweigh the Transaction's likely significant harm to competition in the North Shore Area.

63.     Defendants' principal claim is that the Transaction would result in sufficient cost savings to enable them to participate in a low-price, ultra-narrow network that would be offered by commercial payers. However, Defendants have failed to substantiate the cost savings they claim must be achieved for NorthShore to reduce its cost structure sufficiently to participate in such a product at the price necessary for it to be successful. Moreover, NorthShore's willingness

to participate in an ultra-narrow network insurance product is not a merger-specific efficiency. Therefore, the purported efficiency is not cognizable.

64.     Defendants' other efficiency claims, including those relating to quality improvements, are not substantiated, not merger-specific, and not nearly of the magnitude necessary to justify the Transaction in light of its potential to harm competition. In any event, Defendants' claim that the Transaction will reduce healthcare costs are based on a number of speculative and unsubstantiated assumptions.

## IX.

### LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

65.     This Court, in deciding whether to grant relief, must balance the likelihood of the Commission's ultimate success on the merits against the public equities, using a sliding scale. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public's interest in effective enforcement of the antitrust laws.

66.     The Commission has reason to believe that the Transaction would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. In particular, the Commission is likely to succeed in demonstrating, among other things, that:

> a.     The Transaction would have anticompetitive effects in the market for GAC inpatient hospital services in the North Shore Area;
>
> b.     Substantial and effective entry or expansion into the relevant service and geographic markets is difficult, and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Transaction; and

24

c.   Any efficiencies that Defendants may assert as resulting from the
Transaction are speculative, not merger-specific, and are, in any event,
insufficient as a matter of law to justify the Transaction.

67.   Preliminary relief is warranted and necessary.  The Commission voted
unanimously to issue an administrative complaint.  Should the Commission rule, after the full
administrative trial, that the Transaction is unlawful, reestablishing the *status quo ante* of
competition would be difficult, if not impossible, in the absence of preliminary injunctive relief
from this Court.  The integration of NorthShore's and Advocate's operations, including the
implementation of higher prices and potential staff reductions, would substantially impair any
attempt to restore competition to pre-Transaction levels.

68.   Moreover, in the absence of relief from this Court, substantial harm to
competition could occur immediately, including an increase in the costs that employers and their
employees in Chicago incur for their healthcare and a reduction in the quality of healthcare
administered.  Because any meaningful pro-competitive benefits of the Transaction do not
outweigh the significant interim harm to competition and consumers, the public equities weigh
strongly in favor of Plaintiffs' request for preliminary injunctive relief.

69.   Accordingly, the equitable relief requested here is in the public interest.

WHEREFORE, the Commission and the State of Illinois respectfully request that the Court:

a.     Temporarily restrain and preliminarily enjoin Defendants from taking any further steps to consummate the Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

b.     Retain jurisdiction and maintain the *status quo* until the administrative proceeding that the Commission has initiated concludes;

c.     Award costs of this action to Plaintiffs, including attorneys' fees to the State of Illinois; and

d.     Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: December 21, 2015

Of counsel:

DEBORAH FEINSTEIN
Director
Federal Trade Commission

JONATHAN NUECHTERLEIN
General Counsel
Federal Trade Commission

ALEXIS GILMAN
Assistant Director

MARK SEIDMAN
KEVIN HAHM
Deputy Assistant Directors

SEAN P. PUGH
EMILY BOWNE
ALEXANDER BRYSON
CHRISTOPHER CAPUTO
TIMOTHY CARSON
CHARLES DICKINSON
JAIME FRANCE
CHARLES LOUGHLIN
ANTHONY SAUNDERS
SOPHIA VANDERGRIFT
MICHELLE YOST HALE
Attorneys
Federal Trade Commission
Bureau of Competition

Respectfully Submitted,

JAMES T. GREENE
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-5196
Facsimile: (202) 326-2286
Email: tgreene2@ftc.gov

JAMES H. DAVIS
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
Telephone: (312) 960-5634
Facsimile: (312) 960-5600
Email: jdavis@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

27

FOR PLAINTIFF STATE OF ILLINOIS:

LISA MADIGAN
Attorney General
ROBERT W. PRATT
Chief, Antitrust Bureau
BLAKE L. HARROP
Senior Assistant Attorney General

By: _Robert W. Pratt_

Robert W. Pratt
Blake L. Harrop
Office of the Attorney General
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
Telephone: (312) 814-3000
Facsimile: (312) 814-4209
Email: rpratt@atg.state.il.us
Email: bharrop@atg.state.il.us

28