# APPENDIX

# APPENDIX
# UNPUBLISHED AUTHORITIES RELIED UPON

Table of Contents                                                                Page

*Chamberlain Group v. Interlogix, Inc.*, 2002 U.S. Dist. LEXIS 5468
(N.D. Ill. Mar. 26, 2002) [Attachment 1] ................................................................ 3

*Deangelis v. Corzine*, 2015 U.S. Dist. LEXIS 18207
(S.D.N.Y. Feb. 9, 2015) [Attachment 2] .................................................................. 11

*Dover v. British Airways, PLC*, No. 12 CV 5567, 2014 U.S. Dist. LEXIS 114121,
2014 WL 4065084 (E.D.N.Y. Aug. 15, 2014) [Attachment 3] ................................. 45

*Duncan v. Chevron U.S.A., Inc.,* 2011 U.S. Dist. LEXIS 63707
(E.D. La. June 15, 2011) [Attachment 4] ................................................................ 51

*FTC v. Bass Bros. Enterprises, Inc.,* 1984 U.S. Dist. LEXIS 16889
(N.D. Ohio May 8, 1984) [Attachment 5] ............................................................... 58

*Genband US LLC v. Metaswitch Networks Corp.*, 2016 U.S. Dist. LEXIS 2652
(E.D. Tex. Jan. 8, 2016) [Attachment 6] ................................................................. 62

*Hoffman v. Jacobi*, 2014 U.S. Dist. LEXIS 154284
(S.D. Ind. Oct. 29, 2014) [Attachment 7] ............................................................... 68

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.,* 2008 U.S. Dist.
LEXIS 18118 (N.D. Ill. Mar. 10, 2008) [Attachment 8] ......................................... 75

*Meds. Co. v. Mylan Inc.,* 2013 U.S. Dist. LEXIS 82964
(N.D. Ill. June 13, 2013) [Attachment 9] ................................................................ 81

*Morningware, Inc. v. Hearthware Home Prods., Inc*., No. 09 C 4348, 2012
U.S. Dist. LEXIS 121333, 2012 WL 3721350 (N.D. Ill. Aug. 27, 2012) [Attachment 10] ........ 89

*Pain Ctr. of SE Ind., LLC v. Origin Healthcare Solutions LLC*, 2015
U.S. Dist. LEXIS 164111 (S.D. Ind. Dec. 8, 2015) [Attachment 11] ....................... 108

*Patrick v. City of Chicago*, 2015 U.S. Dist. LEXIS 145811
(N.D. Ill. Oct. 28, 2015) [Attachment 12] ............................................................... 113

*Sloan Valve Co. v. Zurn Indus.*, 2012 U.S. Dist. LEXIS 161749
(N.D. Ill. Nov. 13, 2012) [Attachment 13] .............................................................. 128

*United States v. Capital Tax Corp.,* 2011 U.S. Dist. LEXIS 40747
(N.D. Ill. Apr. 12, 2011) [Attachment 14] ............................................................... 135

Attachment 1

## _Chamberlain Group v. Interlogix, Inc._

United States District Court for the Northern District of Illinois, Eastern Division

March 26, 2002, Decided ; March 27, 2002, Docketed

No. 01 C 6157

**Reporter**: 2002 U.S. Dist. LEXIS 5468; 52 Fed. R. Serv. 3d (Callaghan) 38

CHAMBERLAIN GROUP, Plaintiff, v. INTERLOGIX, INC., Defendant.

**Prior History:** _Chamberlain Group, Inc. v. Interlogix, Inc., 2002 U.S. Dist. LEXIS 3046 (N.D. Ill. Feb. 21, 2002)._

**Disposition: [*1]** Magistrate judge's memorandum opinion and order adopted in part. Defendant's objection sustained. Plaintiff's objection overruled.

**Counsel:** For CHAMBERLAIN GROUP, INC., THE, plaintiff: John F. Flannery, Karl Regan Fink, Rudy I. Kratz, Fitch, Even, Tabin & Flannery, Chicago, IL.

For INTERLOGIX, INC., defendant: Vincent J. Connelly, Sheila Marie Finnegan, Mayer, Brown, Rowe & Maw, Chicago, IL.

For INTERLOGIX, INC., defendant: John C Englander, J Anthony Downs, Goodwin, Procter & Hoar, Paul F Ware, Jr, Susan Reid, Goodwin Proctor LLP, Boston, MA.

For INTERLOGIX, INC., defendant: David W Whealan, Goodwin Procter, LLP, New York, NY.

For INTERLOGIX, INC., counter-claimant: Vincent J. Connelly, Mayer, Brown, Rowe & Maw, Chicago, IL.

For INTERLOGIX, INC., counter-claimant: John C Englander, J Anthony Downs, Goodwin, Procter & Hoar, Paul F Ware, Jr, Susan Reid, Goodwin Proctor LLP, Boston, MA.

For CHAMBERLAIN GROUP, INC., THE, counter-defendant: John F. Flannery, Karl Regan Fink, Rudy I. Kratz, Fitch, Even, Tabin & Flannery, Chicago, IL.

**Judges:** Suzanne B. Conlon, United States District Judge.

**Opinion by:** Suzanne B. Conlon

## Opinion

### [*2] MEMORANDUM OPINION AND ORDER

The Chamberlain Group, Inc. ("Chamberlain") sues Interlogix, Inc. ("Interlogix") for patent infringement under _35 U.S.C. § 271 et seq._ Interlogix counterclaims for a declaratory judgment of non-infringement, invalidity, and unenforceability. Chamberlain and Interlogix object to the magistrate judge's February 21, 2002 memorandum opinion and order granting in part and denying in part the parties' cross-motions to compel discovery.

## DISCUSSION

### I. Standard of Review

When the magistrate judge issues a report and recommendation on a nondispositive pretrial matter, the district court must apply a deferential standard of review. The Federal Rules of Civil Procedure provide: "the district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." _Fed. R. Civ. P. 72(a)_. A finding is clearly erroneous when the court is left with the definite and firm conviction that a mistake has been committed. _Anderson v. City of Bessemer, 470 U.S. 564, 573, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)_. **[*3]** A magistrate judge's conclusions of law are reviewed de novo. _Rajaratnam v. Moyer, 47 F.3d 922, 924 (7th Cir. 1995)_. When procedural issues in a patent case are not unique to patent law, courts "apply the law of the circuit in which the district court sits." _In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 802 (Fed. Cir. 2000)_; _McCook Metals L.L.C. v. Alcoa, Inc., 192 F.R.D. 242, 251 (N.D. Ill. 2000)_.

### II. Implicit Waiver of Attorney-Client Privilege

The magistrate judge held Interlogix's assertion of equitable estoppel and laches defenses waived the attorney-client privilege on Interlogix's attorney opinions on invalidity, unenforceablility, and non-infringement. Interlogix objects to the magistrate judge's order compelling it to produce privileged attorney-client communications.

The Seventh and Federal Circuit Courts of Appeals have not had occasion to address whether the pleading of equitable estoppel and laches defenses constitutes an implicit waiver of attorney-client privilege. In patent cases, judges of this court have reached differing conclusions on whether the assertion of equitable estoppel and laches defenses **[*4]** waives the privilege. _See Videojet Sys. Int'l, Inc. v. Inkjet, Inc., 1997 U.S. Dist. LEXIS 3378_, No. 95 C 7016, _1997 WL 138008_, at *4 (N.D. Ill. Mar. 19, 1997) (Coar, J.) (finding waiver of attorney-client privilege); _THK America Inc. v. NSK Co. Ltd., 157 F.R.D. 637, 650 (N.D. Ill. 1993)_ (Norgle, J.) (same); _see also Southwire v. Essex Group, Inc., 570 F. Supp. 643, 645 (N.D. Ill. 1983)_ (Marshall, J.); _cf. Pittway Corp v. Maple Chase Co., 1992 U.S. Dist. LEXIS 19237_, No. 91 C 3582, _1992 WL 392584_, at *6 (N.D. Il. Dec. 16, 1992) (Zagel, J.) (attorney-client privilege not waived); _Beneficial Franchise, Inc. v. Bank One, 205 F.R.D. 212, 216_ (N.D. Ill. May 8, 2001) (Schenkier, M.J.) (same).

Implicit waiver of attorney-client privilege occurs when the holder of the privilege partially discloses a confidential communication or relies on a legal claim or defense that requires

examination of confidential communications. *Lorenz v. Valley Forge Ins. Co., 815 F.2d 1095, 1098 (7th Cir. 1987)*. In support of the magistrate judge's holding, Chamberlain advances *Southwire*, *Videojet*, and *THX America*. In *Southwire*, the court held the assertion **[\*5]** of equitable estoppel "coupled with defendant's use of its patent counsel's opinions" to defeat a claim of willful infringement waived attorney-client privilege. *Southwire, 570 F. Supp. at 649*. The court determined the defendant's use of attorney opinions required disclosure of those communications for the plaintiff to refute the equitable estoppel defense. *Id.* Significantly, *Southwire* did not hold the pleading of an equitable estoppel defense alone waived the attorney-client privilege.

In *Videojet*, the court found a waiver of privilege because the defendant relied upon the advice of counsel defense to contest willful infringement. *Videojet, 1997 U.S. Dist. LEXIS 3378, 1997 WL 138008*, at \*4. Relying on *Southwire*, the court further stated attorney opinions were necessary for the plaintiff to assess the strength of defendant's reliance on the laches defense. *Id.* Chamberlain contends Interlogix's invocation of the equitable estoppel and laches defenses waives attorney-client privilege. Notably, Interlogix does not advance attorney opinions to defeat a claim of willful infringement. Instead, Chamberlain argues Interlogix's assertion of equitable estoppel and **[\*6]** laches involves an inquiry into Interlogix's state of mind -- whether Interlogix relied on Chamberlain's conduct in not pursuing an infringement action, or on the advice of its counsel on invalidity, unenforceability, and noninfringement of Chamberlain's patents. To establish equitable estoppel, Interlogix must demonstrate: (1) unreasonable and unexcused delay by Chamberlain; (2) prejudice to Interlogix; (3) affirmative conduct induced Interlogix to believe Chamberlain abandoned its claim; and (4) detrimental reliance. *A.C. Aukerman Co. v. Miller Formless, Co., 693 F.2d 697, 701 (7th Cir. 1982)*. To defeat that affirmative defense, Chamberlain argues attorney-client communications are relevant to demonstrate Interlogix relied upon the advice of its attorneys in allegedly infringing the patents, not Chamberlain's conduct.

*Videojet* found a waiver of attorney-client privilege because the defendant asserted an affirmative defense of laches, not equitable estoppel. Laches does not require proof of detrimental reliance. *Dentsply Int'l Inc. v. Sybron Corp., 1986 U.S. Dist. LEXIS 25655*, No. 82 C 3822, 1986 WL 5757, at \*3 (N.D. Ill. May 12, 1996). Instead, the laches defense assesses **[\*7]** whether a defendant suffered harm because of the plaintiff's delay in filing suit. Thus, a defendant's state of mind is not relevant to a laches defense. *See Advertising to Women, Inc. v. Gianni Versace, 1999 U.S. Dist. LEXIS 12263*, No. 98 C 1553, *1999 WL 608711*, at \*6 (N.D. Ill. Aug. 4, 1999) (the assertion of a laches defense does not waive attorney-client privilege because it does not require an inquiry into defendant's state of mind). As a result, a defendant's advice of counsel is irrelevant. Videojet's analysis is unpersuasive.

*THX America* held a defendant's pleading of an equitable estoppel defense waived the attorney-client privilege on attorney opinions to prove detrimental reliance. *THX America, 157 F.R.D. at 650*. The court primarily relied on *Southwire*, which did not hold a defendant's mere assertion of equitable estoppel waives attorney-client privilege. *See Pittway Corp. v. Maple Chase Co., 1992 U.S. Dist. LEXIS 19237*, No. 91 C 3582, *1992 WL 392584*, at \*6 (N.D. Ill. Dec. 16, 1992) (noting that *Southwire* did not support waiver of attorney-client privilege based on the pleading of an

estoppel defense); *Defendants Beware: Raising the Defense of Estoppel May Waive* **[\*8]** *the Attorney-Client Privilege*, 7 Fed. Cir. B.J. 55, 66 (1997) (noting that *THX America* significantly expanded the implicit waiver doctrine in patent actions). Further, the court stated "evidence of reliance on an opinion of counsel that a particular patent is invalid or not infringed is relevant to the question of estoppel." *Id.* On that basis, the court ordered production of attorney-client communications. *Id.* However, the court failed to recognize the attorney-client privilege protects confidential communications from disclosure even where those communications are relevant. Relevancy is not the test for an implicit waiver of attorney-client privilege. *See* *United States v. Zolin, 491 U.S. 554, 562-63, 105 L. Ed. 2d 469, 109 S. Ct. 2619 (1989)* (the attorney-client privilege protects relevant, confidential communications). The implicit waiver rule applies "when the client asserts claims or defenses that put his attorney's advice at issue in the litigation." *Garcia v. Zenith Elect. Corp., 58 F.3d 1171, 1175 n.1 (7th Cir. 1995)*. A party must affirmatively use privileged communications to defend itself or attack its opponent in the action **[\*9]** before the implicit waiver rule is applicable. *Dawson v. New York Life Insurance Co., 901 F. Supp. 1362 (N.D. Ill. 1995)* (finding waiver where defendant made representations about the advice of counsel to establish a qualified immunity defense). For example, an assertion of a good faith defense on the advice of counsel in response to a willful infringement claim directly places defendant's advice of counsel at issue and waives privilege. *See* *Solomon v. Kimberly-Clark Corp., 1999 U.S. Dist. LEXIS 1594*, No. 98 C 7598, *1999 WL 89570*, at \*1 (N.D. Ill. Feb. 12, 1999). In contrast, the crux of *THX* America's holding does not rest on defendant's express reliance on the advice of its counsel. Put another way, defendants did not inject its advice of counsel into contention but merely pled an equitable estoppel defense. *THX America* relied only on the *relevancy* of the attorney-client communications to the equitable estoppel defense in finding an implicit waiver of attorney-client privilege.

In *Beneficial Franchise*, the court held the pleading of equitable estoppel did not waive the privilege in a patent action. Instead, the court determined the privilege is waived only when **[\*10]** "a party chooses to utilize the information to advance a claim or defense." *Beneficial Franchise, 205 F.R.D. at 217*. In *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co., 32 F.3d 851, 864 (3d Cir. 1994)*, the court held "the advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication." *Rhone-Poulenc* expressly rejected an automatic waiver of privilege when an attorney's opinion is relevant to a claim or defense. The court used a patent case as an example, noting the advice of the defendant's lawyer may be "relevant to the question of whether the infringer acted with a willful state of mind." However, the court recognized "the advice of an infringer's counsel is not placed in issue, and the privilege is not waived, unless the infringer seeks to limit its liability by describing that advice and by asserting that he relied on that advice." *Rhone-Poulenc, 32 F.3d at 863*; *see also* *Garcia, 58 F.3d at 1175 n.1* (citing *Rhone-Poulenc*).

*Rhone-Poulenc* and *Beneficial Franchise* are persuasive. **[\*11]** Chamberlain seeks discovery of Interlogix's attorney-client communications because those opinions could be relevant to refute Interlogix's equitable estoppel defense. Advice of counsel is not "in issue" because it is relevant.

*Rhone-Poulenc, 32 F.3d at 863*. Interlogix does not assert advice of counsel as a defense, and it has not used attorney-client communications to prove a claim or defense. Consequently, Interlogix has not waived the attorney-client privilege, and its attorney opinions on Chamberlain's patents are not discoverable. *See also Pittway, 1992 U.S. Dist. LEXIS 19237, 1992 WL 392584*, at *6 (the attorney-client privilege is not waived unless defendant intends to rely on those communications); *Figgie Int'l Inc. v. Wilson Sporting Goods Co., 1987 U.S. Dist. LEXIS 35*, No. 86 C 5757, 1987 WL 5235, at *2 (N.D. Ill. Jan. 8, 1987) (where record evidence suggested reliance on counsel's opinion was a genuine fact issue, court allowed discovery of confidential communications).

This approach is consistent with the narrow construction of the implicit waiver rule in non-patent cases. *See e.g. Baker v. General Motors Corp., 209 F.3d 1051, 1055 (8th Cir. 2000)* (at-issue **[\*12]** waiver applies "when a client uses reliance on legal advice as a defense or when a client brings a legal malpractice action"); *Trustmark Ins. Co. v. General & Cologne, 2000 U.S. Dist. LEXIS 18917*, No. 00 C 1926, *2000 WL 1898518*, at *7 (N.D. Ill. Dec. 20, 2000) (no waiver of the attorney-client privilege because the plaintiff did not affirmatively rely on advice of counsel); *Hucko v. City of Oak Forest, 185 F.R.D. 526, 529 (N.D. Ill. 1999)* (physician-psychotherapist privilege was not waived when it was not affirmatively placed into issue); *Harter v. University of Indianapolis, 5 F. Supp. 2d 657, 665 (S.D. Ind. 1998)* (recognizing that "when a client files a lawsuit in which his or her state of mind . . . may be relevant, the client does not implicitly waive the attorney-client privilege . . . unless the client relies specifically on advice of counsel to support a claim or defense"); *Makula v. Sanwa Business Corp., 1997 U.S. Dist. LEXIS 11741*, No. 96 C 7138, 1997 WL 460935, at *2 (N.D. Ill. Aug. 8, 1997) (assertion of an advice of counsel defense waives attorney-client privilege); *Johnson v. Rauland-Borg Corp., 961 F. Supp. 208, 211 (N.D. Ill. 1997)* (attorney-client **[\*13]** privilege waived in a Title VII case where the employer intended to rely on the advice of its counsel); *Haworth, Inc. v. Herman Miller, Inc.*, No. 97 C 877, 1995 WL 1312674, at *4 (W.D. Mich. Jan. 17, 1995) (assertion of the advice of counsel defense waives attorney-client privilege).

A narrow construction of the implicit waiver rule comports with the basic principles of the attorney-client privilege. When the privilege is waived, it is often because confidential communications are the only source of evidence on the disputed issue. *See Pippenger v. Gruppe, 883 F. Supp. 1201, 1204 (S.D. Ind. 1994)*. However, Chamberlain may dispute equitable estoppel by contesting the remaining three prongs of the affirmative defense. *Id.* (attorney-client communications are not the only source of relevant information; plaintiff could question defendant on the extent of its reliance on plaintiff's conduct). Furthermore, the choice between pleading an equitable estoppel defense and preserving the attorney-client privilege is unduly harsh when a defendant does not affirmatively utilize confidential communications. Indeed, "any party asserting a claim or defense on which **[\*14]** it bears the burden of proof would be stripped of its privilege and left with the draconian choice of abandoning its claim and/or defense or pursuing or protecting its privilege." *Beneficial Franchise*, 205. F.R.D. at 217. Various affirmative claims and defenses require proof of a defendant's state of mind, including fraudulent inducement claims. *Southwire* was concerned only with situations where a party selectively

disclosed privileged information to its advantage but concealed the rest. Those concerns are not present when a defendant pleads an affirmative defense but does not rely on privileged attorney-client communications to prove that defense. Waiving privilege because attorney-client communications are relevant hinders "full and frank communication between attorneys and their clients." *Upjohn Co. v. United States, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981)*. A broad waiver rule also discourages clients from seeking legal advice by removing the assurance of confidentiality.

Relying on *Videojet* and *Southwire*, the magistrate judge reasoned Interlogix's attorney-client communications were necessary to determine whether it was Interlogix's advice of counsel, not Chamberlain's **[\*15]** failure to enforce the patents, that led Interlogix to purportedly infringe the patents. *Chamberlain Gp. Inc. v. Interlogix, Inc., 2002 U.S. Dist. LEXIS 3046, 2002 WL 265174*, at \*1-2 (N.D. Ill. Feb. 21, 2002). The mere assertion of equitable estoppel and laches defenses is insufficient to waive the attorney-client privilege. Accordingly, Interlogix's objection to the magistrate judge's memorandum opinion and order granting Chamberlain's motion to compel answers to interrogatory no. 11 and request to produce no. 4 is sustained to the extent the ruling requires disclosure of Interlogix's privileged attorney-client communications.

### III. Sequencing of Discovery

Chamberlain objects to the magistrate judge's sequencing of discovery. In resolving the parties' cross-motions to compel, the magistrate judge ordered Interlogix to provide Chamberlain with technical and model number information regarding its products; Chamberlain to produce a claim chart; and Interlogix to respond to Chamberlain's interrogatories no. 5 and 6 after its claim chart was completed. Chamberlain's interrogatories no. 5 and 6 request the basis for Interlogix's non-infringement argument.

Chamberlain complains discovery **[\*16]** will be delayed by allowing Interlogix to answer interrogatories no. 5 and 6 at a later date. However, Chamberlain may bring a motion to compel if Interlogix delays providing basic technical information in accordance with the magistrate judge's order. Chamberlain must then submit a claim chart before Interlogix is required to respond to interrogatories no. 5 and 6. Thus, Chamberlain will eventually control the speed at which Interlogix responds to its discovery request. Further, the magistrate judge properly managed the discovery dispute between the parties by sequencing discovery. The court may order discovery in a specified sequence "for the convenience of the parties and witnesses and in the interest of justice." *Fed. R. Civ. P. 26(d)*. In interrogatories no. 5 and 6, Chamberlain asked Interlogix to state the manner in which its products do not infringe Chamberlain's patents. The magistrate judge correctly noted: "Interlogix should not have to guess how Chamberlain believes its patents are infringed." *Chamberlain Gp., 2002 U.S. Dist. LEXIS 3046, 2002 WL 265174*, at \*1; *see also Antonious v. Spalding & Evenflo Co., Inc., 275 F.3d 1066, 1072-74 (Fed. Cir. 2002)* (noting a plaintiff's **[\*17]** pre-filing obligations to construe claims). Chamberlain fails to address the magistrate judge's finding. Finally, Chamberlain will not be prejudiced by submitting a claim chart before Interlogix answers interrogatories no. 5 and 6 because it is obligated to amend its claim chart to include new information. *Chamberlain Gp., 2002 U.S. Dist. LEXIS 3046, 2002 WL*

_265174_, at *1-2. Chamberlain fails to demonstrate the magistrate judge's order was clearly erroneous. Accordingly, Chamberlain's objection is overruled.

**CONCLUSION**

The court adopts the magistrate judge's memorandum opinion and order of February 21, 2002 in part. Interlogix's objection to the magistrate judge's order granting Chamberlain's motion to compel answers to interrogatories no. 11 and request to produce no. 4 is sustained to the extent the ruling requires disclosure of privileged attorney-client communications. Chamberlain's objection to the sequencing of discovery is overruled.

March 26, 2002

ENTER:

Suzanne B. Conlon

United States District Judge

Attachment 2

## *Deangelis v. Corzine*

United States District Court for the Southern District of New York

February 9, 2015, Decided; February 9, 2015, Filed

11 Civ. 7866 (VM) (JCF); 12 MD 2338

**Reporter**: 2015 U.S. Dist. LEXIS 18207

JOSEPH DeANGELIS, et al., Plaintiffs against JON S. CORZINE, et al., Defendants.IN RE MF GLOBAL HOLDINGS LTD. INVESTMENT LITIGATION

**Prior History:** *Deangelis v. Corzine, 286 F.R.D. 220, 2012 U.S. Dist. LEXIS 73993 (S.D.N.Y., 2012)*

**Counsel:** **[*1]** For Virginia Retirement System, Lead Plaintiff (1:11cv7866): Richard David Gluck, LEAD ATTORNEY, Bernstein Litowitz Berger & Grossmann LLP (San Diego), San Diego, CA USA; Cynthia A Hanawalt, New York, NY USA; Dominic J. Auld, New York, NY USA; Gerald H. Silk, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Hannah Elizabeth Ross, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Jai Kamal Chandrasekhar, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Javier Bleichmar, New York, NY USA; Salvatore Jo Graziano, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Stefanie Jill Sundel, Bernstein, Litowitz, Berger & Grossman, New York, NY USA.

For Her Majesty The Queen in Right of Alberta, Lead Plaintiff (1:11cv7866): Richard David Gluck, LEAD ATTORNEY, Bernstein Litowitz Berger & Grossmann LLP (San Diego), San Diego, CA USA; Cynthia A Hanawalt, New York, NY USA; Dominic J. Auld, New York, NY USA; Gerald H. Silk, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Hannah Elizabeth Ross, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Jai Kamal Chandrasekhar, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Javier **[*2]** Bleichmar, New York, NY USA; Salvatore Jo Graziano, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Stefanie Jill Sundel, Bernstein, Litowitz, Berger & Grossman, New York, NY USA.

For Joseph Deangelis, Individually and on behalf of all others similarly situated, Plaintiff (1:11cv7866): Brian C. Kerr, Brower Piven, A Professional Corporation, New York, Ny Xxxxx, David A.P. Brower, Brower Piven, New York, NY USA; Jason Mathew Leviton, PRO HAC VICE, Berman DeValerio (MA), One Liberty Square, 8th Floor, Boston, MA USA; Jeffrey Craig Block, Block & Leviton LLP, New York, NY USA; Scott A Mays, PRO HAC VICE, Berman DeValerio (MA), One Liberty Square, 8th Floor, Boston, MA USA; Block & Leviton LLP, New York, NY USA.

For City of Philadelphia Board of Pensions And Retirement And Palisade Strategic Master Fund (Cayman) Limited, Plaintiff (1:11cv7866), Pro se.

12

For Jerome Vrabel, Plaintiff (1:11cv7866): Amanda Marjorie Steiner, Girard Gibbs LLP, San Francisco, CA USA; Christina H. C. Sharp, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA USA; Daniel Charles Girard, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA USA; Salvatore Jo Graziano, Bernstein Litowitz Berger & Grossmann LLP, **[*3]** New York, NY USA.

For Rogers Varner, Jr., Plaintiff (1:11cv7866): Stuart Halkett McCluer, LEAD ATTORNEY, PRO HAC VICE, McCulley Mccluer PLLC, Oxford, MS USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; R. Bryant McCulley, PRO HAC VICE, McCulley McCluer PLLC, Sullivans Island, SC USA.

For Bearing Fund LP, Plaintiff (1:11cv7866): Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For Nader Tavakoli, as Litigation Trustee of The MF Global Litigation Trust, Plaintiff (1:11cv7866): Christopher J. Lovrien, LEAD ATTORNEY, PRO HAC VICE, Jones Day, Los Angeles, CA USA; Michael S. McCauley, PRO HAC VICE, Jones Day, Los Angeles, CA USA; Michael C. Schneidereit, Jones Day (CA), Los Angeles, CA USA; Peter E. Davids, PRO HAC VICE, Jones Day, Los Angeles, CA USA.

For Waterstone MF Fund, Ltd., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Aqr Funds-Aqr Diversified Arbitrage Fund, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Ag Ofcon, Ltd., Plaintiff **[*4]** (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Prime Captial Master Spc-Got Wat Mac Segregated Portfolio, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Vermont Mutual Insurance Company, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Lord Abbett Investment Trust - Lord Abbett Convertible Fund, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Aqr Ucits Funds, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Cnh Diversified Opportunities Master Account, L.P., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Aqr Delta Master Account, L.P., Plaintiff [*5] (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For American Physicians Assurance Company, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Lazard Asset Management Llc, on behalf of certain of its managed accounts, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Suttonbrook Eureka Fund, LP, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Csaa Insurance Group, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Waterstone Market Neutral Fund, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For The Doctors Company Insurance Group, Plaintiff (1:11cv7866): [*6] Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Ag Oncon, Llc, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Waterstone Offshore ER Fund, Ltd., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Suttonbrook Captial Portfolio LP, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Cnh CA Master Account, L.P., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Aqr Opportunistic Premium Offshore Fund L.P., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Pension, Hospitalization And Benefit Plan of The Electrical Industry - Pension Trust Account, Plaintiff (1:11cv7866): [*7] Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Hfr CA Lazard Rathmore Master Trust, Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Lazard Rathmore Master Fund, L.P., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Aqr Absolute Return Master Account, L.P., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Aqr Delta Sapphire Fund, L.P., Plaintiff (1:11cv7866): Jeff I Ross, PRO HAC VICE, Ross & Orenstein LLC, Minneapolis, MN USA; John B. Orenstein, Ross & Orenstein LLC, Minneapolis, MN USA.

For Monica Rodriguez, individually and on behalf of all others similarly situated, Consolidated Plaintiff (1:11cv7866): Amanda Marjorie Steiner, Girard Gibbs LLP, San Francisco, CA USA; Christina H. C. Sharp, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA USA; Daniel Charles Girard, PRO [*8] HAC VICE, Girard Gibbs LLP, San Francisco, CA USA; Edward H. Glenn, Jr., Zamansky & Associates, L.L.C., New York, NY USA; Jacob H. Zamansky, Zamansky & Associates LLC, New York, NY USA; Salvatore Jo Graziano, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA.

For Cyrille Guillaume, individually and on behalf of all others similarly situated, Consolidated Plaintiff (1:11cv7866): Amanda Marjorie Steiner, Girard Gibbs LLP, San Francisco, CA USA; Daniel Charles Girard, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA USA; Edward H. Glenn, Jr., Zamansky & Associates, L.L.C., New York, NY USA; Jacob H. Zamansky, Zamansky & Associates LLC, New York, NY USA.

For Davide Accomazzo, Consolidated Plaintiff (1:11cv7866): Christopher J. Gray, Law Office of Christopher J. Gray, P.C, New York, NY USA; Stephen David Oestreich, Entwistle & Cappucci LLP (NYC), New York, NY USA.

For Sapere Cta Fund, LP, Consolidated Plaintiff (1:11cv7866): John J. Witmeyer, III, Ford, Marrin, Esposito, Witmeyer & Gleser, L.L.P., New York, NY USA; Jon Ryan Grabowski, Ford Marrin Esposito Witmeyer & Gleser, LLP, New York, NY USA.

For Summit Trust Company, on behalf of itself and all others similarly situated, Consolidated **[*9]** Plaintiff (1:11cv7866): Andrei V. Rado, Milberg LLP (NYC), New York, NY USA; Carla F. Fredericks, Milberg LLP (NYC), New York, NY USA; Charles Michael Plavi, PRO HAC VICE, Finkelstein & Krinsk, LLP, San Diego, CA USA; Jeffrey R. Krinsk, PRO HAC VICE, Finkelstein & Krinsk, LLP, San Diego, CA USA; Mark Leland Knutson, PRO HAC VICE, Finkelstein and Krinsk, San Diego, CA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For Kay P. Tee, Llc, Consolidated Plaintiff (1:11cv7866): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Francis P. Karam, Francis P. Karam, Esq. PC, New York, NY USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. Bernstein, Attorney at Law, New York, NY USA.

For Thomas G. Moran, Consolidated Plaintiff (1:11cv7866): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. Bernstein, Attorney at Law, New York, NY USA. **[*10]**

For John Andrew Szokolay, Consolidated Plaintiff (1:11cv7866): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. Bernstein, Attorney at Law, New York, NY USA.

For Donald Tran, Consolidated Plaintiff (1:11cv7866): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. Bernstein, Attorney at Law, New York, NY USA.

For Gregory Bartell, Consolidated Plaintiff (1:11cv7866): Clinton A. Krislov, PRO HAC VICE, Krislov & Associates, Ltd., Chicago, IL USA.

For Daniel M Pierce, Consolidated Plaintiff (1:11cv7866): Clinton A. Krislov, PRO HAC VICE, Krislov & Associates, Ltd., Chicago, IL USA.

For Henning-Carey Proprietary Trading, L.L.C, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen **[*11]** & Elliott, LLC, Chicago, IL USA.

For Charles Carey, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA.

For Joseph Niciforo, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA.

For Robert Tierney, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA.

For Brian Fisher, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA.

For Shane Mcmahon, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, **[*12]** IL USA.

For Michael Mette, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA.

For Timothy Zaug, Consolidated Plaintiff (1:11cv7866): Brittany E. Kirk, Nisen & Elliott LLC, Chicago, IL USA; Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA.

For Ps Energy Group Inc, Consolidated Plaintiff (1:11cv7866): Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For Mark Kennedy, Consolidated Plaintiff (1:11cv7866): Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For Thomas S. Wacker, Consolidated Plaintiff (1:11cv7866): Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For U.S. Commodity Futures Trading Commission, Consolidated Plaintiff (1:11cv7866): Chad Eric Silverman, CFTC, New York, NY USA; David William Oakland, U.S. Commodity Futures Trading Commission(NYC), New York, NY USA; Douglas Kent Yatter, Commodity Futures Trading Commission(NYC), New York, NY USA; Kenneth Brent Tomer, U.S. Commodity

Futures Trading **[\*13]** Commission(NYC), New York, NY USA; Sheila Louise Marhamati, U.S. Commodity Futures Trading Commission(NYC), New York, NY USA; Steven Ira Ringer, Commodity Futures Trading Commission(NYC), New York, NY USA.

For The Bagwell Group, Movant (1:11cv7866): Jeremy Alan Lieberman, Pomerantz LLP, New York, NY USA.

For Banyan Capital Master Fund, Ltd., Movant (1:11cv7866): Curtis Victor Trinko, Law Offices of Curtis V. Trinko, LLP, New York, NY USA.

For Building Trades United Pension Trust Fund, Movant (1:11cv7866): Danielle Suzanne Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Darren J. Robbins, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (SANDIEGO), San Diego, CA USA; Samuel Howard Rudman, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY USA.

For Union Asset Management Holding AG, Movant (1:11cv7866): Danielle Suzanne Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Darren J. Robbins, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (SANDIEGO), San Diego, CA USA; Samuel Howard Rudman, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY USA.

For Lri Invest S.A., Movant (1:11cv7866): Ann Kimmel Ritter, PRO HAC VICE, Motley Rice LLC (SC), Mount Pleasant, SC USA; Danielle **[\*14]** Suzanne Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Darren J. Robbins, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (SANDIEGO), San Diego, CA USA; Deborah M. Sturman, Milberg LLP (NYC), New York, NY USA; Salvatore Jo Graziano, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Samuel Howard Rudman, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY USA.

For Paradigm Global Fund I Ltd., Movant (1:11cv7866): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA; Marc M. Seltzer, PRO HAC VICE, Susman Godfrey, L.L.P., Los Angeles, CA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For Paradigm Equities Ltd., Movant (1:11cv7866): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA; Marc M. Seltzer, PRO HAC VICE, Susman Godfrey, L.L.P., Los Angeles, CA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For Paradigm Asia Ltd., Movant (1:11cv7866): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle **[\*15]** & Cappucci LLP (NYC), New York, NY USA; Marc M. Seltzer, PRO HAC VICE, Susman Godfrey, L.L.P., Los Angeles, CA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For Zybr Holdings, Llc, Movant (1:11cv7866): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New

York, NY USA; Marc M. Seltzer, PRO HAC VICE, Susman Godfrey, L.L.P., Los Angeles, CA USA.

For Augustus International Master Fund, L.P., Movant (1:11cv7866): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For William Schur, Movant (1:11cv7866): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA; Marc M. Seltzer, PRO HAC VICE, Susman Godfrey, L.L.P., Los Angeles, CA USA.

For Robert Marcin, Movant (1:11cv7866): Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA.

For H. Martin Klinker, Jr., Movant (1:11cv7866): Imtiaz A. Siddiqui, LEAD ATTORNEY, Cotchett, Pitre & McCarthy LLP, New **[\*16]** York, NY USA.

For Rocking K Land And Cattle, Inc., Movant (1:11cv7866): Imtiaz A. Siddiqui, LEAD ATTORNEY, Cotchett, Pitre & McCarthy LLP, New York, NY USA.

For Philip Timothy Johnson, Movant (1:11cv7866): Imtiaz A. Siddiqui, LEAD ATTORNEY, Cotchett, Pitre & McCarthy LLP, New York, NY USA.

For Wade Jacobsen, Movant (1:11cv7866): Imtiaz A. Siddiqui, LEAD ATTORNEY, Cotchett, Pitre & McCarthy LLP, New York, NY USA.

For Futures Capital Management, LLC, Movant (1:11cv7866), Pro se.

For Ali A. Rangchi Bozorki, Movant (1:11cv7866), Pro se.

For Bradley I. Abelow, Defendant (1:11cv7866): Arthur Harlod Aufses, III, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA; Craig Louis Siegel, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA; Paul Henry Schoeman, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA.

For Michael G. Stockman, Defendant (1:11cv7866): Ethan Yu Lee, Milbank, Tweed, Hadley & McCloy LLP (NYC), New York, NY USA; Justin Anthony Alfano, Milbank, Tweed, Hadley & McCloy LLP (NYC), New York, NY USA; Sean Miles Murphy, Milbank, Tweed, Hadley & McCloy LLP (NYC), New York, NY USA; Thomas A. Arena, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, CA USA.

For U.S. Bancorp Investments, **[\*17]** Inc., Defendant (1:11cv7866): Adam Selim Hakki, LEAD ATTORNEY, Shearman & Sterling LLP (NY), New York, NY USA; Christopher Lanzalotto,

Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Jaculin Aaron, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For David Dunne, Defendant (1:11cv7866): Laura Steinberg, LEAD ATTORNEY, Sullivan & Worcester LLP (MA), One Post Office Square, Boston, MA USA.

For Matthew Hughey, Defendant (1:11cv7866): David A Geier, LEAD ATTORNEY, PRO HAC VICE, Geier Homar & Roy, LLP, Madison, WI USA.

For Alison J. Carnwath, Consolidated Defendant (1:11cv7866): David A. Barrett, LEAD ATTORNEY, Boies, Schiller & Flexner, LLP(NYC), New York, NY USA; Marilyn C. Kunstler, Boies, Schiller & Flexner, LLP(NYC), New York, NY USA.

For Bradley I. Abelow, Consolidated Defendant (1:11cv7866): Arthur Harlod Aufses, III, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA.

For Michael G. Stockman, Consolidated Defendant (1:11cv7866): Ethan Yu Lee, Milbank, Tweed, Hadley & McCloy LLP (NYC), New York, NY USA.

For Bernard Dan, Consolidated Defendant (1:11cv7866): [*18] David Michael Rosenfield, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA; Lisamarie Frances Collins, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA; Therese Marie Doherty, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA.

For Bank of America Corporation, Consolidated Defendant (1:11cv7866): Christopher Michael Joralemon, LEAD ATTORNEY, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, LEAD ATTORNEY, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Ladan Fazlollahi Stewart, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Bmo Capital Markets Corp., Consolidated Defendant (1:11cv7866): Adam Selim Hakki, LEAD ATTORNEY, Shearman & Sterling LLP (NY), New York, NY USA; Christopher Lanzalotto, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Jaculin Aaron, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Commerz Markets Llc, Consolidated Defendant (1:11cv7866): Adam Selim Hakki, LEAD ATTORNEY, Shearman & Sterling LLP (NY), New York, NY USA; Christopher Lanzalotto, Shearman & Sterling LLP (NY), New York, [*19] NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Jaculin Aaron, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Natxis Securities North America, Inc., Consolidated Defendant (1:11cv7866): Adam Selim Hakki, LEAD ATTORNEY, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam

Farber, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Lebenthal & Co., Llc, Consolidated Defendant (1:11cv7866): Adam Selim Hakki, LEAD ATTORNEY, Shearman & Sterling LLP (NY), New York, NY USA; Christopher Lanzalotto, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Jaculin Aaron, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Richard W. Gill, Consolidated Defendant (1:11cv7866): G. Robert Gage, Jr., LEAD ATTORNEY, Gage, Spencer & Fleming, LLP, New York, NY USA.

