# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION and STATE OF ILLINOIS, | ) ) ) | |
| Plaintiffs, | ) ) | No. 15 C 11473 |
| v. | ) ) ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ADVOCATE HEALTH CARE NETWORK, ADVOCATE HEALTH AND HOSPITALS CORP., and NORTHSHORE UNIV. HEALTHSYSTEM, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On January 8, 2016, with direction from Judge Alonso, the FTC and the two defendants, Advocate and Northshore, entered into an agreed confidentiality order covering discovery in this litigation. [Dkt. #36]. With the confidentiality order in place, about a week later, the defendants sought production of data and information the FTC relied upon to form the basis of the allegations of its Complaint. [Dkt. #48]. As the FTC concedes, in the run-up to filing suit, it accumulated highly confidential information from a number of third parties, which happen to be the defendants' competitors – information those third parties produced to the FTC in confidence in response to subpoena. [Dkt. #2]. That information included strategic business plans; market and competitive assessments, analyses, studies, profiles, and forecasts; peer analyses; responses to requests for proposals; and pricing lists and reports. Not surprisingly, in the wake of the defendants' motion to compel, those third parties have lined up to intervene in this matter and protect their confidential information from defendants' perusal. The Intervenors weren't a part of the confidentiality order

negotiations, of course, and now, with their highly sensitive confidential information at stake, they understandably want input. Counsel for Intervenors have attempted to negotiate an amendment of the confidentiality order with counsel for defendants that would limit defendants' access to the Intervenors' Highly Confidential information to the defendants' outside counsel. Defendants' counsel declined, but were apparently willing to consider whether specific documents within the broader category of Highly Confidential Information could instead be designated as subject to review by "Outside Counsel Only." That effort has come to naught.

The Intervenors have filed motions to amend the confidentiality order. The defendants oppose any changes to the confidentiality order and charge the third parties with trying to complicate matters and do nothing more than delay or prevent the merger that is the target of the FTC's Complaint in this case. [Dkt. #76, at 1-2].

## I.

The party requesting a protective order has the burden of demonstrating to the court that "good cause" exists for its issuance. *Jepson v. Makita Elec. Works, Ltd.,* 30 F.3d 854, 858 (7th Cir.1994). In this instance, good cause has to be assessed while bearing in mind that the Intervenors – the parties whose confidential information is at risk – had no role in the fashioning of the protective order, which was crafted without anyone representing their interests. Still, given the protection that the FTC and the defendants did put into place, the question is whether allowing in-house counsel access to the Intervenors' – defendants' competitors – highly confidential information creates an unacceptable risk of, or opportunity for, "inadvertent disclosure" of that information. *Matsushita Elec. Indus. Co., Ltd. v. United States,* 929 F.2d 1577, 1579 (Fed.Cir.1991); *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1470 (9th Cir.1992).

In-house counsel stand on different ground than outside counsel, of course. They have "a unique relationship to the corporation by which they are employed. Although in-house counsel serve as legal advocates and advisors for their client, their continuing employment often intimately involves them in the management and operation of the corporation of which they are a part." *FTC v. Exxon Corp.,* 636 F.2d 1336, 1350 (D.C.Cir.1980). It is not as though in-house counsel might intentionally disclose confidential information for the benefit of their employers. "Like retained counsel..., in-house counsel are officers of the court, are bound by the same Code of Professional Responsibility, and are subject to the same sanctions. In-house counsel provide the same services and are subject to the same types of pressures as retained counsel." *United States Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed.Cir.1984). *See also Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 406-07 (N.D.Ill. 2006).

Inadvertent disclosure, however, is another matter, and it presents different challenges. In *United States Steel Corp.*, the Federal Circuit explained it this way:

> The problem and importance of avoiding inadvertent disclosure is the same for both. Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision. Whether an unacceptable opportunity for inadvertent disclosure exists, however, must be determined, as above indicated, by the facts on a counsel-by-counsel basis, and cannot be determined solely by giving controlling weight to the classification of counsel as in-house rather than retained.