For Laurie R. Ferber, Consolidated Defendant (1:11cv7866): Daniel E. Reynolds, LEAD ATTORNEY, Lankler Siffert & Wohl LLP, New York, NY USA; Frank H. Wohl, [*20] LEAD ATTORNEY, Lankler Siffert & Wohl LLP, New York, NY USA; Michael Dayton Longyear, LEAD ATTORNEY, Lankler Siffert & Wohl LLP, New York, NY USA.

For Tracey A. Lowery Whille, Consolidated Defendant (1:11cv7866): G. Robert Gage, Jr., LEAD ATTORNEY, Gage, Spencer & Fleming, LLP, New York, NY USA.

For Christine A. Serwinski, Consolidated Defendant (1:11cv7866): Brett Gerald Canna, Robinson McDonald & Canna LLP, New York, NY USA; Jayne S. Robinson, Robinson McDonald & Canna, LLP, New York, NY USA; Kathryn Ann McDonald, Robinson McDonald & Canna, LLP, New York, NY USA.

For Frederick R. Demler, Consolidated Defendant (1:11cv7866): David Michael Rosenfield, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA; Lisamarie Frances Collins, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA; Therese Marie Doherty, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA.

For Stephen Grady, Consolidated Defendant (1:11cv7866): David Michael Rosenfield, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA; Lisamarie Frances Collins, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA; Therese Marie Doherty, LEAD ATTORNEY, Herrick, Feinstein LLP, New York, NY USA.

For David Simons, Consolidated [*21] Defendant (1:11cv7866): G. Robert Gage, Jr., LEAD ATTORNEY, Gage, Spencer & Fleming, LLP, New York, NY USA.

For Vinay Mahajan, Consolidated Defendant (1:11cv7866): Gregory John O'Connell, De Feis O'Connell & Rose, P.C., New York, NY USA; Philip Canning Patterson, De Feis O'Connell & Rose, P.C., New York, NY USA; Vera Marie Kachnowski, De Feis O'Connell & Rose, P.C., New York, NY USA.

For Edith O'Brien, Consolidated Defendant (1:11cv7866): Darren Bernens Kinkead, LEAD ATTORNEY, Williams, Montgomery and John Ltd, Chicago, IL USA; Christopher James

Barber, PRO HAC VICE, Williams, Montgomery and John Ltd, Chicago, IL USA; Peter Joseph Meyer, Williams Montgomery & John Ltd., Chicago, IL USA.

For Jp Morgan Chase & Co., Consolidated Defendant (1:11cv7866): John F Savarese, LEAD ATTORNEY, Wachtell, Lipton, Rosen & Katz, New York, NY USA; John F. Lynch, Wachtell, Lipton, Rosen & Katz, New York, NY USA; Ralph M. Levene, Wachtell, Lipton, Rosen & Katz, New York, NY USA; Steven Peter Winter, Wachtell, Lipton, Rosen & Katz, New York, NY USA.

For Natixis Securities North America Inc., Consolidated Defendant (1:11cv7866): Adam Selim Hakki, LEAD ATTORNEY, Shearman & Sterling LLP (NY), New York, NY USA; [*22] Christopher Lanzalotto, Shearman & Sterling LLP (NY), New York, NY USA; Jaculin Aaron, Shearman & Sterling LLP (NY), New York, NY USA.

For Ms Global Holdings Ltd., Consolidated Defendant (1:11cv7866): Daniel A. Nathan, Morrison & Foerster L.L.P. (DC), Washington, DC USA.

For Arkansas Public Employees Retirement System, Adr Provider (1:11cv7866): Kenneth Mark Rehns, LEAD ATTORNEY, Cohen Milstein Sellers & Toll P.L.L.C., New York, NY USA.

For Summit Trust Corporation, Adr Provider (1:11cv7866): Mark Leland Knutson, PRO HAC VICE, Finkelstein and Krinsk, San Diego, CA USA.

For Paul Hamann, Adr Provider (1:11cv7866), Pro se, Lake Forest, IL USA.

For Paul Hamann, Adr Provider (1:11cv7866), Pro se, Lake Forest, IL USA.

For Mf Global Holdings Ltd., as Plan Administrator, Miscellaneous (1:11cv7866): Bennett Leon Spiegel, Jones Day (LA), Los Angeles, CA USA; Bruce S Bennett, PRO HAC VICE, Jones Day, Los Angeles, CA USA; Scott Jason Greenberg, Jones Day (NYC), New York, NY USA.

For James W. Giddens, as Trustee For The Sipa Liquidation of MF Global Inc., Interested Party (1:11cv7866): Charles W. Cohen, Hughes Hubbard & Reed LLP (NY), New York, NY USA; Christopher K. Kiplok, Hughes Hubbard & Reed LLP [*23] (NY), New York, NY USA; James Benedict Kobak, Jr, Hughes Hubbard & Reed LLP (NY), New York, NY USA; Sarah Loomis Cave, Hughes Hubbard & Reed LLP (NY), New York, NY USA.

For Virginia Retirement System, Lead Plaintiff (1:12md2338): Christopher J. Keller, Labaton Sucharow, LLP, New York, NY USA; Cynthia A Hanawalt, Bleichmar Fonti Tountas & Auld LLP, New York, NY USA; Dominic J. Auld, Bleichmar Fonti Tountas & Auld LLP, New York, NY USA; Gerald H. Silk, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Hannah Elizabeth Ross, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Iona Maria May Evans, Labaton Sucharow LLP (NYC), New York, NY USA; Javier Bleichmar, Bleichmar Fonti Tountas & Auld LLP, New York, NY USA; Salvatore Jo Graziano, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Sean K. O'Dowd, Bernstein Litowitz

Berger & Grossmann LLP, New York, NY USA; Stefanie Jill Sundel, Bernstein, Litowitz, Berger & Grossman, New York, NY USA; Stephen William Tountas, Labaton & Sucharow LLP (NYC), New York, NY USA.

For Her Majesty The Queen in Right of Alberta, Lead Plaintiff (1:12md2338): Christopher J. Keller, Labaton Sucharow, LLP, New York, NY USA; Cynthia **[*24]** A Hanawalt, Bleichmar Fonti Tountas & Auld LLP, New York, NY USA; Dominic J. Auld, Bleichmar Fonti Tountas & Auld LLP, New York, NY USA; Gerald H. Silk, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Hannah Elizabeth Ross, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Iona Maria May Evans, Labaton Sucharow LLP (NYC), New York, NY USA; Javier Bleichmar, Bleichmar Fonti Tountas & Auld LLP, New York, NY USA; Salvatore Jo Graziano, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Sean K. O'Dowd, Bernstein Litowitz Berger & Grossmann LLP, New York, NY USA; Stefanie Jill Sundel, Bernstein, Litowitz, Berger & Grossman, New York, NY USA; Stephen William Tountas, Labaton & Sucharow LLP (NYC), New York, NY USA.

For Sapere Cta Fund, LP, Plaintiff (1:12md2338): John J. Witmeyer, III, Ford, Marrin, Esposito, Witmeyer & Gleser, L.L.P., New York, NY USA; Jon Ryan Grabowski, Ford Marrin Esposito Witmeyer & Gleser, LLP, New York, NY USA.

For Joseph Deangelis, Individually and on behalf of all others similarly situated, Plaintiff (1:12md2338): Brian C. Kerr, Brower Piven, A Professional Corporation, New York, Ny Xxxxx, David A.P. Brower, Brower Piven, New York, **[*25]** NY USA; Jason Mathew Leviton, PRO HAC VICE, Berman DeValerio (MA), Boston, MA USA; Jeffrey Craig Block, Block & Leviton LLP, New York, NY USA; Scott A Mays, PRO HAC VICE, Berman DeValerio (MA), Boston, MA USA; Block & Leviton LLP, New York, NY USA.

For City of Philadelphia Board of Pensions And Retirement And Palisade Strategic Master Fund (Cayman) Limited, Plaintiff (1:12md2338): Russell David Paul, Berger & Montague, P.C., Philadelphia, PA USA.

For Jerome Vrabel, Plaintiff (1:12md2338): Amanda Marjorie Steiner, Girard Gibbs LLP, San Francisco, CA USA; Christina H. C. Sharp, Girard Gibbs LLP, San Francisco, CA USA; Daniel Charles Girard, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA USA.

For Henning-Carey Proprietary Trading, Llc, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates **[*26]** P.C., Chicago, IL USA.

For Charles Carey, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For Joseph Niciforo, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For Robert Tierney, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; **[\*27]** Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For James Groth, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For Brian Fisher, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter **[\*28]** B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For Shane Mcmahon, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For Michael Mette, Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA;

Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For Timothy Zaug, individually and on behalf of all others similarly situated, [*29] Plaintiff (1:12md2338): Claire E. Gorman, Nisen & Elliott, Chicago, IL USA; Edward T. Joyce, PRO HAC VICE, Edward T. Joyce & Associates, Chicago, IL USA; Hanh Diep Meyers, Carey & Hartmann Llc, Chicago, IL USA; Katherine Therese Hartmann, Carey & Hartmann LLC, Chicago, IL USA; Michael H. Moirano, PRO HAC VICE, Nisen & Elliott, LLC, Chicago, IL USA; Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL USA; Rowena T. Parma, Edward T. Joyce & Associates P.C., Chicago, IL USA.

For Daniel M Pierce, Plaintiff (1:12md2338): Clinton A. Krislov, PRO HAC VICE, Krislov & Associates, Ltd., Chicago, IL USA.

For Gregory Bartell, on behalf of themselves and all others similarly situated, Plaintiff (1:12md2338): Clinton A. Krislov, PRO HAC VICE, Krislov & Associates, Ltd., Chicago, IL USA.

For Juan P Arvelo, Derivatively On Behalf Of the MF Global Ltd. Employee Stock Purchase Plan, The MF Global Ltd. 2007 Long Term Incentive Plan, and The MF Global Ltd. Approved Savings-Related Share Option Plan-A Sub Plan of the MF Global Ltd. Employee Stock Purchase Plan, Plaintiff (1:12md2338): Gregory M. Egleston, Gainey McKenna & Egleston, New York, NY USA; Thomas James McKenna, Gainey McKenna & Egleston, [*30] New York, NY USA.

For Paul Hamann, Plaintiff (1:12md2338), Pro se, Lake Forest, IL USA.

For Bearing Fund LP, Plaintiff (1:12md2338), Pro se.

For Juan P. Arvelo, Consolidated Plaintiff (1:12md2338), Pro se.

For Monica Rodriguez, individually and on behalf of all others similarly situated, Consolidated Plaintiff (1:12md2338): Amanda Marjorie Steiner, Girard Gibbs LLP, San Francisco, CA USA; Christina H. C. Sharp, Girard Gibbs LLP, San Francisco, CA USA; Daniel Charles Girard, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA USA; Edward H. Glenn, Jr., Zamansky & Associates, L.L.C., New York, NY USA; Jacob H. Zamansky, Zamansky & Associates LLC, New York, NY USA.

For Cyrille Guillaume, individually and on behalf of all others similarly situated, Consolidated Plaintiff (1:12md2338): Amanda Marjorie Steiner, Girard Gibbs LLP, San Francisco, CA USA; Daniel Charles Girard, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA USA; Edward H. Glenn, Jr., Zamansky & Associates, L.L.C., New York, NY USA; Jacob H. Zamansky, Zamansky & Associates LLC, New York, NY USA.

For Ernesto Espinoza, Consolidated Plaintiff (1:12md2338), Pro se.

For Vasil Petro, Consolidated Plaintiff (1:12md2338), Pro se.

For Double **[*31]** D Trading, Llc, Consolidated Plaintiff (1:12md2338), Pro se.

For Ibew Local 90 Pension Fund, Consolidated Plaintiff (1:12md2338), Pro se.

For Plumbers' & Pipefitters' Local 562 Pension Fund, Consolidated Plaintiff (1:12md2338), Pro se.

For Davide Accomazzo, Consolidated Plaintiff (1:12md2338): Christopher J. Gray, Law Office of Christopher J. Gray, P.C, New York, NY USA; Stephen David Oestreich, Entwistle & Cappucci LLP (NYC), New York, NY USA.

For Roberto Calle Gracey, Consolidated Plaintiff (1:12md2338), Pro se.

For Robert A. Daly, Jr., Consolidated Plaintiff (1:12md2338), Pro se.

For Summit Trust Company, on behalf of itself and all others similarly situated, Consolidated Plaintiff (1:12md2338): Andrei V. Rado, Milberg LLP (NYC), New York, NY USA; Carla F. Fredericks, Milberg LLP (NYC), New York, NY USA; Charles Michael Plavi, PRO HAC VICE, Finkelstein & Krinsk, LLP, San Diego, CA USA; Jeffrey R. Krinsk, PRO HAC VICE, Finkelstein & Krinsk, LLP, San Diego, CA USA; Mark Leland Knutson, PRO HAC VICE, Finkelstein and Krinsk, San Diego, CA USA.

For Kay P. Tee, Llc, Consolidated Plaintiff (1:12md2338): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Merrill G Davidoff, Berger **[*32]** & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. Bernstein, Attorney at Law, New York, NY USA.

For Thomas G. Moran, Consolidated Plaintiff (1:12md2338): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. Bernstein, Attorney at Law, New York, NY USA.

For John Andrew Szokolay, Consolidated Plaintiff (1:12md2338): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. Bernstein, Attorney at Law, New York, NY USA.

For Donald Tran, Consolidated Plaintiff (1:12md2338): Daniel John Walker, Berger & Montague, P.C., Philadelphia, PA USA; Merrill G Davidoff, Berger & Montague, P.C, Philadelphia, PA USA; Michael Dell'Angelo, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA USA; Roger Joel Bernstein, Roger J. **[*33]** Bernstein, Attorney at Law, New York, NY USA.

For Ps Energy Group Inc, Consolidated Plaintiff (1:12md2338), Pro se.

For The Bagwell Group, Movant (1:12md2338): Jeremy Alan Lieberman, Pomerantz LLP, New York, NY USA.

For Banyan Capital Master Fund, Ltd., Movant (1:12md2338): Curtis Victor Trinko, Law Offices of Curtis V. Trinko, LLP, New York, NY USA.

For Building Trades United Pension Trust Fund, Movant (1:12md2338): Danielle Suzanne Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Darren J. Robbins, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (SANDIEGO), San Diego, CA USA; Samuel Howard Rudman, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY USA.

For Union Asset Management Holding AG, Movant (1:12md2338): Danielle Suzanne Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Darren J. Robbins, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (SANDIEGO), San Diego, CA USA; Samuel Howard Rudman, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY USA.

For Lri Invest S.A., Movant (1:12md2338): Danielle Suzanne Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Darren J. Robbins, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (SANDIEGO), San Diego, CA USA; Samuel **[*34]** Howard Rudman, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY USA.

For Paradigm Global Fund I Ltd., Movant (1:12md2338): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA.

For Paradigm Equities Ltd., Movant (1:12md2338): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA.

For Paradigm Asia Ltd., Movant (1:12md2338): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA.

For Zybr Holdings, Llc, Movant (1:12md2338): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA.

For Augustus International Master Fund, L.P., Movant (1:12md2338): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), New York, NY USA.

For William Schur, Movant (1:12md2338): Andrew J Entwistle, Entwistle & Cappucci LLP (NYC), New York, NY USA; Joshua Killion Porter, Entwistle & Cappucci LLP (NYC), [*35] New York, NY USA.

For Robert Marcin, Movant (1:12md2338), Pro se.

For H. Martin Klinker, Jr., Movant (1:12md2338): Imtiaz A. Siddiqui, Cotchett, Pitre & McCarthy LLP, New York, NY USA.

For Rocking K Land And Cattle, Inc., Movant (1:12md2338): Imtiaz A. Siddiqui, Cotchett, Pitre & McCarthy LLP, New York, NY USA.

For Philip Timothy Johnson, Movant (1:12md2338): Imtiaz A. Siddiqui, Cotchett, Pitre & McCarthy LLP, New York, NY USA.

For Wade Jacobsen, Movant (1:12md2338): Imtiaz A. Siddiqui, Cotchett, Pitre & McCarthy LLP, New York, NY USA.

For Futures Capital Management, Llc, Movant (1:12md2338), Pro se.

For Ali A. Rangchi Bozorki, Movant (1:12md2338), Pro se.

For Jon S. Corzine, Defendant (1:12md2338): Andrew J. Levander, Dechert, LLP (NYC), New York, NY USA; Caryn Lara Trombino, Perkins Coie Llp, Chicago, IL USA; Jonathan R. Streeter, U.S. Attorney's Office, SDNY (St Andw's), New York, NY USA; Matthew Lester Mazur, Dechert, LLP (NYC), New York, NY USA; Patrick M Collins, PRO HAC VICE, Perkins Coie LLP (IL), Chicago, IL USA; Pravin B Rao, PRO HAC VICE, Perkins Coie LLP (IL), Chicago, IL USA; Rebecca Kahan Waldman, Dechert, LLP (NYC), New York, NY USA.

For Bradley I. Abelow, Defendant (1:12md2338): [*36] Arthur Harlod Aufses, III, LEAD ATTORNEY, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA; Michael Tremonte, Sher Tremonte LLP, New York, NY USA.

For Henri J, Steenkamp, Defendant (1:12md2338): Lee S Richards, III, Richards Kibbe & Orbe LLP (NYC), New York, NY USA; Neil Stephen Binder, Binder & Schwartz LLP, New York, NY USA.

For David P. Bolger, Defendant (1:12md2338): David Brendan Toscano, Davis Polk & Wardwell L.L.P., New York, NY USA; Edmund Polubinski, III, Davis Polk & Wardwell L.L.P., New York, NY USA; Julia Nestor, Davis Polk & Wardwell L.L.P., New York, NY USA.

For Eileen S. Fusco, Defendant (1:12md2338): David Brendan Toscano, Davis Polk & Wardwell L.L.P., New York, NY USA; Edmund Polubinski, III, Davis Polk & Wardwell L.L.P., New York, NY USA; Julia Nestor, Davis Polk & Wardwell L.L.P., New York, NY USA.

For David Gelber, Defendant (1:12md2338): David Brendan Toscano, Davis Polk & Wardwell L.L.P., New York, NY USA; Edmund Polubinski, III, Davis Polk & Wardwell L.L.P., New York, NY USA; Julia Nestor, Davis Polk & Wardwell L.L.P., New York, NY USA.

For Martin J. Glynn, Defendant (1:12md2338): David Brendan Toscano, Davis Polk & Wardwell L.L.P., New York, NY USA; Edmund [*37] Polubinski, III, Davis Polk & Wardwell L.L.P., New York, NY USA; Julia Nestor, Davis Polk & Wardwell L.L.P., New York, NY USA.

For Edward L. Goldberg, Defendant (1:12md2338): David Brendan Toscano, Davis Polk & Wardwell L.L.P., New York, NY USA; Edmund Polubinski, III, Davis Polk & Wardwell L.L.P., New York, NY USA; Julia Nestor, Davis Polk & Wardwell L.L.P., New York, NY USA.

For David I. Schamis, Defendant (1:12md2338): David Brendan Toscano, Davis Polk & Wardwell L.L.P., New York, NY USA; Edmund Polubinski, III, Davis Polk & Wardwell L.L.P., New York, NY USA; Julia Nestor, Davis Polk & Wardwell L.L.P., New York, NY USA.

For Robert S Sloan, Defendant (1:12md2338): David Brendan Toscano, Davis Polk & Wardwell L.L.P., New York, NY USA; Edmund Polubinski, III, Davis Polk & Wardwell L.L.P., New York, NY USA; Julia Nestor, Davis Polk & Wardwell L.L.P., New York, NY USA.

For Richard W. Gill, Defendant (1:12md2338): G. Robert Gage, Jr., Gage, Spencer & Fleming, LLP, New York, NY USA.

For Laurie R. Ferber, Defendant (1:12md2338): Daniel E. Reynolds, Lankler Siffert & Wohl LLP, New York, NY USA; Frank H. Wohl, Lankler Siffert & Wohl LLP, New York, NY USA; Michael Dayton Longyear, Lankler Siffert [*38] & Wohl LLP, New York, NY USA.

For John Ranald Macdonald, Defendant (1:12md2338): Dean Lindsay Chapman, Akin Gump Strauss Hauer & Feld ( 1 Battery Pk.), New York, NY USA; Estela Diaz, Akin Gump Strauss Hauer & Feld LLP (NYC), New York, NY USA; Joseph Lee Sorkin, Akin Gump Strauss Hauer & Feld LLP (NYC), New York, NY USA; Robert Henry Hotz, Jr, Akin Gump Strauss Hauer & Feld ( 1 Battery Pk.), New York, NY USA.

For Tracey A. Lowery Whille, Defendant (1:12md2338): G. Robert Gage, Jr., Gage, Spencer & Fleming, LLP, New York, NY USA.

For Christine A. Serwinski, Defendant (1:12md2338): Brett Gerald Canna, Robinson McDonald & Canna LLP, New York, NY USA; Jayne S. Robinson, Robinson McDonald & Canna, LLP, New York, NY USA; Kathryn Ann McDonald, Robinson McDonald & Canna, LLP, New York, NY USA.

For Michael G. Stockman, Defendant (1:12md2338): Justin Anthony Alfano, Milbank, Tweed, Hadley & McCloy LLP (NYC), New York, NY USA; Sean Miles Murphy, Milbank, Tweed, Hadley & McCloy LLP (NYC), New York, NY USA; Thomas A. Arena, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, CA USA.

For Frederick R. Demler, Defendant (1:12md2338): Lisamarie Frances Collins, Herrick, Feinstein LLP, New York, NY USA; Therese **[\*39]** Marie Doherty, Herrick, Feinstein LLP, New York, NY USA.

For Stephen Grady, Defendant (1:12md2338): Lisamarie Frances Collins, Herrick, Feinstein LLP, New York, NY USA; Therese Marie Doherty, Herrick, Feinstein LLP, New York, NY USA.

For Thomas F. Connolly, Defendant (1:12md2338): G. Robert Gage, Jr., Gage, Spencer & Fleming, LLP, New York, NY USA.

For Rick D. Leesley, Defendant (1:12md2338): Lisamarie Frances Collins, Herrick, Feinstein LLP, New York, NY USA; Therese Marie Doherty, Herrick, Feinstein LLP, New York, NY USA.

For David Simons, Defendant (1:12md2338): G. Robert Gage, Jr., Gage, Spencer & Fleming, LLP, New York, NY USA.

For J.C. Flowers & Co. Llc, Defendant (1:12md2338): David William Feder, Debevoise & Plimpton Llp(919 Third Ave), New York, NY USA; Helen Virginia Cantwell, Debevoise & Plimpton, LLP (NYC), New York, NY USA; Maeve L. O'Connor, Debevoise & Plimpton, LLP (NYC), New York, NY USA.

For Christy Vavra, Defendant (1:12md2338): Harris Lee Kay, Henderson & Lyman, Chicago, IL USA; Jeffry M. Henderson, Chicago, IL USA.

For Vinay Mahajan, Defendant (1:12md2338): Gregory John O'Connell, De Feis O'Connell & Rose, P.C., New York, NY USA; Philip Canning Patterson, De Feis O'Connell **[\*40]** & Rose, P.C., New York, NY USA.

For Bradley Abelow, Defendant (1:12md2338): Arthur Harlod Aufses, III, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA; Craig Louis Siegel, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA; Michael Tremonte, Sher Tremonte LLP, New York, NY USA; Paul Henry Schoeman, Kramer Levin Naftalis & Frankel, LLP, New York, NY USA.

For Sandler O'Neill & Partners, L.P., Defendant (1:12md2338): Adam Selim Hakki, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For David Dunne, Defendant (1:12md2338): Laura Steinberg, LEAD ATTORNEY, Sullivan & Worcester LLP (MA), Boston, MA USA.

For J. Randy Macdonald, Consolidated Defendant (1:12md2338): Dean Lindsay Chapman, Akin Gump Strauss Hauer & Feld ( 1 Battery Pk.), New York, NY USA; Estela Diaz, Akin Gump Strauss Hauer & Feld LLP (NYC), New York, NY USA; Joseph Lee Sorkin, Akin Gump Strauss Hauer & Feld LLP (NYC), New York, NY USA; Robert Henry Hotz, Jr, Akin Gump Strauss Hauer & Feld ( 1 Battery Pk.), New York, NY USA.

For Bernard Dan, Consolidated Defendant (1:12md2338): Lisamarie Frances [*41] Collins, Herrick, Feinstein LLP, New York, NY USA; Therese Marie Doherty, Herrick, Feinstein LLP, New York, NY USA.

For Goldman Sachs & Co., Consolidated Defendant (1:12md2338): Christopher Michael Joralemon, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Citigroup Global Market, Inc., Consolidated Defendant (1:12md2338): Christopher Michael Joralemon, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Bank of America Corporation, Consolidated Defendant (1:12md2338): Christopher Michael Joralemon, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Merrill Lynch, Pierce, Fenner & Smith Incorporated, Consolidated Defendant (1:12md2338): Christopher Michael Joralemon, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For J.P. Morgan Securities Inc., Consolidated Defendant (1:12md2338): Christopher Michael Joralemon, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, [*42] Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Deutsche Bank & Securities Inc., Consolidated Defendant (1:12md2338): Christopher Michael Joralemon, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Rbs Securities Inc., Consolidated Defendant (1:12md2338): Christopher Michael Joralemon, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA; Mark Adam Kirsch, Gibson, Dunn & Crutcher, LLP (NY), New York, NY USA.

For Jeffries & Company, Inc., Consolidated Defendant (1:12md2338): Adam Selim Hakki, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling

LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Bmo Capital Markets Corp., Consolidated Defendant (1:12md2338): Adam Selim Hakki, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Commerz Markets Llc, Consolidated Defendant (1:12md2338): Adam Selim Hakki, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), [*43] New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Natxis Securities North America, Inc., Consolidated Defendant (1:12md2338): Adam Selim Hakki, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Lebenthal & Co., Llc, Consolidated Defendant (1:12md2338): Adam Selim Hakki, Shearman & Sterling LLP (NY), New York, NY USA; H. Miriam Farber, Shearman & Sterling LLP (NY), New York, NY USA; Stuart Jay Baskin, Shearman & Sterling LLP (NY), New York, NY USA.

For Edith O'Brien, Consolidated Defendant (1:12md2338): Christopher James Barber, PRO HAC VICE, Williams, Montgomery and John Ltd, Chicago, IL USA; Darren Bernens Kinkead, Williams, Montgomery and John Ltd, Chicago, IL USA; Jonathan Daniel Miller, Steptoe & Johnson LLP, Chicago, IL USA.

For Cme Group Inc., Consolidated Defendant (1:12md2338): Brian Jason Fischer, Jenner & Block LLP (NYC ), New York, NY USA; Charles B. Sklarsky, Jenner & Block LLP (Chicago), Chicago, IL USA; Gregory M Boyle, PRO HAC VICE, Jenner & Block LLP (Chicago), Chicago, IL USA.

For Jp Morgan Chase & [*44] Co., Consolidated Defendant (1:12md2338): John F. Lynch, Wachtell, Lipton, Rosen & Katz, New York, NY USA; John F Savarese, Wachtell, Lipton, Rosen & Katz, New York, NY USA; Ralph M. Levene, Wachtell, Lipton, Rosen & Katz, New York, NY USA; Steven Peter Winter, Wachtell, Lipton, Rosen & Katz, New York, NY USA.

For Arkansas Public Employees Retirement System, Adr Provider (1:12md2338): Kenneth Mark Rehns, Cohen Milstein Sellers & Toll P.L.L.C., New York, NY USA.

For Rogers Varner, Jr., Adr Provider (1:12md2338): R. Bryant McCulley, PRO HAC VICE, McCulley McCluer PLLC, Sullivans Island, SC USA.

**Judges:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JAMES C. FRANCIS IV

# Opinion

MEMORANDUM AND ORDER

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Plaintiffs Bradley Abelow, Jon Corzine, David Dunne, Vinay Mahajan, Edith O'Brien, and Henry Steenkamp (the "Individual Defendants") seek to compel trustee James W. Giddens (the "Trustee"), appointed to liquidate MF Global Inc. ("MFGI") under the Securities Investor Protection Act, *15 U.S.C. § 78aaa et seq.* ("SIPA"), to produce certain work papers, reports, and other documents underlying analyses performed by Ernst & Young on his behalf. The motion is denied.

Background

The background **[*45]** of this litigation has been repeated in numerous opinions of the Honorable Victor Marrero, U.S.D.J., see, e.g., *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP, 57 F. Supp. 3d 206, 207, 2014 U.S. Dist. LEXIS 93333, 2014 WL 3402602, at *1-2 (S.D.N.Y. 2014)*; *In re MF Global Ltd. Investment Litigatigation, 998 F. Supp. 2d 157, 168-74 (S.D.N.Y. 2014)*; *In re MF Global Holdings Ltd. Securities Litigation, 982 F. Supp. 2d 277, 291-300 (S.D.N.Y. 2013)*, so I do not belabor it here. This is the relevant factual background, derived from certain filings in the constellation of cases connected with the implosion of the MF Global enterprise.

The Trustee engaged Ernst & Young to perform "forensic accounting and data preservation as part of [his] statutorily mandated investigation and search for assets, potential causes of action, and sources of recovery" pursuant to *15 U.S.C. § 78fff-1(d)*. (Information Regarding Services Rendered by, Compensation to, and Oversight of Non-Attorney Professionals and Other Staff as Directed by the Order of the Court dated March 21, 2014 ("Trustee Statement") at 6, In re MF Global Inc., No. 11-02790 (Bankr. S.D.N.Y. Aug. 8, 2014), ECF No. 8146).[1] Ernst & Young worked under the direction of the Trustee's counsel to "assist[] in determining the amount of the shortfalls in customer funds that were widely reported to and appeared to exist as of October 31, 2011," the date MFGI (as well as its parent, MF Global Holdings, Ltd.) declared bankruptcy (Trustee Statement at 1); "perform[] a detailed reconciliation of cash transfers" **[*46]** among and between accounts holding customer funds and property (called segregated accounts, secured accounts, and 15c3-3 accounts) and proprietary accounts of MFGI; "reconcile securities movements in the segregated/secured accounts"; "understand and define significant intra[-

---

[1] In conformance with the practice of the parties to this dispute, I will refer to the proceeding in the Bankruptcy Court as the "SIPA Proceeding."

]company transactions that may have involved segregated/secured collateral"; and "analyze[] the drawdown of funds from [MFGI's] unsecured revolving credit facility." (Trustee Statement at 16-18).

In accordance with statutory directive, _15 U.S.C. § 78fff-1(c)_ & _(d)(4)_, the investigation culminated in a report submitted to the Bankruptcy Court in the SIPA Proceeding, which "focus[es] . . . on the underlying reasons for and the consequences of the collapse of MF Global, incliuding the shortfall of segregated customer property that MFGI publicly announced early on the morning of October 31, 2011." (Report of the Trusteed Investigation and Recommendations dated June 4, 2012 ("Report") at 1, In re MF Global Inc., No. 11-02790 (Bankr. S.D.N.Y. June 4, 2012), ECF No. 1865). The Report notes that "the facts as set forth **[\*47]** . . . are not intended to be viewed as findings of fact binding on any court or jury." (Report at 2). In addition, it asserts that "the Trustee is pursuing those claims that he believes to be potentially viable to recover customer property" and consulting with counsel for the commodities customers' putative class in this action about claims to be asserted against Officers and Directors of MFGI (Report at 3); however, the Report does not "comment in detail . . . on the strengths and weaknesses of [the] potential causes of action" (Report at 5).

The Report, which is, after all, publicly available, is not itself a target of the motion; the Individual Defendants seek documents created by Ernst & Young that underlie the Report -- specifically, "work papers, reports, and other documents containing the data, figures, and technical reasoning that underlie and provide support for [Ernst & Young's] public findings that were summarized in the [] Report's annexes." (Reply Memorandum of Law in Further Support of Individual Defendants' Motion to Compel Trustee's Production of EY Documents ("Reply") at 3). They claim that these documents were never protected by attorney-client privilege or work-product **[\*48]** immunity; or, if they were, those protections have been waived because (1) the Trustee failed to keep those documents confidential and (2) the Trustee and the interim representatives of the putative class of former commodities customers of MF Global ("Customer Representatives"), who are assignees of the Trustee's claims in this consolidated action, have put the underlying documents at issue by relying on the Report "as an authoritative source of factual support" in submissions in both the SIPA Proceeding and in this case. (Memorandum of Law in Support of Individual Defendants' Motion to Compel Trustee's Production of EY Documents ("Ind. Def. Memo.") at 2-3, 22). This second waiver argument is based on the plaintiffs' asserted incorporation of Ernst & Young's findings into the operative complaint in this action, as well as into the Customer Representatives' opposition to the Individual Defendants' motion to dismiss that complaint; references to the findings in papers filed in connection with the settlement of claims against JPMorgan Chase Bank, N.A. ("JPMorgan") brought by the Trustee in the SIPA Proceeding and the Customer Representatives in this action (the "JP Morgan Settlement"); **[\*49]** and references in papers filed in connection with a motion in the SIPA Proceeding for authority to allocate general estate property to the customer estates to satisfy customer net equity claims (the "Allocation Motion").[2]

---

[2] These submissions comprise the following submissions in this action: (1) the Consolidated Class Action Complaint for

Discussion

A. Attorney Client Privilege

1. Legal Standard

The attorney-client privilege protects from disclosure "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."[3] *In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007)* (citing *United States v. Construction Products Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996))*; accord *United States v. Ghavami, 882 F. Supp. 2d 532, 536 (S.D.N.Y. 2012)*. Obtaining or providing legal advice need not be the sole purpose of the communication; rather, in this Circuit "[w]e consider whether the predominant purpose of the communication **[*51]** is to render or solicit legal advice." *In re County of Erie, 473 F.3d at 420*. The privilege protects both the advice of the attorney to the client and the information communicated by the client that provides a basis for giving advice. See *Upjohn Co. v. United States, 449 U.S. 383, 390, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)*; *In re Six Grand Jury Witnesses, 979 F.2d 939, 943-44 (2d Cir.1992)*; *Chen-Oster v. Goldman, Sachs & Co., 293 F.R.D. 547, 554 (S.D.N.Y. 2013)*. "[T]he burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984)*; accord *Ghavami, 882 F. Supp. 2d at 536*.

2. Ernst & Young Documents

The Individual Defendants argue that the Ernst & Young documents are not protected by attorney client privilege because the firm's findings were never intended to be kept confidential; rather, they were intended to be incorporated into the published Report. According to the Individual Defendants, the fact that the Report was made public means that "the attorney-client privilege did not attach to any of the information [Ernst & Young] provided to the Trustee concerning its findings." **[*52]** (Ind. Def. Memo. at 13).

---

Violations of the Commodities Exchange Act and Common Law ("Complaint"), ECF No. 382; (2) the Customer Plaintiffs' Memorandum of Law in Response to the Director and Officer Defendants' Joint Motion to Dismiss the Consolidated Amended Class Action Complaint for Violations of the Commodities Exchange Act and Common Law ("Customer Reps. MTD Memo."), ECF No. 549; and (3) Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Settlement with JPMorgan Chase Bank, N.A. ("Customer Reps. Settlement Memo."), ECF No. 469; and these submissions in the SIPA Proceeding: (1) the Trustee's Motion Pursuant to *Federal Rule of Bankruptcy Procedure 9019* for Entry of an Order (i) Approving the Settlement Agreement between the Trustee, the Class Representatives, and JPMorgan; and (ii) Authorizing the Allocation of Certain Assets Made Available by the Settlement Agreement to the Customer **[*50]** Estates for Distribution to Customers, In re MF Global Inc., No. 11-02790 (Bankr. S.D.N.Y. March 19, 2013), ECF No. 6148); (2) Declaration of Josiah S. Trager dated Oct. 2, 2013, In re MF Global Inc., No. 11-02790 (Bankr. S.D.N.Y. Oct. 2, 2013), ECF No. 7104; and (3) the Customer Representatives' Reply in Further Support of Trustee's Motion to (I) Approve the Trustee's Allocation of Property and (II) Approve the Terms of an Advance of General Estate Property for the Purpose of Making a Final 100% Distribution to Former Commodity Futures Customers of MF Global Inc., In re MF Global Inc., No. 11-02790 (Bankr. S.D.N.Y. Nov. 1, 2013), ECF No. 7196).

[3] The Individual Defendants appear to concede that Ernst & Young was functioning as an agent of the attorneys. See, e.g., *Gucci America, Inc. v. Guess?, Inc., 271 F.R.D. 58, 71 (S.D.N.Y. 2010)* (factual investigations conducted by agents of attorney, such as accountants, protected by attorney-client privilege).

In Upjohn, after independent auditors discovered payments made by a subsidiary for the benefit of foreign government officials, the company, in consultation with outside counsel, launched an investigation into those "questionable payments." *449 U.S. at 386*. Attorneys prepared a questionnaire that was sent to certain managers seeking detailed information concerning any payments made to any employee or official of a foreign government. *Id. at 387*. Managers were told to treat the investigation as highly confidential. Id. At the conclusion of the investigation, the company voluntarily submitted a report to the SEC and the IRS. Id. The IRS sought copies of all files related to the company's investigation, including the questionnaires. *Id. at 387-88*. The Supreme Court held that the documents underlying the report were protected by the attorney-client privilege. *Id. at 395*. Similarly, in In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, a subpoena directed at a company's outside counsel sought production of all documents related to the sale of a subsidiary, in order to investigate possible obstruction of justice and fraud charges in connection with prior litigation. *731 F.2d 1032, 1035-36 (2d Cir. 1984)*. Holding that the documents were **[*53]** protected by the attorney-client privilege, the Second Circuit observed:

> The possibility that some of the information contained in these documents may ultimately be [made public] does not vitiate the privilege. First, it is important to bear in mind that the attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that that disclosure would reveal confidential communications. Thus, the fact that certain information in the documents might ultimately be disclosed . . . did not mean that the communications to [counsel] were foreclosed from protection by the privilege as a matter of law. Nor did the fact that certain information might later be disclosed to others create the factual inference that the communications were not intended to be confidential at the time they were made. If confidentiality were not intended, of course, the privilege would not attach; but we see no indication that confidentiality was not intended.

*Id. at 1037* (internal citations omitted).

So it is here. There is no indication that the Ernst & Young documents sought were intended to be made public. Quite the contrary: "[t]he Trustee and **[*54]** his counsel intended that all communications with [Ernst & Young] be confidential, and the confidentiality of [Ernst & Young's] work product was always carefully maintained." (Declaration of Vilia B. Hayes dated Dec. 2, 2014 ("Hayes Decl."), ¶ 7). Indeed, although a court-approved cooperation agreement between the Trustee and counsel for the putative class allows disclosure of confidential material without vitiating privilege, Ernst & Young's work-product has not been shared with counsel for the putative class, with the exception of a list of cash transactions reflected in bank statements from the last week of October 2011.[4] (Hayes Decl., ¶ 8; Amended and Restated Continuing Cooperation and Assignment Agreement dated Sept. 10, 2012 ("Assignment Agreement"), attached as Exh. A to Order dated Oct. 11, 2012, In re MF Global Inc., No. 11-02790 (Bankr.

---

[4] The bank statements have been produced to the Individual Defendants. (Hayes Decl., ¶ 8).

S.D.N.Y. Oct. 11, 2012), ECF No. 3764, attached as Exh. D to Hayes Decl., at 2).