*Id.* at 1468. *See also FTC v. Exxon Corp.,* 636 F.2d 1336, 1350 (D.C.Cir.1980). [1]

---

[1] In *Autotech*, the court explained:

"In the instant case, ADC's legitimate interest in ensuring that certain confidential information be protected must be weighed in the balance with Autotech's competing interest in its counsel having access to that information so that it may prosecute its claims. Those

(continued...)

The confidentiality order in this case precludes in-house counsel "involved" in "competitive decision-making" from accessing Highly Confidential information. [Dkt. #36, ¶5(c)(3)].[2] *United States Steel* employed the phrase, "competitive decision-making," not as a self-defining test, but "as a serviceable *shorthand* for a counsel's activities, association, and relationship with a client that are

---

[1](...continued)
competing interests are accommodated by an "attorneys'-eyes-only" protective order. Such orders have become *de rigeur*, at least where outside counsel are to have access to the information. ... The problem becomes more complicated when a party insists that its in-house counsel have the same access under the protective order. After all, the argument goes, in-house counsel are members of the bar, are bound by the same canons of ethics as other lawyers, and are subject to the same sanctions as outside counsel for violations of the order. Consequently, to introduce some asymmetry into the right of access at once unfairly stigmatizes in-house counsel and impermissibly prejudices the party that employs them. But to concede that the rectitude of in-house counsel is equal to that of outside counsel and that the same deterrent sanctions apply equally to both groups does not require a finding of perfect equivalence between in-house and outside counsel. "Regardless of an occasional statement of some courts to the contrary, house counsel are subject to pressures different from. those which outside counsel face, if only that their own economic well-being is inextricably bound up with their employer'." ... Nonetheless, preferring a rule of fairness to one of administrative convenience and simplicity, the federal courts have refused to allow controlling weight to be given to the classification of counsel as in-house rather than retained. They have required a case-by-case analysis where it is claimed that in-house counsel ought not be allowed to have access to information that is otherwise available to outside counsel."

[2] Paragraph 3(c) provides:

Defendants' Designees. The Defendants may designate, subject to such persons having completed the certification contained in Attachment A, Acknowledgment and Agreement to Be Bound, and subject to the approval of the Court, up to one representative each of Advocate Health Care Network and NorthShore University HealthSystem who can have access to Highly Confidential Information. The proposal to designate Defendants' employees must be accompanied by a declaration from each proposed designee detailing their responsibilities at Defendants' companies, confirming that they are not involved in "competitive decision-making," as considered most recently in *FTC v. Sysco Corp.*, 83 F. Supp. 3d 1, at *3 (D.D.C. Mar. 12, 2015), and confirming that they will not share Highly Confidential Information or relate the substance therein to anyone not approved by the Court. Defendants' Designees may only access Highly Confidential Information in person at the offices of their outside counsel, or using a secure electronic data room or document review platform using individual login identifications and passwords;

such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." 730 F.2d at 1468 n. 3. (Parenthesis in original)(Emphasis supplied). *See also Exxon Corp.,* 636 F.2d at 1350. *United States Steel* made it clear that analysis of the risk of inadvertent disclosure involves a careful and sensitive  assessment of the entire setting in which in-house counsel functions, and that involvement in competitive decision-making, while an important consideration, was not necessarily the exclusive one. Indeed, the parties in that case called it *one* basis for limiting access, and the court said it was an example of an instance where a party ought to be forced to rely on outside counsel. 730 F.2d at 1468 and n. 3.

As it is simply a convenient shorthand for an inevitably complex inquiry, merely insisting that one is not "involved in competitive decision-making" cannot pretermit inquiry into the underling facts or serve as a shibboleth the mere invocation of which  permits  access to Highly Confidential information. The compendious phrase  used in *United States Steel* is not an exception: Thus, the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure. *U.S. Steel Corp.*, 730 F.2d at 1468. That conclusion is dictated by the broader principle that "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Sandra T.E. v. South Berwyn School Dist.*, 100 600 F.3d 612, 619 (7th Cir. 2010).