*United States v. Tellier, 255 F.2d 441 (2d Cir. 1958)*, does not undermine this conclusion. In that case, the defendant and his attorney had a telephone conversation in which the attorney warned that issuing debentures to raise **[\*55]** funds for a failing company represented by the defendant's securities firm would likely be illegal. *Id. at 443-45*. During the call, the attorney stated that he would write a letter to the defendant, with copies to be disclosed to certain others with whom he did not have an attorney-client relationship, "substantially setting forth the conversation and pointing out that for legal reasons there should not be any public sales at this time." *Id. at 447*. The Second Circuit held that the conversation was not protected, because the context made clear that it was not intended to be confidential: the attorney stated that the conversation would be memorialized in a letter that would be disclosed outside the attorney-client relationship.[5] Id. Here, however, Ernst & Young did not "communicate[] information [from the underlying documents] to [the Trustee's] attorney with the understanding that the information [would] be revealed to others," *United States v. (Under Seal), 748 F.2d 871, 875 (4th Cir. 1984)*; rather, all understood that those specific communications would remain confidential. (Hayes Decl., ¶ 7). They are therefore protected. See, e.g., *In re Feldberg, 862 F.2d 622, 629 (7th Cir. 1988)* ("Rare is the case in which attorney-client conversations do not lead to some public disclosure. . . . [For example,] **[\*56]** [a] corporation prepares and publishes an internal report about 'questionable payments' abroad; we know from Upjohn Co. that it does not follow that the government has access to the interviews underlying the published report.").

B. Work-product Protection

1. Legal Standard

The work-product doctrine "shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need." *United States v. Adlman, 68 F.3d 1495, 1501 (2d Cir. 1995)* (quoting *Fed R. Civ. P. 26(b) (3)*). It is designed to protect "mental impressions, conclusions, opinions or theories . . . concerning the litigation." *United States v. Adlman, 134 F.3d 1194, 1197 (2d Cir. 1998)*. The burden of establishing any right to protection is on the party asserting it, *In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003)*, **[\*57]** and is "not discharged by mere conclusory or ipse dixit assertions," *In re Grand Jury Subpoena, 750 F. 2d at 224-25* (citations and internal quotation marks omitted). The protection claimed must be narrowly construed and its application must be consistent with the purposes underlying the asserted immunity. *In re Grand Jury Subpoenas, 318 F.3d at 384*.

Under *Rule 26(b)(3) of the Federal Rules of Civil Procedure*, "[t]hree conditions must be fulfilled in order for work product protection to apply. The material must (1) be a document or a

---

[5] At least one case suggests that Tellier and similar cases are best understood not as addressing the confidentiality of attorney-client communications, but rather as addressing "implied" or "at issue" waiver, which occurs where "the party making the disclosure was seeking to use it affirmatively in the controversy in issue without permitting its adversary to inquire about the basis or accuracy of the disclosure: in other words, the classic sword instead of shield." *Calvin Klein Trademark Trust v. Wachner, 124 F. Supp. 2d 207, 210 (S.D.N.Y. 2000)*. This type of waiver is discussed below.

tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative." *In re Veeco Instruments, Inc. Securities Litigation, No. 05 MD 1695, 2007 U.S. Dist. LEXIS 16922, 2007 WL 724555, at \*4 (S.D.N.Y. March 9, 2007)* (internal quotation marks omitted); accord *Adlman, 134 F.3d at 1195 n.1* (quoting *Fed. R. Civ. P. 26(b) (3)*). A document is prepared "in anticipation of litigation" if "in light of the nature of the document and the factual situation in the particular case, [it] can fairly be said to have been prepared or obtained because of the prospect of litigation." *Adlman, 134 F.3d at 1202* (internal quotation marks omitted). "If, regardless of the prospect of litigation, the document would have been prepared anyway, in the ordinary course of business or in 'essentially similar form,' it is not entitled to work product protection," *Clarke v. J.P. Morgan Chase & Co., No. 08 Civ. 2400, 2009 U.S. Dist. LEXIS 30719, 2009 WL 970940, at \*7 (S.D.N.Y. April 10, 2009)* (quoting *Adlman, 134 F.3d at 1202*).

2. **[\*58]** Ernst & Young Documents

The Individual Defendants contend that the documents at issue are, at best, "dual purpose" documents created pursuant to statutory mandate, and are unprotected because the Trustee has not shown that the prospect of litigation significantly influenced the form in which they were created. (Ind. Def. Memo. at 17-18). They assert that Ernst & Young "would have been engaged to perform essentially the same analyses, would have produced essentially the same findings -- and likewise would have supported those findings with reference to essentially the same [] [d]ocuments -- regardless of whether or not litigation was contemplated." (Ind. Def. Memo. at 18). The Trustee asserts that the documents underlying the Report are "intrinsically related to litigation" because the Trustee is required by statute to investigate potential causes of action that might be brought on behalf of the estate. (Memorandum of Law in Opposition to Individual Defendants' Motion to Compel Trustee's Production of EY Documents ("Trustee Memo.") at 15 (citing *15 U.S.C. § 78fff-1(d)(3)*)).

I am flummoxed by this dispute. The Report and its underlying documents were created only because of the SIPA Proceeding. The Trustee would not have **[\*59]** been appointed but for the SIPA Proceeding. See *15 U.S.C. § 78eee(b)(3)*; (Order dated Oct. 31, 2011, Securities Investor Protection Corp. v. MF Global Inc., No. 11 Civ. 7750 (S.D.N.Y. Oct. 31, 2011), ECF No. 3). The Trustee created the Report for the court in the SIPA Proceeding. See *15 U.S.C. § 78fff-1(d)(3)*. And the SIPA Proceeding court directs dissemination of the Trustee's Report. *15 U.S.C. § 78fff-1(d)(4)*. Thus, in the absence of litigation -- the SIPA Proceeding -- the documents would not have been created at all. And, of course, Supreme Court precedent teaches that work-product created in connection with a different litigation is still protected in subsequent litigation. See *Federal Trade Commission v. Grolier, Inc., 462 U.S. 19, 25, 103 S. Ct. 2209, 76 L. Ed. 2d 387 (1983)*; see also *General Electric Capital Corp. v. DirecTV, Inc., No. 3:97 CV 1901, 1998 U.S. Dist. LEXIS 18932, 1998 WL 849389, at \*9 n.5 (D. Conn. July 30, 1998)* (collecting cases); *Liberty Environmental Systems, Inc. v. County of Westchester, No. 94 Civ. 7431, 1997 U.S. Dist. LEXIS 12200, 1997 WL 471053, at \*7 (S.D.N.Y. Aug. 18, 1997)*. A straightforward application of the standards for work-product protection establishes that the documents are protected, unless that protection has been waived.

Even if the underlying documents were dual purpose documents, as urged by the Individual Defendants, they would be protected as work-product. The Trustee has produced competent evidence that the Ernst & Young documents were produced in anticipation of litigation and that the form in which they were produced was affected [*60] by that litigation. A member of the team responsible for investigating MF Global's failure and preparing the Report has provided a declaration establishing that Ernst & Young's work was conducted at a time when litigation was "virtually inevitable." (Hayes Decl. ¶¶ 2-3, 5). The declaration states, "The Trustee's instructions to and communications with [Ernst & Young] were inextricably intertwined with litigation considerations, and litigation considerations necessarily shaped the nature and scope of [Ernst & Young's] work, along with the [Ernst & Young] [d]ocuments." (Hayes Decl., ¶ 6). This is not, then, a situation the assertion of privilege is unsupported by evidence, as in the cases cited by the Individual Defendants. Compare _Weber v. Paduano, No. 02 Civ. 3392, 2003 U.S. Dist. LEXIS 858, 2003 WL 161340, at *5-9 (S.D.N.Y. Jan. 22, 2003)_ (noting, repeatedly, that no evidence was produced in support of claim that reports were produced in contemplation of litigation), and _Koppel v. United National Insurance Co., No. 08 CV 1965, 2008 U.S. Dist. LEXIS 96672, 2008 WL 5111288, at *2 (E.D.N.Y. Nov. 26, 2008)_ (rejecting application of work-product protection because affidavit submitted not based on personal knowledge) (cited in Reply at 7), with _In re Veeco Instruments, Inc. Securities Litigation, No. 05 MD 1695, 2007 U.S. Dist. LEXIS 16922, 2007 WL 724555, at *2, 5-6 (S.D.N.Y. March 9, 2007)_ (affirming decision finding documents protected as work-product where supported by declarations indicating they would [*61] not have been prepared in substantially same form in absence of threat of litigation), and _In re Woolworth Corp. Securities Class Action Litigation, No. 94 Civ. 2217, 1996 U.S. Dist. LEXIS 7773, 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996)_ (finding documents protected as work-product when "all participants knew . . . that litigation . . . [was a] virtual certaint[y]," and observing that "[a]pplying a distinction between 'anticipation of litigation' and 'business purposes'" in such situations is "artificial [and] unrealistic").[6]

C. Waiver

1. Disclosure

Both attorney-client and work-product protections may be waived "when a party selectively discloses [protected] communications to an adverse government entity." _Gruss v. Zwirn, No. 09_

_____

[6] The Individual Defendants insist that "[w]hen a statute or other source of law requires a document to be created, the document almost never constitutes work product." (Ind. Def. Memo. at 17). But the cases they cite neither state nor support such a rule. For example, in United States v. Richey, the Ninth Circuit held that the work papers of an attorney hired to appraise the value of an easement for income tax purposes were not protected as work-product based on the fact that there was no evidence in the record that the work file would have been prepared differently in the absence of prospective litigation. _632 F.3d 559, 567-68_ (cited in Ind. Def. Memo. at 17). This is merely a direct application of the rule established in _Adlman, 134 F.3d at 1202_. In _Westernbank Puerto Rico v. Kachkar, Nos. M8-85 X3, 07 Civ. 1606, 2009 U.S. Dist. LEXIS 75419, 2009 WL 856392, at *1, 4 (S.D.N.Y. March 27, 2009)_ (cited in Ind. Def. Memo. at 17-18), the court found that papers prepared [*62] by an accountant regarding the restatement of a company's financials for the purpose of a 10-K Report did not constitute work-product. In that case, however, there was no indication that there was any other purpose for the creation of the documents other than for inclusion in the 10-K. Id. These cases simply do not support the notion that determination of work-product protection for documents created pursuant to statute or regulation is somehow qualitatively different from the standard inquiry.

_Civ. 6441, 2013 U.S. Dist. LEXIS 100012, 2013 WL 3481350, at *12 (S.D.N.Y. July 10, 2013)_. In such a situation, "the privilege is waived not only as to the materials provided, but also as to the underlying source materials." _Id._ In their opening brief, the Individual Defendants assert that "[Ernst & Young] discussed with the CFTC and SEC its key findings concerning the flow of funds through MFGI and beyond," (Ind. Def. Memo. at 22). In response, counsel for the Trustee affirms that neither the Trustee's attorneys nor Ernst & Young is aware of any of the relevant documents having been shared with any **[\*63]** government agency or official. (Hayes Decl., ¶ 9 & n.6). The Individual Defendants do not address waiver by disclosure or counsel's affirmation in their Reply except to mention, in one sentence, that "the Trustee also discussed [Ernst & Young's] findings with the CFTC and other adverse government agencies." (Reply at 1).

Assuming the Individual Defendants have not abandoned this argument, I find that the Trustee has adequately established that there was no disclosure of privileged information to adverse government bodies, and therefore neither attorney-client nor work-product protection has been waived on this ground.

2. "At Issue" Waiver

Both attorney-client privilege and work-product immunity "may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." _United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991)_. But the fact that a privileged communication may simply be relevant to a claim or defense is insufficient to effect forfeiture of the privilege. _Id. at 1293_; accord _Aiossa v. Bank of America, N.A., No. 10 CV 1275, 2011 U.S. Dist. LEXIS 102207, 2011 WL 4026902, at *2 (E.D.N.Y. Sept. 12, 2011)_. The paramount consideration is "[w]hether fairness requires disclosure," which must be determined "on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted." _In re Grand Jury Proceedings, 219 F.3d 175, 183 (2d Cir. 2000)_. The "fairness **[\*64]** doctrine" analysis applies to waiver of work-product protection just as it does to waiver of attorney-client privilege. See _id. at 191_.

The Individual Defendants claim that the Trustee and the Customer Representatives have relied on the Report in both the SIPA Proceeding and in this action. But I fail to see how the Individual Defendants here are affected by any alleged reliance on the document in a different case. As the court in _Federal Housing Finance Agency v. UBS Americas Inc., Nos. 11 Civ. 5201 et al., 2012 U.S. Dist. LEXIS 164236, 2012 WL 5473722, at *1 (S.D.N.Y. Nov. 12, 2012)_, indicates, placing a matter at issue in one action generally will not result in waiver of protection in a separate action. This is because it is not likely that unfairness or prejudice to a litigant in one action will result from reliance on privileged material in another, unless the two are closely intertwined. See, e.g., _National Immigration Project of the National Lawyers Guild v. United States Department of Homeland Security, 842 F. Supp. 2d 720, 722, 725-28 (S.D.N.Y. 2012)_ (representation made in brief to Supreme Court waived privilege for materials underlying representation in action pursuant to FOIA directed at learning facts upon which challenged representation was based). To be sure, the SIPA Proceeding is connected to this litigation. However, Judge Marrero has already determined that issues decided in the SIPA Proceeding have no **[\*65]** effect on the Individual Defendants' rights in this action. See _In re MF Global Inc., 505 B.R. 623, 629 (S.D.N.Y. 2014)_

("The Court is simply at a loss to understand why [the Individual Defendants] believe that the Bankruptcy Court's Order has any effect on their defenses in the Customer Action."). And, although the Individual Defendants cite the use of the Report in the SIPA Proceeding, they fail to show how that use affects their rights here.[7] There is no need, therefore, to address the waiver question in connection with documents filed in the SIPA Proceeding. Rather, the only documents relevant to the "at issue" waiver are the Complaint, the Customer Representatives' brief on the motion to dismiss, and the Customer Representatives' brief filed in connection with preliminary approval of the JPMorgan Settlement.

Before discussing the details of these documents, I address the Customer Representatives' argument that they are incapable of waiving privilege here because the privilege belongs to the Trustee. (Customer Reps. Memo. at 13-14). They assert that the common interest agreement and the assignment agreement between the Trustee and the Customer Representatives "expressly prohibit[]" the Customer Representatives from waiving any privilege belonging to the Trustee. (Customer Reps. Memo. at 13). But, as I read these two agreements, they merely state that sharing privileged information among the parties to the agreements does not waive privilege. (Assignment Agreement at 2, 4-5; Common Interest Agreement dated June 8, 2012, attached as Exh. E to Hayes Decl., at 1). And, indeed, it is generally recognized that any privilege that attaches to material covered by the common interest doctrine belongs to the group sharing the common [*67] interest, and can be waived by any member of the group as to that member only. See, e.g., Katharine Traylor Schaffzin, An Uncertain Privilege: Why the Common Interest Doctrine Does Not Work and How Uniformity Can Fix it, 15 B.U. Pub. Int. L.J. 49, 83-85 (2005) (stating, "Courts treat the unauthorized waiver of the privilege by one member of a common interest group as a waiver as to that party only," and collecting cases). Thus, it appears that the Customer Representatives are capable of waiving the privilege over common interest materials in this litigation, to which the Trustee is not a party.

However, there are two related reasons that the Customer Representatives cannot have waived privilege over the vast majority of the documents created by Ernst & Young. It is undisputed that, except for a list of cash transactions during the final week of October 2011, no privileged Ernst & Young documents were shared with the Customer Representatives -- that is, with the exception of that single document, none of the Ernst & Young documents can be called common interest material. The Customer Representatives therefore do not hold any privileges over those Ernst & Young documents, and cannot waive them. Moreover, even without the wrinkle [*68] of the common interest doctrine, the mere fact that the Customer Representatives have never seen the Ernst & Young documents (with one exception) means that they cannot have waived

---

[7] As the Individual Defendants point out, counsel for the putative class has represented in a letter that at least one determination made by the court in the SIPA Proceeding has been "conclusively resolved" for the purposes of this action -- a determination made in connection with the Allocation Motion that the shortfall in the customer estates was $560 million. (Letter of Merrill G. Davidoff and Andrew J. Entwistle dated Oct. 29, [*66] 2014). This assertion is directly contradicted by the ruling noted above and is disclaimed by the Customer Representatives' brief in this dispute. (Customer Representatives' Response to Individual Defendants' Motion to Compel Trustee's Production of EY Documents ("Customer Reps. Memo.") at 9-10 & n.17). I therefore do not credit this ipse dixit.

protection over them. In <u>In re Grand Jury Proceedings</u>, the district court had held, among other things, that a witness' testimony before a grand jury regarding his attorney's advice waived privilege even as to work-product created by that attorney but never seen by the witness. <u>219 F.3d at 181</u>. The Second Circuit vacated the district court's order, specifically noting, "[W]e have previously stated that work-product not communicated to the client remains shielded." <u>Id. at 192</u>. It further stated that, because the waiver argument was based on the witness' testimony, it is reasonable to conclude that the witness "could waive only as to documents that could have informed his testimony." <u>Id</u>. Here, documents not seen by the Customer Representatives could not have informed their submissions in this litigation.[8] There is only one document, therefore, over which the Customer Representatives have the ability to waive privilege, and the question becomes whether the use of the Report effected that waiver.

The Individual Defendants contend that large portions of the Complaint are based on or lifted from the Report. They point specifically to allegations regarding the shortfall in segregated accounts on October 26, 2011, and the source and destination of intraday transfers on October 26 and 28, 2011. (Ind. Def. Memo. at 6-7 (citing Complaint, ¶¶ 277-281, 290, 295-299; Report at 103-05, 111, 113, 122, 130-36)). In addition, they highlight statements made in connection with the Individual Defendants' motion to dismiss: the Customer Representatives' assertion that "the well-supported allegations in the [Complaint] -- most of which are directly supported by documentary **[*70]** evidence and the investigations of Customer [Representatives'] counsel and the [SIPA] Trustee's professionals -- are simply not susceptible to dismissal," and that "the [Complaint] incorporates allegations in the public Trustee's Report, which was the result of an eight month investigation into internal [MF Global] documents and bank records and included extensive witness interviews" (Customer Reps. MTD Memo. at 7, 25 (internal citations omitted)). They also cite Judge Marrero's citation in the decision denying the motion to dismiss to a finding in the Report that the shortfall on October 26, 2011, was originally understated because of an improperly accounted transfer on that date, <u>In re MF Global, 9 98 F. Supp. 2d at 172-73</u>; (Complaint, ¶ 290). Finally, the Individual Defendants observe that the Customer Representatives relied on the Report in their motion for preliminary approval of the JPMorgan settlement -- particularly in the sections reciting background facts and supporting the settlement's fairness. (Customer Reps. Settlement Memo. at 7-12).

As noted above, a court determining whether waiver of protection has been implied must consider whether, under the circumstances in which the claim of privilege (and the contention of waiver) is made, fairness requires disclosure. Here, **[*71]** the Customer Representatives have relied on a publicly available report, as well as "evaluat[ion of] all the internal [MF Global] documents that are the basis for the [Complaints'] allegations." (Customer Reps, MTD Memo. at

---

[8] This disposes of the Individual Defendants' **[*69]** argument -- inappropriately raised in a footnote in their Reply, <u>see In re Crude Oil Commodity Litigation, No. 06 Civ. 6677, 2007 U.S. Dist. LEXIS 66208, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007)</u> ("Arguments which appear in footnotes are generally deemed to have been waived.") -- that the Customer Representatives waived the Trustee's privilege over the Ernst & Young documents based on an agency theory. (Reply at 10 n.11). A second argument (included in that same footnote) that the Trustee ratified the alleged waiver by his silence is similarly faulty, in addition to being belied by the Trustee's vigorous assertion of privilege in opposition to this motion.

25; Customer Reps. Memo. at 5-6). The Individual Defendants have access to all of those underlying documents. (Customer Reps. Memo. at 2 & n.3); _Dover v. British Airways, PLC, No. 12 CV 5567, 2014 U.S. Dist. LEXIS 114121, 2014 WL 4065084, at *2 (E.D.N.Y. Aug. 15, 2014)_ (finding no waiver in part because data underlying expert analysis produced to opposing party). The Individual Defendants, therefore, do not lack access to the raw material underlying the Report. Cf. _In re Kidder Peabody Securities Litigation, 168 F.R.D. 459, 461-62, 469-70 (S.D.N.Y. 1996)_ (requiring production of notes and memoranda based on confidential attorney interviews underlying published report). They argue that the information in the Ernst & Young documents is not "obtainable by other means" because Ernst & Young "performed original work to correct the underlying data." (Reply at 10). But there has been no suggestion that the documents already in the Individual Defendants' possession do not themselves include the information that Ernst & Young used to make these corrections. Nor does the Complaint or any other submission selectively quote or identifiably paraphrase any privileged documents prepared by Ernst & Young, let alone the single document that the Customer Representatives **[*72]** had access to -- indeed, the Individual Defendants' major complaint is that certain allegations in the Complaint mirror sections of the (public) Report -- or that the Customer Representatives plan to use such documents to their advantage during depositions, _see Granite Partners, L.P. v. Bear, Stearns & Co., 184 F.R.D. 49, 56 (S.D.N.Y. 1999)_ (work-product protection waived where plaintiff quoted third-party's privileged documents in complaint and used privileged notes and memoranda in depositions to question witnesses), or at trial, _see Dover, 2014 U.S. Dist. LEXIS 114121, 2014 WL 4065084, at *2_ (taking into account whether evidence will be used at trial in assessing "at issue" waiver). The only evidence of any concrete effect of the Customer Representatives' reference to material included in the Report is Judge Marrero's mention of an allegation included both in the Complaint and in the Report in his decision on the motion to dismiss. _In re MF Global, 998 F. Supp. 2d at 172-73_. However, this did not constitute a finding of fact in this litigation and cannot have prejudiced the Individual Defendants. Fairness does not dictate disclosure of any material protected by attorney-client privilege or work-product immunity.

D. Substantial Need

Finally, the Individual Defendants argue, in a footnote, that they have a substantial need for the work-product sought and would **[*73]** suffer undue hardship procuring its substantial equivalent. (Ind. Def. Memo. at 21 n.10 (citing _Fed. R. Civ. P. 26(b)(3)(A)(ii)_)). Their three sentence footnote does not carry this burden. They do not explain why they have a substantial need for work-product -- largely unavailable to their adversary -- when they have the same underlying raw data that the Trustee and the Customer Representatives possess. As to hardship, their argument cites an inflated cost for the Trustee's production of the Report (Ind. Def. Memo. at 21 n.10; Trustee Memo. at 4 n.6), and provides no estimate of the cost they would incur examining the same documents to rebut the conclusions in the Report.[9] Whether or not it is deemed waived, _see In re_

---

[9] It is particularly tempting in this case, where extraordinary litigation costs have eroded the resources available to pay a judgment or fund a settlement, to require the disclosure of work product in order to avoid duplicative work by counsel. However, such a rationale would apply to some extent to every case and would undermine the work-product doctrine.

_Crude Oil Commodity Litigation, 2007 U.S. Dist. LEXIS 66208, 2007 WL 2589482, at *3_, the argument fails.

<u>Conclusion</u>

For these reasons, the Individual Defendants' Motion to Compel Trustee's Production of EY Documents (Docket no. 789) is denied.

SO ORDERED.

/s/ James **[\*74]** C. Francis IV

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

February 9, 2015

Attachment 3

2014 WL 4065084
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Russel DOVER, et al., Plaintiffs,
v.
BRITISH AIRWAYS, PLC (UK), Defendant.
No. CV 2012–5567(RJD)(MDG).
|
Signed Aug. 15, 2014.

**Attorneys and Law Firms**

David S. Stellings, Douglas Ian Cuthbertson, Jason Louis Lichtman, Nicholas Robert Diamand, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY, Clive Zietman, Fiona Stewart, Niel Loblowitz, Stewarts Law, LLP, Mark Schlachet Law Offices of Mark Schlachet, Cleveland, OH for Plaintiffs.

Richard Francis Hans, Colleen Michelle Carey, David Victor Sack, Edwin R. Cortes, Keara M. Gordon, Timothy H. Birnbaum, DLA Piper LLP, New York, NY, for Defendant.

### *ORDER*

MARILYN D. GO, United States Magistrate Judge.

**\*1** Defendant British Airways ("BA") moves to compel (ct.doc. 81) production of spreadsheets containing the "r-squared analysis" of plaintiffs' non-testifying experts which plaintiffs had designated as confidential, but had inadvertently produced on March 7, 2014 and May 2, 2014. Defendant contends the information is not protectable work product and, to the extent the documents are protected, plaintiffs have forfeited protection by inadvertently disclosing the protected spreadsheets twice.

The documents at issue are spreadsheets containing publicly available data on fare prices and BA's fuel surcharge over time, along with analysis by the experts and their names on the last page of the spreadsheet. Plaintiffs contend that the r-squared analysis and the names of the experts are confidential and had been so designated pursuant to a protective order, which contains a clawback provision for inadvertently produced documents. *See* ct. doc. 47 (Order). Following entry of that protective order, plaintiffs produced the unredacted spreadsheets on March 4, 2014, and notified the defendant of the inadvertent production on March 7, 2014. *See* ct. doc. 83 (Pl.'s Opp'n) at 1–2. BA destroyed the documents following plaintiffs' request, in accordance with the protective order. *See id.,* Ex. B (BA Letter dated 5/30/13) at 1. Plaintiffs then provided the defendant with a redacted version to use which did not contain the calculations at the end of the original spreadsheets or the experts' names. *Id.;* ct. doc. 81 (Def.'s Mot.), Ex. D (Redacted Spreadsheet).

On May 2, 2014, plaintiffs reproduced all previously produced documents to comply with BA's

request for metadata, and in so doing, inadvertently reproduced two pages of the unredacted version of the spreadsheets (BA–PLTF–000345–378 and BA–PLTF000281). *See id.* at 1–2. At the deposition of plaintiff Cody Rank, defendant questioned Mr. Rank about the spreadsheets, including the portions that the plaintiffs now seek to recover *See id.,* Ex. G (Rank Depo. Tr.).

### *DISCUSSION*

This Court first addresses whether the information on the spreadsheets is entitled to protection from disclosure. Defendant argues that the spreadsheets should not be protected as work product because the work product doctrine does not apply "underlying facts" and the spreadsheets are simply an aggregation of factual data with some statistical analysis. *See* ct. doc. 81 (Def.'s Mot.) at 2.

Although defendant is correct that the spreadsheets contain information culled from publicly available facts, the spreadsheets were prepared by an expert who is not expected to be called as a witness at trial. Thus, the spreadsheets are "subject to the more stringent discovery rules" of Rule 26(b)(4)(D) of the Federal Rules of Civil Procedure, which protects against disclosure of information from non-testifying, consulting experts. *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.,* 2014 WL 655206, 2 (D.Conn. Feb.20, 2014); *see also Employees Committed for Justice v. Eastman Kodak Co.,* 251 F.R.D. 101, 104 (W.D.N.Y.2008) ("material reviewed or generated by [a consulting] expert[, is] generally privileged and immune from disclosure"). The rule restricts discovery of "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Fed.R.Civ.P. 26(b)(4)(D). The Rule also protects the identity of a non-testifying expert from disclosure. *Williams v. Bridgeport Music, Inc.,* 2014 WL 1779204 at *2–3 (S.D.N.Y. May 5, 2014).

**\*2** Rule 26(b) (4)(D) permits discovery "only: (i) as provided in Rule 35(b); or (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." *Id.; OBE Ins. Corp. v. Interstate Fire & Safety Equipment Co., Inc.,* 2011 WL 692982, at *5 (D.Conn. Feb.18, 2011). No exceptional circumstances exist here since the information at issue pertains to pre-litigation analysis by a non-testifying expert based on publicly available facts, as defendant has argued.

Defendant contends that plaintiffs waived any protection by putting the r-squared analysis and spreadsheets at issue in allegations in the Complaint and in submissions and at oral argument on the motion to dismiss. With respect to "at issue" waiver, it is well established that in certain circumstances, a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted. *John Doe Co. v. United States,* 350 F.3d 299, 302 (2d Cir.2003). Implied waiver of the privilege is premised on the "unfairness to the adversary of having to defend against the privilege holder's claim without access to pertinent privileged materials that might refute the claim." *Id.* at 304. The determination of "[w]hether fairness requires disclosure ... is best decided on a case by case basis, and depends primarily on the specific context in which the privilege is asserted." *In re Grand Jury Proceedings,* 219 F.3d 175, 183 (2d Cir.2000)).

This Court finds significant that plaintiffs state they do not intend to use the same r-squared analysis at trial and have already provided the underlying data used by their consulting expert in his regression analysis. Importantly, plaintiffs also advise that they intend to use different experts at trial who will base their analyses on information obtained in discovery beyond what was publicly available pre-litigation. Needless to say, plaintiffs will be required to provide defendant with expert reports and disclose underlying facts and data from all testifying experts they intend to call at trial, as required by Rule 26(b)(2).

In addition, although plaintiffs refer to r-squared analysis in the complaint in alleging that there is little correlation between BA's fuel surcharges and the cost of fuel, the actual rsquared analysis itself is not "at issue" here. As alleged in the complaint, r-squared analysis is simply a statistical methodology to show the relationships between two variables, and plaintiffs utilized that analysis to illustrate their claim that BA breached the contract with Executive Club members by improperly imposing fuel surcharges unrelated to the price of fuel. Defendant challenged plaintiffs' analysis in its motion to dismiss and, in fact, countered with its own analysis, arguing that "the correlation of fuel surcharge to the volatile price of jet fuel over the relevant period is demonstrable" and that "plaintiffs' regression analysis proves nothing, as it is based upon a false predicate." Ct. doc. 26 (Def.'s Mem. in support of the Mot. to Dismiss) at 6, 20. In denying defendant's motion, Judge Dearie recognized that the competing analyses offered by the parties may ultimately have to be tested at trial. Ct. doc. 52 (Memorandum & Order dated 10/8/14) at 9–10. In light of the posture of this case, it is not surprising that plaintiffs, and probably defendant, too, will later call experts to provide different statistical analysis based on considerably more data than what was available to plaintiffs at the beginning of this case. Thus, this Court finds there simply is no prejudice and unfairness to BA if it is not permitted to use the spreadsheets created before commencement of this litigation which contain the identity and initial r-squared analysis of the plaintiffs' consulting expert.

**\*3** With respect to defendant's argument that implied waiver resulted from inadvertent disclosure of privileged information, this Court notes that the parties entered into a stipulated protective order approved by this Court which contains a provision concerning inadvertent disclosures. *See* Advisory Committee Notes to Fed.R.Evid. 502(e) recognizing "the well-established proposition that parties can enter an agreement to limit the effect of waiver of disclosure by or among them." Paragraph 10 of the stipulation signed by the parties states that "[p]ursuant to Fed.R.Evid. 502(d), the inadvertent disclosure of any material that qualifies as Protected Information does not waive the protection or the privilege for either that material or for the subject matter of that material." Ct. doc. 47 (Order), Ex. A at ¶ 10. Because such a stipulation reflects an agreement of the parties "to avoid litigation of inadvertent production issues," this Court construes this provision to accord "heightened protection" to plaintiffs, the producing parties here. *U.S. Commodity Futures Trading Com'n v. Parnon Energy Inc.,* 2014 WL 2116147 at \*4–5 (S.D.N.Y. May 14, 2014) (quoting *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.,* 1997 WL 736726, at \*4 (S.D.N.Y. Nov.26, 1997)). Accordingly, a finding of "waiver is appropriate only if production of the privileged material was 'completely reckless.' " *Id.* at (quoting *U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.,* 2000 WL 744369, at \*4 (S.D.N.Y. Jun.8, 2000). Under the "completely reckless" standard, "inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest

that it was not concerned with the protection of the asserted privilege." *In re Copper Market Antitrust Litig.,* 200 F.R.D. 213, 221–22 (S.D.N.Y.2001). Such a standard is appropriate because "merely incorporat[ing] caselaw standards governing inadvertent disclosure" would nullify inadvertent waiver provisions in a stipulated confidentiality agreement. *Prescient Partners,* 1997 WL 736726, at *4 (citation omitted).

Although plaintiffs inadvertently produced the protected information on the spreadsheets twice and concede they were "careless," this Court does not find plaintiffs' conduct to be so "completely reckless" to warrant disclosure here. The protected r-squared analysis consists of a few rows and columns of information embedded on two of 34 pages of spreadsheets containing multiple columns and rows of numbers. The protected information occupies a small percentage of the cells on the spreadsheets and, as plaintiffs note, the unredacted spreadsheet looks "virtually identical" to the redacted version.

After plaintiffs first inadvertently disclosed the unredacted spreadsheets as part of a 137–page production in March 2014, they promptly gave defendant notice a few days after production. Defendant does not challenge that disclosure. The second inadvertent disclosure occurred when plaintiffs produced documents on May 2, 2014 which they had sent to a vendor to assist in reproducing documents in electronic format with metadata in response defendant's request. Two unredacted spreadsheets with the r-squared analysis included in the production were later marked and used during the deposition of plaintiff Cody Rank on May 23, 2014. During that questioning, plaintiffs raised several objections at the time that BA asked Rank questions regarding the purportedly protected portions of the spreadsheet, without indicating the nature of the objections. *See* Def's Mot., Ex. G (excerpt from Rank Depo. Tr.) at 230–32. Six days after the deposition, plaintiffs again sought return of the protected documents.

**\*4** Defendant is correct that plaintiffs should have been on notice with the first inadvertent disclosure that the spreadsheets contained protected information and should have carefully reviewed the spreadsheets before providing them to their vendor and producing them to defendant. However, under the totality of the circumstances, particularly given the nature of the production and the fact plaintiffs sought return of the unredacted spreadsheet within six days after the deposition of Mr. Rank, I do not find that plaintiffs have evidenced a complete disregard for preserving the confidentiality of the spreadsheets.

Moreover, the "overriding issues of fairness"[1] which underlie all determinations regarding waiver or forfeiture of protection of privileged documents weigh even more heavily here, in light of the heightened deference accorded the stipulated inadvertent waiver provision. For the reasons discussed above, there has been no unfairness to the defendant. The only conceivable prejudice defendant has suffered is that it will be deprived of material that it may find tactically important, but which is now of little usefulness in future assessment of the merits of the claims asserted herein. *See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 446 (S.D.N.Y. Feb.28, 1995) (noting that "[t]he prejudice factor focuses only on whether the act of restoring immunity to an inadvertently disclosed document would be unfair, not whether the privilege itself deprives parties of pertinent information"). Nor is this an instance where plaintiffs "made strategic use of the selective waiver of the privilege," since the document was introduced at the Rank deposition by the defendants, not the plaintiffs. *Johnson v. Sea–Land Service, Inc.,*

2001 WL 897185, at *6 (S.D.N.Y. August 9, 2001). Although defendant used the spreadsheets in the deposition of Mr. Rank, it apparently did not rely on the disclosure of the protected information.

Thus, as a matter of fairness, I decline to find waiver under the circumstances here. *See In re Grand Jury Subpoena,* 219 F.3d at 188 (fairness dictates that any "waiver should be tailored to remedy the prejudice"); *John Doe Co.,* 350 F.3d at 304.

## *CONCLUSION*

For the foregoing reasons, defendant's motion to compel is denied.

**SO ORDERED.**

**All Citations**

Slip Copy, 2014 WL 4065084

Footnotes

1    *See In re Copper Market Antitrust Litigation,* 200 F.R.D. 213, 217 (S.D.N.Y.2001) (discussing the factors in the case law for analyzing inadvertent waiver and *citing Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985)).

Attachment 4

### *Duncan v. Chevron U.S.A., Inc.*

United States District Court for the Eastern District of Louisiana

June 15, 2011, Decided; June 16, 2011, Filed

CIVIL ACTION NO: 10-0298; 10-1455 SECTION: "I" (4)

**Reporter:** 2011 U.S. Dist. LEXIS 63707

WAYNE PAUL DUNCAN, ET AL. versus CHEVRON U.S.A., INC.

**Subsequent History:** Motion granted by *Duncan v. Chevron U.S.A., Inc., 2011 U.S. Dist. LEXIS 65910 (E.D. La., June 15, 2011)*

**Counsel:** **[*1]** For Wayne Paul Duncan (2:10cv298), Plaintiff: Charles Clarence Bourque , Jr., LEAD ATTORNEY, Christopher John St. Martin, Joseph G. Jevic , III, St. Martin & Bourque, Houma, LA; Benjamin B. Saunders, Carisa Renee German-Oden, Joseph Mark Miller, Davis Saunders, PLC, Mandeville, LA.

For Belinda Duncan, Plaintiff: Charles Clarence Bourque , Jr., LEAD ATTORNEY, Christopher John St. Martin, Joseph G. Jevic , III, St. Martin & Bourque, Houma, LA; Benjamin B. Saunders, Davis Saunders, PLC, Mandeville, LA.

For Gerald Delacerda, Karen Delacerda, Consol Plaintiffs: Charles Clarence Bourque , Jr., LEAD ATTORNEY, Christopher John St. Martin, Joseph G. Jevic , III, St. Martin, Williams & Bourque, APLC, Houma, LA.

For Seabright Insurance Company, Intervenor Plaintiff: Henry H. LeBas, LEAD ATTORNEY, LeBas Law Offices, Lafayaette, LA.

For Chevron U.S.A., Inc., Defendant, Consol Defendant, Intervenor Defendant: James Robert Silverstein, LEAD ATTORNEY, Carl Edward Hellmers , III, Frilot L.L.C., New Orleans, LA.

For Sparrows Crane Limited, Sparrows Offshore Group Limited, Defendants, Consol Defendants, Cross Claimant, Consol Cross Claimant: Coleman Taylor Organ, LEAD ATTORNEY, Bastian & Associates, New Orleans, **[*2]** LA.

For Gear Products, Inc., Defendant, Consol Defendant, Cross Defendant, Consol Cross Defendant: Richard S. Vale, LEAD ATTORNEY, John Covington Henry, Michelle A. Beaty-Gullage, Pamela Ferrage Noya, Blue Williams, LLP (Metairie), Metairie, LA.

For Wayne P Duncan, Intervenor Defendant: Charles Clarence Bourque , Jr., LEAD ATTORNEY, Christopher John St. Martin, Joseph G. Jevic , III, St. Martin, Williams & Bourque, APLC, Houma, LA.

For Sparrows Crane Limited, Intervenor Defendant: Coleman Taylor Organ, Bastian & Associates, New Orleans, LA.

52

For Sparrows Offshore Group Limited, Intervenor Defendant: Coleman Taylor Organ, LEAD ATTORNEY, Bastian & Associates, New Orleans, LA.

For Gear Products, Inc., Intervenor Defendant, Consol Third Party Defendant: John Covington Henry, Blue Williams, LLP (Metairie), Metairie, LA.

For Chevron U.S.A. Inc., Consol Third Party Plaintiff, Third Party Plaintiff: James Robert Silverstein, LEAD ATTORNEY, Frilot L.L.C., New Orleans, LA.

For Sparrows Crane Limited, Sparrows Offshore Group Limited, Third Party Defendants: Coleman Taylor Organ, Bastian & Associates, New Orleans, LA.

For Gear Products, Inc., Third Party Defendant: Richard S. Vale, LEAD ATTORNEY, Michelle [*3] A. Beaty-Gullage, Pamela Ferrage Noya, Blue Williams, LLP (Metairie), Metairie, LA.

For Gerald Delacerda, Karen Delacerda (2:10cv1455), Plaintiffs: Charles Clarence Bourque , Jr., LEAD ATTORNEY, Christopher John St. Martin, Joseph G. Jevic , III, St. Martin, Williams & Bourque, APLC, Houma, LA.