Where in-house counsel are involved in competitive decision making, in the broad and discerning sense envisioned by *United States Steel,* the risk of inadvertent disclosure is obviously higher than for retained counsel. In that context, compartmentalization of protected information from

that which may be properly utilized in competitive decision-making is, to borrow Justice Cardozo's phrase used in another context, "a feat beyond the compass of ordinary minds." *Shepard v. United States,* 290 U.S. 96 (1933). The inescapable reality is that once an expert—or a lawyer for that matter—learns the confidential information that is being sought, that individual cannot rid himself of the knowledge he has gained; he cannot perform a prefrontal lobotomy on himself, as courts in various contexts have recognized. *Cf. AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1205 (7th Cir.1987). *See also Continental Automotive Systems, U.S., Inc. v. Omron Automotive Electronics, Inc.,* 2014 WL 2808984, 4 (N.D.Ill. 2014)*; BASF Corp. v. United States,* 321 F.Supp.2d 1373, 1380 (insert cite 2004)("It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so."); *Intel Corp. v. VIA Technologies, Inc.,* 198 F.R.D. 525, 531 (N.D.Cal.2000)("good intentions are insufficient to prevent inadvertent disclosure of confidential information because it is not possible for counsel to 'lock-up trade secrets in [her] mind'"); *Exxon Corp.*, 636 F.2d at 1350("[I]t is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.").[3]

That risk is one that a party must, of necessity, endure. But it is not one that a nonparty ought to be forced to take where the party seeking the information is its foremost competitor and there appear to be alternative sources of information. The inescapable reality is that once an expert—or

---

[3] The challenge of compartmentalization and the very real risk of inadvertent disclosure despite best efforts and intentions has been adverted to over and over again in arguing against opening of access to in-house counsel. See e.g., *Stanley Works v. Newell Co.*, No. 92 C 20157, 1992 WL 229652, at *5 (N.D. Ill. Aug. 27, 1992); *Trading Techs. Int'l, Inc. v. BCG Partners, Inc*., No. 10 C 715, 2011 WL 1748607, at *6 (N.D. Ill. 2011); *Cummins Allison Corp. v. Glory Ltd.*, No. 02 C 7008, 2003 WL 26620151, at *7 (N.D. Ill. 2003); *Cummins Allison Corp. v. Glory Ltd.*, No. 02 C 7008, 2003 WL 26620151, at *7 (N.D. Ill. 2003).

a lawyer for that matter—learns the confidential information that is being sought, that individual cannot rid himself of the knowledge he has gained; he cannot perform a prefrontal lobotomy on himself, as courts in other contexts have recognized. *Cf. AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1205 (7th Cir.1987). *See also BASF Corp. v. United States*, 321 F.Supp.2d 1373, 1380 (CIT 2004)("It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.");*Continental Automotive Systems, U.S., Inc.*, 2014 WL 2808984, at *4.

## II.

Under the confidentiality order, the parties can designate protected information under one of two categories: "Confidential" or "Highly Confidential." (Confidentiality Order ¶ 3). Material designated as "Confidential" can be shared with defendants and their employees to the extent counsel determines in good faith that the employees' assistance is reasonably necessary to the conduct of the litigation in which the information is disclosed. (Confidentiality Order ¶ 5(b)(3)). Information designated as "Highly Confidential" can be shared with one designated representative of each defendant. The designation is subject to the court's approval, and each such designee must (a) completes a certification, acknowledgment, and agreement to be bound by the Confidentiality Order and (b) complete a Declaration detailing their responsibilities at the defendants' companies, confirming that they are not involved in "competitive decision-making" and that they will not share Highly Confidential information or relate the substance of it to anyone not approved by the court. (Confidentiality Order ¶ 5(c)(3)).