For Chevron USA Inc, Defendant, Third Party Plaintiff: James Robert Silverstein, LEAD ATTORNEY, Frilot L.L.C., New Orleans, LA.

For Sparrows Crane Limited, Sparrows Offshore Group Limited, Defendants, Cross Claimants, Third Party Defendants: Coleman Taylor Organ, LEAD ATTORNEY, Bastian & Associates, New Orleans, LA.

For Gear Products, Inc., Defendant, Cross Defendant: Richard S. Vale, LEAD ATTORNEY, John Covington Henry, Michelle A. Beaty-Gullage, Pamela Ferrage Noya, Blue Williams, LLP (Metairie), Metairie, LA.

**Judges:** KAREN WELLS ROBY, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** KAREN WELLS ROBY

## Opinion

### ORDER

Before the Court is a **Motion to Compel (R. Doc. 80)** filed by Gear Products, Inc. which seeks to compel the Defendant, Chevron USA to produce documents reflecting testing results performed on the subject gear assembly as well as the "exemplar" gear assemblies have been removed from its cranes. Chevron opposes the motion. **[*4]** (R. Doc. 83.) This motion was heard with oral argument on **Wednesday, May 11, 2011**.

**I.Background**

53

On October 4, 2009, the Plaintiffs, Wayne Duncan and Gerald DeLacerda were transferred in a personnel basket from the M/V D. Steven to Chevron's platform at EI-238H. The personnel basket was picked up by a crane on the Chevron platform. During the transfer, the swing gear box on the platform crane failed, which resulted in the boom of the crane impacting the bride connecting the EI 238H and EI-238F. As a result, the Plaintiffs were injured.

The swing gear box and was disassembled after the accident. It was determined that the output shaft had fractured. The Plaintiffs have sued Chevron as the owner and operator of the crane and have also asserted products liability claims against the crane manufacturer, Sparrows, and the manufacturer of the swing gear box, Gear Products.

As to the instant motion, Gear Products seeks more complete responses to its discovery requests. Gear Products seeks the production of Chevron's engineer's notes and assessments generated during their observation and inspection of the swing gear box. Gear Products argues that it does not seek the disclosure of opinions or impressions **[*5]** of Chevron's experts, and instead seeks the raw data, measurements, test results, and photographs which are facts that experts may subsequently rely upon in formulating its opinion. Chevron opposes the motion.

## II. Standard of Review

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). The Rule specifies that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). The discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials. *Herbert v. Lando, 441 U.S. 153, 176, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979)*. Nevertheless, discovery does have "ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978)* (quoting *Hickman v. Taylor, 329 U.S. 495, 507, 67 S. Ct. 385, 91 L. Ed. 451 (1947))*. Furthermore, "it is well established that the scope of discovery is within the sound discretion of the trial court." *Coleman v. American Red Cross, 23 F.3d 1091, 1096 (6th Cir.1994)*.

Under Rule 26(b)(2)(C), discovery may be limited **[*6]** if: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from another, more convenient, less burdensome, or less expensive source; (2) the party seeking discovery has had ample opportunity to obtain the information sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit. Fed.R.Civ.P. 26(b)(2)(C). In assessing whether the burden of the discovery and outweighs the benefit, a court must account for: (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4) the importance of the issues at stake in the litigation; and (5) the importance of the proposed discovery in resolving the issues. *Id*.

## III. Analysis

Gear Products contends that it seeks a more complete response to its Request for Production 3, which sought "any and all testing results, documents, or photos that support your denial or

qualified admission to the Requests for Admissions propounded above." [1] (R. Doc. 80-2, p. 6.) Chevron responded,

> Objection. This request is vague, ambiguous and overly broad. Subject to and without waiting this objection, all photographs, maintenance records, crane manual and crane documents have been produced. **[*7]** Further, the swing gear box has already been produced for inspection and testing. The results of Mr. Stanfields testing are protected by the attorney/client privilege and or attorney/work product privilege and or was prepared in anticipation of litigation.

(R. Doc. 80-2, p. 7.)

Gear Products contends this objection should be overruled because it has requested data and finite measurements Chevron has received from tests and studies performed, and does not seek the disclosure of the opinions or impressions of Chevron's experts. Instead, it seeks raw data, measurements, test results, and photographs which the experts may subsequently rely upon in formulating an opinion.

Chevron, on the other hand, maintains its objection that the request is over broad. Further, it contends that it has already produced all photographs of the subject swing gear box assembly and the two exemplars. It has further produced the actual parts **[*8]** for inspection and has provided Gear Products with the opportunity to take its own pictures.

In addition, Chevron contends that this request, as written, would require it to disclose information relied upon by their in-house metallurgical expert, Dennis Stanfield, and documents relied upon by its expert Michael Stevenson [2]. Chevron asserts that these documents are not currently discoverable.

Chevron contends that the documents relied upon by Stanford are not discoverable because Stanfield's purpose as an in-house expert is to make findings in anticipation of litigation. He is utilized only as a consulting expert in this matter and has not been designated as a testifying expert in this matter by Chevron. Chevron contends that Gear Products must demonstrate "exceptional circumstances" in order for the Court to compel the production of these documents. Chevron contends that Gear Products cannot meet this burden because it has already produced photographs and two exemplars. In addition, it has provided Gear Products with the opportunity to inspect the subject swing gear box.

Chevron further asserts that Stanfield's report is protected **[*9]** by the Attorney-Work Product Privilege and the Attorney-Client Privilege. Chevron contends that the report was clearly

---

[1] Request for Admission No. 1 stated, "The shaft involved in the accident made the basis of this lawsuit was not unreasonably dangerous in construction or composition at the time it left the control of Gear Products, Inc." (R. Doc. 80-2, p. 1.) Chevron responded, "Denied." *Id.*

[2] Chevron did not disclose Stevenson's area of expertise.

prepared in anticipation of litigation and it was further prepared at the request of Kristi L. Hamlin, in house counsel for Chevron. The report outlines Stanfield's analysis of the swing gear box involved in the accident. As such, the work product privilege applies.

Finally, Chevron contends that Gear Products' attempt to obtain the information relied upon by its expert, Michael Stevenson, is premature. Chevron contends that Stevenson may serve as its testifying expert. However, his expert report is not due until July 5, 2011. Therefore, he is still reviewing depositions and documents in order to formulate his opinions.

The Court finds that the document request, as written, is over broad and is not reasonably calculated to lead to the discovery of admissible evidence. It is drafted broadly enough that it could encompass tests, documents, and photograph created by any individual involved in this litigation, including Chevron's counsel. Therefore, Chevron's objections are sustained.

Further, to the extent that Gear Products seeks to compel the underlying documents relied **[*10]** upon Stanfield in his report, Chevron's objections are sustained. [3] Under the Federal Rules of Civil Procedure,

> Ordinarily, a party may not, by interrogatories or deposition, discovery facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only . . . on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Fed.R.Civ.P. 26(b)(4)(B)(ii). Here, Gear Products has not shown any exceptional circumstances which persuade this Court that these documents should be produced.

Finally, to the extent that Gear Products seeks the production of documents relied upon by Stevenson, this request is denied. Stevenson has not completed his expert report, nor is he required to under the presiding Judge's Scheduling Order until July 5, 2011. As he is still in the process of evaluating and rendering his opinion, it is unclear whether **[*11]** he is currently in possession of all of the documents that Gear Products seeks. According to the representations at the hearing, Stevenson is still in the process of accumulating documents and evaluating them to render an opinion. Therefore, Gear Products' request for documents relied upon by Stevenson is premature. As a result, the motion to compel is denied.

**IV.** **Conclusion**

Accordingly,

**IT IS ORDERED** that the **Motion to Compel (R. Doc. 80)** is hereby **DENIED.**

---

[3] At the hearing, counsel for Gear Products reiterated that he does not seek the disclosure of Stanfield's report.

New Orleans, Louisiana, this 15th day of June 2011

/s/ Karen Wells Roby

**KAREN WELLS ROBY**

**UNITED STATES MAGISTRATE JUDGE**

Attachment 5

**Federal Trade Commission v. Bass Brothers Enterprises, Inc., Sid Richardson Carbon & Gasoline Co., and Ashland Oil, Inc.; Federal Trade Commission v. Columbian Enterprises, Inc. and Conoco, Inc.**

**No. C84-1304; No. C84-1311.**

**United States District Court for the Northern District of Ohio, Eastern Division.**

*1984 U.S. Dist. LEXIS 16889; 39 Fed. R. Serv. 2d (Callaghan) 800; 1984-1 Trade Cas. (CCH) P66,009*

**May 8, 1984**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the Federal Trade Commission, brought an antitrust action against defendant enterprises challenging a proposed acquisition. The enterprises sought to compel the commission to produce a report prepared by its staff working under the direction of the its attorneys in investigating the enterprises' proposed acquisition, and the notes of interviews conducted by the commission's lawyers of third parties concerning the acquisition.

**OVERVIEW:** The commission resisted discovery on the grounds that the deliberative process privilege and the work product privilege protected the report and the notes. With regard to the report, the commission asserted that it had supplied the enterprises with the raw data upon which the expert based his opinion and analysis. Likewise, the commission provided the enterprises with the transcripts of the investigational hearing. Denying the enterprises' motion to compel, the court ruled that the report was protected by the deliberative process privilege and the notes were protected work product. The court reasoned that the enterprises failed to show a compelling need for the report because they were able to hire their own expert to refute the opinions and conclusion of the commission's expert. The court determined that the notes were within the scope of protected work product because they contained summaries of witness' testimony as well as the impressions of and conclusions of counsel, made in preparation and anticipation of the instant litigation. The enterprises failed to show that they had a substantial need of the notes in view of the fact that they were provided with the transcripts.

**OUTCOME:** The court denied the enterprises' motion to compel the commission to produce certain documents in the commission's antitrust action.

**OPINION BY:** [*1] WHITE

**OPINION**

Memorandum and Order

WHITE D.J.: In this antitrust action instituted by the Federal Trade Commission, the defending enterprises of case No. 84-1304 have moved to compel the production of documents

(1) prepared by Commission staff economist and an accountant who were working in cooperation with, and under the direction of, the Commission's attorneys in investigating the proposed acquisition in question ("the Reprot"), and (2) notes of interviews conducted by the Commission's lawyers of third parties concerning the acquisition. The federal plaintiff has resisted discovery on the grounds that the Report and notes of interviews are protected by the deliberative process privilege and the work product privilege.

[Deliberative Process Privilege]

The purpose of the deliberative process privilege is to prevent injury to the quality of agency deicision-making by promoting "frank discussions of legal or policy matters." *NLRB v. Sears, Roebuck & Company, 421 U.S. 132, 150 (1975).* The privilege "is designed to encourage candid suggestions, advice, recommendations, and opinion, . . . [and] [HN1] protects only suggestions, advice, recommendations and opinions, rather than factual [*2] and investigatory reprots, data, and surveys in government files." *United States v. Leggett & Platt, Inc. [1976-2 TRADE CASES P61,124], 542 F.2d 655, 658* f.n. 4 (6th Cir. 1976), cert. denied, *430 U.S. 945 (1976).* As the plaintiff points out "a party is not entitled to probe the deliberations of administrative officials . . . or screen the internal documents and communciations they utilize" in reaching a decision. *Braniff Airways, Inc., v. CAB, 379 F.2d 453, 462 (D.C. Cir. 1967).*

The Court is persuaded that the Report sought by the defendants is an internal report of the Commission which was instrumental in its deliberation of whether or not to bring an enforcement action.

[HN2] The deliberative process privilege is a qualified, rather than an aboslute privilege, which can be overcome by showing by the movant of a compelling need for the material. *United States v. Leggett & Platt, Inc., supra.*

The federal plaintiff has represented that it has supplied the defendants with the raw data upon which the expert based his opinion and analysis. The defendants can hire their own expert to refute the opinions and ocnclusion of the plaintiff's expert. The Court is unpersuaded by the defendants' [*3] contention that they cannot get an expert to prepare an opinion prior to the preliminary injunction hearing as the parties themselves selected the hearing date and vigorously persuaded this Court to set the hearing at the earliest possible date on the calendar.

Finally, it is important to note that the purpose of the preliminary inunction is not to test de novo whether the Commission should have instituted this enforcement action, but rather whether the proposed merger appears to violate Section 7 of the Clayton Act in order to preserve the status quo, pending an administrative decision. As the Court has found that the Report is protected by the deliberative process privilege, the Court declines to address the issue of whether the Report is also protected by the work product privilege.

[Work-Product Privilege]

The Court finds that the work product privilege prevents however, the disclosure of notes of non-party interviews.

The parties have filed conflicting descriptions of the non-party interviews. As the plaintiff has represented that it has provided that defendants with the investigational hearing transcripts, the Court finds that the defendants are seeking the Commission [*4] staff notes and memoranda of informal meeting and interviews drafted by Commission personnel. The Court is persuaded by the declarations filed in support of the plaintiff's brief that the notes contain summaries of

witness' testimony as well as the impressions of and conclusions of counsel, made in preparation and anticipation of the instant litigation. Accordingly, they are within the scope of protected work product.

The defendants have failed to persuade the Court that they have substantial need of these notes and memoranda, especially in view of the fact that the federal plaintiff has provided them with investigational hearing transcripts.

The Motion to Compel is Denied.

It Is So Ordered.

Attachment 6

GENBAND US LLC v. METASWITCH NETWORKS CORP., ET
AL.

Case No. 2:14-cv-33-JRG-RSP

UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF TEXAS, MARSHALL DIVISION

*2016 U.S. Dist. LEXIS 2652*

**January 8, 2016, Decided**
**January 8, 2016, Filed**

**PRIOR HISTORY:** *Genband USA LLC v. Metaswitch Networks Ltd., 2015 U.S. Dist. LEXIS 43295 (E.D. Tex., Apr. 1, 2015)*

**COUNSEL:** [*1] Jeff Kaplan, Mediator, Pro se, Dallas, TX.

For David Keyzer, Technical Advisor: David Michael Keyzer, Law Office of David Keyzer, PC, El Dorado Hills, CA.

For GENBAND US LLC, Plaintiff: Christopher Scott Ponder, Baker Botts LLP Palo Alto, Palo Alto, Ca; Deron R Dacus, Peter Aaron Kerr, Shannon Marie Dacus, The Dacus Firm, PC, Tyler, TX; Jeffery Derek Baxter, Kurt Max Pankratz, Roshan Suresh Mansinghani, Susan Cannon Kennedy, Tim Joseph Calloway, Vernon Edward Evans, Douglas Mark Kubehl, Baker Botts LLP - Dallas, Dallas, TX.

For Metaswitch Networks Corp., Metaswitch Networks Ltd, Defendants: Jennifer A Kash, Alexander Bromley Binder, Brian E Mack, Charles Kramer Verhoeven, Felicity Grisham, Iman Lordgooei, LEAD ATTORNEYS, Quinn Emanuel Urquhart & Sullivan LLP - San Francisco, San Francisco, CA; Gregory Blake Thompson, James Mark Mann, Mann Tindel & Thompson, Henderson, TX; Lance Lin Yang, Quinn Emanuel Urquhart & Sullivan - LA, Los Angeles, CA; Sayuri Kuo Sharper, Quinn Emanuel Urquhart & Sullivan - Redwood, Redwood Shores, CA.

For Metaswitch Networks Ltd, Metaswitch Networks Corp., Counter Claimants: Alexander Bromley Binder, Charles Kramer Verhoeven, Iman Lordgooei, LEAD ATTORNEYS, Quinn [*2] Emanuel Urquhart & Sullivan LLP - San Francisco, San Francisco, CA; Gregory Blake Thompson, James Mark Mann, Mann Tindel & Thompson, Henderson, TX; Lance Lin Yang, Quinn Emanuel Urquhart & Sullivan - LA, Los Angeles, CA.

For GENBAND US LLC, Counter Defendant: Deron R Dacus, The Dacus Firm, PC, Tyler, TX; Jeffery Derek Baxter, Roshan Suresh Mansinghani, Tim Joseph Calloway, Vernon Edward Evans, Douglas Mark Kubehl, Baker Botts LLP - Dallas, Dallas, TX.

**JUDGES:** ROY S. PAYNE, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** ROY S. PAYNE

**OPINION**

## ORDER ON MOTIONS TO STRIKE

Before the Court is a Motion to Strike the Expert Reports of Dr. Robert Akl and Dr. Tim Williams on Essentiality filed by Plaintiff Genband US LLC ("Genband") (Dkt. No. 259). Also before the Court is Genband's Motion to Strike Testimony on Non-Infringing Alternatives. (Dkt. No. 260).

These are not *Daubert* motions under *Fed. R. Evid. 702*. Instead, both motions are premised on the argument that Metaswitch Networks Ltd and Metaswitch Networks Corp. (collectively "Metaswitch") failed to timely disclose its contentions in the course of discovery.

## I. LAW

A party "who has responded to an interrogatory . . . must supplement or correct its disclosure or response . . . in a timely manner [*3] if the party learns that in some material respect, the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Fed. R. Civ. P. 26(e)(1)*. If a party fails to provide information as required by *Rule 26(a)* or *(e)*, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. *Fed. R. Civ. P. 37(c)(1)*.

A court considers four factors in determining whether a Rule 26 violation is harmless: (1) the party's explanation, if any, for its failure to disclose the information in a timely manner; (2) the prejudice to the opposing party if the evidence is admitted; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the evidence. *See Texas A & M Research Found. v. Magna Transp. Inc., 338 F.3d 394, 402 (5th Cir. 2003)*. Courts have broad discretion in determining whether to admit expert submissions under *Rule 37(c)*. *Burleson v. Tex. Dep't of Criminal Justice, 393 F.3d 577, 583 (5th Cir. 2004)*.

The Federal Rules contemplate that contention interrogatories need not necessarily be answered early in a case. *See Fed. R. Civ. Proc. 33(a)(2)*; see also Rule 33 advisory committee's note (1970 amendment, subdivision (b)) ("Since interrogatories involving mixed questions of law and fact may [*4] create disputes between the parties which are best resolved after much or all of the other discovery has been completed, the court is expressly authorized to defer an answer"). In responding to interrogatories, a party is "not required [] to disclose its experts' opinions in advance of the deadline for serving expert reports." *See Beneficial Innovations, Inc. v. AOL LLC*, Case No. 2:07-cv-555, Dkt. No. 260 at 1 (E.D. Tex. May 26, 2010) (Dkt. No. 256); *see also IP Innovation L.L.C. v. Sharp Corp., 219 F.R.D. 427, 430 (N.D. Ill. 2003)* ("Plaintiffs' request for an invalidity analysis before Sharp is required to produce its expert report is denied as premature"); *Duncan v. Chevron U.S.A., Inc., 2011 U.S. Dist. LEXIS 63707 at *10-11 (E.D. La. June 15, 2011)* (discovery seeking disclosure of expert opinions and bases for such opinions was premature in light of expert disclosure deadline imposed by the Court).

## II. ANALYSIS

**A. Standards Essentiality Opinions**

On April 16, 2014, GENBAND propounded Interrogatory No. 6, which sought information about whether Metaswitch contended that any claims of the asserted claims were essential to the practice of any standard:

> State your entire factual basis for any contention you have that GENBAND is subject to a FRAND/RAND commitment including identifying the standard setting organization, the relevant standard, the claims [*5] of any of the Asserted Patents that you believe are essential to implementation of that standard and the portion of that standard that you contend any such claims are essential to, all reasons why you contend any such claim is essential to implementation of that standard, specifically how you contend GENBAND undertook any such FRAND/RAND commitment, and what you believe the relevant FRAND/RAND rate is.

(Dkt. No. 259-2 at 8). Metaswitch served responses and supplemental responses to this interrogatory, culminating in a response on May 5, 2015 (the day before the close of fact discovery) that identified approximately 75 standards "including each of the standards discussed in [] Metaswitch's expert reports." *See* (Dkt. No. 259 at 8).

When it received Metaswitch's May 5, 2015 response, Genband did not file a motion arguing that the response was deficient or late, and there is no evidence in the record indicating that Metaswitch could have served its response earlier. Accordingly, the Court has no reason to conclude that Metaswitch's response was untimely. The only remaining question is whether it was sufficiently complete.

Parties are not required to disclose the details of expert opinions [*6] prior to the expert disclosure deadline. However, a party must provide fair notice of its contentions when this information is sought during discovery. Metaswitch was therefore required to disclose the standards it contends are essential, which it did. Metaswitch was not required to disclose the details of the analysis its experts would subsequently rely upon to render their opinions that these standards are essential.

Accordingly, the Court finds that the essentiality opinions disclosed in the May 8, 2015 expert reports of Dr. Akl and Dr. Williams were sufficiently disclosed during discovery. Moreover, Genband had a full and fair opportunity to inquire into the details of these essentiality opinions during expert discovery. The Court declines to exclude these opinions.

Genband also argues that the purported "rebuttal" opinions of Dr. Akl, served June 19, 2015, are untimely. These opinions were served more than a month after the expert disclosure deadline. The opinions concern the alleged standards-essentiality of claims 70 and 92 of the *'971 Patent*. (Dkt. No. 259-9). Although characterized as "rebuttal" opinions, Dr. Akl's opinions on standards essentiality do not appear to address or rebut the [*7] opinion of any other expert, other than to note that "Dr. Beckmann has not provided any opinions regarding claim 21 of the *'971 patent*." (*Id.* at ¶ 211).

Dr. Akl's June Report was not timely disclosed, but an untimely expert report is nevertheless admissible if the party offering it demonstrates good cause under the four factor *Primrose* test.

*Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 563-64 (5th Cir. 2004)* ("(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose").

Metaswitch's justification for serving Dr. Akl's report after the expert disclosure deadline is that Genband dropped claim 21 of the *'971 Patent*. (Dkt. No. 324 at 5). Dr. Akl discussed claim 21 in his opening report and opined that claim 21 showed that the *'971 Patent* is standard-essential. (Dkt. No. 259-7 at ¶ 54). Genband argues that Dr. Akl should have opined about claims 70 and 92 in his opening report as well. (Dkt. No. 302 at 7). However, Genband identifies no evidence of actual prejudice. Genband was aware that Dr. Akl would opine that the *'971 patent* was standards-essential, and the record indicates that Genband was able to ask Dr. Akl about his [*8] late-disclosed opinions at his deposition. (Dkt. No. 259-11 at 220:1-221:3).

Because Metaswitch offers some justification for its late disclosure and explains why Dr. Akl's late opinions are necessary, and because Genband does not appear to have suffered any prejudice, the Court holds that the late disclosure of Dr. Akl's June report was harmless under *Primrose* and therefore declines to strike it.

## B. Non-Infringing Alternatives Opinions

On January 15, 2015, GENBAND propounded Interrogatory No. 16, which asked Metaswitch to identify "design-arounds" alleged to be non-infringing alternatives:

> Separately for each of the Asserted Patents, identify and describe in detail any alleged design-around or alternative technology or method ("design-around") that You allege can be used as an alternative to claimed subject matter of the asserted claims of the Asserted Patents, including: (a) a description of the alleged design-around; (b) when and how the alleged design-around was developed; (c) individuals involved in developing the alleged design-around, including an identification of their titles and departments if they are or were Metaswitch employees; (d) when the alleged design-around was available [*9] for use, and the costs associated with implementation and use of the alleged design-around; (e) whether the alleged design-around is incorporated or utilized by the Metaswitch Accused Products and, if so, the date on which each Metaswitch Accused Product incorporated or utilized the alleged design-around.

(Dkt. No. 260-2 at 9). Metaswitch served a response identifying its own accused products as non-infringing alternatives (because Metaswitch contends they do not infringe), and also identified the prior art in its invalidity contentions as potential non-infringing alternatives. (Dkt. No. 260 at at 6). On May 5 and May 6 2015, Metaswitch served supplemental interrogatory responses outlining a variety of hypothetical design-arounds and providing some information about how these designs might be implemented. (Dkt. No. 260-4 at 50-59; Dkt. No. 301-4 at 145-48). Metaswitch's experts Dr. Akl, Dr. Williams, and Mr. Gunderson offer opinions about some of these alleged design-arounds. (Dkt. No. 278 at 5).

The facts and arguments Genband relies on to support its Motion to Strike non-infringing alternatives closely parallel those addressed above for Genband's Motion to Strike regarding

standards [*10] essentiality. As with Genband's Interrogatory No. 6, there is no evidence that Metaswitch could have served its response to Interrogatory No. 16 responses earlier than it did, and Genband never moved the Court for relief when it received Metaswitch's responses. Metaswitch's interrogatory responses provide sufficient notice to Genband of Metaswitch's contentions, and Genband was not entitled to the detailed analyses of Metaswitch's experts prior to the expert disclosure deadline.

Genband points out that Metaswitch's 30(b)(6) witnesses testified they were not aware of any design-arounds. (Dkt. No. 260 at 8-10). But it appears these witnesses were questioned about "[n]oninfringing alternatives considered, planned, or implemented" by Metaswitch. (Dkt. No. 278 at 14). That Metaswitch testified it did not consider, plan, or implement any non-infringing alternatives does not preclude its experts from opining that non-infringing alternatives exist. The Court declines to strike Metaswitch's experts' opinions about non-infringing alternatives.

## III. CONCLUSION

Genband's Motion to Strike the Expert Reports of Dr. Robert Akl and Dr. Tim Williams on Essentiality (Dkt. No. 259) is **DENIED**. Genband's Motion to Strike [*11] Testimony on Non-Infringing Alternatives. (Dkt. No. 260) is **DENIED**.

**SIGNED this 8th day of January, 2016**.

/s/ Roy S. Payne

ROY S. PAYNE

UNITED STATES MAGISTRATE JUDGE

Attachment 7

# *Hoffman v. Jacobi*

United States District Court for the Southern District of Indiana, New Albany Division

October 29, 2014, Decided; October 29, 2014, Filed

No. 4:14-cv-00012-SEB-TAB

**Reporter:** 2014 U.S. Dist. LEXIS 154284

DESTINY HOFFMAN, et al., Plaintiffs, vs. JEROME JACOBI, et al., Defendants.

**Prior History:** *Hoffman v. Jacobi, 2014 U.S. Dist. LEXIS 148367 (S.D. Ind., Oct. 17, 2014)*

**Counsel:** **[*1]** For DESTINY HOFFMAN, On behalf of themselves and on behalf of others similarly situated, NATHAN CLIFFORD, On behalf of themselves and on behalf of others similarly situated, JOSHUA FOLEY, On behalf of themselves and on behalf of others similarly situated, JESSE HASH, On behalf of themselves and on behalf of others similarly situated, ASHLEIGH SANTIAGO, On behalf of themselves and on behalf of others similarly situated, JAMES BENNETT, On behalf of themselves and on behalf of others similarly situated, AMY BENNETT, On behalf of themselves and on behalf of others similarly situated, LEE SPAULDING, On behalf of themselves and on behalf of others similarly situated, MICHAEL CAMPBELL, On behalf of themselves and on behalf of others similarly situated, AMY TUTTLE, On behalf of themselves and on behalf of others similarly situated, AMANDA CAMPBELL, On behalf of themselves and on behalf of others similarly situated, BOBBY UPTON, On behalf of themselves and on behalf of others similarly situated, SHANE BRATCHER, On behalf of themselves and on behalf of others similarly situated formerly known as COURTNEY COWHERD, JUSTIN LANHAM, On behalf of themselves and on behalf of others similarly situated, **[*2]** TRENTNEY RHODES, On behalf of themselves and on behalf of others similarly situated, JOANIE WATSON, On behalf of themselves and on behalf of others similarly situated, Plaintiffs: Brennan Soergel, SOERGEL LAW OFFICE PLLC, Louisville, KY; James Michael Bolus, Jr., JAMES M. BOLUS, JR. P.S.C., Louisville, KY; Michael A. Augustus, MICHAEL A. AUGUSTUS, PSC, Louisville, KY.

For JEROME JACOBI, Judge, Defendant: David A. Arthur, OFFICE OF THE ATTORNEY GENERAL, Indianapolis, IN.

For SUSAN KNOEBEL, JEREMY SNELLING, Defendants: Rosemary L. Borek, Wayne E. Uhl, STEPHENSON MOROW & SEMLER, Indianapolis, IN.

For HENRY FORD, DANNY RODDEN, Clark County Sheriff, DANIELLE GRISSETT, STEPHEN MASON, UNKNOWN CLARK COUNTY WORK RELEASE EMPLOYEE(S), UNKNOWN CLARK COUNTY CIRCUIT CLERK, CLARK COUNTY BOARD OF COMMISSIONERS, Defendants: R. Jeffrey Lowe, KIGHTLINGER & GRAY, LLP-New Albany, New Albany, IN.

For JOSH SEYBOLD, Defendant: Douglas Alan Hoffman, CARSON BOXBERGER, Bloomington, IN; R. Jeffrey Lowe, KIGHTLINGER & GRAY, LLP-New Albany, New Albany, IN.

**Judges:** SARAH EVANS BARKER, United States District Judge.

**Opinion by:** SARAH EVANS BARKER

## Opinion

**ORDER ON DEFENDANTS' MOTION FOR LEAVE TO FILE THRESHOLD MOTION FOR SUMMARY JUDGMENT**

This cause is **[*3]** before the Court on the motion of Defendants Susan Knoebel and Jeremy Snelling seeking leave to file a threshold summary judgment motion [Docket No. 62], filed on September 25, 2014. For the reasons set forth below, the motion is DENIED.

**Background**

Plaintiffs are a group of current or former criminal defendants in the court system of Clark County, Indiana who have alleged that a number of officials in that court system, and various county employees, violated their constitutional rights.[1] Two of the five claims raised by the Plaintiffs' Amended Complaint—those concerning the Clark County Drug Treatment Court—are relevant to this motion. First, in Claim 1 of the Amended Complaint, twelve participants in the Drug Treatment Court allege that, based solely upon the representations of a probation officer who accused them of violating a condition of their participation in the program, they were held in jail for more than 72 hours without a hearing, formal notice of the charge against them, counsel, the consideration of bond, the opportunity to hear the evidence against them, or the opportunity to cross examine the government's witnesses. According to Plaintiffs, such incarceration violated their **[*4]** due process rights under the _Fifth_ and _Fourteenth Amendments_; in the alternative, they argue that it constituted cruel and unusual punishment in violation of the _Eighth Amendment_. Am. Compl. ¶¶ 145-154. Second, in Claim 4, four Drug Treatment Court participants allege that they were arrested by county employees who lacked the legal authority to do so, in violation of their _Fourth Amendment_ rights. Am. Compl. ¶¶ 71-78, 85-87, 92-96, 107-110, 173.

As Defendants Knoebel and Snelling state in their motion, they intend to introduce evidence that each of the participants in the Clark County Drug Treatment Court program—including those Plaintiffs named in Claims 1 and 4 of the Amended Complaint—signed a "participation agreement" releasing the court's employees from any liability arising from the Plaintiffs' participation in the Drug Treatment Court. Docket No. 62 at 2. The agreement, a copy of which

---

[1] We have discussed the legal nature of Plaintiffs' allegations more fully in our recent Order denying Defendants' motion to sever. Docket No. 75. A detailed accounting of the facts upon which these allegations center is not necessary or possible at this stage, as we discuss below.

Defendants have attached to their motion,[2] states in relevant part as follows: **[*5]**

> The Defendant [i.e. Plaintiff in the present action] releases and forever discharges the complaining witness, victims, judge, prosecutor, defense counsel, police departments, drug court staff, and service providers and their respective heirs, successors and executors from any and all claims of any kind or nature whatsoever, either in law or inequity [sic], arising out of his or her arrest, participation in, or termination from, the Drug Treatment Court Program and does expressly release and forever hold harmless from any criminal or civil action which the Defendant may have a right to bring as a result of the Defendant's arrest or participation in the Drug Treatment Court Program.

Docket No. 62, Ex. A at ¶ 11. The 33-paragraph document concludes with three blanks which participants are required to initial; in initialing, signatories recite that: (1) "I read and write the English language," (2) "I have fully read this Agreement to Enter Drug Court," and (3) "I have had the opportunity to discuss this agreement with my attorney whose name is [attorney name]." *Id*. at 7.

## Legal **[*6]** Analysis

### I. Rule 16 Standard

The Case Management Plan tendered by Plaintiff Destiny Hoffman and approved by the Magistrate requires that the parties submit any dispositive motions by April 8, 2015; it further provides that, "[a]bsent leave of court, and for good cause shown, all issues raised on summary judgment under _Fed. R. Civ. Pro. 56_ must be raised by a party in a *single motion*." Docket No. 44 at 7 (emphasis added). The additional "threshold" summary judgment motion Defendants Knoebel and Snelling seek permission to file would, as Defendants acknowledge, require modification of the Case Management Plan. *See* Docket No. 62 at 3.

Under the Federal Rules of Civil Procedure and this District's Local Rules, a court's scheduling order may be amended "only for good cause and with the judge's consent." _Fed. R. Civ. Pro. 16(b)(4)_; _S.D. Ind. L.R. 16-1(e)_ ("Absent court order, deadlines established in any order or pretrial entry under this rule may not be altered unless the parties and the court agree, or for good cause shown."). Although the Court has "inherent authority to modify pre-trial procedural deadlines to serve the best interests of justice," _Gomez v. Trustees of Harvard Univ., 676 F. Supp. 13, 15 (D.D.C. 1987)_ (citing _Link v. Wabash R.R. Co., 370 U.S. 626, 630-631, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962))_, the party seeking to alter our prior orders must overcome a "presumption against modification." *See* _Kortum v. Raffles Holdings, Ltd., 2002 U.S. Dist. LEXIS 21252, 2002 WL 31455994, at *3 (N.D. Ill. Oct. 30, 2002)_ **[*7]** . In weighing whether the moving party has met its burden of showing good cause, a primary focus of inquiry is the moving party's "diligence." _Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am., 424 F.3d 542, 553 (7th Cir._

---

[2] Defendants implicitly assert, though they have not established, that each of the Plaintiffs signed the same form agreement.

*2005)*.

## II. Defendants' Motion

Defendants Knoebler and Snelling devote little of their brief to supplying a "good cause" rationale for the modification of the Case Management Plan; rather, the preponderance of their filing consists of a discussion of the merits of their proposed summary judgment motion. They do offer two rationales for modification, both consisting of a single sentence—and without citations to authority or any elaboration. First, they contend, "[e]arly adjudication of the legal effect of the releases would serve judicial economy by potentially narrowing the scope of the action and reducing the number of defendants." Docket No. 62 at 3-4. Second, they assert that allowing a threshold motion would be fundamentally fair, because it could result in the release of Knoebel and Snelling from the case before they are subjected to the "costs and burdens of discovery and litigation of all issues."[3] *Id*. at 4.

The threadbare nature of Defendants' argument on good cause is, to a certain extent, understandable. In the run of cases in which a party seeks leave to modify a case management plan, the alteration sought is a deadline extension. Such circumstances are more conducive to justifications regarding diligence or "clean hands"—the presence of other compelling excuses warranting a departure from the court's scheduling orders. *See, e.g., Trustmark, 424 F.3d at 553*; *Hollis v. Defender Sec. Co., 2010 U.S. Dist. LEXIS 26310, 2010 WL 1137485, at *2 (S.D. Ind. Mar. 19, 2010)*. Here, Defendants' lack of diligence lies not in dilatory conduct but in failing to bring to the Court's attention their putative "threshold" issue before they agreed to a standard Case Management Plan calling for parties to present only one summary judgment motion. They failed to raise the waiver/release argument earlier, Defendants assert, because it was only after "reviewing the signed releases and conducting legal research" that they appreciated the importance and ripeness of the question; they further assert that were nevertheless "timely" in bringing the present motion less than three months after the Case Management Plan's approval. Docket No. 72 at 1-2.

It is eminently **[*9]** reasonable for a party not to have done the necessary legal research and evidence-gathering for a summary judgment motion before discovery has commenced. Defendants' burden here, however, is to justify their decision to file this motion so *early*, not so late. The fact that their request to modify the Court's briefing schedule has a novel complexion, in other words, does not absolve Defendants from showing that "good cause" justifies it—and we are not persuaded that either judicial efficiency or fundamental fairness to the parties warrants such a deviation. This is because, contrary to Defendants' assurances, the issue raised by their proposed summary judgment motion is not a "pure question of law." *Contra* Docket No. 72 at 2.

Federal courts are rightly skeptical, albeit not uniformly dismissive, of claims that a plaintiff has waived his constitutional rights or has released a defendant from liability for violating them. We

---

[3] As Snelling and Knoebel recognize, a grant of summary judgment on the grounds they propose would greatly affect a number of other Defendants as well; it would **[*8]** release Defendants Ford and Seybold from the case entirely. Docket No. 62 at 4 n.3.

"indulge every reasonable presumption against waiver of fundamental constitutional rights," *Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)*; *Bayo v. Napolitano, 593 F.3d 495, 503 (7th Cir. 2010)*, and we acquiesce in a waiver only if it has been "knowing, intelligent, and voluntary." *Schriro v. Landrigan, 550 U.S. 465, 484, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007)*. Although the Seventh Circuit does not appear to have addressed the type of release **[*10]** Defendants present here in the context of a drug court participation agreement, it has recognized that prospective "release-dismissal" agreements deserve scrutiny with a "critical eye" because of their "potential for . . . abuse." *Gonzalez v. Kokot, 314 F.3d 311, 317 (7th Cir. 2002)*. And, as Justice O'Connor recognized in her concurrence in *Town of Newton v. Rumery, 480 U.S. 386, 107 S. Ct. 1187, 94 L. Ed. 2d 405 (1987)*, the adequacy of such a prospective release is a fact-dependent question: "Many factors may bear on whether a release was voluntary and not the product of overreaching, some of which readily come to mind. The knowledge and experience of the criminal defendant and the circumstances of the execution of the release, including, importantly, whether the defendant was counseled, are clearly relevant. . . ." *480 U.S. at 401-402* (O'Connor, J., concurring).[4] *See also Gonzalez, 314 F.3d at 317-318*. Moreover, Indiana courts have construed drug court participation agreements, a relatively recent statutory innovation, as analogous to the waivers of rights contained in criminal plea bargains. *See House v. State, 901 N.E.2d 598, 600 (Ind. Ct. App. 2009)*.

Without offering any opinion on the merits of Defendants' proposed summary judgment motion, we thus readily perceive that our eventual resolution of the matter will require careful inquiry into the circumstances in which each of the Plaintiffs agreed to the purported release. We cannot engage in such an inquiry without proper development of the facts, and addressing this issue prematurely would be both unhelpful to the orderly resolution of the case and unfair to the Plaintiffs in question. *See Hollis, 2010 U.S. Dist. LEXIS 26310, 2010 WL 1137485, at *2* (noting the importance of prejudice to the Plaintiff in a Rule 16 motion) (citing *Kortum, 2002 U.S. Dist. LEXIS 21252, 2002 WL 31455994, at *5)*. "The purpose of pre-trial procedure is to serve the best interests of justice by eliminating unnecessary proof and issues and weeding out unsupportable claims." *Gomez, 676 F. Supp. at 15*. Defendants Knoebel and Snelling have not met their burden of showing that this purpose is best served by deviating from the Case Management Plan already approved by the Court. The motion for leave to file a threshold summary judgment motion is accordingly DENIED.

IT IS SO ORDERED.

Date: 10/29/2014. /s/ Sarah Evans Barker

SARAH EVANS BARKER, JUDGE

United States District Court

---

[4] Justice O'Connor went on to discuss other factors, including the nature of the criminal charges pending, the presence of a valid law-enforcement objective in securing the release, and the mitigating effects of judicial supervision, if any. *480 U.S. at 401-402* (O'Connor, J., concurring). **[*11]**

Southern District of Indiana

Attachment 8

# *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

March 10, 2008, Decided; March 10, 2008, Filed

No. 02 C 5893

**Reporter**: 2008 U.S. Dist. LEXIS 18118; 2008 WL 687220

LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. HOUSEHOLD INTERNATIONAL, INC., et al., Defendants.