The Confidentiality Order defines "Highly Confidential Information" to cover some categories of particularly competitively sensitive information – *e.g.*, strategic plans; market and

competitive assessments, analyses, studies, profiles, and forecasts; peer analyses; responses to requests for proposals; and pricing lists and reports (Confidentiality Order ¶ 2(b)) – of the sort the Intervenors provided to the FTC.

Next, the defendants each designated in-house counsel – Eric Tower and Sean O'Grady – to have access to all Highly Confidential information. Each attorney filed a Declaration. The core of the Declarations is essentially identical, with each Declaration parroting the language of the confidentiality order and assuring that the Declarant does not participate in executive level decision-making; or business decisions regarding pricing, marketing, or design; competitive decision-making in areas like expansion, pricing, or strategies. Each attorney stated that it was essential that he be provided access to all Highly Confidential information, but neither explained why.

Of course, the Intervenors objected – and with good reason. Mr. Tower's and Mr. O'Grady's Declarations were perfectly structured to fit this case. But as often occurs, Declarations, even by lawyers, cannot be accorded the weight of an encyclical. *See, e.g., Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 379 (N.D.Ill. 2012)("As it turned out, much of what Ms. Wright said in her affidavit was not based on personal knowledge [contrary to her affidavit], and a good deal of what she said in the affidavit was open to serious question, to say the very least.").

The Intervenors' lawyers did what any careful contemporary lawyer would do – they turned to social media to see whether there was information that might bear on the assertions in the Declarations. And, lo and behold, the Linked-in profiles of Mr. Tower and Mr. O'Grady told a very different story than that in their Declarations. (In modern parlance, and in light of the designated in-house counsel's Linked-in postings, Mr. Tower and Mr. O'Grady were, from the Intervenors' perspective, "swipe left.").

Mr. Tower publically boasted on social media that his responsibilities most certainly *do* "include development of strategy" in a variety of competitive areas, like mergers, affiliations, and asset purchases. [Dkt. #81-2]. He advises Advocate on contract matters [Dkt. #81-2] – so, he does at least participate and is involved in business decisions. Mr. O'Grady says on his social media cite that he "is responsible for operations, management, *strategic planning* and program development." [Dkt. #81-3 (emphasis supplied)]. He emphasized that one of his specialties is "strategic and business planning." [Dkt. #81-4]. No one disputes the authenticity of these postings. *See* Rule 901(a), Federal Rules of Evidence. Under the agreed upon terms of the protective order, neither of these gentlemen can be approved to have access to the Intervenors' Highly Confidential information.

Moreover, it is unclear why it would be essential for either of these gentlemen to pour over the Intervenors' Highly Confidential information. The defendants never get around to explaining that, other than to cite, very general, boilerplate language regarding attorneys needing to share facts with their clients in order to adequately represent them. And they seem to put out of the equation that we are not talking about an exchange of documents between two sides in a lawsuit. We are talking about a number of third parties, not targets of any FTC action, who had to give up exceedingly confidential information in response to a government subpoena. This is not the garden variety trade secrets situation that is addressed in the cases the defendants rely on, like *Motorola Inc. v. Lemko Corp.*, 2010 WL 2179170, at *5 (N.D. Ill. 2010) or *Kraft Foods Glob., Inc. v. Dairilean, Inc.*, No. 10 C 8006, 2011 WL 1557881, at *5 (N.D. Ill. 2011). That makes the hollow aphorisms the defendants pluck from those case even less instructive than they would be in the first place. It must not be forgotten that "general propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting). *See also Daubert v. Merrell Dow*, 509 U.S. 579, 598

(1993)(Rehnquist, C.J., concurring in part and dissenting in part)("'general observations'" suffer from the common flaw that they are not applied to the specific matter and "therefore they tend to be not only general, but vague and abstract.").