**Prior History:** *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., 244 F.R.D. 412, 2006 U.S. Dist. LEXIS 88826 (N.D. Ill., 2006)*

**Counsel:** **[*1]** For Lawrence E Jaffe, Pension Plan, on behalf of itself and all others similary situated, Plaintiff: Gary L. Specks, LEAD ATTORNEY, Kaplan Fox & Kilsheimer LLP, Highland Park, IL; Frederic S Fox, Kaplan, Kilsheimer & Fox LLP, New York, NY; Joy Ann Bull, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA.

For Glickenhaus Inst Grp, individually and on behalf of all others similarly situated, Plaintiff: Spencer A Burkholz, LEAD ATTORNEY, Coughlin Stoia Geller Rudman & Robbins, San Diego, CA; Azra Z Mehdi, David Cameron Baker, Luke O Brooks, Monique C Winkler, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA; Jason C. Davis, Coughlin Stoia Geller Rudman & Robbins, San Francisco, CA; John A. Lowther, Joy Ann Bull, Michael J. Dowd, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; Marvin Alan Miller, Miller Law LLC, Chicago, IL; Patrick J Coughlin, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA; William S Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA.

For Household International Inc., Defendant: Nathan P. Eimer, LEAD ATTORNEY, Adam B. Deutsch, Christine M. Johnson, Eimer Stahl Klevorn & Solberg, LLP, Chicago, IL; Craig **[*2]** S. Kesch, David R. Owen, Howard G. Sloane, Joshua M. Greenblatt, Landis C Best, Thomas J Kavaler, Cahill, Gordon & Reindel, New York, NY; Janet A. Beer, Jason M. Hall, Jason A. Otto, Joshua M. Newville, Laura C. Fraher, Patricia Farren, Susan Buckley, Cahill Gordon & Reindel, LLP, New York, NY.

For Arthur Andersen, L.L.P., Defendant: Stanley J. Parzen, LEAD ATTORNEY, Debra L Bogo-Ernst, Lucia Nale, Sheila Marie Finnegan, Susan Charles, Mayer Brown LLP, Chicago, IL; Christine M. Johnson, Eimer Stahl Klevorn & Solberg, LLP, Chicago, IL; Eric S. Palles, Attorney, Chicago, IL; Gary Jay Ravitz, Ravitz & Palles, P.C., Chicago, IL; Jason M. Hall, Laura C. Fraher, Patricia Farren, Cahill Gordon & Reindel, LLP, New York, NY; Mark Douglas Brookstein, Gould & Ratner, Chicago, IL; Marshall J. Hartman, Chicago, IL; Paul Vizcarrondo, Jr, Wachtell, Lipton, Rosen & Katz, New York, HY.

For W F Aldinger, Defendant: Nathan P. Eimer, LEAD ATTORNEY, Adam B. Deutsch, Christine M. Johnson, Eimer Stahl Klevorn & Solberg, LLP, Chicago, IL; Craig S. Kesch, David R. Owen, Howard G. Sloane, Joshua M. Greenblatt, Landis C Best, Thomas J Kavaler, Cahill, Gordon & Reindel, New York, NY; Janet A. Beer, Jason M. Hall, **[*3]** Joshua M. Newville, Susan Buckley, Cahill Gordon & Reindel, LLP, New York, NY.

For D A Schoenhold, Defendant: Nathan P. Eimer, LEAD ATTORNEY, Adam B. Deutsch, Christine M. Johnson, Eimer Stahl Klevorn & Solberg, LLP, Chicago, IL; Craig S. Kesch, David R. Owen, Howard G. Sloane, Joshua M. Greenblatt, Landis C Best, Thomas J Kavaler, Cahill, Gordon & Reindel, New York, NY; Janet A. Beer, Jason M. Hall, Joshua M. Newville, Laura C. Fraher, Susan Buckley, Cahill Gordon & Reindel, LLP, New York, NY.

For Carl A. LaSusa, Respondent: Craig Allen Varga, LEAD ATTORNEY, Varga, Berger, Ledsky, Hayes & Casey, Chicago, IL.

For State of Vermont, Movant: Brudget C. Asay, Montpelier, VT.

**Judges:** NAN R. NOLAN, United States Magistrate Judge.

**Opinion by:** NAN R. NOLAN

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiffs have filed this securities fraud class action alleging that Defendants Household International, Inc., Household Finance Corporation, and certain individuals (collectively, "Household") engaged in predatory lending practices between July 30, 1999 and October 11, 2002 (the "Class Period"). Currently before the court is Plaintiffs' Motion to Compel Production of Documents by Defendants' Experts Pursuant to Plaintiffs' Subpoenas. **[*4]** For the reasons set forth below, the motion is denied.

### BACKGROUND

Plaintiffs seek to compel three of Defendants' experts -- Robert E. Litan, Carl A. LaSusa, and John L. Bley -- to produce documents pursuant to subpoenas issued on or about February 5, 2008. The experts have all timely objected to the subpoenas on numerous grounds. (*See* Exs. 4-6 of Pl.'s Mot.)

As a preliminary matter, the court notes that the parties placed a joint call to chambers on or about February 26, 2008 to discuss this issue, as well as a continuing dispute regarding Defendants' identification of 23 witnesses as non-retained "experts" pursuant to Judge Guzman's ruling in *Sunstar, Inc. v. Alberto-Culver Co., No. 01 C 736, 2006 U.S. Dist. LEXIS 85678 (N.D. Ill. Nov. 16, 2006)*. At the time, the court was completely unaware of the subpoena dispute and had not received any motion, documentation, or other information about it. As usual, the parties

bickered extensively and tossed out numerous facts and arguments, and the court instructed Plaintiffs to file an appropriate motion.

After receiving the motion, the court issued an Order addressing the *Sunstar* matter and setting a short briefing schedule on the subpoena dispute. **[*5]** (Minute Order of 2/26/08, Doc. 1187.) The court did not understand, however, that Mr. LaSusa was represented by separate counsel who did not yet have an appearance on file in the case and who had never been contacted by Plaintiffs' counsel for a meet and confer. The court appreciates that Mr. LaSusa's counsel has prepared a response to this motion despite receiving late notice of the court's February 26, 2008 Order.

## DISCUSSION

### A. The Litan and Bley Subpoenas

The Litan and Bley subpoenas were not issued by this court and cannot properly be enforced here. *Federal Rule of Civil Procedure 45* clearly states that "[i]f an objection [to a subpoena] is made . . . the serving party may move the issuing court for an order compelling production or inspection." *FED. R. CIV. P. 45(c)(2)(B)(i)*. The Litan subpoena was issued by the district court for the Western District of Missouri, and the Bley subpoena was issued by the district court for the Western District of Washington. (*See* Exs. 2 and 3 to Def. Resp.) Curiously, Plaintiffs misleadingly omit these significant facts from the body of their motion. Contrary to Plaintiffs' assertion, attachment of the experts' objections with case captions from the **[*6]** other jurisdictions as exhibits to the motion is not adequate notice to this court. Nor are the statements made by Defendants' counsel to the court's law clerk during the contentious February 26, 2008 telephone call.

Plaintiffs argue that the subpoenas are properly before this court because the individuals "are not uninterested, independent third parties" but, rather, are "paid experts." (Pl. Reply, at 4.) It is clear, however, that "a subpoena *duces tecum* issued pursuant to *Rule 45* is an appropriate discovery mechanism against nonparties such as a party's expert witness." *Expeditors Int'l of Washington, Inc. v. Vastera, Inc., No. 04 C 321, 2004 U.S. Dist. LEXIS 2501, 2004 WL 406999, at *3 (N.D. Ill. Feb. 26, 2004)*. Plaintiffs have not cited a single case suggesting that this court can enforce *Rule 45* subpoenas issued by other jurisdictions merely because they are addressed to expert witnesses. To the extent this is not the issuing court for the Litan and Bley subpoenas, and in light of the misleading nature of Plaintiffs' motion, the court will not address those two subpoenas here. *See Steadfast Ins. Co. v. Auto Marketing Network, Inc., No. 97 C 5696, 2001 U.S. Dist. LEXIS 11708, 2001 WL 881354, at *7 (N.D. Ill. Aug. 2, 2001)* ("[T]his court **[*7]** lacks the power to enforce or modify subpoenas obtained from other district courts."); *Lieberman v. American Dietetic Ass'n, No. 94 C 5353, 1995 U.S. Dist. LEXIS 5520, 1995 WL 250414, at *1 (N.D. Ill. Apr. 25, 1995)* ("Nothing . . . authorizes *this* court to either enforce or modify subpoenas obtained from the California district court.") (emphasis in original).

### B. The LaSusa Subpoena

The LaSusa subpoena did issue from this court, but it suffers from other defects. First, as

mentioned earlier, Plaintiffs never conducted a meet and confer session with Mr. LaSusa's counsel prior to bringing this motion, as required by Local Rule 37.2 and this court's Standing Order on Discovery Motions.

In addition, on March 30, 2007, the parties entered into a detailed Stipulation Regarding Expert Discovery designed to "limit the scope of discoverable information relating to . . . experts' opinions." (Stipulation, Ex. 7 to Pl. Mot., P 1.) Pursuant to the Stipulation, the parties agreed that testifying experts would provide five categories of information: (1) expert reports; (2) a list of all case-related materials relied upon by each expert, with corresponding Bates stamp numbers and deposition pages, as well as copies of all other **[*8]** documents or information the expert relied upon; (3) the compensation the expert received for the study and testimony; (4) the expert's qualifications, including a list of all publications authored within the preceding 10 years; and (5) a list of cases in which the expert testified as an expert at trial, hearing, or deposition within the preceding four years. (*Id.* P 2.) This largely mirrors the requirements of *Rule 26(a)(2)(B)*. The parties also agreed that if the expert had in his possession, custody or control reports submitted in the cases identified in subpart 5, he would produce them along with the expert report in this case, unless subject to a protective or confidentiality order. (*Id.* P 3.) Finally, the parties agreed that the content of communications between counsel and experts, and notes or other preliminary work created by, for, or at the direction of the experts, need not be produced. (*Id.* P 4.)

Plaintiffs now argue that the Stipulation does not serve as a limit on their ability to seek additional documents from Defendants' experts. (Pl. Mot. at 4.) Defendants disagree, arguing that the Stipulation "clearly and unambiguously defines the bounds of the permissible scope of **[*9]** material an expert is required to produce." (Def. Resp., at 5.) "As with other contracts, courts interpret stipulations according to the objective intentions of the parties." *United States v. Johnson, 396 F.3d 902, 905 (7th Cir. 2005)*. Thus, the court "do[es] not look beyond the four corners of the agreement unless the stipulation is reasonably subject to more than one interpretation." *Id.* Whether an agreement is clear or ambiguous is a question of law. *Kaplan v. Shure Bros., Inc., 266 F.3d 598, 604-05 (7th Cir. 2001)* (citing *Frydman v. Horn Eye Ctr., Ltd., 286 Ill. App. 3d 853, 858, 676 N.E.2d 1355, 1359, 222 Ill. Dec. 151 (1st Dist. 1997)*). "Courts will not find ambiguity in contractual language where none exists, . . . and contract language will only be found ambiguous when it is reasonably susceptible to different constructions, not merely when the parties disagree as to its proper construction or application." *Id. at 605* (citing *In re Estate of Powless, 315 Ill. App. 3d 859, 864, 734 N.E.2d 111, 116, 248 Ill. Dec. 403 (5th Dist. 2000)* and *Allied Asphalt Paving Co. v. Village of Hillside, 314 Ill. App. 3d 138, 144, 731 N.E.2d 425, 429, 246 Ill. Dec. 897 (1st Dist. 2000)*).

As noted, Paragraph 1 of the Stipulation states that the purpose **[*10]** of the agreement is "to limit the scope of discoverable information relating to such experts' opinions as follows." The parties' dispute focuses on the meaning of the phrase "as follows." Plaintiffs insist that the phrase means that expert discovery is limited as stated in the Stipulation, but otherwise not limited at all. Defendants counter that the phrase means that discovery is limited as stated in the Stipulation, such that no other discovery is permissible.

Applying the above legal principles, and viewing the Stipulation as a whole, the court finds no ambiguity in the agreement. Giving the phrase "as follows" its ordinary meaning, the Stipulation sets forth the entire universe of discoverable information relating to the parties' experts. *Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc., 225 F.3d 876, 879 (7th Cir. 2000)* ("In Illinois, clear and unambiguous terms in a contract are given their ordinary and natural meaning.") (internal quotations omitted). The Stipulation details in the five paragraphs after the "as follows" language both the experts' required disclosures as well as information that need not be disclosed. It is also states that the Stipulation **[*11]** does not prevent deposition questions relating to the substance of the experts' opinions, his compensation, his hours of preparation, or the frequency and duration of meetings with counsel regarding the report. To the extent that paragraph 2 of the Stipulation essentially parallels the requirements of *Rule 26(a)(2)(B)*, Plaintiffs' proposed interpretation to allow additional discovery would render the remainder of the Stipulation largely meaningless. Illinois, however, "requires that contracts be interpreted as a whole, in a way that gives effect to all terms, in the light of their ordinary and natural meanings." *LaSalle Nat'l Trust, N.A. v. ECM Motor Co., 76 F.3d 140, 144 (7th Cir. 1996)*.

The Stipulation clearly sets forth the parties' rights and responsibilities with respect to expert disclosures and covers the scope of discoverable information in that regard. *See Woods v. Southwest Airlines, Co., 523 F. Supp. 2d 812, 821 (N.D. Ill. 2007)* ("Illinois contract law presumes that a written agreement communicates the intent of the parties without a need to resort to extrinsic evidence of the same.") Thus, Plaintiffs' subpoena for additional expert disclosures from Mr. LaSusa is improper, **[*12]** and his objections are sustained. Plaintiffs of course remain free to pursue areas of inquiry contemplated by the subpoena during Mr. LaSusa's deposition.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Compel Production of Documents by Defendants' Experts Pursuant to Plaintiffs' Subpoenas [Doc. 1184] is denied.

Dated: March 10, 2008

/s/ Nan R. Nolan

NAN R. NOLAN

United States Magistrate Judge

Attachment 9

# _Meds. Co. v. Mylan Inc._

United States District Court for the Northern District of Illinois, Eastern Division

June 13, 2013, Decided; June 13, 2013, Filed

Case No. 11-cv-1285

**Reporter:** 2013 U.S. Dist. LEXIS 82964; 2013 WL 2926944

THE MEDICINES COMPANY, Plaintiff, v. MYLAN INC., MYLAN PHARMACEUTICALS INC., and BIONICHE PHARMA USA, LLC, Defendants.

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by, Patent interpreted by _Meds. Co. v. Mylan Pharms., Inc., 2013 U.S. Dist. LEXIS 176269 (N.D. Ill., Dec. 16, 2013)_

**Prior History:** _Meds. Co. v. Mylan, Inc., 2013 U.S. Dist. LEXIS 73597 (N.D. Ill., May 24, 2013)_

**Counsel:** [*1] For The Medicines Company, Plaintiff: David A. Zwally, Frommwer Lawerence & Haug LLP, New York, NY; John Bostjancich, Patricia Susan Smart, Smart & Bostjancich, Chicago, IL; Mark P Walters, Frommer Lawrence & Haug LLP, Seattle, WA; Porter F. Fleming, Frommer Lawrence & Haug LLP, New York, NY.

For Mylan Inc., Mylan Pharmaceuticals Inc., Bioniche Pharma USA, LLC, Defendants: David E. Jones, LEAD ATTORNEY, PRO HAC VICE, Perkins Coie Llp, Madison, WI; Autumn N. Nero, David J. Harth, Emily J. Greb, PRO HAC VICE, Perkins Coie Llp, Madison, WI; James B Coughlan, Perkins Coie LLP, Chicago, IL; Scott D. Eads, PRO HAC VICE, Perkins Coie Llp, Portland, OR; Shannon M. Bloodworth, PRO HAC VICE, Perkins Coie Llp, Washington, DC.

For Bioniche Pharma USA, LLC, Mylan Pharmaceuticals Inc., Mylan Inc., Counter Claimants: David E. Jones, LEAD ATTORNEY, PRO HAC VICE, Perkins Coie Llp, Madison, WI; Scott D. Eads, LEAD ATTORNEY, Perkins Coie Llp, Portland, OR; Autumn N. Nero, David J. Harth, Emily J. Greb, Perkins Coie Llp, Madison, WI; James B Coughlan, Perkins Coie LLP, Chicago, IL; Shannon M. Bloodworth, Perkins Coie Llp, Washington, DC.

For The Medicines Company, Counter Defendant: John Bostjancich, Patricia [*2] Susan Smart, Smart & Bostjancich, Chicago, IL; Mark P Walters, Frommer Lawrence & Haug LLP, Seattle, WA; Porter F. Fleming, Frommer Lawrence & Haug LLP, New York, NY.

For Bioniche Pharma USA, LLC, Counter Claimant: David E. Jones, LEAD ATTORNEY, PRO HAC VICE, Perkins Coie Llp, Madison, WI; Autumn N. Nero, David J. Harth, Emily J. Greb, Perkins Coie Llp, Madison, WI; James B Coughlan, Perkins Coie LLP, Chicago, IL; Scott D. Eads, Perkins Coie Llp, Portland, OR; Shannon M. Bloodworth, Perkins Coie Llp, Washington, DC.

**Judges:** AMY J. ST. EVE, United States District Court Judge.

82

Opinion by: AMY J. ST. EVE

## Opinion

<u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiff The Medicines Company's ("TMC") motion to compel testimony and production of information withheld on the basis of privilege by Defendant Mylan Inc., Mylan Pharmaceuticals Inc., and Bioniche Pharma USA, LLC (collectively, "Mylan"), pursuant to <u>*Federal Rule of Civil Procedure ("Rule") 37(a)*</u>. (R. 225, Mot. to Compel.) Specifically, Plaintiff seeks production of (1) Mylan's expert, Dr. Fred E. Regnier, for a continuation of his deposition and (2) draft expert reports and attorney-expert communications related to Dr. Regnier's **[\*3]** opening and reply expert reports. For the following reasons, the Court denies Plaintiff's motion to compel in its entirety.

## BACKGROUND

### I. Patents-in-Suit

Plaintiff TMC brought this lawsuit against Defendants, asserting that they infringed U.S. Patent Nos. 7,582,727 (the " '727 Patent") and 7,598,343 (the " '343 Patent," and collectively with the '727 Patent, the "patents-in-suit"). The patents-in-suit pertain to pharmaceutical formulations of Bivalirudin and the processes of making Bivalirudin (the "New Process"). (R. 1, Compl.) Bivalirudin is the active ingredient in Angiomax ®, an anticoagulant drug used in patients with unstable angina who are undergoing percutaneous transluminal coronary angioplasty. (*Id.* ¶¶ 11, 13.) TMC markets Angiomax ®. (*Id.* ¶¶ 11, 13.)

TMC alleges that Mylan, before the expiration of the patents-in-suit, submitted Abbreviated New Drug Application ("ANDA") No. 202471 to the U.S. Food and Drug Administration ("FDA"), seeking approval to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of its generic Angiomax ® product. TMC avers that Mylan's ANDA No. 202471 infringes certain claims of the patents-in-suit.

In response to TMC's lawsuit, **[\*4]** Mylan asserts, among others, a defense of inequitable conduct. (R. 185, Memo. Mot. to Compel at 1.) Mylan bases this defense on TMC's alleged deliberate failure to disclose highly material information to the United States Patent & Trademark Office ("PTO") during prosecution of the patents-in-suit. (*Id.*) Specifically, Mylan alleges that one of TMC's production batches of Bivalirudin—Lot No. 1344985—manufactured by Ben Venue Laboratories ("Ben Venue") violated a requirement of the patents-in-suit in that it contained a high level of the impurity Asp9. (*Id.* at 3.) The patents-in-suit claim the New Process produces Bivalirudin with a maximum Asp9 impurity level of 0.6% Asp9, but Mylan alleges that Lot No. 1344985, manufactured using the New Process, produced an Asp9 impurity level of

1.5% Asp9-150% higher than the maximum level recited in the patent claims. (*Id.* at 2-3; R. 199, Defs.' Reply at 5.) Mylan contends that TMC never disclosed the results of Lot No. 1344985 to the PTO. This failure serves as the basis for Mylan's inequitable conduct claim.

The Court presumes familiarity with the additional background of this litigation, and incorporates herein by reference the background information **[\*5]** set forth in the Court's opinion dated August 6, 2012. (R. 119.)

## II. Current Discovery Dispute

On February 8, 2013, Mylan's expert in high performance liquid chromatography ("HPLC"), Dr. Fred E. Regnier, served an opening expert report that included his opinions regarding the patents-in-suit. On March 8, 2013, TMC's expert, Dr. Alexander Klibanov, submitted a rebuttal report that responded to Dr. Regnier's opening report and then Dr. Regnier submitted a reply report on April 8, 2013. On April 26, 2013, counsel for TMC deposed Dr. Regnier. Prior to Dr. Regnier's deposition, TMC did not request Mylan to produce any additional documents relating to Dr. Regnier's expert reports. During the deposition, TMC's counsel interrogated Dr. Regnier regarding his opening report because it appeared to use language from a 2011 declaration in another case submitted by a different party's expert, Bernard A. Olsen, Ph.D. (the "Olsen declaration"). The Olsen declaration pertained to the same patents-in-suit involved in a case pending in the District of Delaware. *See The Medicines Company v. Teva Parental Medicines, Inc., et al.*, No. 09-cv-750-ER (D. Del.). In total, Dr. Regnier used approximately 4 to 5 **[\*6]** pages of text from the Olsen declaration in his export report that was 33 pages in length. The text appears to pertain to basic scientific principles that underlie HPLC. Dr. Regnier did not cite or quote the language from the Olsen declaration but did list the Olsen declaration as a document that he considered to formulate his opinions. (R. 234, Defs.' Response to Mot. to Compel at 9.) In addition, TMC's counsel alleges that Dr. Regnier also used language from Dr. David Auslander, another expert retained by Mylan, regarding the definition of a person of ordinary skill in the art ("POSA"). Dr. Regnier testified that Mylan's counsel provided Dr. Regnier with a copy of the Olsen Declaration and communicated Dr. Auslander's definition of a POSA to him. (*Id.* at 8.) He testified, however, that the report states his opinions and that his opinions do not rely upon communications with Mylan's counsel. (*Id.* at 9.) During the deposition, Defendant Mylan's attorney instructed Dr. Regnier not to answer the inquiry of authorship, asserting work-product protection under *Rule 26(b)(4)*.

At the end of Dr. Regnier's deposition, TMC asserted that the deposition would remain open and that TMC is entitled **[\*7]** to testimony concerning authorship of Dr. Regnier's export report. On May 3, 2013, TMC's counsel requested Dr. Regnier for a second deposition as well as Dr. Regnier's draft reports and all associated communications between Dr. Regnier and Mylan's counsel. Mylan's counsel responded on May 6, stating that they were available to discuss the matter on the afternoon of May 7. TMC ignored Mylan's request and filed the motion to compel without conferral.

## LEGAL STANDARD

This motion implicates standards that govern discovery as it relates to testifying experts. The Supreme Court amended _Rule 26(b)(4)_, effective December 1, 2010, by adding _Rule 26(b)(4)(B)_ to provide work product protection under _Rule 26(b)(3)(A)_ and _(B)_ for drafts of expert reports. _Rule 26(b)(4)(C)_ extends work product protection to most communications between trial counsel and experts. _Fed. R. Civ. P. 26(b)_.

Three exceptions apply to the protections afforded under _Rule 26(b)(4)(C)_. First, attorney-expert communications that relate to expert compensation. _Fed. R. Civ. P. 26(b)(4)(C)(i)_. Second, communications that identify facts or data that the party's attorney provided and that the expert considered in forming the opinions **[*8]** to be expressed. _Fed. R. Civ. P. 26(b)(4)(C)(ii)_. Third, communications that identify the assumptions that the party's attorney provided and that the expert relied upon in forming his opinions. _Fed. R. Civ. P. 26(b)(4)(C)(iii)_. Discovery concerning attorney-expert communications on subjects outside the three exceptions as articulated above, or regarding draft expert reports or disclosures, is permitted only when a party makes a showing of substantial need and cannot obtain the substantial equivalent without undue hardship. _Fed. R. Civ. P. 26(b)(3)(A)(ii)_. Further, when there is such a showing, the advisory committee notes show that "[i]n the rare case in which a party does make this showing, the court must protect against disclosure of the attorney's mental impressions, conclusions, opinions, or legal theories under _Rule 26(b)(3)(B)_." _Fed. R. Civ. P. 26(b)(3)(B)_ advisory committee's note (2010). The Seventh Circuit instructs that in a motion to compel "a district court may grant or deny the motion in whole or in part, and similar to ruling on a request for a protective order under _Rule 26(c)_, the district court may fashion a ruling appropriate for the circumstances of the case." _Gile v. United Air Lines, Inc., 95 F.3d 492, 496 (7th Cir. 1996)_. **[*9]** As with all discovery matters, courts have broad discretion in determining motions to compel. _See James v. Hyatt Regency Chi., 707 F.3d 775, 784 (7th Cir. 2013)_; _Peals v. Terre Haute Police Dep't, 535 F.3d 621, 629 (7th Cir. 2008)_.

## ANALYSIS

TMC contends that Mylan's litigation counsel authored numerous sections of Dr. Regnier's expert reports because they included language from the Olsen declaration and Dr. Auslander's definition of POSA. Consequently, TMC seeks production of (1) Defendant's expert, Dr. Regnier, for a continuation of his deposition and (2) draft expert reports and attorney-expert communications related to Dr. Regnier's opening and reply expert reports. It argues that _Rule 26_ does not protect the aforementioned material from discovery because Mylan's attorneys allegedly wrote the reports. In response, Mylan argues that: (1) TMC failed to comply with Local Rule 37.2 and (2) _Rule 26_ does protect the documents and information from discovery. The court agrees with Mylan.

## I. Local Rule 37.2 ("L.R. 37.2")

Before addressing the merits of TMC's motion, Mylan argues that TMC elected not to meet and confer with Mylan's counsel prior to filing its motion. Therefore, TMC failed to **[*10]** comply with Local Rule 37.2, which requires that "[t]o curtail undue delay and expense, this court shall

hereafter refuse to hear any and all motions for discovery and production of documents under *Rules 26* and *37*" unless counsel has attempted to resolve differences and are unable to reach an accord. N.D. Ill. L.R. 37.2. TMC responds that the opposing counsel's positions were made clear during Dr. Regnier's deposition and that it filed this motion in view of Mylan's refusal to provide the discovery sought. TMC has failed to comply with Local Rule 37.2. Given the numerous discovery disputes in the case, TMC certainly knows that the Court expects the parties to comply with this Rule in good faith. Despite TMC's failure to do so, the Court nonetheless will address the merits of the motion given the posture of this case in order to avoid needless delay.

## II. Rule 26 Protects the Documents and Information from Discovery

### A. Work-Product Immunity under Amended Rule 26

*Rule 26(b)(4)(B)* provides work product protection under *Rule 26(b)(3)(A)* and *(B)* for drafts of expert reports, and *Rule 26(b)(4)(C)* extends work product protection to most communications between trial counsel and experts. *Fed. R. Civ. P. 26(b)(4)(B)-(C)*. **[*11]** Communications that relate to expert compensation or identify facts, data or assumptions that the party's attorney provided, and that the expert considered and relied upon in forming the opinions to be expressed, are not precluded from discovery. *Fed. R. Civ. P. 26(b)(4)(C)(i)-(iii)*.

Mylan argues that *Rule 26* protects the draft expert reports and communications from discovery because TMC has failed to demonstrate that any of the three exceptions to the work product immunity apply. (R. 234, Defs.' Resp. at 7.) The Court agrees.

The parties acknowledge that Dr. Regnier used language from the Olsen declaration in his expert report. Further, the parties acknowledge that Mylan's counsel provided Dr. Regnier with the Olsen Declaration and that Dr. Regnier himself did not author the Olsen Declaration. (R. 227, Memo. Mot. to Compel. at 6, 9.) TMC does not allege that Mylan's counsel authored the Olsen declaration, but they suggest that Mylan's counsel copied language from the Olsen declaration and instructed Dr. Regnier to include that information in his expert report. (*Id.* at 12) The first and third exceptions to *Rule 26(b)(4)(C)* do not apply here because TMC is not concerned with information **[*12]** that relates to Dr. Regnier's compensation or assumptions that Mylan's counsel provided to Dr. Regnier. Instead, TMC argues that *Rule 26* does not protect draft expert reports and attorney-expert communications related to Dr. Regnier's opening and reply expert reports because it is entitled to "facts" that Mylan's counsel may have provided to Dr. Regnier, including authorship of specific paragraphs. (R. 227, Memo. Mot. to Compel.) TMC's assertion, however, is speculative at best and neither precedent nor the language of *Rule 26* supports its assertion. As Mylan properly asserts, the types of documents and communications that TMC seeks are limited to those that identify "facts and data." Any "further communications about the potential relevance of the facts or data" that may have been provided to Dr. Regnier are protected from discovery. Fed. R. Civ. P. 26 advisory committee's note (2010). TMC heavily relies on a recent decision from the Oregon District Court in *Gerke v. Travelers Casualty Ins. Co., 289 F.R.D. 316 (D. Ore. 2013)* in support of its position. Even if *Gerke* correctly applied *Rule 26*, *Gerke* is inapplicable to the facts of this case. Here, Mylan's counsel, unlike the defendant's **[*13]** counsel

in *Gerke*, did not write any portion of the document that the counsel gave to the expert, Dr. Regnier. It is evident that Mylan's counsel in fact gave the Olsen declaration to Dr. Regnier for convenience and because it was written with respect to the same patents-in-suit. Additionally, a distinguished scholar such as Dr. Regnier is entitled to his own opinion regarding another expert's scientific opinion regarding the same patents-in-suit. *See Cimaglia v. Union Pacific R. Co., 586 F. Supp. 2d 1039, 1043 (C.D. Ill. 2008)* (noting that an expert can review a previous expert's report and reach his own conclusion). Furthermore, Dr. Regnier testified that his opinions were his own opinions. The factual information he considered in Dr. Olsen's report pertained to HPLC and how it works. (R. 237. Ex. 7 at 257-59.) Dr. Regnier further explained that, based on his 40 years of experience in HPLC, he knows and understands HPLC independent of Dr. Olsen's declaration. (*Id.* at 258.) Of course, TMC may confront Dr. Regnier on cross-examination with the fact that portions of his report are identical to those of Dr. Olsen's declaration. The jury is free to decide what impact this similarity has **[\*14]** on his credibility. *See Walden v. City of Chi., 755 F. Supp. 2d 942, 952-53 (N.D. Ill. 2010)* ("[t]he question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusion and the facts on which they are based."); *see also Walker v. Soo Line R.R. Co., 208 F.3d 581, 589-90 (7th Cir. 2000)*.

## B. Substantial Need

The Court next turns to whether TMC has demonstrated a substantial need that may justify discovery of the requested documents and a continuation of Dr. Regnier's deposition. Discovery concerning attorney-expert communications on subjects outside the three exceptions of *Rule 26(b)(4)(C)*, or regarding draft expert reports or disclosures, is permitted only when a party makes a showing of substantial need and cannot obtain the substantial equivalent without undue hardship. *Fed. R. Civ. P. 26(b)(3)(A)(ii)*. When there is such a showing, the advisory committee notes show that "[i]n the rare case in which a party does make this showing, the court must protect against **[\*15]** disclosure of the attorney's mental impressions, conclusions, opinions, or legal theories under *Rule 26(b)(3)(B)*." Fed. R. Civ. P. advisory committee's note (2010). This is not one of those rare cases.

Mylan argues that *Rule 26* protects the draft expert reports and communications from discovery and that TMC should not depose Dr. Regnier again because TMC has failed to demonstrate that there is a 'substantial need.' (R. 234, Defs.' Resp. at 8.) The Court agrees.

Although TMC asserts that the author of Dr. Regnier's export report is unknown and this factor may undermine Dr. Regnier's credibility, these facts do not demonstrate a "substantial need" sufficient to overcome the work-product immunity attached to the draft reports and authorship information. TMC again cites the decision in *Gerke* to bolster its argument that there is a 'substantial need.' Again, however, *Gerke* is inapplicable to the facts here. Mylan, on the other hand, relies upon a recent decision from this District in *Sara Lee Corp. v. Kraft Foods, Inc., 273 F.R.D. 416 (N.D. Ill. 2011)* that is applicable here. TMC, similar to the plaintiff in *Sara Lee*,

examined Dr. Regnier's report, deposed Dr. Regnier about his report, and **[*16]** retained its own expert to rebut the report. The fact that Mylan instructed Dr. Regnier to withhold authorship information does not change the fact that TMC had ample time and opportunity to question Dr. Regnier regarding his report and the opinions therein. In addition, TMC has the Olsen declaration and language from Dr. Auslander upon which Dr. Regnier relied. It is free to use this information to cross examine Dr. Regnier. TMC has failed to demonstrate that Mylan's withholding authorship information constitutes a 'substantial need' sufficient to overcome work product immunity.

**CONCLUSION**

For the foregoing reasons, the Court denies Plaintiff TMC's motion to compel in its entirety.

**Date:** June 13, 2013

**ENTERED**

/s/ Amy J. St. Eve

AMY J. ST. EVE

United States District Court Judge

Attachment 10

2012 WL 3721350
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

MORNINGWARE, INC., Plaintiff,
v.
HEARTHWARE HOME PRODUCTS, INC., Defendant.
IBC–Hearthware, Inc. d/b/a Hearthware Home Products, Inc., Plaintiff,
v.
Morningware, Inc., Defendant.
No. 09 C 4348.
|
Aug. 27, 2012.

**Attorneys and Law Firms**

Edward L. Bishop, Nicholas S. Lee, Monique Ann Morneault, Bishop & Diehl, Ltd., Schaumburg, IL, for Plaintiff.

Lewis T. Steadman, Jr., Hearthware Home Products, Inc., Gurnee, IL, Adam P. Lerner, IP Law Leaders PLLC, Cameron H. Tousi, David M. Farnum, Albrecht Tousi & Farnum PLLC, Washington, DC, Joseph William Vucko, IB-Hearthware, Inc., Libertyville, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

**\*1** On July 20, 2009, Plaintiff Morningware, Inc. ("Morningware"), filed its Complaint against Hearthware Home Products, Inc. ("Hearthware"), alleging that Hearthware had commercially disparaged Morningware's counter-top oven, had committed the common-law tort of unfair competition, and had violated the Deceptive Trade Practices Act of Illinois, as well as the unfair-competition and product-disparagement provisions of the federal Lanham Act. (R. 1.) Separately, Hearthware brought an action against Morningware alleging that the latter had infringed U.S. Patent No. 6,201,217 ("the '217 Patent"). (*IBC–Hearthware, Inc. v. Morningware, Inc.,* No. 09–CV–4903 (N.D.Ill.) (R. 1).) The Court consolidated both cases on August 26, 2009. (Id.(R.19).) Morningware filed an Amended Complaint on November 4, 2011. (R. 244, First Am. Compl. ("Complaint").) Before the Court are the following:

1) Morningware's motion for summary judgment on Counts I through V of its First Amended Complaint (R. 279);

Hearthware's cross-motion for summary judgment on Counts I through V of Morningware's First Amended Complaint (R. 317);

3) Morningware's motion to strike the affidavit of James H. Nelems (R. 308); and

4) Morningware's motion to exclude the Vanderhart Rebuttal Report and Documents Produced After the Close of Discovery (R. 309).[1]

For the following reasons, the Court denies Morningware's motion for summary judgment; denies Hearthware's cross-motion for summary judgment; grants Morningware's motion to strike Mr. Nelems' affidavit; and denies, without prejudice, Morningware's motion to exclude Dr. Vanderhart's rebuttal report and documents produced after the close of discovery.

# BACKGROUND

## I. Northern District of Illinois Local Rule 56.1

"For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them."*Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir.2012). Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence."*Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir.2000)."The Rule is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary."*Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir.2011) (citation omitted).

Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue."*Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir.2009)."The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.' " *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) response, but must rely on the nonmovant's Local Rule 56.1(b)(3)(C) statement of additional facts. *See Ciomber v. Coop. Plus, Inc.,* 527 F.3d 635, 643 (7th Cir.2008). The Court disregards Rule 56.1 statements and responses that do not cite to specific portions of the record, as well as those that contain factual or legal argument. *See Cracco,* 559 F.3d at 632 ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."); *Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir .2006) ("statement of material facts did [ ] not comply with Rule 56 .1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"); *Bordelon,* 233 F.3d at 528 (the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted"); *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809–10 (7th Cir.2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56. 1, the court chooses to ignore and not consider the additional

facts that a litigant has proposed.").

## II. The Parties Failed to Comply with Local Rule 56.1

**\*2** The parites' Local Rule 56.1 statements and responses contain significant problems. Several of Morningware's "statements of material facts," for example, are either unsupported by citations to the evidence, or they are not statements of fact at all, but rather legal argument or legal conclusions. (*See* R. 280, Morningware's Local Rule 56.1(a)(3) Statement of Facts in Support of its Mot. for Summ. J. ("Morningware's SOF") ¶¶ 7, 25, 27–41, 47, 49, 52–53.) In addition, most of Hearthware's Local Rule 56.1(b)(3)(C) additional statements of material fact suffer from the same problems. (*See, e.g.,* R. 298, Hearthware's Local Rule 56.1 Statement of Additional Material Facts That Require Denial of Morningware's Mot. for Summ. J. ("Hearthware's Add'l SOF") ¶¶ 7–28, 30–37.) As explained above, the purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady,* 467 F.3d at 1060;*see also Judson Atkinson Candies, Inc. v. Latini– Hohberger Dhimantec,* 529 F.3d 371, 382 n. 2 (7th Cir.2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."). As such, the Court will not deem these "facts" as true unless the opposing party admits them.

Moreover, Hearthware's Local Rule 56.1(b)(3)(B) responses to Morningware's Local Rule 56.1(a)(3) statement of facts largely fail to comply with the Local Rule 56.1. Specifically, Local Rule 56. 1(b)(3)(B) requires the opposing party "to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.' " *Cracco,* 559 F.3d at 632 (quoting N.D. Ill. R. 56.1(b)(3)(B)). Hearthware's responses do not cite specific, or even general, portions of the record or other evidence in support of its denials of Morningware's statements of fact. Instead, Hearthware states, in the majority of its denials, that because "Hearthware does not have personal knowledge of the facts presented," it denies the particular statement of fact. While such a response is permissible in an answer to a complaint, *see*Fed.R.Civ.P. 8(b)(5), it is an insufficient response to a Rule 56.1 statement of fact. *See* N.D. Ill. R. 56. 1(b)(3)(B); *Cracco,* 559 F.3d at 632. As such, for the particular statements of fact that contain such a response from Hearthware, the Court deems Morningware's statements of fact as admitted for the purposes of its motion. *See Cracco,* 559 F.3d at 632;*see also Sojka,* 686 F.3d at 398 ("The obligation set forth in Local Rule 56.1 'is not a mere formality.' Rather, '[i]t follows from the obligation imposed by Fed.R.Civ.P. 56(e) on the party opposing summary judgment to identify specific facts that establish a genuine issue for trial.' ") (quoting *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir.2011) (internal citations omitted)).[2]

**\*3** The parties also failed to cite to the Rule 56.1 Statements of Fact in their respective memoranda of law, and instead cited to the record directly. In memoranda of law in support of, or in opposition to, summary judgment, parties should cite to the specific statement(s) of fact in support of the argument, not to the record directly. *See LaSalvia v. City of Evanston,* 806 F.Supp.2d 1043, 1046 (N.D.Ill.2011) (citing *Malec v. Sanford,* 191 F.R.D. 581, 586 (N.D.Ill.2000) (citations in the fact section should be to the 56.1(a) or (b) statement of facts only)).