In *Motorola*, a number of plaintiffs' employees worked simultaneously for the defendant, a competitor, and accessed and divulged plaintiff's trade secrets to the defendant. During discovery, the plaintiff quite naturally wanted to see just what the defendant had spirited away, if anything. Outside counsel would have no familiarity with whether the information constituted plaintiff's trade secrets, whereas in-house employees familiar with the information readily would. *Kraft* was a patent case, but it similarly involved a need for those in-house attorneys who were intimately familiar with the processes and formulations used in making cheese products to review the confidential materials at issue.

This case is not about trade secrets, but a merger. As such, and as defendants put it, "market shares, concentration, and diversion ratio calculations are at the very heart of" it. [Dkt. #49, at 8]. To be sure, some of these calculations are dependent on the evidence the FTC subpoenaed from the Intervenors. [Dkt. #49, at 1-2]. But, according to the defendants, the calculations employing that evidence are "simple" and "straightforward." [Dkt. #49, at 5, 7]. And, given the extraordinarily sophisticated, experienced and talented counsel in this case, the critical question is: why is it "essential," as the defendants put it, that in-house counsel, as opposed to outside counsel, review the calculations and the information from the Intervenors underlying those calculations? It's a question left unanswered in all the defendants' submissions aside, of course from their attorneys' *ipse dixit*. The defendants have not come up with anything that would convince one that their outside counsel would be hamstrung in their trial preparations without input from in-house counsel in these

circumstances. *United States v. Sungard Data Sys., Inc.*, 173 F. Supp. 2d 20, 22 (D.D.C. 2001).

If there is no one among the dozen or so attorneys from Drinker Biddle or Winston & Strawn, who are representing the defendants, who can make heads or tails out of the numbers underlying these "simple calculations" without help it would be astonishing. For example, David Dahlquist of Winston & Strawn specializes in antitrust and healthcare law and "is a veteran of multiple FTC investigations, merger reviews, and divestiture sales in the healthcare industry . . . [and] currently antitrust counsel on behalf of multiple pending hospital mergers . . . ."[4] http://www.winston.com/en/ who-we-are/attorneys/dahlquist-david-e.html. One suspects that Winston's lawyers will not need Mr. O'Grady to explain to them the materials obtained from the Intervenors that went into the FTC's calculations. As a further example, Michael Pullos is a member of Winston & Strawn's Antitrust & Competition practice, has worked in a wide variety of antitrust case including merger enforcements, and routinely provides antitrust counseling for mergers and acquisitions. http://www.winston.com/en/who-we-are/attorneys/pullos-michael-s.html. It simply cannot be argued that the lawyers in this case lack sufficient familiarity with the Herfindahl-Hirschman Index.

Robert McCann of Drinker Biddle Rob "has practiced law in the health care field since 1978, presently focusing on antitrust counseling and litigation, mergers and acquisitions, and capital financing. His experience includes representation as general counsel or special antitrust counsel to

---

[4] Winston & Strawn's global antitrust/competition attorneys help clients in myriad industries resolve their most complex problems. Regularly handling issues of every size and scope, our internationally renowned lawyers are proud to offer a full range of related services, including advice and representation related to all aspects of global cartel defense, civil and criminal litigation, government investigations, mergers and acquisitions, and regulatory counseling and compliance. The group has been ranked as "Highly Recommended" by Global Competition Review and as National Tier 1 in U.S. News & World Report and Best Lawyers® 2014 "Best Law Firms." http://www.winston.com/en/what-we-do/services /antitrust-litigation/index.html.