## RELEVANT FACTS

The Court now turns to the facts relevant to Counts I–V of Morningware's Complaint. Hearthware is a corporation organized under Illinois law, with its principal place of business at 1795 North Butterfield Road, Libertyville, Illinois. (Hearthware's Add'l SOF ¶ 2.) Morningware is a corporation organized under Illinois law, with its principal place of business at 1699 Wall Street, Mount Prospect, Illinois. (*Id.* ¶ 3.) Morningware has only one employee.(*Id.* ¶ 29.)The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331, 1338(b), and 1367(a).(*Id.* ¶ 4.) Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).(*Id.* ¶ 6.)

Morningware owns United States Trademark Registration No. 3,802,040, which issued on June 15, 2010, for "MORNINGWARE." (Morningware's SOF ¶ 4.) The registration is for use in small electric kitchen appliances-namely, infrared wave-producing convection ovens. (*Id.)* It has used this mark since at least 2002. (*Id.* ¶ 5.) Morningware markets, advertises, and sells counter-top electronic ovens in the United States, primarily via the internet, through its website at www.morningware.com, and through retail. (*Id.* ¶¶ 1–2.)Morningware also has promoted its Morningware Halogen/Halo Oven at tradeshows and through infomercials and catalogs. (*Id.* ¶ 3.) Since at least January 2009, Morningware has used the designation "Halo" to identify its counter-top electronic ovens. (*Id.* ¶ 6.) Morningware has not given Hearthware permission to use the terms "Morningware" or "Halo." (*Id.* ¶ 8.)

Hearthware has participated in "pay-per-click" ("PPC") internet advertising through various search engine providers. (*Id .* ¶ 9.) Specifically, Hearthware purchased the keywords "Morningware" and "Morning Ware" from the Google, Yahoo!, and MSN search engines from October 14, 2008 through July 7, 2009. (*Id.* ¶ 10.)Hearthware uses keyword advertising with Yahoo! and Bing, through which Hearthware pays to have its ads displayed when a user searches for a word or phrase that Hearthware defines. (*Id.* ¶¶ 11–12.)Through this type of advertising, when a user searches the term "morningware," Hearthware's ad appears at the top of the search results. (*Id.* ¶ 13.)The ad contains a link to Hearthware's website, www.mynuwaveoven.com, and states that "[t]he Real NuWave® Oven Pro *Why Buy an Imitation?* 90–Day Gty."(*Id.* ¶¶ 13, 48.)When a user clicks on Hearthware's ad, the user is directed to Hearthware's website.(*Id.* ¶ 13.)

**\*4** Hearthware has purchased or bid on the following keywords: morningware, morning ware, by morningware, halo oven by morningware, morningware halo oven, morningware halo oven reviews, halogen oven by morningware, morningware oven, morning ware oven, morningware halogen oven, morningware infrared oven, morning ware infrared oven, morningware infrared halogen oven, morningware convection oven, morningware reviews, morningware HO 1200, morningware com, oven by morningware, halo trainer, halo halogen oven, halo infrared oven, halo convection oven, halo countertop oven, halo oven reviews. (*Id.* ¶ 14.)Hearthware has initiated approximately ten "campaigns" for Google AdWords, which included ads that Hearthware created to display when a user searches keywords that Hearthware bid on. (*Id.* ¶¶ 15–16.)

Before April 1, 2011, Hearthware lumped all of its AdWords campaigns under a single "Campaign No. 1." (*Id.* ¶ 17.)Hearthware used the "Morningware" mark and "Halo" in Campaign No. 1. (*Id.*)On April 1, 2011, Mr. David Kaplan began working at Hearthware. (*Id.* ¶ 18.)At some point thereafter, at Mr. Kaplan's direction, Hearthware began employing a "competitor campaign," which included using the "Morningware" mark and the "Halo" designation. (*Id.* ¶ 19.)Hearthware stopped this campaign when its counsel instructed Mr. Kaplan to do so. (*Id.* ¶ 20.)When it purchased these keywords, Hearthware knew that Morningware was a direct competitor. (*Id.* ¶ 21.)

Hearthware's purchase and use of keywords is in "interstate commerce." (*Id.* ¶ 26.)Hearthware bid on a total of twenty-five keywords that incorporated the "Morningware" and/or "Halo" designations, and Hearthware chose to bid on those specific keywords with the intent that the search engines would place Hearthware's ads in the search results. (*Id.* ¶¶ 38–40.)

Morningware's expert, Mr. James Berger, conducted a survey on behalf of Morningware to determine whether Hearthware's use of Morningware's marks creates confusion among consumers. (*Id.* ¶ 42.)Mr. Berger concluded that 43% of persons surveyed believed they could purchase Morningware's oven from Hearthware's advertised website for its NuWave® Oven. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."*Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 255 (quotation omitted). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704–05 (7th Cir.2011) (internal citations omitted).

## MORNINGWARE'S MOTIONS TO STRIKE AND EXCLUDE

**\*5** Morningware has filed two ancillary motions that relate to the Court's consideration of its motion for summary judgment and Hearthware's cross-motion. The first is a motion to strike the affidavit of James H. Nelems, and the second is a motion to exclude the rebuttal report of Dr. Jennifer Vanderhart and documents Hearthware produced after the close of discovery upon

which Dr. Vanderhart relies. (R. 308, 309.) For the following reasons, the Court grants Morningware's motion to strike and denies, without prejudice, Morningware's motion to exclude.

## I. The Court Grants Morningware's Motion to Strike Mr. Nelems' Affidavit

Federal Rule of Civil Procedure 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."Fed.R.Civ.P. 37(c)(1). Exclusion of the untimely-disclosed evidence is automatic unless the non-compliant party meets its burden to show that the untimely disclosure was substantially justified or harmless.*Tribble v. Evangelides,* 670 F.3d 753, 760 (7th Cir.2012) ("Under Rule 37(c)(1), 'exclusion of non-disclosed evidence is automatic and mandatory ... unless non-disclosure was justified or harmless.'") (quoting *Musser v. Gentiva Health Servs.,* 356 F.3d 751, 758 (7th Cir.2004)); *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir.2003) ("the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified for harmless").

The Court has broad discretion to determine whether a party's failure to comply with Rule 26(e) is substantially justified or harmless. *Keach v. U.S. Trust Co.,* 419 F.3d 626, 640 (7th Cir.2005); *David,* 324 F.3d at 857. The following factors are relevant to the Court's determination:

   (1) the prejudice or surprise to the party against whom the evidence is offered;

   (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and
   (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

*Tribble,* 670 F.3d at 760 (citing David, 324 F.3d at 857).

This case has been pending for over three years. The Court has repeatedly granted the parties' requests for discovery extensions. On December 8, 2011, the Court ordered the following expert discovery schedule: identification of burden of proof experts by January 5, 2012, exchange of burden of proof expert reports by February 2, 2012, identification of rebuttal experts on February 16, 2012, and exchange of rebuttal expert reports by March 15, 2012. (R. 256.) On February 27, 2012, at the parties' request, the Court granted an extension of the expert discovery schedule as follows: exchange of burden of proof expert reports by March 15, 2012, identification of rebuttal experts by March 29, 2012, and exchange of rebuttal expert reports by April 26, 2012. (R. 275.) The Court also set a dispositive motion deadline of June 7, 2012. (*Id.*)

**\*6** Morningware timely disclosed five experts, one of whom is Mr. James T. Berger. Mr. Berger's report details a survey that is relevant to Morningware's Lanham Act claims against Hearthware. Hearthware timely disclosed a damages expert and a patent expert. On April 6, 2012, one week after the Court's deadline, Hearthware re-identified its damages expert and its patent expert as rebuttal experts. Hearthware did not identify any additional experts.

On April 10, 2012, Morningware filed its motion for summary judgment on Counts I through V of its Complaint, in which it relies on Mr. Berger's report in support of its argument that

Hearthware's conduct violated the Lanham Act. Specifically, Mr. Berger conducted a survey in which he attempted to determine whether Hearthware's advertisement caused confusion. Hearthware filed its opposition to Morningware's motion on June 2, 2012, attaching an affidavit from Mr. Nelems. Mr. Nelems' affidavit criticizes Mr. Berger's survey methodology and the conclusions in his report. Moreover, Hearthware relies upon Mr. Nelems' affidavit in support of its cross-motion for summary judgment. Prior to filing its response, Hearthware did not identify Mr. Nelems as an expert, nor did it disclose any of his opinions. Hearthware never sought leave of Court to disclose Mr. Nelems after the Court-ordered deadline.

Hearthware's untimely disclosure of Mr. Nelems' expert opinions is neither harmless nor substantially justified. *See Tribble,* 670 F.3d at 760. Discovery has closed, and the time for filing dispositive motions has passed. Morningware represents that it moved for summary judgment based, at least in part, on the fact that Hearthware had not retained an expert to rebut Mr. Berger's opinions. Allowing Hearthware to rely on expert evidence disclosed for the first time in response to summary judgment would severely prejudice Morningware. It would require the Court to re-open discovery to allow Morningware to depose Mr. Nelems, and it would require the parties to re-assess their summary judgment strategy, and if necessary, re-file revised motions for summary judgment. The time and expense associated with those circumstances cannot be characterized as harmless.

Moreover, Hearthware has woefully failed to convince the Court that its untimely disclosure was "substantially justified." Hearthware argues that because it hired Mr. Nelems as a "consulting" expert, it did not need to identify him to Morningware or offer a report within the Court's expert discovery schedule. Hearthware's argument, however, reflects a gross misunderstanding regarding the difference between a consulting expert and a testifying expert, as well as the purpose of summary judgment. Consulting experts do not offer testimonial evidence during a litigation proceeding, and parties are therefore not entitled to discovery from consulting experts. *See* Fed.R.Civ.P. 26(b)(4)(D). Testifying experts, however, offer testimony that the parties use as evidence, and therefore the parties are entitled to discovery regarding these experts and their opinions. *See* Fed.R.Civ.P. 26(a)(2) and 26(b)(4)(A).

**\*7** Although Hearthware initially may have intended Mr. Nelems to serve only as a consulting expert, when Mr. Nelems submitted a sworn affidavit (i.e., testimony) to the Court in connection with its opposition to summary judgment and its cross-motion for summary judgment, Mr. Nelems became a testifying expert. That Hearthware submits the testimony in connection with summary judgment and not trial is of no consequence, given that the purpose of summary judgment is to determine, based on all of the evidence gleaned in discovery, whether any disputed issues of material fact exist for trial. *See Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir.2003) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."); *see also Siegel v. Shell Oil Co.,* 612 F.3d 932, 937 (7th Cir.2010) (same).

Adopting Hearthware's reasoning would allow parties to hire "consulting" experts, fail to disclose them to opposing counsel, and then submit affidavits from those experts to block summary judgment (and in this case, to obtain summary judgment in the noncompliant party's favor). Such a result is non-sensical and runs counter to the Federal Rules of Civil Procedure.

Morningware's motion to strike is granted. The Court will not consider Mr. Nelems' opinions in ruling on the summary judgment motions, and he may not testify at trial.

**II. The Court Denies, Without Prejudice, Morningware's Motion to Exclude Dr. Vanderhart's Rebuttal Report and Documents That Hearthware Produced After the Close of Discovery**

The Court next considers Morningware's motion to exclude the rebuttal report of Dr. Jennifer Vanderhart and certain documents that Hearthware produced after the close of discovery. Morningware argues that Dr. Vanderhart's rebuttal report, which Hearthware timely disclosed, "improperly attempts to supplement her earlier Report ... to include opinions on damages issues pertaining to Morningware's Lanham Act and related claims" even though her initial report did not opine on damages relating to those claims. (R. 309, Morningware's Mot. to Exclude at 1.) Morningware further argues that Dr. Vanderhart relied on documents that Hearthware refused to produce to Morningware during discovery and which Hearthware produced only after disclosing Dr. Vanderhart's report.

The parties agree that, in a Lanham Act case seeking lost profits, the plaintiff has the burden of proving the defendant's sales, and then the burden shifts to the defendant to prove its costs or other deductions. *See* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."). Hearthware disclosed Dr. Vanderhart's initial report on March 16, 2012, in which she opined on Hearthware's damages arising out of its patent and Lanham Act claims against Morningware. (R. 309–1, Vanderhart Initial Report.) Dr. Vanderhart did not proffer any opinions on Morningware's Lanham Act claims against Hearthware in that report. Morningware disclosed a "report" from Mr. Jon Tepp, whom Morningware contends is not an expert, on March 14, 2012 regarding Hearthware's sales of its NuWave ovens. Morningware contends that because Mr. Tepp is not an expert, Dr. Vanderhart was not entitled to rebut his report. After Hearthware cross-moved to exclude Mr. Tepp's report, Morningware represented to the Court that it will not use Mr. Tepp's report, and Mr. Tepp will not testify at trial. Indeed, Morningware does not rely on Mr. Tepp's report in its summary judgment motion. As such, the Court denied Hearthware's cross-motion as moot. (R. 334.) Given that Mr. Tepp is no longer a witness in this case, and Morningware will not use his report at trial, Dr. Vanderhart's rebuttal opinions on Morningware's Lanham Act claims appear unnecessary. Accordingly, the Court denies, without prejudice, Morningware's motion to exclude.

**\*8** Dr. Vanderhart's contested opinion is not material to the pending motions for summary judgment, and thus the Court does not consider it. The parties should meet and confer after receiving this Order to determine whether Hearthware intends to offer Dr. Vanderhart's rebuttal opinions at trial. If necessary, Morningware may re-file its motion to exclude before trial.[3]

*MORNINGWARE'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I–V OF ITS FIRST AMENDED COMPLAINT AND HEARTHWARE'S CROSS–MOTION FOR*

*SUMMARY JUDGMENT ON THE SAME COUNTS*

In its Complaint, Morningware asserts the following claims against Hearthware: unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count I); product disparagement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count II); violation of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2 ("the Illinois UDTPA") (Count III); common law unfair competition (Count IV); and common law commercial disparagement (Count V).[4] (R. 244, First Am. Compl.) Morningware has moved for summary judgment on all five counts, and Hearthware has cross-moved for summary judgment on the same counts.

### I. The Court Denies Both Parties' Motions for Summary Judgment on Count I–False Representation of Origin Under 15 U.S.C. § 1125(a) (1)(A)

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), provides that

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). To prevail on its Lanham Act claim, Morningware must prove "(1) that [Morningware] owns a protectible trademark, and (2) that use of this mark by [Hearthware] is likely to cause confusion among customers." *Morningware, Inc. v. Hearthware Home Prods., Inc.,* 673 F.Supp.2d 630, 634 (N.D.Ill.2009) (quoting *Segal v. Geisha NYC LLC,* 517 F.3d 501, 506 (7th Cir.2008)). Morningware must also prove that Hearthware used the marks in interstate commerce. *See id.* at 635.

There is no genuine dispute that the "Morningware" mark and the "Halo" designation are protectible trademarks (Morningware's SOF ¶ 4–6), or that Hearthware used these marks in interstate commerce. (*Id.* ¶¶ 9–21, 26.)Accordingly, the Court turns to the likelihood of confusion element.

As the Seventh Circuit teaches, "[w]hether consumers are likely to be confused about the origin of a defendant's products or services is ultimately a question of fact" that may be resolved on a motion for summary judgment "only 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.' " *Autozone, Inc. v. Strick,* 543 F.3d 923, 929 (7th Cir.2008) (quoting *McGraw–Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1167 (7th Cir.1986) and *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 627 (7th Cir.2001)). " 'In assessing the likelihood of consumer confusion, [courts] consider (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the

strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's.' " *Morningware,* 673 F.Supp.2d at 636 (quoting *Promatek Indus., Ltd. v. Equitrac Corp. .,* 300 F.3d 808, 812 (7th Cir.2002)). Although "[n]one of these factors are dispositive and the proper weight given to each will vary in each case," the "similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance." *Promatek,* 300 F.3d at 812 (citing *Ty, Inc. v. Jones Grp.,* 237 F.3d 891, 897–98 (7th Cir.2001)).

**\*9** While evidence exists in this case to support a finding of a likelihood of confusion, Morningware has failed to meet its heavy burden of showing that "the evidence is so one-sided that there can be no doubt about how the questions should be answered."*See Autozone,* 543 F.3d at 929. As such, the Court denies both parties' motion for summary judgment.

Morningware asserts a theory of "initial interest confusion," which the Seventh Circuit has held is actionable under the Lanham Act. *See Promatek,* 300 F.3d at 812. Initial interest confusion "occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated."*Id.* In *Promatek,* the defendant diverted internet consumers to its website by placing the plaintiff's trademark in the defendant's website as a metatag.[5]*Id.* The court held that this had the effect of diverting the plaintiff's goodwill, even though consumers may have been "only briefly confused." *Id.* ("that confusion as to the source of a product or service is eventually dispelled does not eliminate the trademark infringement which has already occurred") (quoting *Forum Corp. of N. Am. v. Forum, Ltd.,* 903 F.2d 434, 442 n. 2 (7th Cir.1990))."What is important is not the duration of the confusion, it is the misappropriation of [the plaintiff's] goodwill. [The defendant] cannot unring the bell."*Id.* at 812–13.Relying on *Promatek,* Morningware argues that consumers were confused when, upon searching for Plaintiff's trademark or a variation thereof, Hearthware's advertisement for its counter-top oven displayed in the search results.

Hearthware does not challenge Morningware's argument with respect to the first, second, and third likelihood of confusion factors. Specifically, there is no genuine dispute of material fact that Hearthware used Morningware's actual marks, which Morningware uses to advertise its counter-top ovens, in connection with the advertising and sale of Hearthware's NuWave® counter-top oven by purchasing those keywords that included Morningware's trademarks. (Morningware's SOF ¶¶ 9–13, 48.) Moreover, the marks are not only similar, but identical, and the products are very similar. The third factor, the area and manner of concurrent use of the products, also weighs in favor of a finding of confusion because both Morningware and Hearthware sell their respective counter-top ovens through the internet. (*Id.* ¶¶ 1–2, 13, 48.)The seventh factor—Hearthware's intent—is also largely undisputed. Hearthware bid on a total of twenty-five keywords that incorporated the "Morningware" and/or "Halo" designations. Hearthware chose to bid on those specific keywords with the intent that the search engines would place Hearthware's ads in the search results and knowing that Morningware is a direct competitor.[6](*Id.* ¶ ¶ 21, 38–40.)These facts strongly support a finding that Hearthware intended to divert consumers to its website.

**\*10** The fourth factor—the degree of care likely to be exercised by customers—is less clear. Relying on *Promatek,* Morningware argues that the degree of care is "generally low" when a

customer searches for a product on the internet, and therefore this factor weighs in favor of Morningware. (R. 279, Morningware's Mot. at 9.) Morningware further submits that the degree of care that a consumer uses when he or she decides on which links to click after the search results have been displayed on the webpage is the relevant consideration, as opposed to the degree of care that a consumer uses when actually purchasing the product. (*Id.*; R. 329, Morningware's Reply at 6.) Hearthware, on the other hand, focuses on the degree of care that a consumer uses when actually purchasing the product, and argues that because the ovens at issue cost between $80 and $100, consumers exercise a higher degree of care than with products that only cost a few dollars.[7](R. 295, Hearthware's Resp. at 9–10); *see Autozone,* 543 F.3d at 932 ("[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases") (citation omitted).

Because Morningware asserts an initial interest confusion theory in this case, the relevant focus is the degree of care a consumer uses when deciding on which link to click after the search results are displayed on the webpage, as that is the point at which consumer confusion can occur. *See Promatek,* 300 F.3d at 812. This focus, however, does not mean that the nature of the goods, including the cost, as well as the relevant consumers' characteristics, are irrelevant to the degree of care factor. *See, e.g., Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137, 1152 (9th Cir.2011) ("The nature of the goods and the type of consumer is highly relevant to determining the likelihood of confusion in the keyword advertising context.... [T]he degree of care analysis cannot begin and end at the marketing channel.") (quoting *Brookfield Communications,* 174 F.3d at 1060).[8]

In *Network Automation,* a recent case involving keyword advertising over the internet, the Ninth Circuit held that the district court erred in determining that the degree of care factor favored a likelihood of confusion finding. 638 F.3d at 1153. In connection with the plaintiff's motion for a preliminary injunction, the district court, relying on the Ninth Circuit's conclusion in *Brookfield Communications,* had determined that the degree of care factor weighed in favor of a likelihood of confusion because "there is generally a low degree of care exercised by Internet consumers."*Id.* at 1152.The Ninth Circuit explained that while this conclusion may have been accurate at the time it decided *Brookfield Communications,* it "suspect[s] that there are many contexts in which it no longer holds true" due to consumers' evolving sophistication with respect to internet commerce. *Id.* at 1152–53 ("We have recently acknowledged that the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace."). Accordingly, "the degree of care analysis cannot begin and end at the marketing channel. We still must consider the nature and cost of the goods, and whether 'the products being sold are marketed primarily to expert buyers.'"*Id.* at 1152 (quoting *Brookfield Communications,* 174 F.3d at 1060).[9]

**\*11** The Court agrees with the observation and reasoning in *Network Automation,* which is not contrary to or inconsistent with the Seventh Circuit's decision in *Promatek.*Indeed, statistics from the United States Department of Commerce and the United States Census Bureau support this observation. *See Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir.2003) (taking judicial notice of information found on the website of a government agency); *Trundle v. Astrue,* No. 09–CV02058, 2010 WL 5421418, at * 11 n. 10 (E.D.Cal. Dec. 20, 2010) (taking judicial notice of

the United States Department of Labor statistics) (citing cases). In 2000, for example, online business-to-consumer retail "shipments, sales, and revenues" equaled $28 billion. *See* United States Dep't of Commerce E–Stats Report for 2001, issued March 19, 2003, *available at* http://www.census.gov//econ/estats/2001/2001 estatstext.pdf. In 2002, the year in which the Seventh Circuit issued *Promatek,* that figure rose to $44 billion. *See* United States Dep't of Commerce E–Stats Report for 2002, issued April 15, 2004, *available at* http://www.census.gov// econ/estats/2002/2002finaltext.pdf. By 2010, that number had nearly quadrupled to $169 billion. *See* United States Dep't of Commerce E–Stats Report for 2010, issued on May 10, 2012, *available at* www.census.gov/econ/estats/2010/2010reportfinal.pdf. Given the ever-increasing commonplace of consumers searching for and purchasing goods online, the fact that this case involves a theory of initial interest confusion in keyword advertising does not, without more, necessitate a finding that consumers exercise a low degree of care. The additional factors that the *Network Automation* court discussed—i.e., the nature and cost of the goods, as well as the characteristics of the target consumers—are relevant. Morningware has not sufficiently addressed or proven these additional factors. The degree of care factor, therefore, does not weigh clearly in favor of Morningware or Hearthware.

The fifth factor—the strength of Morningware's marks—favors a likelihood of confusion finding, but not overwhelmingly so. A mark's "strength" refers to its distinctiveness, "meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 684 (7th Cir.2001)."The stronger the mark, the more likely it is that encroachment on it will produce confusion."*Autozone,* 543 F.3d at 933 (quoting 2 McCarthy § 11.73, at 11–169 to 170 (2008)). In determining the strength of the mark, courts consider, among other factors, the uniqueness of the mark, the length of use of the mark, the sales associated with the mark, and advertising expenditures connected with the mark. *See CAE,* 267 F.3d at 684.

The record contains sufficient evidence from which a jury could find this factor weighs in favor of Morningware. The terms "Morningware" and "Halo," for example, are arbitrary marks because they are not necessary to the description of a counter-top oven, and therefore they are unique marks. *See Sullivan v. CBS Corp.,* 385 F.3d 772, 776 (7th Cir.2004) (explaining that the word " 'survivor' when used as a band name is arbitrary because there is nothing about the word which is necessary to the description of a band").[10] Moreover, the "Morningware" mark has been registered since 2010, and Morningware has used that mark on counter-top ovens for almost ten years. (Morningware's SOF ¶¶ 4–6.) Other evidence in the record (and the lack thereof) however, cuts against a finding of a strong mark. Morningware, for example, is a one-person company. (Hearthware's Add'l SOF ¶ 29.) Moreover, Morningware has not provided any evidence of the economic strength of its marks, such as the frequency with which it advertises the marks or the amount of money it spends to advertise them.[11] *Cf. Autozone,* 543 F.3d at 933 (noting that there was sufficient evidence to support the conclusion that the Autozone mark has economic and marketing strength where it "is displayed prominently on more than 3,000 stores nationwide and it has been the subject of hundreds of millions of dollars' worth of advertising since 1987"); *see also Flagstar Bank, FSB v. Freestar Bank, N.A.,* 687 F.Supp.2d 811, 832 (C.D.Ill.2009) ( "evidence of the frequency of a mark's display and the amount of advertising dollars used to promote the mark are relevant factors when determining a mark's strength") (citing *Autozone,* 543 F.3d at 933)).

**\*12** The same is true for actual confusion, the sixth factor. In support of its assertion that Hearthware's use of Morningware's trademark has caused actual consumer confusion, Morningware submits a survey that its expert, Mr. Berger, conducted. Based on his survey, Mr. Berger concluded that 43% of persons surveyed believed they could purchase Morningware's oven from Hearthware's advertised website for its NuWave® Oven. (Morningware's SOF ¶ 42.) Hearthware does not present any expert testimony to rebut Mr. Berger's conclusions or to contest the methodology he employed in his survey.

Hearthware, however, criticizes Mr. Berger's survey on several independent grounds. It argues, for example, that Mr. Berger omitted consumers from the Southern portion of the United States from its survey, despite stating that he wanted a national sampling presence. (R. 360, Hearthware's Sur–Reply at 8.) Hearthware also argues that Mr. Berger's survey asked the respondents to make several inappropriate factual assumptions for which he could not provide an explanation. (*Id.*) Additionally, Hearthware submits that Mr. Berger asked leading questions of survey respondents and did not code or quantify the respondents' answers to the first five questions of the survey. (*Id.* at 8–10.)Hearthware further argues that Mr. Berger's survey is flawed because it does not account for non-Google AdWords campaigns, such as Bing, Yahoo, or Safari. (*Id.* at 10.)

Morningware, as the plaintiff, bears the burden of proving actual confusion by a preponderance of the evidence, and it relies solely on Mr. Berger's testimony to do so. Although, as explained above, Hearthware cannot offer Mr. Nelems as a witness at trial to rebut Mr. Berger's testimony, Hearthware may still cross-examine Mr. Berger at trial. In this case, Hearthware's many criticisms of Mr. Berger's survey create issues of fact for the jury. *See O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir.2011) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders.") (quoting *Berry v. Chicago Transit Auth.,* 618 F.3d 688, 691 (7th Cir.2010)). While Mr. Berger's survey opinions provide a sufficient evidentiary basis for a jury to conclude that Hearthware's conduct caused actual consumer confusion, a jury could also find that Mr. Berger's survey methodology was flawed and thus created inaccurate results.[12]It is simply not the Court's province to weigh expert testimony at the summary judgment stage, particularly here, where the expert's testimony is critical to the actual confusion factor. *See O'Leary, 657 F.3d at 630;AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 616 (7th Cir.1993) ("We have stated a number of times that the trial court's ultimate conclusion on the likelihood of confusion is a finding of fact. Accordingly, a motion for summary judgment in trademark infringement cases must be approached with great caution.") (internal citation omitted). As such, there is a genuine dispute of material fact as to whether Hearthware's conduct caused actual confusion.

**\*13** Considering all of the above factors, neither party is entitled to summary judgment on Morningware's false representation of origin claim. While Morningware has set forth evidence upon which a jury could find in its favor, it has not shown that the evidence is so "one-sided that there can be no doubt about how the question should be answered."*Autozone,* 543 F.3d 923. As such, the Court denies both parties' motions for summary judgment as to Count I of Morningware's Complaint.

**II. The Court Denies Both Parties' Motions for Summary Judgment on Count II–Product Disparagement Under 15 U.S.C. § 1125(a) (1)(B)**
Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), provides that

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> ...
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). As the Court has previously explained in this case, to establish this claim, Morningware must prove "(1) a false statement of fact by [Hearthware] in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) [Hearthware] caused its false statement to enter interstate commerce; and (5) [Morningware] has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to [Hearthware] or by a loss of goodwill associated with its products."*Morningware,* 673 F.Supp.2d at 638 (quoting *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 820 (7th Cir.1999))."In addition, to recover money damages under the Act, [Morningware] must prove both actual damages and a causal link between [Hearthware's] violation and those damages."*Hot Wax,* 191 F.3d at 819–20.

Morningware argues that Hearthware's advertisement, which contained a link to Hearthware's website and stated "The Real NuWave® Oven Pro Why Buy an Imitation? 90–Day Gty,""misleads and/or confuses consumers into believing that Morningware's ovens are inferior to Hearthware's because they are imitations."(Morningware's Mot. at 12.) It is undisputed that Hearthware, in connection with its keyword advertising campaign, made the statement identified above. (Morningware's SOF ¶¶ 13, 48.) Issues of material fact exist, however, with respect to several of the elements of Morningware's claim, as explained in more detail below.

**\*14** A false statement establishing liability under the Lanham Act "generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive customers."*Hot Wax,* 191 F.3d at 820;*see also LG Elecs. U.S.A., Inc. v. Whirlpool Corp.,* 661 F.Supp.2d 940, 948 (N.D.Ill.2009). If the statement is literally false, "the plaintiff need not show that the statement either actually deceived customers or was likely to do so."*Hot Wax,* 191 F.3d at 820. When a statement is literally true or ambiguous, "the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion."*Id.* Regardless of whether the theory is one of literal or implied

103

falsity, " 'whether a claim is either 'false' or 'misleading' is an issue of fact rather than law.' " *LG Elecs.*, 661 F.Supp.2d at 948 (quoting *Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir.2000)). "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." *Id.* (quoting *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297–98 (2d Cir.1992)).

Morningware does not argue, and has not set forth any evidence to prove, that Hearthware's statement is literally false. Instead, Morningware argues that Hearthware's statement "conveys a false impression and is misleading in context."(Morningware's Reply at 7.) To succeed on this implied falsity theory, Morningware must establish that a "statistically significant portion of the target audience received the implied message allegedly communicated by the challenged advertisement-without such proof, the plaintiff cannot establish injury arising from the advertiser's allegedly false message."*LG Elecs.*, 661 F.Supp.2d at 950;*see also B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 972 (7th Cir.1999) ("[W]here the statement is literally true or ambiguous, then the plaintiff is obliged to prove that the statement is 'misleading in context, as demonstrated by actual consumer confusion.'") (quoting *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir.1994))."[B]efore a court can consider the truth or falsity of an advertisement's message, 'it must first determine what message was actually conveyed to the viewing audience .' " *LG Elecs.*, 661 F.Supp.2d at 950 (quoting *Johnson & Johnson*, 960 F.2d at 298). Because of the difficulty in obtaining this information from the consuming public, plaintiffs often present consumer surveys to prove this element. *Id.* ("Indeed, some courts have held that 'the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey.' ") (quoting *Johnson & Johnson*, 960 F.2d at 298).

**\*15** Morningware relies on Mr. Berger's survey to establish that consumers received a misleading message from Hearthware's advertisement—namely, that Morningware's counter-top oven is an imitation of Hearthware's NuWave® Oven Pro. (*See* R. 279–1, Berger Report ¶ 15 ("many of the respondents were under the impression [that] the Nu Wave Oven Pro is an authentic product while the Morningware product was a 'fake' or 'imitation' ").) Although Morningware contends that Mr. Berger's conclusions are undisputed (Morningware's Mot. at 12), that is not the case. First, Morningware did not include any of Mr. Berger's opinions on this issue in its Local Rule 56.1 Statement of Facts, and thus they are not undisputed. *See Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F.Supp.3d 503, 508 (N.D.Ill.2011) ("Adherence to Local Rule 56.1 gives the opposing party the opportunity to either admit or deny the statement of fact, and to provide record support for either assertion. By not following the rule, a party injects facts into the case that have not been subject to the opposing side's scrutiny, nor presented to the court for its review."). Second, Hearthware vehemently disputes Mr. Berger's survey methodology and conclusions in its brief. Specifically, Hearthware argues that (1) Mr. Berger's questions were suggestive and leading, (2) Mr. Berger failed to "code," or assign categories of meaning to, the respondents' answers, and (3) Mr. Berger's report does not show that Hearthware's statement deceived "a substantial segment of its audience" because Mr. Berger did not quantify the results of the relevant survey question.[13](Morningware's Reply at 12–13.) These disputes raise issues of fact for the jury. See *LG Elecs.*, 661 F.Supp.2d at 948 (whether an advertisement conveys a misleading message is an issue of fact). Because genuine disputes of material fact exist as to whether Hearthware's advertisement conveys a misleading message to a

"statistically significant portion of the target audience," *see id.* at 950, summary judgment is not appropriate.

Additionally, a genuine dispute of material fact exists as to whether the allegedly false statement is material to consumers' decisions to purchase the goods. "A claim is considered material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product.' " *LG Elecs. v. Whirlpool Corp.,* No. 08 C 242, 2010 WL 2921633, at *2 (N.D.Ill. July 22, 2010) (quoting *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir.1992)).[14] Relatedly, a dispute of material fact exists as to whether Morningware has or is likely to suffer injury as a result of Hearthware's advertisement. *See LG Elecs.,* 661 F.Supp.2d at 950 (without proof that a "statistically significant portion of the target audience received the implied message allegedly communicated by the challenged advertisement," a plaintiff "cannot establish injury arising from the advertiser's allegedly false message"). Because disputes of material fact exist as to Morningware's false advertising claim, the Court denies both parties' motions for summary judgment.

### III. Morningware's State Law Claims

**\*16** Both parties agree that Morningware's state law claims (violation of the Illinois UDTPA, common law unfair competition, and common law commercial disparagement) rise and fall with its Lanham Act claims. (Morningware's Mot. at 13; Hearthware's Resp. at 14–15); *see also Morningware,* 673 F.Supp.2d at 639.[15]Because the Court denies both parties' motions for summary judgment on Morningware's Lanham Act claims, the Court also denies their motions for summary judgment on Morningware's state law claims.

### CONCLUSION

For the reasons explained above, the Court denies Morningware's motion for summary judgment on Counts I–V of its First Amended Complaint and Hearthware's cross motion for summary judgment on those same counts. The Court grants Morningware's motion to strike Mr. Nelems' affidavit, and denies, without prejudice, Morningware's motion to exclude Dr. Vanderhart's rebuttal report and documents that Hearthware produced after the close of discovery.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 3721350

### Footnotes

1      Also pending before the Court are four additional motions for summary judgment relating to Hearthware's patent claims: 1) Morningware's motion for summary judgment that the '217 Patent is unenforceable due to inequitable conduct (R. 287); 2) Morningware's motion for summary judgment of invalidity of claim 3 of the '217 Patent (R. 291); 3) Morningware's motion for summary judgment of non-infringement of claim 3 of the '217

Patent (R. 299); and 4) Morningware's motion for summary judgment on Hearthware's third and fifth through eighth claims for relief in its First Amended Counterclaims (R. 301). The Court will address these motions in separate orders.

2    Further, because the Court strikes Mr. James H. Nelems' affidavit, as explained below, the Court does not consider any statement of fact, or response thereto, in which Hearthware relies on Mr. Nelems' affidavit to dispute a statement of fact.

3    The Court cannot discern from the parties' briefing when Hearthware produced the documentation upon which Dr. Vanderhart relies. If Morningware re-files its motion to exclude at a later time, the parties should advise the Court of the specific dates on which Hearthware produced that information and whether Morningware had the opportunity to depose Dr. Vanderhart regarding those documents.

4    Morningware also has asserted additional counterclaims against Hearthware, including declaration of non-infringement of United States Patent No. 6,201,217 ("the '217 Patent") (Count VI); declaration of invalidity of the '217 Patent (Count VII); declaration of unenforceability of the '217 Patent (Count VIII); tortious interference with prospective economic advantage (Count IX); and exceptional case (Count X). (*See* R. 243, Morningware, Inc.'s First Amended Answer to Hearthware's First Amended Counterclaims and Morningware's Second Amended Counterclaims.)

5    As the *Promatek* court explained, "[m]etatags are HTML [HyperText Markup Languge] code intended to describe the contents of a web site.... The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be 'hit' in a search for that keyword and the higher on the list of 'hits' the webpage will appear."300 F.3d at 811 (quoting *Brookfield Comm'cns, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1045 (9th Cir.1999)).

6    Hearthware suggests that it did not have any intent to confuse customers, arguing that it "makes little corporate sense" for it to "use the ad words of a single-employee company a fraction of its own size with a fraction of its own market."(R. 295, Hearthware's Memorandum in Opposition to Morningware's Mot. for Summ. J. ("Hearthware's Resp.") at 10–11.) This, however, is of little significance here, where Hearthware has admitted to purchasing key words encompassing Morningware's protected marks.

7    Neither party submitted evidence regarding the price point of their respective countertop ovens.

8    In *Promatek,* the Seventh Circuit followed the Ninth Circuit's reasoning in *Brookfield Communications* regarding the degree of care factor in initial interest confusion cases involving the internet. *See Promatek,* 300 F.3d at 812–13.

9    Significantly, the Seventh Circuit in *Promatek* cited *Brookfield Communications* in its discussion of the degree of care factor in initial interest confusion cases. 300 F.3d at 812–13.

10    "Trademarks are classified in one of four categories-fanciful, arbitrary, descriptive, and generic. The amount of protection inherently available tends to increase from generic to fanciful. Generic words are entitled to no protection, whereas fanciful terms are usually entitled to strong protection." *Id.*

11    Hearthware argues that because Morningware's revenues are much lower than Hearthware's, Morningware's marks are not strong. In support, Hearthware relies on Dr. Vanderhart's conclusions, which it did not include in its statement of additional facts. As such, the Court cannot discern whether Morningware disputes this "evidence." The Court, accordingly, does not place any merit on Hearthware's argument.

12    Although the absence of actual confusion does not preclude a finding of a likelihood of confusion, it is nevertheless a highly relevant favor. *See Facebook, Inc. v. Teachbook.com LLC,* 819 F.Supp.2d 764, 781 (N.D.Ill.2011) ("[E]ven though actual confusion is one of the three factors upon which courts place particular emphasis, the absence of actual confusion is not fatal to an infringement claim.") (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 960 (7th Cir.1992) and *CAE, Inc.,* 267 F.3d at 686).

13    Hearthware has not moved to exclude Mr. Berger's expert testimony on this issue pursuant to Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

14    Although Morningware does not offer expert testimony on this issue, that does not require the Court to grant Hearthware's motion for summary judgment. *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp. .,* No. 08 C 242, 2010 WL 3397358, at *13, n. 2 (N.D.Ill. Aug.24, 2010) ("Courts do not require that a party proffer expert testimony to establish that the subject of the false or misleading advertising was material to the consumer's decision to purchase the goods.") (citing cases).