health care clients in mergers and acquisitions, . . . ." http://www.drinkerbiddle.com/ people/attorneys/mccann-robert-w. He is the firm's primary contact for healthcare/antitrust issues. Kenneth Vorrasi's antitrust practice at Drinker Biddle focuses on "litigation, merger and conduct investigations before the U.S. Department of Justice, Federal Trade Commission and state enforcement authorities, . . . . and appearing before the federal antitrust agencies to obtain clearance of mergers, acquisitions, and joint ventures." http://www.drinkerbiddle.com/people/attorneys/ vorrasi-kenneth-m. The defendants surely cannot be heard to argue that they have insufficient familiarity with the calculations involved in this case. Lee Roach of Drinker Biddle has extensive antitrust experience and "has helped secure merger clearance for clients from federal regulators and has defended clients' interests in lawsuits alleging . . . anticompetitive conduct." There is absolutely nothing to indicate that, in the context of information from the Intervenors, Mr. Tower can bring anything more to the table. In short, it is difficult to see how Mr. O'Grady or Mr. Tower would have any special insight into confidential materials from companies they don't work for – or at least that they would have a familiarity sufficiently different from that possessed by their outside counsel that could justify the risk of exposing the highly confidential information provided by the defendants' competitors.

In sum, good cause for amending the confidentiality order in this instance has been established. First, while the defendants say the protections of the confidentiality order are adequate, neither the FTC nor certainly the defendants had any concern about the Intervenors' confidential information when they hammered out the terms. This isn't a criticism – the parties had no incentive to take special care of any third parties. We note that, unlike the order in one of the cases the parties expressly used as a template – *FTC v. Sysco Corp.*, 83 F. Supp. 3d 1 (D.D.C. 2015) – the

confidentiality order here has no teeth. The order in *Sysco* included a clause providing for specific and severe fines and punishment in the event of disclosures. 83 F. Supp. 3d at 5; *see also United States v. Sungard Data Sys., Inc.*, 173 F. Supp. 2d 20, 21 22 (D.D.C. 2001)(judge may deem *any* violation of the order punishable by a $250,000 fine to be paid by in-house counsel themselves and not reimbursable by their employers). There's nothing approaching that in the confidentiality order here, other than some vague mention that a violation of the confidentiality order "may" – not "will," incidently – result in unspecified penalties for contempt.

Second, given the inconsistency between the Declarations of in-house counsel and their social media postings, it is now clear that the only sure way to protect the Intervenors' confidential information is to carve out a special category of Highly Confidential information for them that is not accessible to in-house designees. Of course, the matter can be revisited if there is an instance in the future where the defendants are able to demonstrate – going far beyond their unsupported conclusions here – that in-house counsel's special knowledge is essential to review of the Intervenors' information. *Compare INS v. Phinpathya*, 464 U.S. 183, 188–89 n. 6 (1984) (unsupported statements in briefs are not evidence and do not count). *Accord United States v. Adriatico–Fernandez*, 498 Fed.Appx. 596, 599–600 (7th Cir. 2012); *United States v. Chapman*, 694 F.3d 908, 914 (7th Cir. 2012); *Clifford v. Crop Production Services, Inc.*, 627 F.3d 268, 273 n. 6 (7th Cir. 2010); *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 610–611 (7th Cir. 2006).

Third, and finally, the risk of potential harm to the defendants from restrictions imposed against their in-house counsel accessing the Intervenors' Highly Confidential information is substantially outweighed by the risk of inadvertent disclosure and harm to the Intervenors. *See In*

*re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1380 (Fed. Cir. 2010); *U.S. Steel,* 730 F.2d at 1468; *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1470 (9th Cir.1992). There is nothing in any of the defendants' submissions that explains why it is essential that in-house counsel pour over the Highly Confidential information their competitors had to produce to the FTC pursuant to government subpoena. There is only the *ipse dixit* of the defendants to sustain their position. And that is not enough. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990). "[U]nfortunately ... saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010).

The defendants' motion for an order approving designation of representatives [Dkt. #72] is DENIED. The Intervenors' motions to amend the confidentiality order [Dkt. #81, 115, 121, 123] are GRANTED.


**ENTERED:** _____
                    **UNITED STATES MAGISTRATE JUDGE**


**DATE:** 2/29/16

14