15    Although the Court's memorandum opinion and order regarding Hearthware's Rule 12(b)(6) motion to dismiss explained that Morningware's claims for unfair competition and United States District Court Judge violation of the Illinois UDPTA track its Lanham Act claims, the Court addressed Morningware's claim for commercial disparagement separately. *See Morningware,* 673 F.Supp.2d at 639–40. Neither party, however, presents an argument regarding Morningware's claim for common law commercial disparagement that is independent of the Lanham Act arguments.

Attachment 11

## *Pain Ctr. of SE Ind., LLC v. Origin Healthcare Solutions LLC*

United States District Court for the Southern District of Indiana, Indianapolis Division

December 8, 2015, Decided; December 8, 2015, Filed

1:13-cv-00133-RLY-DKL

**Reporter:** 2015 U.S. Dist. LEXIS 164111

PAIN CENTER OF SE INDIANA, LLC; INDIANA PAIN MEDICINE AND REHABILITATION CENTER, P.C.; and ANTHONY ALEXANDER, M.D., Plaintiffs, vs. ORIGIN HEALTHCARE SOLUTIONS LLC; SSIMED (d/b/a SSIMED Holding, LLC); ORIGIN HOLDINGS, INC., a Delaware Corporation; JOHN DOES (1-50) inclusive; and JOHN DOES (1-100) inclusive, Defendants.

**Prior History:** *Pain Ctr. of Se Ind., LLC v. Origin Healthcare Solutions, LLC, 2014 U.S. Dist. LEXIS 10062 (S.D. Ind., Jan. 28, 2014)*

**Counsel:** **[\*1]** For PAIN CENTER OF SE INDIANA, LLC, INDIANA PAIN MEDICINE AND REHABILITATION CENTER, P.C., ANTHONY ALEXANDER, M.D., Plaintiffs: Volney Brand, PRO HAC VICE, BRAND LAW PLLC, Dallas, TX.

For ORIGIN HEALTHCARE SOLUTIONS LLC, SSIMED, LLC, ORIGIN HOLDINGS, INC., a Delaware Corporation, Defendants: James Dimos, Rachel M. Schafer, FROST BROWN TODD LLC, Indianapolis, IN.

**Judges:** RICHARD L. YOUNG, Chief United States District Judge.

**Opinion by:** RICHARD L. YOUNG

# Opinion

### ENTRY ON PLAINTIFFS' OBJECTION TO THE MAGISTRATE JUDGE'S JULY 17, 2015 ENTRY AND ORDER

On June 11, 2015, the Magistrate Judge extended the fact discovery deadline from June 30 to July 10, 2015, to accommodate a few outstanding depositions. She emphasized that this fifth extension was "a firm deadline that will not be extended." (Filing No. 240 ("June 11 Entry") at 5). On June 30, Plaintiffs, the Pain Center of SE Indiana, LLC, the Indiana Pain Medicine and Rehabilitation Center, P.C., and Anthony Alexander, M.D., again moved to extend the discovery deadlines. Defendants, SSIMED, d/b/a SSIMED Holding, LLC, Origin Healthcare Solutions, LLC, and Origin Holdings, Inc., opposed the motion. On July 17, 2015, the Magistrate Judge denied the motion in part, finding that **[\*2]** Plaintiffs failed to show good cause for another extension. (Filing No. 254 ("July 17 Entry") at 3). Plaintiffs now object to the ruling, pursuant to *Federal Rule of Civil Procedure 72(a)*, to the extent the Magistrate Judge declined to extend the deposition deadline from July 10 to August 15, 2015. For reasons set forth below, the court

**OVERRULES** Plaintiffs' objection.[1]

The district court reviews the non-dispositive discovery decisions of a magistrate judge for clear error. _Domanus v. Lewicki, 742 F.3d 290, 295 (7th Cir. 2014)_ (citation omitted); _Fed. R. Civ. P. 72(a)_. The court, therefore, will not upset a magistrate judge's decision unless it runs contrary to law or leaves the court with a definite and firm conviction that the magistrate judge made a mistake. _Weeks v. Samsung Heavy Indus. Co., 126 F.3d 926, 943 (7th Cir. 1997)_. When reviewing a non-dispositive matter for clear error, the court considers only arguments and issues put forth before the Magistrate Judge. _Murray v. Nationwide Better Health, No. 10-3262, 2011 U.S. Dist. LEXIS 67967, 2011 WL 2516909, at *2 (C.D. Ill. June 24, 2011)_ (citations omitted). **[*3]**

The Magistrate Judge denied the motion for extension of time on grounds that (1) Plaintiffs failed to establish the relevance or importance of the expected testimony of either Dr. Philip R. Corvo or Dr. Carol Harris, and (2) Plaintiffs failed to explain how Defendants' delayed production of "alter ego" discovery prevented Plaintiffs from examining either doctor prior to the deadline.[2] Plaintiffs claim these findings amount to clear error.

_Federal Rule of Civil Procedure 16(b)_ charges the court with issuing a scheduling order that limits, _inter alia_, the time to complete discovery. **[*4]** A party seeking to modify the schedule may do so only with the court's consent upon a showing of good cause. _Fed. R. Civ. P. 16(b)(4)_. "Courts have a legitimate interest in ensuring that parties abide by scheduling orders to ensure prompt and orderly litigation." _Campania Mgmt. Co. v. Rooks, Pitts & Poust, 290 F.3d 843, 851 (7th Cir. 2002)_ (citation omitted). Accordingly, the Seventh Circuit advises district courts to firmly adhere to discovery deadlines established after consultation with the parties. _Id. at 851-52_.

In their motion for extensions of time, Plaintiffs cursorily stated that delayed production of alter ego discovery and "witness cancellations" warranted another deadline extension to complete depositions. (_See_ Filing No. 246 ¶ 3). Denying the motion, the Magistrate Judge noted Plaintiffs' failure to even minimally specify the documents, if any, missing from Defendants' production of alter ego discovery and how their absence prevented meaningful examination of the witnesses. In an attempt to show clear error, Plaintiffs merely remind the court that it previously determined Plaintiffs were entitled to certain alter ego discovery. (_See_ Filing No. 260 4-5). This falls far short of explaining how delayed receipt of such discovery prevented Plaintiffs from deposing either doctor. It accomplishes **[*5]** even less in showing clear error.

---

[1] Plaintiffs note that Defendants filed their brief in opposition beyond the fourteen-day window provided by Local Rule 7-1(c). Defendants' untimely response has no consequence, however, because the court can overrule Plaintiffs' objection on its face, as discussed _infra_. The court will cite to Defendants' materials only for illuminative purposes to place the Magistrate Judge's ruling into context.

[2] The "alter ego" discovery at issue relates to the ownership interests and operational interdependence among the defendant entities. This production was the subject of a prolonged dispute which the court ultimately resolved in Plaintiffs' favor. (_See_ Filing No. 154). The record reflects that Defendants produced alter ego discovery in two phases—the first on January 15 and the second on February 6, 2015. (_See_ Filing No. 264-1). Plaintiffs represent that the inconsistent labeling of data discs made it impossible for Plaintiffs' counsel to confirm whether the production was fully responsive until mid-June. (_See_ Filing No. 274 at 3; Filing No. 243 at 2).

As to the depositions of Dr. Corvo and Dr. Harris, Plaintiffs attempted to show good cause only with respect to Dr. Harris, claiming that her employer interfered with the deposition by "intimat[ing] that a motion to compel is necessary in order to obtain her deposition . . . ." (*See* Filing No. 252 at 2-3). The Magistrate Judge deemed this insufficient to establish good cause because Plaintiffs' made no attempt to describe the relevance or nature of either doctor's expected testimony.[3] Absent the slightest effort to establish good cause—i.e., some reason to believe the absence of the sought testimony would prejudice Plaintiffs—*Rule 16(b)* compelled denial of Plaintiffs' motion.

Now on objection, Plaintiffs' rely on the faulty conclusion that the Magistrate Judge deemed the doctors' expected testimony irrelevant. A finding that Plaintiffs failed to make their case for relevance or prejudice does not equate to a finding of irrelevance. (*See* July 17 Entry at 4 ("Plaintiffs also have not shown the relevance or materiality of any expected **[*6]** testimony from Drs. Corvo or Harris.")). Indeed, during a June 11 conference, the Magistrate Judge accepted Plaintiffs' representation, over Defendants' objection, that Dr. Corvo "might have insight into the [EMger and Practice Manager Suite software at issue]." (June 11 Entry at 1-2). Plaintiffs subpoenaed Dr. Corvo on June 6 for a deposition set for Saturday, June 20, immediately following five consecutive days of depositions. (July 17 Entry at 3; Filing No. 264-1). On June 11, Plaintiffs' counsel still had not confirmed Dr. Corvo's availability for June 20. Because no exceptional circumstances warranted ordering a deposition to occur on a Saturday, the Magistrate Judge instructed Plaintiffs to find another date (before the July 10 deadline) for the deposition. (June 11 Entry 2-3). Plaintiffs failed to do so and likewise failed to explain their failure to the Magistrate Judge.[4] Thus, the claim that the Magistrate Judge found the expected testimony of Drs. Corvo and Harris irrelevant has no basis in fact. Plaintiffs, once again, simply failed to make their case before the Magistrate Judge and resorted to *Rule 72* for a second take. (*See, e.g.*, Filing No. 258 at 5-7 (rejecting arguments raised **[*7]** for the first time on a *Rule 72(a)* objection).

Plaintiffs also suggest that because the Magistrate Judge permitted the depositions to go forward in the first place, they did not need to further defend the relevance or importance of the expected testimony to justify another deadline extension. (*See* Filing No. 260 at 3). This wrongly presumes that a minimum justification for subpoenaing a potential witness during the discovery period suffices as good cause to depart from a scheduling order. Plaintiffs' logic, in effect, would remove the teeth from any such deadline. Failure to establish good cause before the Magistrate Judge condemns Plaintiffs' objection to defeat. *See Fed. R. Civ. P. 16(b)(4)*; *Murray, 2011 U.S. Dist. LEXIS 67967, 2011 WL 2516909, at *2*.

---

[3] The court also notes the complete absence of documentation, prior to the filing of the present objection, to support Plaintiffs' claim of interference.

[4] The closest Plaintiffs come to showing good cause lies in an attempt to establish their diligence, claiming that "during the last few months there have been over [twenty] depositions conducted." (Filing No. 252 at 2). They also divert blame to Defendants by baldly asserting that their "enormous obstruction" caused Plaintiffs' predicament. (*Id.* at 3). Without more, the Magistrate Judge was well within her discretion to discredit such claims.

**Conclusion**

For the foregoing reasons, Plaintiffs' Objection to the Magistrate Judge's July 17, **[*8]** 2015 Entry and Order (Filing No. 260) is **OVERRULED**.

**SO ORDERED** this 8th day of December 2015.

/s/ Richard L. Young

RICHARD L. YOUNG, CHIEF JUDGE

United States District Court

Southern District of Indiana

Attachment 12

## *Patrick v. City of Chicago*

United States District Court for the Northern District of Illinois, Eastern Division

October 28, 2015, Decided; October 28, 2015, Filed

No. 14 C 3658

**Reporter:** 2015 U.S. Dist. LEXIS 145811

DEON PATRICK, Plaintiff, v. CITY OF CHICAGO, et al., Defendants.

**Prior History:** *Patrick v. City of Chi., 2014 U.S. Dist. LEXIS 174325 (N.D. Ill., Dec. 17, 2014)*

**Counsel: [\*1]** For Deon Patrick, Plaintiff: Nicole Nehama Auerbach, LEAD ATTORNEY, Daniel C F Wucherer, Stuart Jay Chanen, Valorem Law Group LLC, Chicago, IL.

For City of Chicago, Defendant: Terrence Michael Burns, LEAD ATTORNEY, Daniel Matthew Noland, Harry N. Arger, Molly E. Thompson, Paul A. Michalik, Dykema Gossett PLLc, Chicago, IL.

For Anthony Villardita, Thomas Johnson, Rick Abreu, Terry O'Connor, Brian Killacky, Sean Glinski, Michael Berti, Defendants: Steven Blair Borkan, LEAD ATTORNEY, Graham P. Miller, Misha Itchhaporia, Timothy P Scahill, Whitney Newton Hutchinson, Borkan & Scahill, Ltd., Chicago, IL.

For Martin Fogarty, Joseph Magats, Defendants: Lisa Marie Meador, LEAD ATTORNEY, Thomas Edward Nowinski, Cook County State's Attorney, Chicago, IL.

**Judges:** Jeffrey Cole, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Jeffrey Cole

# Opinion

**MEMORANDUM OPINION AND ORDER**

**I**.

**INTRODUCTION AND FACTUAL BACKGROUND**

In 1995, Deon Patrick was convicted in the Circuit Court of Cook County, Illinois, of two counts of murder, two counts of home invasion, and one count of armed robbery. He was sentenced to life imprisonment without parole. [First Amended Complaint, Dkt. #92, ¶ 4-5]. The Illinois Appellate Court affirmed the convictions and sentence **[\*2]** on July 7, 1998, and five months later the Illinois Supreme Court denied a Petition for Leave to Appeal. Mr. Patrick made several unsuccessful attempts to obtain relief from his convictions, beginning with a *pro se* Petition for

Post-Conviction Relief, (the "Petition") filed on June 2, 1999, in the Circuit Court of Cook County, claiming ineffective assistance of his trial counsel, John Theis, and his appellate counsel, Linda Kahn. [Dkt. #95, Exh. B].

The skillfully drafted Petition alleged that Mr. Theis refused to investigate or meet with the individuals whom Mr. Patrick identified as being his alibi witnesses.[1] In fact, the Petition alleged that Mr. Theis told Mr. Patrick he could not raise an alibi defense because of the incriminating statement he gave to the police, even though, the Petition alleged, Mr. Patrick told Mr. Theis that he was coerced into making that statement and that the statement was false. [Dkt. #95, Exh. B at 14-15]. To the Petition, Mr. Patrick attached a letter he wrote to Ms. Kahn in which he said he had told Mr. Theis that he wanted to testify but that Mr. Theis had talked him out of it, and had "lied" when he said that Mr. Patrick could not testify. The letter went on to say **[*3]** that Mr. Patrick had told Mr. Theis about alibi witnesses, to no avail. [Dkt. #95, Exh. C]. The Petition alleged that Mr. Theis failed to argue that Mr. Patrick's statement to the police was false and coerced, failed to properly investigate alibi witnesses, and effectively prevented him from testifying at trial. [Dkt. # 95-2, Exh. B at 8, 14-15]. Ms. Kahn, according to the Petition, failed to raise these claims on direct appeal.

Mr. Patrick also attached affidavits to the petition swearing that he told Mr. Theis that he had been coerced by the police into making a false statement, and that he wanted to explain to the jury where he was at the time of the murders. The affidavit went on to say that Mr. Theis told him that he "was not going to testify...." [Dkt. #95, Exh. D]. In another affidavit, Mr. Patrick swore he had told Mr. Theis prior to trial that he'd been coerced by the police into making a false statement, and that he had alibi witnesses. Mr. Theis, it was **[*4]** alleged, told him that he could not raise an alibi defense because of the statement he gave to the police, and that Mr. Theis refused to interview Audrey Mathews and Kimberly Jefferson, who could provide an alibi. [Dkt. #95, Exh E]. The Petition and Mr. Patrick's letter and affidavits were not filed under seal.

No protective order was sought or issued in the 1999 post conviction proceedings or over the intervening years, even though Mr. Patrick had counsel as long ago as 2003, and his present counsel have been involved in this case since at least 2013. [Dkt. #129 at 4]. Thus, the information contained in the Petition and its attachments has been a part of the public record for almost two decades with no effort being made to procure an appropriate protective order from the Circuit Court of Cook County or from the United States District Court for the Northern District of Illinois following the filing of the Patrick Complaint in 2014.

The Petition was followed by a petition for a writ of *habeas corpus* filed on December 3, 1999, in the United States District Court for the Northern District of Illinois. [Dkt.## 95-2, 124]. The federal *habeas* petition was stayed while Mr. Patrick's claims **[*5]** were pending before the Illinois courts. The Petition was dismissed as untimely because it was filed more than three years after the date of the conviction. Counsel was not appointed. [Dkt. #124]. Mr. Patrick appealed,

---

[1] While it is exceedingly unlikely that Patrick was its author, the Petition was clear, succinct, perfectly typed, paginated and paragraphed, and the citations to the cited cases and to the Illinois Code of Civil Procedure were in proper form.

and the Illinois Appellate Court affirmed the dismissal. Leave to appeal to the Illinois Supreme Court was not sought. The federal *habeas* petition was denied on October 8, 2003. That ruling was not appealed. [Dkt. #124].

A decade later, Mr. Patrick sought to vacate his convictions, alleging actual innocence and the withholding of exculpatory evidence by the prosecution at his criminal trial. The Cook County State's Attorney's Office (CCSAO) did not object, and in fact, on January 10, 2014, moved to vacate Mr. Patrick's convictions and subsequently dismissed the charges against him. The CCSAO also did not oppose Mr. Patrick's petition for a Certificate of Innocence, which was granted on January 23, 2014 by the Chief Judge of the Cook County Criminal Court. [Dkt. #124].[2] Mr. Patrick then brought the present suit on May 19, 2014, alleging civil rights violations under 28 U.S.C. § 1983 and several supplemental state law claims against the arresting officers, alleging they coerced a false **[*6]** confession from him and fabricated evidence against him. [*See* Dkt. ## 1, 92].

During discovery, the defendants deposed Mr. Patrick and Mr. Theis and sought to inquire about the conversations (and related topics) that were disclosed in Mr. Patrick's Petition and the attached letter and affidavits. Mr. Theis and Mr. Patrick refused to answer, invoking the attorney/client privilege and work-product protection. **[*7]** [Dkt. #95 at 2]. The defendants have moved to compel Mr. Patrick and Mr. Theis to answer these and other questions and produce documents related to their conversations at the time of the criminal trial in 1995.

While conceding that these conversations were covered by the attorney-client privilege in the 1995 criminal case, the Defendants insist that Mr. Patrick waived the privilege when, in 1999, he filed his Petition in which he revealed the content of his conversations with Mr. Theis.[3] Mr. Patrick does not dispute that the Petition resulted in a waiver of the attorney-client privilege in the proceeding in which it was filed, but argues that the waiver is limited to that proceeding and, in the words of the case on which he relies, is not operative "for all times and all purposes." *Bittaker v. Woodford, 331 F.3d 715 (9th Cir. 2003)(en banc), cert denied, Woodford v. Bittaker, 540 U.S. 1013, 124 S. Ct. 536, 157 L. Ed. 2d 424 (2003)*. [*See* Dkt. #124].

The defendants, not unexpectedly, have a very different view of the proper scope of that waiver and of the applicability of *Bittaker* in the context of this case. If they are right, the waiver has a life beyond the 1995 state court proceeding, and the defendants are entitled to depose **[*8]** Mr. Patrick and Mr. Theis about the conversations disclosed in the Petition in which they discussed

---

[2] Illinois law provides for the issuance of what is called a "Certificate of Innocence" declaring that the petitioner was innocent of all offenses for which he or she was incarcerated. *See 735 ILCS 5/2-702*. The underlying petition must state facts in sufficient detail to permit the court to find that the petitioner is likely to succeed at trial in proving that the petitioner is innocent of the offenses charged in the indictment. *Id.* at *§702(d)*. The statute contains limitations on the purposes for which and the circumstances under which the Certificate can be used. These limitations are not pertinent to the present motion, and the issue of whether Illinois law or some other statutory or evidentiary principle will permit Mr. Patrick to have the Certificate admitted at trial is not implicated by the current motion.

[3] The fact that Mr. Patrick was proceeding *pro se* does not affect the waiver doctrine. *United States v. Pinson, 584 F.3d 972, 974, 978 (10th Cir. 2009)*; *Jenkins v. United States, 2010 U.S. Dist. LEXIS 8732, 2010 WL 145850, *2 (E.D.Wis. 2010)*.

alibi witnesses and police coercion of Mr. Patrick. If, however, *Bittaker* is to be extended to the factual circumstances presented by this case, their motion to compel must be denied. As the briefs point out, this is a question on which there is precious little, if any, direct authority.

**II**.

**ANALYSIS**

**A**.

**The Attorney-Client Privilege and the Law Governing the Questions Raised in This Case**

The threshold question is whether state or federal law governs the issue of waiver of the attorney-client privilege — the oldest of the privileges for confidential communications known to the common law. *United States v. Jicarilla Apache Nation, 131 S.Ct. 2313, 2320, 180 L. Ed. 2d 187 (2011)*; *Hunt v. Blackburn, 128 U.S. 464, 470-71, 9 S. Ct. 125, 32 L. Ed. 488 (1888)*. The purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice...." *Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)*. The privilege exists where legal advice is sought from a professional legal advisor acting as such, and the communication relates to that purpose and is made in confidence by the client. *United States v. Bey, 772 F.3d 1099, 1101 (7th Cir. 2014)*; *Radiant Burners, Inc. v. American Gas Association, 320 F.2d 314, 318 (7th Cir. 1963)*, cert denied, *375 U.S. 929, 84 S. Ct. 330, 11 L. Ed. 2d 262 (1963)*.

The attorney-client privilege, like all testimonial privileges and all exclusionary **[\*9]** rules, comes at a price. Since it makes the search for truth more difficult by preventing disclosure of what is often exceedingly relevant information, the privilege is strictly construed and is limited to those instances where it is necessary to achieve its purposes. *University of Pennsylvania v. EEOC, 493 U.S. 182, 185, 189, 110 S. Ct. 577, 107 L. Ed. 2d 571 (1990)*; *Fisher v. United States, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976)*; *Jenkins v. Bartlett, 487 F.3d 482, 490 (7th Cir. 2007)*; *United States v. Lawless, 709 F.2d 485, 487 (7th Cir.1983)*(scope of privilege should be "strictly confined within the narrowest possible limits"). Illinois courts subscribe to this view of the privilege as well. *Center Partners, Ltd. v. Growth Head GP, LLC, 2012 IL 113107, 981 N.E.2d 345, 356, 367 Ill. Dec. 20 (Ill. 2012)*. Indeed, in Illinois, it is "the privilege, not the duty to disclose, that is the exception." *Waste Management, Inc. v. International Surplus Lines Ins. Co., 144 Ill.2d 178, 190, 579 N.E.2d 322, 327, 161 Ill. Dec. 774 (1991)*; *Doe v. Township High School Dist. 211, 2015 IL App (1st) 140857, 393 Ill. Dec. 451, 34 N.E.3d 652, 670 (1st Dist. 2015)*. These principles also apply to claims of work product. *See Gallegos v. Safeco Insurance Company of America, 2015 U.S. Dist. LEXIS 26964, 2015 WL 1009247, 2 (D.Colo. 2015)*; *Algonquin Heights v. United States, 2008 U.S. Claims LEXIS 479, 2008 WL 2019025, 7 (Fed.Cl. 2008)*.

Mr. Patrick's Complaint is based on 28 U.S.C. §1983, with jurisdiction pursuant to *28 U.S.C. §1331*. [Dkt. #92, ¶5]. "Questions of privilege that arise in the adjudication of federal rights . . .

[require courts to] address the question[s] as a matter of the federal common law of privileges." *United States v. Zolin, 491 U.S. 554, 562, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989)*. *See Fed. R. Evidence. 501*. State law therefore does not provide the rule of decision. The presence of supplemental state law claims for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy included in the First Amended Complaint [Dkt. #92, ¶¶126-143] does not change the applicability of federal common law. *See, e.g., Memorial Hospital for McHenry County v. Shadur, 664 F.2d 1058, 1061 & n 3 (7th Cir. 1981)*; *Lewis v. United States, 517 F.2d 236, 237 (9th Cir. 1975)*; *Babych v. Psychiatric Solutions, Inc., 271 F.R.D. 603, 609 (N.D.Ill. 2010 )*. See also S. Rep. **[*10]** No. 93-1277, 93d Cong., 2d Sess. at 12 & n 16 (1974)("It is also intended that the Federal law of privileges should be applied with respect to pendant [sic] State law claims when they arise in a Federal question case.").

**B**.

**Waiver of the Attorney-Client Privilege**

The attorney-client privilege, like other rights and privileges (including the work-product doctrine) can be waived. *United States v. Nobles, 422 U.S. 225, 239, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975)*; *United States v. Brock, 724 F.3d 817, 821 (7th Cir. 2013)*. Waiver of the privilege can occur either explicitly or by implication. *Lorenz v. Valley Forge Ins. Co., 815 F.2d 1095, 1098 (7th Cir. 1987)*. Express waiver of the privilege occurs primarily when information that would otherwise be privileged is not kept confidential. *United States v. Buljubasic, 808 F.2d 1260, 1268 (7th Cir. 1987)*. Disclosure of confidential communications is inconsistent with the attorney-client relationship and almost invariably waives the privilege "with respect to the world at large; selective disclosure is not an option." *Burden-Meeks v. Welch, 319 F.3d 897, 899 (7th Cir. 2003)*.

"'The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality as to others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.'" *In re Columbia/HCA Healthcare Corp. Billing Practices Litigation, 293 F.3d 289, 302-303 (6th Cir. 2002)*. *See also Bittaker, 331 F.3d at 719*; *Sarkes Tarzian, Inc. v. U.S. Trust Co. of Fla. Sav. Bank, 397 F.3d 577, 584 (7th Cir. 2005)*; *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16 (1st Cir. 2003)*; *Powers v. Chicago Transit Authority, 890 F.2d 1355, 1359 (7th Cir. 1989)*. And information once disclosed to a party opponent waives the attorney-client privilege as to future proceedings. *See, [*11] e.g., United States v. Mass. Inst. of Technology, 129 F.3d 681, 686 (1st Cir. 1997)*; *Genentech, Inc. v. United States Int'l Trade Comm'n, 122 F.3d 1409, 1416, 1416-18 (Fed.Cir. 1997)*; *In re Steinhardt Partners, L.P., 9 F.3d 230, 236 (2d Cir.1993)*; *In re Martin Marietta Corp., 856 F.2d 619, 623-24 (4th Cir. 1988)*; In re von *Bulow, 828 F.2d 94, 101-02 (2nd Cir.1987)*; *United States v. Suarez, 820 F.2d 1158, 1161 (11th Cir. 1987)*; 8 J. Wigmore, Evidence §2328 at 638-39 (McNaughton rev. 1961)("A waiver [of attorney-client privilege] at one stage of a trial should be final for all further stages, and a waiver at a first trial should suffice as a waiver for a later trial, since there is no longer any reason for preserving secrecy.").

Waiver can also occur by implication, which occurs when a party takes a position in litigation that makes it unfair to protect that party's privileged communications. The implied waiver doctrine ultimately is based on considerations of fairness: that is, a party may not use privilege as a tool for manipulation of the truth-seeking process. *Bittaker, 331 F.3d at 719*. The doctrine of waiver by implication reflects the position that the attorney-client privilege was intended as a shield, not a sword. *Center Partners, Ltd., 981 N.E.2d at 362*.

In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials. The party asserting the claim is said to have implicitly waived the privilege. 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence §503.41[1]*, at 503-104.1 to.2 (Joseph M. McLaughlin ed., 2003). *See also In re Kellogg Brown & Root, Inc., 796 F.3d 137, 145-146 (D.C. Cir. 2015)*; *Seneca Ins. Co., Inc. v. Western Claims, Inc., 774 F.3d 1272, 1278 (10th Cir. 2014)*. Courts **[\*12]** that have imposed waivers under the fairness principle have tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question. Only those documents or portions of documents relating to the claim asserted by the client should be disclosed. *Bittaker, 331 F.3d at 720*.

**C**.

**The Scope of Mr. Patrick's 1999 Waiver of the Attorney-Client Privilege**

**1**.

While conceding that the attorney-client privilege and work product protection were waived in the state court litigation in which the Petition was filed, [Dkt. #124 at 9, 10 n.3], the plaintiff argues that the waiver is limited to those proceedings. The argument is based on the Ninth Circuit's *en banc* decision in *Bittaker v. Woodford, supra.* In *Bittaker*, a death row inmate challenged his conviction in the federal court via a petition for a writ of *habeas corpus*, claiming ineffective assistance of counsel. The State sought discovery of trial counsel's file, and the district court granted the motion. *Bittaker* refused to be deposed and refused to allow his trial counsel to be deposed or to allow the State access to his trial counsel's files without a protective order precluding dissemination of the discovered materials outside the federal habeas proceeding. *Bittaker, 331 F.3d at 729* (O'Scannlain, **[\*13]** J., concurring).

The district judge granted Bittaker's request for a protective order in advance of discovery, restricting the use of privileged communications that might be obtained in discovery by the State from the petitioner. *331 F.3d at 717 & n 1*. The State appealed, asking that the protective order be vacated, contending that by virtue of the claim of ineffective assistance of counsel, the defendant had waived the attorney/client privilege, and that the waiver should extend to the retrial of the criminal case. The Court of Appeals, sitting *en banc*, upheld the action of the district court. For Mr. Patrick, Bittaker and the cases that have followed it[4] — all of which, it

---

[4] See, e.g., *United States v. Nicholson, 611 F.3d 191, 217 (4th Cir. 2010)*; *United States v. Pinson, 584 F.3d 972, 978 (10th Cir.*

should be noted, arose in corresponding factual situations[5]—must apply equally in a federal civil rights suit that charges the police with having framed the defendant. But "[a]cquiescence in a precedent does not require approval of its extension," _Dennis v. United States, 339 U.S. 162, 175, 70 S. Ct. 519, 94 L. Ed. 734 (1950)_(Frankfurter, J., dissenting), especially "to an entirely new context." _Scott v. Houk, 760 F.3d 497, 506 (6th Cir. 2014)_.

Indeed, since _Cohens v. Virginia, 19 U.S. 264, 5 L. Ed. 257 (1821)_(Marshall, C.J.), it has been accepted that general expressions in every opinion are to be read in context and **[\*14]** not as "'referring to quite different circumstances that the Court was not then considering.'" _United States v. Ker Yang, 799 F.3d 750, 755 (7th Cir. 2015)_. _See also United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010)_. When _Bittaker_ is read in the animating and defining context of its facts, it is clear that it was not intended to and ought not apply to the very different situation presented by the instant case.

**2.**

_Bittaker's_ focus was on the effect a "broad" waiver of the attorney-client privilege would have on the retrial of a state court criminal case in the event a claim of ineffective assistance of counsel were to succeed. The court concluded that if the federal courts were to require habeas petitioners to give up the privilege categorically, criminal defense attorneys "would have to worry constantly about whether their casefiles and client conversations would fall into the hands of the prosecution." Additionally, and perhaps more importantly, "they would have to consider the very real possibility that they might be called by the prosecution on a retrial of the criminal case as a witness against their clients...." From this, the court concluded that a "broad waiver rule would _no doubt_ inhibit the kind of frank attorney-client communications and vigorous investigation of all possible defenses **[\*15]** that the attorney-client and work product privileges are designed to promote." _331 F.3d at 722_ (emphasis supplied). No further explanation was given for this conclusion, and no evidence was given in support of it.[6]

Long experience has shown that criminal defense lawyers are made of stronger stuff than _Bittaker_ (and Mr. Patrick) assume, and that it is unrealistic to presume that they would pursue the self-defeating and obviously unethical strategy of limiting their discussions with their clients and curtailing their investigative efforts to avoid being a possible witness on retrial. But accepting _Bittaker's_ hypothesis in the context of a criminal case does not mean that it should apply in a federal civil rights case like Mr. Patrick's. If, absent a "narrow" waiver, there is not a reasonable **[\*16]** likelihood or danger that a criminal defense lawyer will curtail his efforts on

---

_2009)_; _In re Lott, 424 F.3d 446, 453 (6th Cir. 2005)_; _Fife v. United States, 2014 U.S. Dist. LEXIS 65500, 2015 WL 2189712, at \*2 (E.D. Wis. 2015)_; _United States v. Watson, 2015 U.S. Dist. LEXIS 54017, 2015 WL 1905881 (S.D. Ohio 2015)_; _United States v. Collyard, 2013 U.S. Dist. LEXIS 49077, 2013 WL 1346202 (D. Minn. 2013)_.

[5] The plaintiff's response brief ignores this critical fact. [See Dkt. #124 at 1].

[6] The same is true of Mr. Patrick's brief, which recites the _Bittaker_ prophecy about the supposed inhibiting effect a broad waiver would have on a defense lawyer's interactions with his client and his pursuit of possible defenses and concludes, without any analysis, that absent a narrow waiver, the same thing would happen in this and like cases. [Dkt. #124 at 9-10]. But conclusions without reasons are not persuasive. _United States v. Eiselt, 988 F.2d 677, 680 (7th Cir. 1993)_.

behalf of his client as *Bittaker* predicts, merely because at some point in the indeterminate future he might be a witness in a civil rights case — *Bittaker* alleviates any concern that defense counsel might have about being a witness in a retrial of the criminal case — *Bittaker* should not be extended outside the criminal context.[7]

For there to be a likelihood that *Bittaker's* dire prophesy would come to pass in the context of a case like Mr. Patrick's, the lawyer in the criminal case would have to make the following conscious calculation: (1) the defendant will likely be convicted;[8] (2) he will likely file a postconviction claim for ineffective assistance of counsel; (3) he will likely prevail on that claim; (4) he will be retried and likely acquitted; or (5) if convicted, his conviction will likely be overturned or, in one way or another, at some point in the indeterminate future, be set aside; **[*17]** and (6) the vindicated defendant will bring a civil rights suit against police. This is necessarily a more complicated and extended analysis than the one *Bittaker* assumed a criminal defense lawyer in a state court criminal case would make. But experience and logic teach that no criminal defense lawyer in a state court criminal case would allow his fidelity to his client to be affected because of the speculative possibility that years in the future he might be a witness in a federal civil rights civil rights case, and consciously (and unethically) curtail his efforts in the criminal case. For to do so would increase the chance of a prosecution victory and with it the likelihood that he might be a witness years later in a civil rights case — the very thing that is sought to be avoided.

Thus, it is apparent **[*18]** that the argument for extending *Bittaker* beyond its criminal case origins to a federal civil rights case like Mr. Patrick's is bottomed on an unsupported and illogical assumption about how criminal defense lawyers think and act. It is thus unacceptable, since analysis should be "'guided by 'common sense and ordinary human experience.'" *United States v Montoya De Hernandez, 473 U.S. 531, 542, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985). Accord Greenstone v. Cambex Corp., 975 F.2d 22, 26 (1st Cir.1992)*(Breyer, C.J.); *Cooney v. Rossiter, 583 F.3d 967, 971 (7th Cir. 2009); Dabertin v. HCR Manor Care, Inc., 373 F.3d 822, 830 (7th Cir. 2004). See also Posner*, How Judges Think at 116 (Harv. Univ. Press 2008). In considering whether *Bittaker* should be extended to Mr. Patrick's and like cases, we would do well to recall Justice Brandeis's wise admonition: "the logic of words should yield to the logic of realities." *DiSanto v. Pennsylvania, 273 U.S. 34, 43, 47 S. Ct. 267, 71 L. Ed. 524 (1927)*.

In sum, like the court in *Tennison v. City & County of San Francisco, 226 F.R.D. 615, 623 (N.D.Cal.2005)*, I do not think that "there a likelihood that communications between a criminal defendant and his attorney will be chilled as a result of the limited waiver found under the

---

[7] In the *First Amendment* context, the danger of a chilling effect must be based on a realistic likelihood of danger and not on tendentious speculation. *Faustin v. City and County of Denver, Colorado, 423 F.3d 1192, 1199 (10th Cir. 2005)*. There is every reason why that requirement should obtain in cases like Mr. Patrick's.

[8] If the defendant is acquitted in the criminal case, the issue in Bittaker will never arise. And the civil rights suit will not of its own force waive the attorney-client privilege that the defendant (now plaintiff) and his attorney had in the criminal case. *See In re Lott, 424 F.3d 446* (6th Cir. 2005). *Contra In re Lott, 424 F.3d at 456* (Boggs, C.J., dissenting)(raising claim of actual innocence waives the attorney-client privilege).

circumstances of this lawsuit."

**3**.

Also conspicuously absent in the context of a case like Mr. Patrick's are the other concerns (which are constitutional in nature) that underlay *Bittaker*, namely ensuring that the retrial would not "immediately and perversely [be] skew[ed]...in the prosecution's favor by handing to the State all the information in the petitioner's first counsel's case file." *Id. at 722*. That result, the court held, **[\*19]** would be dissonant with the goal of restoring the defendant to the position he would have occupied had the first trial been constitutionally error-free — that is, had he received effective representation. Giving the prosecution the advantage of obtaining the defense casefile and forcing defense counsel to testify against his client during the retrial "would assuredly not put the parties back at the same starting gate." *Id. at 723*. Here, there is no prosecutor, and no second criminal trial to be skewed in the prosecution's favor. Since the evils *Bittaker* predicted (in the context of a retrial of a state court criminal case) are not present in a federal civil rights case like Mr. Patrick's, the waiver of the attorney-client privilege in a federal civil rights suit need not be "narrow."

*Lambright v. Ryan, 698 F.3d 808 (9th Cir. 2012)* explained *Bittaker* as holding that the defendant impliedly waived his attorney-client privilege when he filed his *habeas* petition so that therefore "he could not *later* [in discovery] expressly waive the privilege by simply disclosing privileged documents without objection." *Id. at 819 (Emphasis supplied)*. In this case, Mr. Patrick did not simply file a petition alleging ineffective assistance of counsel and "later" make explicit disclosures **[\*20]** about communications between him and Mr. Theis. Rather, he attached to the Petition a letter disclosing one of those conversations and multiple affidavits, disclosing conversations he had with Mr. Theis. [*See* Dkt. #124]. Consequently, the sequence of events that the Ninth Circuit found necessarily precluded a "later" express waiver during discovery does not exist here.[9]

*Bittaker* also concluded that were a "broad" waiver necessary to satisfy federal interests, the State's interest in protecting lawyer-client confidences might have to yield. *331 F.3d at 722*. But, the court perceived no paramount federal interest that would be compromised by a narrow waiver and declined to enlarge the scope of the waiver beyond what was needed to litigate the ineffective assistance of counsel **[\*21]** claim. *See Laughner v. United States, 373 F.2d 326, 327 (5th Cir. 1967)*. In this case, there are federal interests involved in Mr. Patrick's case, namely how a case based on a federal civil rights statute is to be tried in federal court.

It is obviously important that the trial be fair and that the jury's decision be an informed one. The defendants vigorously deny they did anything wrong and that the case is a sham, sinisterly

---

[9] Illinois law requires that a postconviction petition have attached thereto "affidavits, records, or other evidence supporting its allegations" or explain why they are not attached. *725 ILCS 5/122-2* (West 2002). Noncompliance with this section can be fatal and can justify the petition's summary dismissal. *People v. Harris, 862 N.E.2d 960, 967, 224 Ill.2d 115, 126, 308 Ill. Dec. 757 (2007)*. The plaintiff raises no argument based on this section of the Code of Civil Procedure, and so any argument that might have been raised is waived.

orchestrated by Mr. Patrick, who they continue to insist is guilty of the murders. However, if Mr. Patrick is right, the defendants are guilty of the most despicable conduct and ought to be subject to condign punishment. For the jury to be able fairly to resolve this case and arrive at the truth, which is the goal of all trials, *United States v. Slone, 833 F.2d 595, 597 (6th Cir.1987)*; *Center Partners, Ltd., 2012 IL 113107, 981 N.E.2d 345 at 356, 367, 367 Ill. Dec. 20*; *Rule 102, Federal Rules Evidence*, the jury should have available to it all relevant, nonprivileged, admissible evidence. Under the circumstances of this case, a narrow waiver disserves that interest; a broad one furthers it.

**4**.

The conversations plaintiff voluntarily disclosed in the Petition are not privileged pursuant to *Federal Rule of Evidence 502*. Under *Rule 502*, when the disclosure of a communication covered by the attorney-privilege "is made in a state proceeding and is not the subject of a state-court order concerning waiver, the disclosure does not operate **[*22]** as a waiver in a federal proceeding if the disclosure: (1) would not be a waiver under this rule if it had been made in a federal proceeding; or (2) is not a waiver under the law of the state where the disclosure occurred." Here, plaintiff's voluntary disclosures of his conversations with his attorney were not the subject of a state-court order concerning the waiver. Plaintiff's disclosures would constitute a waiver in federal court. Additionally, plaintiff cites no Illinois law limiting the waiver made by plaintiff, and plaintiff has not pointed to any language in the Illinois Post-Conviction Hearing Act limiting waivers of the attorney-client privilege.

Often a disclosure of privileged communications waives the privilege as to all other communications on that same subject matter. *See, e.g., Appleton Papers, Inc. v. EPA, 702 F.3d 1018, 1025 (7th Cir. 2012)*; *Medicines Co. v. Mylan, Inc., 936 F. Supp. 2d 894, 903 (N.D.Ill. 2013)*. But subject matter waiver generally occurs only where the party holding the privilege seeks to gain some strategic advantage by disclosing favorable, privileged information, while holding back that which is unfavorable. *See In re Sealed Case, 676 F.2d 793, 809, 219 U.S. App. D.C. 195 & n 54 (D.C. Cir. 1982)*; *Graco Children's Products, Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd., 1995 U.S. Dist. LEXIS 8157, 1995 WL 360590, *8 (N.D.Ill. 1995)*. That is not what is occurring here. Mr. Patrick has not attempted to rely on any aspect of any conversation he ever had with Mr. Theis. Quite the contrary. He is quite **[*23]** adamant that none of those conversations should be admissible in this case. Mr. Patrick is therefore not seeking to use the privilege simultaneously "as a shield and a sword." *United States v. Bilzerian, 926 F.2d 1285, 1292 (2nd Cir.1991)*. Hence, the traditional subject matter waiver ought not apply here.

**5**.

**The Work-Product Doctrine**

The remaining issue to be decided is whether Mr. Theis and Mr. Patrick's claim of work product protection should be honored, or whether it, like the attorney-client privilege, has been waived. In an earlier decision in this case, we explored the work product doctrine, and that analysis need

not be repeated. *Patrick v. City of Chicago, 2015 U.S. Dist. LEXIS 85719, 2015 WL 3989152, at *4 (N.D.Ill. 2015)*. It is sufficient for present purposes to note that the work-product doctrine "protects many of the same interests" as the attorney/client privilege, *Bittaker, 331 F.3d at 722, n. 6*, and, like the attorney-client privilege, it can be expressly or impliedly waived.[10]

At the parties' request, I conducted an *in camera* review of the documents for which work product protection has been claimed. Mr. Patrick's counsel has provided me with an "Index of Withheld Documents" attached to her letter to me of September 23, 2015. The difficulty is that some of the documents are difficult to read. But to the extent that I have been able to decipher the documents, many appear to be entitled to work product protection. Others do not appear to cast light on the central questions in this case. For the same reasons that the attorney-client privilege has been waived, that waiver extends to those documents that discuss or elaborate on the topics disclosed in the letter and affidavits Mr. Patrick attached to his 1995 Petition.

Thus, those documents discussed in paragraphs 1, 2, 3 (but not any portions reflecting Mr. Theis's legal research), 4 and 5 of the Index should be turned **[*25]** over to the defendants. Since the waiver in this case extends to conversations between Mr. Theis and Mr. Patrick regarding the topics disclosed in the Petition and its attachments — there may be multiple conversations that are discoverable — the defendants need not turn over the documents referred to in paragraphs 6, 8, 9, 10 and 11 of the Index of Withheld Documents. There has there been no waiver of opinion work product, and thus any documents reflecting Mr. Theis's opinions, legal research, or strategies for the defense of the murder case need not be turned over.[11]

Counsel for Mr. Patrick must review the documents again to ensure that there is nothing in those listed in paragraphs **[*26]** 6, 8, 9, 10 and 11 that refers, reflects, or relates to the disclosures in Mr. Patrick's 1995 Petition and attachments. To the extent any of the documents contain such information, they must be turned over to the defendants.

**6.**
**The Decision in *Taylor v. The City of Chicago***

---

[10] The work-product doctrine is governed by *Federal Rule of Civil Procedure 26(b)(3)*, which provides, in relevant part that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . [however,] those materials may be discovered if: (i) they are otherwise discoverable under *Rule 26(b)(1)*; and (ii) the party shows that it has substantial **[*24]** need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Fed. R. Civ. P. 26(b)(3)(B)*. But the question in this case is whether there has been a waiver of work product protection, not whether otherwise protected documents are discoverable pursuant to *Rule 26(b)(3)*.

[11] Opinion work product receives greater protection than ordinary work product, *In re Cendant Corp. Sec. Litig., 343 F.3d 658, 663 (3rd Cir.2003)* and "enjoys a nearly absolute immunity...." *Smith v. Scottsdale Ins. Co., 2015 U.S. App. LEXIS 13290, 2015 WL 4569284, at *2 (4th Cir. 2015)*. The showing necessary to obtain opinion work product far exceeds the substantial need/undue hardship test required under *Rule 26(b)(3)* for non-opinion work product. *Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir.1992)*. Mr. Theis' mental impressions are not at issue in the instant case. For purposes of discovery all that is relevant is what Mr. Theis was told by his client in their conversations about the topics disclosed in the Petition and its attachments.

124

Daniel Taylor was also charged in 1995 in connection with the murders. In a separate trial, he was convicted and, like Mr. Patrick, spent more than 20 years in prison before being released. He has brought a separate suit under *42 U.S.C. §1983*, alleging that the City of Chicago and several Chicago police officers coerced him into falsely confessing to the murders and concealed exculpatory evidence in violation of *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*. [14 C 737]. Mr. Taylor and his former criminal defense lawyer, Nathan Diamond-Falk, invoked the attorney-client privilege and work product doctrine during their depositions in the Taylor case. The defendants then moved to compel answers to certain questions, contending that *Mr. Taylor's Brady* claim resulted in an implied waiver of the attorney-client privilege and work product protection.

The *Taylor* court recently agreed, since Mr. Taylor's *Brady* claim is specifically about his treatment in police custody and "whether his attorney **[\*27]** knew about the abuse." The court concluded "he has therefore placed at issue the conversation he and [his attorney] had relating to the allegedly coerced confession, and the attorney-client privilege does not shield them from answering questions on that topic." [14 C 737, Dkt. #219 at 9]. The court came to the same conclusion regarding whether the defendants' lawyer knew or should have known about the existence and identity of an alleged alibi witness. Id. at 13. These conclusions are in accord with and necessitated by basic principles under established *Brady* case law and principles of implied waiver.

To succeed on a *Brady* claim, a plaintiff must prove the existence of the facts claimed to be suppressed, that the facts meet the standard of constitutional materiality, and that he and his attorney lacked knowledge of that evidence. Cf., *California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)*; *United States v. Dupuy, 760 F.2d 1492, 1502, n. 5 (9th Cir.1985)*(no suppression when defense knew of undisclosed witnesses' identities); *United States v. Grossman, 843 F.2d 78, 85 (2nd Cir. 1988)*(no due process violation "where a defendant knew of or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available to defendant from another source"); *Tennison, 226 F.R.D. at 622-23*.

Claims of implied waiver are guided primarily by "fairness" principles. **[\*28]** *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 23 (1st Cir. 2003)*; 8 J. Wigmore, Evidence § 2327 at 636 (J. McNaughton rev. 1961). And so, an implied waiver may be found where the privilege holder relies on a "legal claim or defense, the truthful resolution of which will require examining confidential communications." *Lorenz v. Valley Forge Insurance Co., 815 F.2d 1095, 1098 (7th Cir.1987)*. See also, *In re Grand Jury Proceedings, 219 F.3d 175, 182 (2nd Cir. 2000)*. In light of these fundamental principles, it is not surprising that the court in Taylor concluded that by virtue of his *Brady* claims, the plaintiff impliedly waived the attorney-client privilege and work product protection as to those communications the subject matter of which involved the allegedly withheld information. But since not all of the claims fell within this definition, the motion was granted in part and denied in part.

The defendants in the instant case contend that the *Taylor* opinion supports their arguments in

this case. Mr. Patrick's view is that *Taylor* is irrelevant here, as the issues in the two cases are dissimilar. I agree. While the issues explored in the *Taylor* opinion and those involved here involve implied waivers, the issues are not congruent as evidenced by the dissimilar briefing in the two cases. It is not surprising that *Bittaker* and the cases and arguments based on it, while **[*29]** vital here, were not mentioned in the briefs in *Taylor*. [Dkt. ##201, 203]. Similarly, except for a tangential reference in the defendants' reply brief [Dkt. #129 at 2], *Brady* is not cited or discussed in the briefs in the instant case [Dkt. ##95, 124] even though *Brady* was the cynosure of the briefs and of the court's opinion in *Taylor*.

Finally, there is the argument that Mr. Theis' declaration filed in support of a motion for partial summary judgment has no relevance to this case. During his deposition, Mr. Theis did answer a number of questions, (*see*, Plaintiff's Response To City Defendants Motion To Cite Additional Authority, [Dkt. #177]), contrary to the intimation in the defendants' motion to cite additional authority. The focus of the questions and answers related to whether Daniel Taylor was in police custody at the time of the murders and how the answer to that question could have related to Mr. Patrick's defense. Mr. Theis' affidavit in support of the motion for partial summary judgment does not expand the scope of the waiver that exists in this case resulting from the Petition and its attachments.

## CONCLUSION

*Bittaker* recognized that law, like life, often requires that a choice **[*30]** between competing alternatives be made. And so, the court held, a defendant in a criminal who had filed a postconviction claim for ineffective assistance of counsel case had to choose between protecting the confidentiality of communications with his criminal defense lawyer or pursuing his claim. If he chose to abandon his claim, the confidentiality of his communications would be preserved. If he chose to pursue his claim, the confidentiality of those communications would vanish. But choose he must. *331 F.3d at 720*. The same is true for Mr. Patrick. And like the plaintiff in *Bittaker*, he cannot have both objects of his desire. That the choice between pursuing a claim or preserving the confidentiality of communications with one's lawyer presents difficult and incompatible alternatives does not, as *Bittaker* recognized, make it impermissible to require that the choice be made. The legal system "'is replete with situations requiring the making of difficult judgments as to which course to follow.'" *McGautha v. California, 402 U.S. 183, 213, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971)*. The fact that Mr. Patrick had to make such an election does not entitle him to judicial shelter from the consequences of his choice. *Cf., United States v. Martinez-Salazar, 528 U.S. 304, 307, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000)*.

The Defendants' Motion to Compel Responses to Certain Discovery [Dkt. **[*31]** #95] is GRANTED IN PART and DENIED IN PART. Mr. Patrick and Mr. Theis shall answer the questions they refused to answer during their depositions pertaining to the conversations disclosed in Mr. Patrick's 1999 Petition for Post-Conviction Relief and the attached exhibits. The waiver resulting from those disclosures includes: (1) Mr. Patrick's claimed alibi witnesses; (2) whether Mr. Patrick told Mr. Theis he wanted to raise an alibi defense and identified alibi witnesses; and (3) whether Mr. Patrick was coerced by the police into making a false inculpatory

statement. To the extent that the Defendants' questions seek information regarding discussions with Mr. Theis not disclosed in the Petition or its attachments, Mr. Patrick and Mr. Theis are nor required to provide that information.

**DATE**: 10/28/15

**ENTERED**: /s/ Jeffrey Cole

**UNITED STATES MAGISTRATE JUDGE**

Attachment 13

### *Sloan Valve Co. v. Zurn Indus.*

United States District Court for the Northern District of Illinois

November 13, 2012, Decided; November 13, 2012, Filed

10 C 204

**Reporter:** 2012 U.S. Dist. LEXIS 161749; 2012 WL 5499412

Sloan Valve Co vs. Zurn Industries

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Motion to strike granted by *Sloan Valve Co. v. Zurn Indus., 2012 U.S. Dist. LEXIS 176554 (N.D. Ill., Dec. 13, 2012)*

**Prior History:** *Sloan Valve Co. v. Zurn Indus., LLC, 2012 U.S. Dist. LEXIS 153909 (N.D. Ill., Oct. 26, 2012)*

**Counsel:** **[*1]** For Sloan Valve Company, a Delaware corporation, Plaintiff, Counter Defendant: Slawomir Z. Szczepanskic, LEAD ATTORNEY, Steptoe & Johnson LLP, Chicago, IL; Gregory S. Norrod, Jason Andrew Berta, Foley & Lardner, Chicago, IL; Richard S. Florsheim, PRO HAC VICE, Foley & Lardner, Milwaukee, WI; Scott Richard Kaspar, Foley & Lardner LLP, Chicago, IL.

For Zurn Industries, Inc., a Delaware corporation, Zurn Industries, LLC., a Delaware limited liability company, Defendants: Bryan C. Clark, PRO HAC VICE, John W McIlvaine, III, Kent E. Baldauf, jr., PRO HAC VICE, Steven M. Johnston, PRO HAC VICE, Thomas C Wolski, PRO HAC VICE, The Webb Law Firm, Pittsburgh, PA; David R. Cross, Quarles & Brady, Milwaukee, WI; John E Conour, Michael Steven Rhinehart, Nicole M Murray, Quarles & Brady Llp, Chicago, IL.

For Zurn Industries, LLC., a Delaware limited liability company, Zurn Industries, Inc., a Delaware corporation, Counter Claimants: Bryan C. Clark, PRO HAC VICE, Kent E. Baldauf, jr. , PRO HAC VICE, Steven M. Johnston, PRO HAC VICE, Thomas C Wolski, PRO HAC VICE, The Webb Law Firm, Pittsburgh, PA; Michael Steven Rhinehart, Nicole M Murray, Quarles & Brady Llp, Chicago, IL.

For Zurn Industries, LLC., a **[*2]** Delaware limited liability company, Zurn Industries, Inc., a Delaware corporation, Counter Claimants: Bryan C. Clark, PRO HAC VICE, John W McIlvaine, III, Kent E. Baldauf, jr., PRO HAC VICE, Steven M. Johnston, PRO HAC VICE, Thomas C Wolski, PRO HAC VICE, The Webb Law Firm, Pittsburgh, PA; Michael Steven Rhinehart, Nicole M Murray, Quarles & Brady Llp, Chicago, IL.

**Judges:** Amy J. St. Eve.

**Opinion by:** Amy J. St. Eve

# Opinion

## STATEMENT

Before the Court is Plaintiff Sloan Valve Company's ("Sloan") motion for a protective order. (R. 402, Mot.) Sloan moves this Court to enter a protective order pursuant to *Federal Rule of Civil Procedure ("Rule") 26(c)* barring Defendants, Zurn Industries, Inc. and Zurn Industries, LLC (collectively, "Zurn"), from conducting a *Rule 30(b)(6)* deposition regarding Sloan's infringement contentions. [1] (*Id.*) For the following reasons, the Court grants Sloan's motion for a protective order.

## BACKGROUND

In January 2010, Sloan sued Zurn for infringement of U.S. Patent No. 7,607,635 ("the '635 Patent"). [2] (R. 1, Compl.) On November 22, 2011, Sloan served upon Zurn its Updated Final Infringement Contentions. (Mot. at 2.) On January 27, 2012, Zurn served on Sloan Defendants' Notice of Deposition of Plaintiff Pursuant to *F.R.C.P. 30(b)(6)* **[*4]** ("the 30(b)(6) notice"), requesting a corporate witness to testify on numerous topics related to Sloan's final infringement contentions. (*Id.*) On March 19, 2012 Sloan served upon Zurn Supplemental Updated Final Infringement Contentions to address concerns Zurn had expressed during a March 6, 2012 meet and confer telephone conference. (*Id.* at 4.) On October 12, 2012, Sloan served upon Zurn its Amended Final Infringement Contentions. (*Id.* at 5.) Sloan seeks a protective order to bar Zurn from conducting *Rule 30(b)(6)* fact depositions on its final infringement contentions. (Mot. at 1-7.)

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide that a "court may, for good cause, issue an order to

---

[1]

      Sloan's motion seeks a protective order (1) barring Zurn from conducting a fact deposition on Sloan's infringement contentions and (2) barring Zurn from exceeding deposition time limits. On October 18, 2012, the Court denied the latter request as moot. (R. 404, Min. Ent.) The Court, therefore, does not address **[*3]** the arguments regarding deposition time limits in this Order. Additionally, during the status hearing on October 18, 2012, Zurn informed the Court that it seeks to depose a non-testifying expert, though Sloan's motion specifically addresses whether Zurn can depose a Sloan attorney. (Reply, Ex. G, 10/18/2012 St. Hrg. Trnspt. at 11-12.) For completeness, the Court addresses the propriety of deposing either Sloan's trial counsel or a non-testifying expert regarding Sloan's infringement contentions. Additionally, since Zurn issued its *Rule 30(b)(6)* notice, Sloan has amended its infringement contentions multiple times. (*See* Mot. at 2-5.) The Court assumes that Zurn will depose Sloan's corporate representative on the final version of the infringement contentions. The version of the infringement contentions at issue, however, does not change the analysis.

[2]

      A description of the '635 Patent and factual background regarding the infringement dispute can be found in the Court's October 26, 2012 Memorandum Opinion and Order regarding Zurn's motion for partial summary judgment. (R. 412, Opinion.) A detailed description of the procedural posture of this case can be found in the Court's April 12, 2012 Order regarding Sloan's motion to strike and to compel discovery. (R. 285, Order.)

protect a party or person from annoyance, embarrassment, oppression, or **[\*5]** undue burden or expense." _Fed. R. Civ. P. 26(c)(1)_. The moving party bears the burden of showing good cause for a protective order. See _Central States, Se. & Sw. Areas Pension Fund v. Nat'l Lumber Co., No. 10 C 2881, 2012 U.S. Dist. LEXIS 95773, 2012 WL 2863478, at \*2, (N.D. Ill. July 11, 2012)_ (citing _Jepson, Inc. v. Makita Elec. Works, Ltd., 30 F.3d 854, 858 (7th Cir. 1994)_. Under _Rule 26(c)(1)_ the Court may forbid the disclosure or discovery sought by a party or forbid inquiry into certain matters. See _Fed. R. Civ. P. 26(c)(1)(A)_ & _(D)_. "_Rule 26(c)_ confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." _Gordon v. Countryside Nursing & Rehab. Ctr., LLC, No. 11 C 2433, 2012 U.S. Dist. LEXIS 98085, 2012 WL 2905607, at \*2 (N.D. Ill. July 16, 2012)_

**ANALYSIS**

As a threshold matter, despite filing a Response (R. 405) and a Sur-Reply (R. 418), Zurn has largely failed to address the specific issue raised in Sloan's motion and Reply, namely whether the Court should bar Zurn from taking a _Rule 30(b)(6)_ deposition regarding Sloan's infringement contentions. Rather than address the deposition issue, Zurn repeatedly argues that the Court should require Sloan to "produce all **[\*6]** documents and data, including any documents and data prepared by non-testifying experts, responsive to Zurn's discovery requests." (Resp. at 3, 7-10; Sur-Reply at. 2.) Indeed, Zurn repeatedly requests that the Court enter an order compelling Sloan to produce documents and data relating to testing done on Zurn's own device. (_See e.g._, Resp. at 11-12; Sur-Reply at 2.) Such a request is proper in a motion to compel, not in response to this motion for a protective order. The Court, therefore, disregards these arguments and finds that Zurn has waived any argument regarding whether it may depose one of Sloan's trial attorneys regarding its infringement contentions and whether there are any "exceptional circumstances" necessitating a deposition of Sloan's non-testifying expert, as Zurn has addressed neither contention. See _Bonte v. U.S. Bank, N.A., 624 F.3d 461, 466 (7th Cir. 2010)_ ("Failure to respond to an argument . . . results in waiver."); _United States v. Foster, 652 F.3d 776, 792 (7th Cir. 2011)_ ("As we have said numerous times, undeveloped arguments are deemed waived[.]"); _Fed. R. Civ. P. 26(b)(4)(D)(ii)_.

Even if Zurn had not waived these arguments, the Court would not require Sloan **[\*7]** to produce a _Rule 30(b)(6)_ witness to testify about the infringement contentions. First, Zurn has not shown that it needs to obtain information specifically from an attorney. Second, Zurn cannot show any exceptional circumstances justifying discovery of the "facts known or opinions held by" Sloan's consulting experts who conducted the tests at issue. See _Fed. R. Civ. P. 26(b)(4)(D)(ii)_.

**I. Zurn May Not Depose a Sloan Attorney or Other Corporate Representative About Sloans' Attorneys' Mental Impressions or Legal Theories**

Although _Rule 30(a)_ permits a party to take a deposition of "any person," some courts have found that "'[t]he deposition by one party of the other side's attorney in the litigation . . . is disfavored and should be permitted only if there is no other reasonable means to obtain relevant and significant information that the attorney possesses." _Fields v. City of Chi., No. 10 C 1168,_

*2012 U.S. Dist. LEXIS 148053, 2012 WL 4892392, at \*3 (N.D. Ill. Oct. 15, 2012)* (citing *S.E.C. v. Buntrock, 217 F.R.D. 441, 445 (N.D. Ill. 2003)* (collecting cases); *see also Shelton v. Am. Motors Corp., 805 F.2d 1323 (8th Cir. 1986)* (outlining the test for when deposition of opposing counsel is appropriate). The Seventh Circuit **[\*8]** has not decided whether these stringent requirements apply to depositions of opposing counsel, however, the Court finds this test instructive here because Zurn cannot meet these requirements.

First, Zurn's *Rule 30(b)(6)* notice improperly seeks testimony implicating the mental impressions and legal theories of the trial counsel who drafted them. (Mot., Ex. A); *see also In re Sulfuric Acid Antitrust Litig., No. 03 C 4576, 2005 U.S. Dist. LEXIS 17420, 2005 WL 1994105, at \*1 n. 2 (N.D. Ill. Aug. 19, 2005)* ("[T]he topics are improper under *Rule 30(b)(6)* in that they seek to elicit their contentions and legal theories"); *Buntrock, 2004 U.S. Dist. LEXIS 12036, 2004 WL 1470278, at \*2* (upholding magistrate judge's finding that 30(b)(6) notice impermissibly sought to delve into theories of counsel). Zurn, for example, seeks "[d]escription and explanation" of statements in the infringement contentions, which Sloan's counsel strategically drafted. (Mot., Ex. A ¶ 2; *see also* Resp. at 10 (stating that Zurn is entitled to this discovery "because it reflects Sloan's understanding of how the accused device operates."). Zurn cannot seek this privileged information via a *Rule 30(b)(6)* deposition or any other discovery mechanism.

If Zurn instead seeks only "information **[\*9]** regarding what, if any, pre- and post-litigation testing the accused device(s) were subject to, and the data obtained from those tests," as alleged in its Response, such documents may be protected by the work product privilege.[3] (Resp. at 5-6.) Moreover, even if this information is not privileged, Zurn has not offered any evidence to establish that there is "no other reasonable means" of obtaining it. *Fields, 2012 U.S. Dist. LEXIS 148053, 2012 WL 4892392 at \*3*. Additionally, Zurn has offered no argument to counter Sloan's claim that deposing its trial counsel would be unduly burdensome. (Mot. at 6-7.)

## II. Zurn May Not Depose Sloan's Consulting Expert or Other Corporate Representative

---

[3]
Sloan has asserted the work-product privilege over the tests conducted by its consulting experts. (Mot. at 7; Reply at 7-8.) Zurn, without any legal citation, argues that the "underlying test data" is not "subject to work product immunity for at least the reasons set forth in the Court's Order of April 12, 2012." (*Id.* at 9.) Zurn cites to the April 12, 2012 Order also for the proposition that "Sloan's complaint and contentions effectively waived whatever work product or privilege immunity might arguable have protected the results of Sloan's testing and analysis." (*Id.* at 10.) Zurn also argues that the Court's April **[\*10]** 12, 2012 Order requiring Zurn to produce testing data and a 30(b)(6) witness is "law of the case" and requires the Court to deny Sloan's motion for a protective order. (Sur-Reply. at 2; *see also* Resp. at 10-11 (describing Zurn's request as seeking "directly parallel discovery").) The Court's April 12, 2012 Order, which related to Zurn's tests of valves within Zurn's control that Zurn put "at issue," is not determinative of whether data and results from Sloans tests of Zurn's device are privileged. (Order at 5-9.) The Court need not resolve this issue, however, because (1) Sloan has agreed to produce non-privileged pre-complaint testing data and documents and to log the privileged materials in a privilege log and (2) as discussed in this Order, the remaining information Zurn seeks with its 30(b)(6) notice is protected under *Rule 26(b)(4)(D)*. (Reply, Ex. G. 10/18/2012 St. Hrg. Trnspt at 7-8.) Notably, despite Zurn's attempts to cite the April 12, 2012 Order as dispositive to this motion, the issue of whether *Rule 26(b)(4)(D)* protects certain data or testing results from discovery was not before the Court at that time whereas Sloan bases many of its arguments for a protective order on **[\*11]** *Rule 26(b)(4)(D)*'s protections. (*See* Order; *see also* R. 234, Zurn's Mot. to Strike.)

132

**About the Work of Sloan's Consulting Expert**

Despite Sloan's initial contention that Zurn's 30(b)(6) notice seeks testimony from Sloan's counsel, Zurn clarified in open court that it seeks to depose a non-testifying expert. (Reply, Ex. G, 10/18/2012 St. Hrg. Trnspt. at 11-12.) The Court agrees with Sloan that "investigations done by non-testifying experts are protected from deposition discovery by _Rule 26(b)(4)(D)._" (Reply at 2); _see e.g., Morningware, Inc. v. Hearthware Home Prods., Inc., No. 09 C 4348, 2012 U.S. Dist. LEXIS 121333, 2012 WL 3721350, at \*6 (N.D. Ill. Aug. 27, 2012)_ ("Consulting experts do not offer testimonial evidence during a litigation proceeding, and parties are therefore not entitled to discovery from consulting experts."). Under _Rule 26(b)(4)(D)(ii),_ a party may depose a non-testifying expert "on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Zurn has not made any such showing.

Here, Zurn seeks testimony regarding testing Sloan conducted **[\*12]** on Zurn's own product. (Mot., Ex. A.) Zurn does not need the results of Sloan's tests to gain an understanding of how the product works. In its April 12, 2012 Order, the Court required Zurn to disclose testing data and information relating to the worn valves Zurn fabricated using the Zurn machine, which Zurn had put "at issue" and were only in Zurn's possession. (Order at 6-7.) Contrastingly, the testing information Zurn seeks relates to tests of its own device, which Zurn can test and analyze at any time.

Additionally, Zurn will be able to review Sloan's expert disclosures, which are due on November 30, 2012 and will likely contain certain testing results. Indeed, under _Rule 26(a)(2)(B)(ii)_, Sloan's expert reports must contain "the facts or data considered by the witness in forming [his opinions]." In fact, Zurn acknowledges that "Sloan's forthcoming expert report will undoubtedly include _some_ information relating to Sloan's theory of infringement," but wants to also discover "Sloan's understanding and analysis of the accused device at the time each of its revised Infringement Contentions were served." (Resp. at 5.) Seeking the "understanding and analysis of Sloan, meaning its attorneys, **[\*13]** is improper, as previously discussed. Seeking the "understanding and analysis" by consultants hired by Sloan to test the accused device is improper under _Rule 26(b)(4)(D)._

Unlike the work product doctrine, _Rule 26(b)(4)(D)_ does not only prohibit discovery of mental impressions, it also protects "facts known or opinions held" by a consulting expert as well. _Fed. R. Civ. P. 26(b)(4)(D)_. Even the methodology employed by a consulting expert is off-limits. _See e.g., Sara Lee Corp. v. Kraft Foods Inc., 273 F.R.D. 416, 420 (N.D. Ill. 2011)_ (finding that materials relating to the methodology of a consulting expert which might shed light on an expert's report were not discoverable). Moreover, how Sloan, its consultants, and its attorneys came to the conclusions reflected in the infringement contentions is not relevant to any party's claim or defense. _See Fed. R. Civ. P. 26(b)(1)_ ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense"). Zurn has received Sloan's contentions, will receive Sloan's expert reports, can depose Sloan's testifying experts, and has access to the device at issue to conduct its own tests. The Court will not additionally **[\*14]** allow

Zurn to depose a non-testifying expert on the tests Sloan conducted on Zurn's own product in anticipation of litigation and to formulate its theory of infringement.

**CONCLUSION**

For the foregoing reasons, the Court grants Sloan's motion for a protective order barring Zurn from conducting a deposition on Sloan's final infringement contentions or pursuant to the *Rule 30(b)(6)* deposition notice dated January 27, 2012, Exhibit A of Sloan's motion.

Attachment 14

## _United States v. Capital Tax Corp._

United States District Court for the Northern District of Illinois, Eastern Division

April 12, 2011, Decided; April 12, 2011, Filed

No. 04 C 4138

**Reporter:** 2011 U.S. Dist. LEXIS 40747; 2011 WL 1399258

UNITED STATES OF AMERICA, Plaintiff, v. CAPITAL TAX CORPORATION, et al., Defendants.

**Subsequent History:** Motion granted by, Motion granted by, in part, Motion denied by, in part _United States v. Capital Tax, 2011 U.S. Dist. LEXIS 69940 (N.D. Ill., June 29, 2011)_

**Prior History:** _United States v. Capital Tax Corp., 2011 U.S. Dist. LEXIS 13242 (N.D. Ill., Feb. 10, 2011)_

**Counsel: [*1]** For United States of America, Plaintiff: Joseph A. Stewart, LEAD ATTORNEY, AUSA, Kurt N. Lindlan, United States Attorney's Office (NDIL), Chicago, IL; Matthew R. Oakes, LEAD ATTORNEY, Thomas A Benson, U.S. Department of Justice, Washington, DC; Alison Carew McGregor, PRO HAC VICE, Department of Justice, Washington, DC; Sumona Nandi Majumdar, Department of Justice, ENRD Environmental Enforcement, Washington, DC.

For Capital Tax Corporation, Defendant, Counter Claimant, Cross Claimant: Lindsay Ann Wolter, Seyfarth Shaw LLP, Chicago, IL; Michael D Hayes, Norman Benjamin Berger, Varga, Berger, Ledsky, Hayes & Casey, Chicago, IL.

For Stephen J Pedi, Defendant, Cross Defendant: Mark J McAndrew, LEAD ATTORNEY, Barnes & Thornburg LLP, Chicago, IL; Norman V Chimenti, Martin, Craig, Chester & Sonnenschein, Oak Brook, IL.

For William - Lerch, Defendant: Gary James Fernandez, LEAD ATTORNEY, Fernandez and Associates, Glen Ellyn, IL.

For Mervyn Dukatt, Defendant: Mark D. Erzen, LEAD ATTORNEY, Mark D. Erzen, P.C., Chicago, IL.

For United States of America, Counter Defendant: Matthew R. Oakes, LEAD ATTORNEY, Thomas A Benson, U.S. Department of Justice, Washington, DC; AUSA, United States Attorney's Office **[*2]** (NDIL), Chicago, IL; Alison Carew McGregor, PRO HAC VICE, Department of Justice, Washington, DC.

For Capital Tax Corporation, Cross Defendant, Counter Claimants, ThirdParty Plaintiff: Michael D Hayes, Norman Benjamin Berger, Varga, Berger, Ledsky, Hayes & Casey, Chicago, IL.

For United States of America, Counter Defendants. Cross Defendant: Matthew R. Oakes LEAD ATTORNEY, U.S. Department of Justice, Washington, DC; Alison Carew McGregor, PRO HAC VICE, Department of Justice, Washington, DC.

For Frank Pedi,Cross Claimant: Mark J McAndrew, Barnes & Thornburg LLP, Chicago, IL.

For United States of America, Cross Defendant Matthew R. Oakes, LEAD ATTORNEY, U.S. Department of Justice, Washington, DC; Alison Carew McGregor, PRO HAC VICE, Department of Justice, Washington, DC; Kurt N. Lindlan, United States Attorney's Office (NDIL), Chicago, IL.

**Judges:** George M. Marovich, United States District Judge.

**Opinion by:** George M. Marovich

## Opinion

### MEMORANDUM OPINION AND ORDER

Defendant Mervyn Dukatt ("Dukatt") has filed objections to Magistrate Judge Kim's February 10, 2011 order that denied Dukatt's motion to compel production of responses to interrogatories and document requests to which plaintiff United States had objected on the **[*3]** grounds of privilege. For the reasons set forth below, the Court overrules Dukatt's objections.

### I. Standard of review

When a party timely objects to a pretrial, non-dispositive ruling by a magistrate judge, the district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." _Fed.R.Civ.P. 72(a)_.

### II. Discussion

After the statute of limitations had run, the Court allowed plaintiff United States to add Dukatt as a defendant and to assert against him a claim for response costs under CERCLA. _See 42 U.S.C. § 9607(a)_. To prevail on that claim, the United States will need to establish that Dukatt is equitably estopped (because he took steps to conceal his liability until after the statute of limitations had run) from asserting the statute of limitations. Discovery with respect to equitable estoppel is what brings the parties before the Court today.

When Dukatt issued discovery requests, the United States objected on the grounds that the requested information was protected from disclosure by the attorney-client privilege. Dukatt moved to compel, arguing, among other things, that the United States had waived the privilege **[*4]** by putting equitable estoppel at issue. Judge Kim denied the motion to compel. Dukatt makes two objections to Judge Kim's ruling.

First, Dukatt objects to Judge Kim's conclusion that the government did not waive the attorney-client privilege by putting privileged information at issue. Pursuant to _Rule 501 of the Federal_

*Rules of Evidence*, federal common law governs privilege issues with respect to federal claims. *See Fed.R.Evid. 501*. When a court sits in diversity, by contrast, courts apply state privilege law. *Lorenz v. Valley Forge, 815 F.2d 1095, 1097 (7th Cir. 1987)* ("Because the basis of our jurisdiction is diversity, we apply the Indiana state law of privilege.") (citing *Fed.R.Evid. 501*). [1]

The Seventh Circuit has not clearly stated the federal common-law standard for when a party waives the attorney-client privilege by putting privileged information at issue in a case. This Court agrees with the courts in this district that have followed the Third Circuit's decision in *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co., 32 F.3d 851 (3rd Cir. 1994)*. [*5] *See Silverman v. Motorola, Inc., Case No. 07 C 4507, 2010 U.S. Dist. LEXIS 67230, 2010 WL 2697599 at *4 (N.D. Ill. July 7, 2010)* ("courts in this district have followed the Third Circuit's guidance that 'at issue' waiver applies only where 'the client asserts a claim or defense and attempts to prove that claim or defense by disclosing or describing attorney-client communication.'"); *Chamberlain Group v. Interlogix, Case No. 01 C 6157, 2002 U.S. Dist. LEXIS 5468, 2002 WL 467153 at *3 (N.D. Ill. Mar. 27, 2002)*; *Beneficial Franchise Co., Inc. v. Bank One, N.A., 205 F.R.D. 212, 216 (N.D. Ill. 2001)*. In fact, the Seventh Circuit has cited *Rhone-Poulenc*, albeit in dicta and without discussion. *See Garcia v. Zenith Electronics Corp., 58 F.3d 1171, 1175 n. 1 (7th Cir. 1995)*.

In *Rhone-Poulenc*, the Third Circuit explained the circumstances in which a client waives the attorney-client privilege by making privileged information an issue in a case:

> There is authority for the proposition that a party can waive the attorney client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation. * * *
>
> In these cases, the client has made the decision and taken the affirmative step in litigation to place the advice [*6] of the attorney in issue. Courts have found that by placing the advice in issue, the client has opened to examination facts relating to that advice. Advice is not in issue *merely because it is relevant*, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner. *The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense* by disclosing or describing an attorney client communication.

*Rhone-Poulenc, 32 F.3d at 863* (emphasis added). The Third Circuit also explained that it "completely undermines the interest" served by the attorney-client privilege for a court to find waiver merely because the communications are relevant. *Rhone-Poulenc, 32 F.3d at 864*. The Court agrees with this approach and agrees that merely asserting a claim or defense to which attorney-client communications are relevant does not constitute a waiver of the privilege under federal common law. *See Beneficial Franchise, 205 F.R.D. at 216-217* ("[W]e do not believe that merely asserting a defense or a claim is sufficient, without more, to waive the privilege. Were it

---

[1] Dukatt relies heavily on *Lorenz*, but in that case, the Seventh Circuit was applying Indiana law, not the federal common law that applies here.

otherwise, **[\*7]** then any party asserting a claim or defense on which it bears the burden of proof would be stripped of its privilege and left with the draconian choice of abandoning its claim and/or defense or pursuing and protecting the privilege."). Only if the party also attempts to prove the claim or defense by disclosing or describing attorney-client communications is the privilege waived.

In this case, the United States did not waive its attorney-client privilege merely by asserting equitable estoppel, and Dukatt does not argue that the United States has attempted to establish equitable estoppel by disclosing or describing attorney-client communications. Accordingly, the Court concludes that the United States has not waived its privilege and that Judge Kim was not clearly erroneous when he concluded that, "[b]ecause the government intends to meet its burden of proof without disclosing privileged information, at-issue waiver does not apply here." Dukatt's first objection is overruled.

Dukatt's second objection to Judge Kim's ruling is that Judge Kim allowed the government to withhold information not protected by the privilege. Specifically, Dukatt challenges Judge Kim's conclusion that the government's **[\*8]** responses to interrogatories 7, 8, 9, 10 and 11 were adequate.

In interrogatories 7,8 and 11, Dukatt sought the identities of persons who took particular actions with respect to the government's case. In interrogatory number seven, Dukatt wanted to know who decided what persons would be named as defendants in this case. In eight and 11, Dukatt requested the identity of the person who decided there was no basis for naming Dukatt as an owner (early in the case) and the person who decided the government did not have a viable case (early in the case) against Dukatt. The government objected on the basis of attorney-client privilege and provided no further answer. Judge Kim concluded that requiring the government to identify the lawyers who had made particular decisions would "serve□ as a crowbar to pry open a window into the strategic thought process of the government's attorneys." That conclusion was not clearly erroneous. Dukatt is not seeking merely facts but also information about the government's lawyers' thought processes, which are protected from disclosure by the attorney-client privilege and the work-product doctrine.

Next, Dukatt asserts that he was merely seeking objective facts **[\*9]** in interrogatories 9 and 10, which asked the government to state what "essential information" about Dukatt it had been unable to discover during the limitations period and what "active steps" Dukatt had taken to prevent the government from discovering that essential information. The Court agrees that such facts are not privileged. Judge Kim, however, did not conclude that the government need not answer the interrogatories based on privilege. Rather, Judge Kim concluded that the government's response-which was to refer Dukatt to its previously-filed brief that outlined those facts-was adequate. That conclusion was not clearly erroneous. [2] Accordingly, the Court overrules Dukatt's second objection.

---

[2] Of course, by answering the interrogatories the way it has, the government has limited the evidence it may use to establish equitable estoppel. *See Fed.R.Civ.P. 37(c)(1)*.

### III. <u>Conclusion</u>

For the reasons set forth above, the Court overrules defendant Dukatt's objections to Judge Kim's February 10, 2011 opinion.
ENTER:

/s/ George M. Marovich

George M. Marovich

United States District Judge

DATED: April 12, 2011