**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> and <br><br> STATE OF ILLINOIS <br><br> *Plaintiffs*, <br><br> v. <br><br> ADVOCATE HEALTH CARE NETWORK, <br><br> ADVOCATE HEALTH AND HOSPITALS CORP., <br><br> and <br><br> NORTHSHORE UNIVERSITY HEALTHSYSTEM, <br><br> *Defendants*. | Case No.: 1:15-cv-11473 <br> Judge Jorge L. Alonso <br> Mag. Judge Jeffrey Cole <br><br> ██████████████ |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Robert W. McCann, Esq.
Kenneth M. Vorrasi, Esq.
John L. Roach, IV, Esq.
Jonathan Todt, Esq.
Drinker Biddle & Reath LLP
1500 K Street, N.W.
Washington, D.C. 20005

J. Robert Robertson, Esq.
Leigh Oliver, Esq.
Robert F. Leibenluft, Esq.
Hogan Lovells US LLP
555 13th Street, N.W.
Washington, D.C. 20004

Dan K. Webb, Esq.
David E. Dahlquist, Esq.
Michael S. Pullos, Esq.
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, Illinois 60601

*Counsel for Defendants Advocate Health Care
Network and Advocate Health and Hospitals Corp.*

*Counsel for Defendant NorthShore
University HealthSystem*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ v

(cont'd) .................................................................................................................. v

FINDINGS OF FACT ............................................................................................... 1

I.  Background. ..................................................................................................... 1

    A.  The Merging Parties. ............................................................................ 1

        1.  Advocate. .................................................................................. 1

        2.  NorthShore. .............................................................................. 1

        3.  The Affiliation. ........................................................................ 2

    B.  The Health Insurance Marketplace. ..................................................... 2

        1.  Current Product Offerings in the Chicagoland Area. ............... 3

        2.  Payers. ...................................................................................... 3

        3.  Managed Care Contracting. ...................................................... 4

        4.  Reimbursement Methodologies. ............................................... 5

    C.  Merger Rationale. ................................................................................ 7

        1.  Advocate's High Performing Network Strategy and Rationale for Merging with NorthShore. ....................................................... 7

        2.  NorthShore's Rationale for Merging with Advocate. .............. 10

II.  Plaintiffs Have Not Established a *Prima Facie* Showing that the Merger Will Cause Anticompetitive Effects. ......................................................................... 12

    A.  The Inpatient Services Product Market Is Constrained by Other Significant Competitive Factors. ............................................................................. 12

    B.  The Plaintiffs Have Not Properly Defined a Relevant Geographic Market. ....... 13

        1.  Neither the "Tenn North Shore Area" Nor Merely the Six Party Hospitals in that Area Are a Relevant Geographic Market. ............ 14

        2.  Patients in the Alleged Market Travel in Large Numbers to Hospitals Outside of the Alleged Market, and Patients Outside of the Alleged Market Travel in Larger Numbers to Hospitals in the Alleged Market. ........................................................................ 15

        3.  Plaintiffs' Proposed Geographic Market Is Contrary to the FTC's Own Merger Guidelines. ........................................................... 17

i

C.  A Properly-Defined Relevant Geographic Market Includes at Least All Hospitals that Draw More Volume from the Tenn North Shore Area than One or More of the Six Party Hospitals Plaintiffs Include in Their Proposed Market. ........................................................................................ 18

    1.  There Is No Basis to Exclude the So-Called "Destination Hospitals." ................................................................................... 18

    2.  There Is No Basis to Exclude Hospitals that Constrain Only One Set of Party Hospitals but not Both Sets of Party Hospitals. .................. 25

    3.  There Is No Basis to Exclude Hospitals that Have a Higher Share in the North Shore Area than a Hospital that Plaintiffs Include in Their Proposed Geographic Market. ........................................................ 29

D.  In a Properly Defined Market, the Merger Does Not Result in Market Concentration Levels that Create a Presumption of Anticompetitive Harm. ...... 30

III.  There Is No Other Evidence that Indicates Anticompetitive Effects from this Merger Are Likely. ............................................................................................. 31

A.  Advocate and NorthShore Are not Each Other's Closest Competitors. .............. 31

    1.  Northwestern, not Advocate, Is NorthShore's Closest Competitor. ......... 31

    2.  NorthShore Is not Advocate's Closest Competitor. ................................. 33

    3.  Payer Testimony Confirms that Advocate and NorthShore Are not Each Other's Next Best Network Alternative. ......................................... 34

    4.  Real-World "Natural Experiments" Establish that Advocate and NorthShore Are not Each Other's Next Best Substitutes. ...................... 35

    5.  Plaintiffs' Alleged Examples of Close Substitution Are Misplaced ........ 36

B.  Payers Support the Merger as Procompetitive and a Benefit to Consumers. ...... 39

C.  BCBSIL Opposes the Merger as a Threat to its Own Market Dominance. .......... 41

D.  There Is No Evidence that the Merger Will Lead to Higher Prices. .................... 42

    1.  The Hospital Merger Simulation Model Endorsed by the FTC Indicates that There Is No Basis to Predict a Statistically Significant Post-Merger Price Increase. .................................................. 44

    2.  Dr. Tenn Relied on a Screening Test that Is Unsuited for, and Has Never Been Used to, Predict a Price Increase in a Hospital Merger Case. ........................................................................................ 46

    3.  Dr. Tenn's Model Is Unreliable Because, Among Other Things, It Fails to Provide any Estimate of the Relevant Bargaining Strengths. ............................................................................................... 48

E.  Significant Repositioning by Payers and Competitors Further Reduces any Likelihood of Anticompetitive Effects. .............................................................. 48

|   |   | 1. | There Is Dynamic and Persistent Provider Competition in Chicagoland. | 48 |
|   |   | 2. | "Project Remedy" Represents a Coordinated Health Plan/Provider Competitive Response to the Merger. | 50 |
| IV. | | | The Merger Will Generate Substantial Savings for Chicago Consumers, Price Efficiencies, and Cost Efficiencies, All of Which Outweigh any Potential Harm Estimated by Plaintiffs. | 51 |
|   | A. | | HPN Pricing Efficiencies. | 51 |
|   |   | 1. | Overview of the High Performing Network. | 51 |
|   |   | 2. | Consumers Will Each Save Hundreds of Dollars Per Year in Price Reductions from Switching to the HPN. | 53 |
|   |   | 3. | The Offsetting HPN Enrollment Necessary for the Consumer Savings to Outweigh Plaintiffs' Estimated Potential Harm Is Achievable. | 55 |
|   |   | 4. | The HPN Price Savings Consumers Will Receive Cannot, and Will Not, Occur Without this Merger. | 58 |
|   | B. | | Price Savings from Reductions in NorthShore Physicians' Rates | 62 |
|   | C. | | Clinical Efficiencies Resulting in Reductions of Total Cost of Care | 63 |
|   | D. | | Cost Efficiencies | 66 |

CONCLUSIONS OF LAW ............................................................................................ 67

| I. | | Plaintiffs' Motion for Preliminary Injunction Must Be Denied Because They Have Failed to Prove They Are Likely to Succeed on the Merits. | 67 |
|   | A. | Plaintiffs Carry the Burden of Proof. | 67 |
|   | B. | Plaintiffs Must Demonstrate a Likelihood of Success on the Merits. | 68 |
|   | C. | Plaintiffs Failed to Prove a Relevant Market. | 68 |
|   | D. | Plaintiffs Have Not Established that Anticompetitive Effects Are Likely. | 69 |
|   | E. | Substantial Consumer Benefits Will Result from this Merger and Outweigh Plaintiffs' Estimate of Potential Harm. | 70 |

| II. | | The Balance of Equities Favors the Merger. | 71 |

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ................................................................................. 69

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ............................................................................................... 68

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2007) ............................................................... 68, 69

*FTC v. Butterworth Health Corp.*,
    946 F. Supp. 1285 (W.D. Mich. 1996). .................................................................. 72

*FTC v. CCC Holdings*,
    605 F. Supp. 2d 26 (D.D.C. 2009). ........................................................................ 71

*FTC v. Freeman Hosp.*,
    69 F.3d 260 (8th Cir. 1995) ................................................................................... 68

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) .............................................................................. 68

*FTC v. Lab. Corp. of Am.*,
    No. SAV 10-1873 AG, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ................... 72

*FTC v. Penn State Hershey Med. Ctr.*,
    Civ. Action No. 1:15-cv-2362, 2016 WL 2622372 (M.D. Pa. May 9, 2016) ......... 68, 69, 71, 72

*FTC v. Swedish Match*,
    131 F. Supp. 2d 151 (D.D.C. 2000). ...................................................................... 71

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ......................................................................... 69, 71

*FTC v. Univ. Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991) ....................................................................... 71, 72

*FTC v. Whole Food Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008). ...................................................................... 70, 72

*FTC v. Whole Foods Mkt., Inc.*,
    502 F. Supp. 2d 1 (D.D.C. 2007) .......................................................................... 70

# TABLE OF AUTHORITIES
**(cont'd)**

**Page(s)**

*In re Evanston Nw. Healthcare Corp.*,
   FTC Docket No. 9315, 2007 WL 22861958 (Aug. 6, 2007). ................................................. 33

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ................................................................................................ 71

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) .............................................................................................. 68

*United States v. Gen. Dynamics Corp.*,
   415 U.S. 486 (1974)....................................................................................................... 68, 72

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) ............................................................................... 70

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963).............................................................................................................. 69

## STATUTES

15 U.S.C. § 18 ............................................................................................................................ 67

15 U.S.C. § 53(b). ..................................................................................................................... 68

## GLOSSARY OF ABBREVIATED TERMS

Abbreviations used in Defendants' Proposed Findings of Fact and Conclusions of Law have the following meanings:

**1.** *Exhibits and Transcripts*

| | |
|---|---|
| PX | Plaintiffs' Exhibit |
| DX | Defendants' Exhibit |
| JX | Joint Plaintiffs' and Defendants' Exhibit |
| DDX | Defendants' Demonstrative Exhibit |
| Hr'g Tr. | Hearing Transcript |
| Dep. Tr. | Deposition Transcript |

**2.** *Names and Terms*

| | |
|---|---|
| ABHS | Alexian Brothers Health System |
| ABMC | Alexian Brothers Medical Center |
| ACO | Accountable Care Organization |
| ACS | Aetna's Accountable Care Solutions |
| Aetna | Aetna Inc. |
| Advocate | Advocate Health Care Network |
| AMCs | Academic medical centers |
| ANHP | Advocate NorthShore Health Partners |
| Aon | Aon plc |
| APP | Advocate Physician Partners |
| AWH | Aetna Whole Health |
| BCBSIL | Blue Cross Blue Shield of Illinois |
| BCD | BlueCare Direct with Advocate |
| Centegra | Centegra Health System |
| Centegra-McHenry | Centegra Hospital—McHenry |
| Cigna | Cigna Corp. |
| FFS | Fee-for-service |
| FFV | Fee-for-value |
| FTC | Federal Trade Commission |
| HHI | Herfindahl-Hirschman Index |
| HMS | Hospital Merger Simulation Model |
| HPN | High Performing Network |
| Humana | Humana Inc. |
| Lake Forest | Northwestern Lake Forest Hospital |
| Land of Lincoln (or LoL) | Land of Lincoln Mutual Ins. Co. |

Lurie                         Ann & Robert H. Lurie Children's Hospital
MSA                           Metropolitan Statistical Area
NorthShore                    NorthShore University HealthSystem
Northwest                     Northwest Community Hospital
NCH                           Northwest Community Healthcare
Northwestern (or NWM)         Northwestern Memorial HealthCare
PHM                           Population health management
PMPM                          Per member, per month
Presence                      Presence Health
Public Exchange               Illinois Insurance Exchange
Resurrection                  Presence Resurrection Hospital
RUMC                          Rush University Medical Center
Rush                          Rush Health
St. Alexius                   St. Alexius Hospital
St. Francis                   Presence St. Francis Hospital
SSNIP                         Small but significant non-transitory increase in price
Swedish Covenant              Swedish Covenant Hospital
Tenn North Shore Area         Plaintiffs' proposed geographic market
UCMC                          University of Chicago Medical Center
United                        United HealthCare
Vista                         Vista Hospital—East
WTP                           Willingness-to-pay

3. *Hearing Witnesses*

Joanne Beck                   United HealthCare
James Dechene                 Northwestern Memorial HealthCare
Dr. Adams Dudley              Defendants' expert
Dr. David Eisenstadt          Defendants' expert
Steve Hamman                  Health Care Service Corp. (BCBSIL)
Dr. Joe Golbus                NorthShore University HealthSystem
Dr. Ashish Jha                Plaintiffs' expert
Dr. Thomas McCarthy           Defendants' expert
Mark Neaman                   NorthShore University HealthSystem
Brigitte Nettesheim          Aetna Inc.
Tyler Norton                  Cigna Inc.
Dr. Lee Sacks                 Advocate Health Care Network
James Skogsbergh              Advocate Health Care Network
Dr. Steven Tenn               Plaintiffs' expert
Dr. Kent Van Liere            Defendants' expert

**4. *Deponents and Declarants***

| | |
|---|---|
| James Abrams | Medline Industries, Inc. |
| Richard Allegretti | Health Care Service Corp. (BCBSIL) |
| Audre Bagnall | University of Chicago Medical Center |
| Nitin Bhargarva | Aetna Inc. |
| Peter Butler | Rush Health |
| Patricia Cassidy | Alexian Bros. Health System (AMITA Health) |
| Scott Dewey | Waukegan Illinois Hospital Company, LLC (Vista) |
| Tina Esposito | Advocate Health Care Network |
| Benjamin Fisk | NorthShore University HealthSystem |
| J.P. Gallagher | NorthShore University HealthSystem |
| Jesse Hall | NorthShore University HealthSystem |
| Michael Hartke | Northwest Community Healthcare |
| Damon Havill | Advocate Health Care Network |
| Michael Hodge | Albertson's LLC |
| Matthew Levin | Aon plc |
| Paul Maxwell | Humana Inc. |
| Jason Montrie | Land of Lincoln Mutual Ins. Co. |
| Mark Newton | Swedish Covenant |
| Scott Powder | Advocate Health Care Network |
| Matthew Primack | Advocate Health Care Network |
| Sean Pugh | Federal Trade Commission (Rule 30(b)(6) Deponent) |
| Janelle Reilly | Presence Health |
| Dr. Glenn Steele | Defendants' expert |
| Brian Washa | NorthShore University HealthSystem |
| Gary Weiss | NorthShore University HealthSystem |

<u>**FINDINGS OF FACT**</u>

**I.   BACKGROUND.**

   **A.   The Merging Parties.**

      **1.   Advocate.**

1.     Advocate Health Care Network ("Advocate"), the parent entity of Advocate Health and Hospitals Corp., is a twelve-hospital faith-based health care system.[1] Ten are located in the six-county Chicagoland area, including Lutheran General in Park Ridge, Condell in Libertyville, Good Shepherd in Barrington, and Illinois Masonic in Chicago.[2]

2.     Advocate Physician Partners ("APP") is a physician hospital organization that comprises Advocate Medical Group (approximately 1,400 employed physicians) and independent physicians who are aligned with Advocate through its clinical integration program.[3]

3.     Advocate operates over 200 sites of care in Chicagoland.[4] Advocate lacks any outpatient or physician offices along the lakefront suburbs east of Interstate 94.[5]

      **2.   NorthShore.**

4.     NorthShore University HealthSystem ("NorthShore") is an integrated health system located in the northern suburbs of Chicago that includes four hospitals: Evanston Hospital, Glenbrook Hospital (based in Glenview), Highland Park Hospital, and Skokie Hospital.[6]

5.     NorthShore Medical Group is NorthShore's employed physician group consisting of 900

---

[1] DX7004B.0005; Advocate Hospitals, Advocate Health Care, http://www.advocatehealth.com/hospital-locations (last visited May 17, 2016).

[2] *Id.*

[3] DX7004B.0006.

[4] About Advocate, Advocate Health Care, http://www.advocatehealth.com/overview-of-advocate (last visited May 17, 2016); Outpatient locations, Advocate Health Care, http://www.advocatehealth.com/outpatient-locations (last visited May 17, 2016); Advocate Medical Group, Advocate Medical Group, http://www.advocatehealth.com/amg-location (last visited May 17, 2016).

[5] Hr'g Tr. 1434:10-1435:14, Apr. 20, 2016 (Dr. Sacks, Advocate); DDX12041.0011.

[6] Hr'g Tr. 657:21-658:4, Apr. 14, 2016 (M. Neaman, NorthShore).

primary care physicians and specialists, and approximately 1,600 affiliated physicians.[7]

6.      NorthShore operates approximately 100 outpatient facilities and physician offices that are located from downtown Chicago extending north to the Wisconsin border.[8]

### 3.      The Affiliation.

7.      Advocate and NorthShore signed an Affiliation Agreement in September 2014 to merge into one integrated health system to be called Advocate NorthShore Health Partners ("ANHP").[9]

## B.      The Health Insurance Marketplace.

8.      Insured individuals typically obtain either government health insurance (like Medicare and Medicaid) or private health insurance (commercial insurance).[10]

9.      The commercial market includes: individuals (on and off the Public Exchange); small employer groups (under 50 employees); and large employer groups (50 or more employees).[11]

10.     In the Chicagoland area, approximately 600,000 patients obtain commercial insurance individually through the Public Exchange[12] and approximately 4.8 million people—90% of the commercial market—purchase their insurance through their employer (small and large group).[13]

11.     About four million people—74% of commercial lives—are in the large group market.[14]

---

[7] Hr'g Tr. 764:6-765:17, Apr. 14, 2016 (Dr. Golbus, NorthShore).

[8] Hr'g Tr. 674:6-15, Apr. 14, 2016 (M. Neaman, NorthShore).

[9] Hr'g Tr. 424:10-425:8, Apr. 13, 2016 (J. Skogsbergh, Advocate); DX3118.0006.

[10] *See* Hr'g Tr. 145:15-20, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1403:8-17, Apr. 20, 2016 (Dr. Sacks, Advocate).

[11] Hr'g Tr. 1403:16-17, 1423:14-22, 1569:8-11, Apr. 20, 2016 (Dr. Sacks, Advocate); *see also* ███████
███████████████████

[12] Hr'g Tr. 1423:8-13, Apr. 20, 2016 (Dr. Sacks, Advocate).

[13] Hr'g Tr. 1423:14-22, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 1491:22-1492:14, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert).

[14] Hr'g Tr. 1423:20-22, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 1491:22-1492:9, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert).

### 1. Current Product Offerings in the Chicagoland Area.

12.     Commercial plans include (i) PPOs that generally allow customers "open access" to a network and (ii) HMOs that are "more restrictive" by typically requiring referrals to access providers within the network.[15] PPOs or HMOs may have broad or narrow networks.[16]

13.     Chicago is historically a "PPO-dominated market."[17]

14.     As customers look for products that are lower cost and higher quality, the general national trend in the industry is for health plans to introduce narrow networks.[18] Growth of narrow network plans in the Chicago market, however, has been slow.[19]

15.     Narrow network plans offered in Chicago, like ██████████, Cigna's HMO, and Aetna Whole Health ("AWH"), have not achieved significant enrollment.[20]

### 2. Payers.

16.     Blue Cross Blue Shield of Illinois ("BCBSIL"), a subsidiary of Health Care Service Corp., is the largest of six sizable payers in the Chicago market, with approximately four million members in the seven-county Chicago Metropolitan Statistical Area ("MSA")—2.5 million of whom reside in the counties of Cook and Lake.[21]

17.     The other Chicago payers include: United Health Group ("United") with 1.5 million total members in Illinois,[22] Aetna Inc. ("Aetna") with 389,000 members in the Chicagoland area,[23]

---

[15] Hr'g Tr. 145:21-146:14, Apr. 12, 2016 (S. Hamman, BCBSIL).

[16] Hr'g Tr. 147:5-9, Apr. 12, 2016 (S. Hamman, BCBSIL).

[17] Hr'g Tr. 1460:1-3, Apr. 20, 2016 (Dr. Sacks, Advocate).

[18] Hr'g Tr. 153:25-154:2, 207:18-21, 209:11-16, Apr. 12, 2016 (S. Hamman, BCBSIL).

[19] Hr'g Tr. 250:8-10, 251:6-9, Apr. 12, 2016 (S. Hamman, BCBSIL).

[20] Hr'g Tr. 72:5-10, ██████, Apr. 11, 2016 (T. Norton, Cigna); Hr'g Tr. 1482:9-18, Apr. 20, 2016 (Dr. Sacks, Advocate); Apr. 18, 2016 Hearing Tr. 1188:1-9 (B. Nettesheim, Aetna); DX1793.0001.

[21] Hr'g Tr. 143:13-17, 145:9-14, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1414:21-22, Apr. 20, 2016 (Dr. Sacks, Advocate).

[22] Hr'g Tr. 1115:5-9, Apr. 18, 2016 (J. Beck, United).

Cigna Corp. ("Cigna") with 350,000 members in the Chicagoland area,[24] Humana Inc. ("Humana") with ████████████ in the Chicagoland area,[25] and Land of Lincoln Mutual Health Ins. Co. ("Land of Lincoln") with 65,000 members in Illinois.[26]

18.     Chicago's payer market is ██████████████████████████████████ ██████████████,"[27] ████████████████████████████████████ ████████████████████████████████████.[28]

19.     BCBSIL is "very dominant" in the payer market, with over 70% market share,[29] United is second with approximately 15-16% market share, with the others each in the single digits.[30]

20.     BCSBIL's high market share makes it "difficult for Aetna or any small player to gain market share."[31] It also allows BCBSIL to obtain lower rates from providers than its competitors.[32] For example, ████████████████████████████████████████████████

### 3.     Managed Care Contracting.

21.     In seeking to construct a marketable provider network, payers evaluate providers' geographic coverage—including physician offices and outpatient locations—their price, their "read-

---

[23] Hr'g Tr. 1165:16-17, Apr. 18, 2016 (B. Nettesheim, Aetna); DX1862.0005.

[24] Hr'g Tr. 72:2-4, Apr. 11, 2016 (T. Norton, Cigna).

[25] DX1515.0002 ██████████████████████

[26] DX1878, J. Montrie (LoL) Dep. Tr. 8:1-2, 34:19-22, Mar. 7, 2016.

[27] ██████████; *see* Hr'g Tr. 1120:18-25, Apr. 18, 2016 (J. Beck, United).

[28] ██████████

[29] Hr'g Tr. 1121:3-4, Apr. 18, 2016 (J. Beck, United); Hr'g Tr. 412:18-25, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 1175:3-22, Apr. 18, 2016 (B. Nettesheim, Aetna); ████████████████████

[30] Hr'g Tr. 1121:4-8, Apr. 18, 2016 (J. Beck, United); ████████████████████████ ██████████████

[31] Hr'g Tr. 1175:5-15, Apr. 18, 2016 (B. Nettesheim, Aetna).

[32] DX0011.0043-44 (United's rate differential analysis compared to the "Dominant Payer").

[33] ████████████████████

iness . . . to manage populations," and their quality and attractiveness to patients.[34]

22.    In determining geographic adequacy in the Chicago market, payers typically look at the entire six- or seven-county area.[35]

23.    In determining whether a provider network offers appropriate geographic coverage, one general acute care hospital every 30 miles meets Illinois' regulatory standards in urban areas.[36]

24.    Due to the increasing cost of medical coverage, "employers today are very price sensitive," even more so than in the past.[37] Likewise, individuals purchasing their own plan most often choose the lowest-cost plan.[38]

25.    Because of the importance of price, BCBSIL's goal is to "get the lowest reimbursement possible" from the included providers.[39]

### 4.    Reimbursement Methodologies.

26.    Under a fee-for-service reimbursement system ("FFS"), an insurer pays a health care provider an agreed-upon fee for every service or procedure the provider performs for a patient.[40]

27.    Most of the Chicago market remains entrenched in FFS payment models.[41]

---

[34] Hr'g Tr. 149:1-11, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1180:9-25, Apr. 18, 2016 (B. Nettesheim, Aetna); DX1878, J. Montrie (LoL) Dep. Tr. 100:10-17, Apr. 7, 2016; JX00019, P. Maxwell (Humana) Dep. Tr. 93:13-18, Mar. 3, 2016.

[35] Hr'g Tr. 1168:25-1169:12, 1170:23-1171:10, Apr. 18, 2016 (B. Nettesheim, Aetna); Hr'g Tr. 241:2-14, Apr. 12, 2016 (S. Hamman, BCBSIL).

[36] Hr'g Tr. 233:1-25, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1115:12-24, April 18, 2016 (J. Beck, United).

[37] JX00019, P. Maxwell (Humana) Dep. Tr. 25:12-24; *see* Hr'g Tr. 76:5-7, Apr. 11, 2016 (T. Norton, Cigna).

[38] JX00002, R. Allegretti (BCBSIL) Dep. Tr. 34:18-35:20, Feb. 22, 2016; JX00017, M. Levin (Aon) Dep. Tr. 27:1-14, 28:15-21, Mar. 7, 2016.

[39] Hr'g Tr. 147:14-24, Apr. 12, 2016 (S. Hamman, BCBSIL).

[40] Hr'g Tr., 85:14-18, Apr. 11, 2016 (T. Norton, Cigna); Hr'g Tr. 1419:8-10, 1465:18-20, Apr. 20, 2016 (Dr. Sacks, Advocate).

[41] Hr'g Tr. 210:25-211:3, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 415:8-416:4, Apr. 13, 2016 (J. Skogsbergh, Advocate).

28.     FFS has "perverse incentives," rewarding providers for performing more services over fewer, without regard to whether those services were avoidable or delivered well, while failing to compensate physician behaviors that lead to better health outcomes.[42]

29.     Due to high health care costs, the health care market is moving toward "integrated, population-level care coordination, with chronic care/disease management emerging as a vital competency," and "improvement in total cost" becoming "an industry imperative."[43]

30.     There has been recent growth in "value-based" contracting, which are payment arrangements that allow providers to share in potential savings by better caring for populations, such as with an Accountable Care Organization ("ACO").[44]

31.     Value-based payment models, or fee-for-value ("FFV"), run on a continuum on the low end with pay for performance, meaning a provider receives a bonus for meeting defined quality metrics, up to full risk contracting (also known as "global risk" or "capitation"), where a provider receives a defined payment to manage an entire population with the provider at risk for the costs of that care.[45]

32.     Value-based arrangements change providers' incentives and allow them to invest revenue into resources to improve the health outcomes of their patients and lower the total cost of care.[46]

33.     In risk-based arrangements, a provider's surplus depends on effective management of the

---

[42] Hr'g Tr. 1419:4-22, 1465:11-20, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 209:17-210:14, 214:19-24, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1466:21-21, Apr. 20, 2016 (Dr. Dudley, Defs.' Expert); DX0058.0013.

[43] DX7000, Dudley Report ¶¶ 18-19; DX0008.0003.

[44] Hr'g Tr. 213:20-23, Apr. 12, 2016 (S. Hamman, BCBSIL); ███████████████████████ ; *see* DX0090.0008, 0018; DX0092.0016.

[45] Hr'g Tr. 783:15-784:6, 792:10-22, Apr. 14, 2016 (Dr. Golbus, NorthShore); *see also* Hr'g Tr. 785:19-786:9, 786:21-787:3, 788:1-7, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 1399:18-23, Apr. 20, 2016 (Dr. Sacks, Advocate); DX0090.0018.

[46] Hr'g Tr. 792:10-22, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 162:7-13, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1418:21-1419:22, 1431:19-1432:10, 1478:4-8, Apr. 20, 2016 (Dr. Sacks, Advocate); ████████████ ; DX7000, Dudley Report ¶¶ 9, 19.

attributed population through population health management ("PHM") efforts, which requires significant cultural change and investment in infrastructure.[47]

34.    There is a vast difference between hospitals taking on some risk and taking on global risk.[48] Partial risk reimbursement does not create sufficient incentives to drive alignment and reductions to total cost of care.[49]

35.    In 2016, over 44% of Advocate's inpatient commercial revenue will come from global risk contracts.[50] Over 46% of Advocate's outpatient commercial revenue will come from global risk contracts.[51] Value-based contracts are projected to be 69% of its commercial revenue.[52]

36.    Payers acknowledge that Advocate has performed well under risk-based contracts in lowering the total cost of care while achieving high quality.[53]

37.    Since 2010, Advocate has consistently reduced prices and the total cost of care to patients despite insurance rates increasing as much as 30% in the last two years.[54]

###    C.    Merger Rationale.

####        1.    Advocate's High Performing Network Strategy and Rationale for Merging with NorthShore.

38.    Advocate seeks to merge with NorthShore to create a new, low-cost, high performing network ("HPN") insurance product that can be sold to employers and their employees through-

---

[47] Hr'g Tr. 799:6-800:13, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 1398:2-8, Apr. 20, 2016 (Dr. Sacks, Advocate); DX0038.0017; DX8006.0003.

[48] Hr'g Tr. 207:22-208:4, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1398:17-19, Apr. 20, 2016 (Dr. Sacks, Advocate).

[49] Hr'g Tr. 1392:2-1394:20, 1399:3-17, Apr. 20, 2016 (Dr. Sacks, Advocate).

[50] Hr'g Tr. 1410:6-16; 1410:18-20, Apr. 20, 2016 (Dr. Sacks, Advocate); DX7067.0003.

[51] DX7067.0003.

[52] DX7067.0003.

[53] Hr'g Tr. 1114:13-24, Apr. 18, 2016 (J. Beck, United); Hr'g Tr. 211:10-12, 212:17-21, Apr. 12, 2016 (S. Hamman, BCBSIL); *see also* DX0003.0001; DX8000, Steele Report ¶ 18.

[54] Hr'g Tr. 1389:23-1390:14, Apr. 20, 2016 (Dr. Sacks, Advocate).

out Chicagoland, furthering its goal to provide greater access to high-quality care at lower cost.[55]

39.    The HPN furthers Advocate's commitment to provide high-quality care at a lower cost through its pursuit of PHM strategies and payment-for-value arrangements that keep patients out of the hospital through better care management and utilization reductions.[56]

40.    Advocate found it ineffective to reduce unit prices to capture additional volume since most commercial lives in the Chicagoland area are enrolled in broad-network PPO products that allow enrollees to choose any in-network provider and receive the same coverage, with few or no incentives for patients to choose a lower cost or more efficient provider in that broad network.[57]

41.    Due to such "leakage," Advocate found that its investment in PHM often results in subsidies to higher-cost providers which "free-ride" on Advocate's investment.[58]

42.    Payers also recognize that leakage is a concern for providers like Advocate engaged in PHM because it is difficult to be accountable for an attributed population when that provider is not providing *all* of that population's care.[59]

43.    More than 50% of services received by Advocate's attributed ACO patient population are obtained from non-Advocate providers, impeding Advocate's ability to coordinate and manage care of its attributed population, despite Advocate achieving a high-level of cost savings.[60]

44.    Advocate concluded that the most effective strategy to gain share and maintain adequate profitability would be through the design of lower-cost, lower-priced Advocate-centered insurance products, *i.e.*, the HPN, using its PHM techniques and sold through health plans based on a

---

[55] Hr'g Tr. 1389:14-22, Apr. 20, 2016 (Dr. Sacks, Advocate).

[56] Hr'g Tr. 1389:23-1390:9, Apr. 20, 2016 (Dr. Sacks, Advocate); PX04018-005.

[57] Hr'g Tr. 1462:6-18, Apr. 20, 2016 (Dr. Sacks, Advocate); PX04018-005.

[58] Hr'g Tr. 1462:6-18, Apr. 20, 2016 (Dr. Sacks, Advocate); PX04018-028-029.

[59] ███████████████████████████████████████████████████; Hr'g Tr. 231:20-232:15, Apr. 12, 2016 (S. Hamman, BCBS); *see also* DX0119.0001.

[60] Hr'g Tr. 1395:5-23, Apr. 20, 2016 (Dr. Sacks, Advocate).

benefit design that would capture sufficient volume to justify Advocate's investments.[61]

45.     Payers need geographic coverage across the entire six-county Chicagoland region, and Advocate was advised by market participants that for the HPN to be successful among employer groups, it would need "sufficient geographic reach so that the plan could be attractive to a critical mass of employees throughout the Chicagoland area."[62]

46.     Specifically, payers, employers, and brokers—including Aetna, United, Humana, BCBSIL, Aon, and Medline, among others—informed Advocate that its geographic gap east of Interstate 94 in the northern suburbs of Chicago was too large for its HPN to be commercially successful.[63]   In that gap, Advocate simply lacks physicians and outpatient sites to draw patients.[64]

47.     Aetna, based on its success selling single-provider narrow network products in other metropolitan markets, advised Advocate that its geographic gap would preclude it from successfully marketing such a product. Aetna made it clear that any Advocate-centered network would need to include either Northwestern or NorthShore to attract sufficient employee volume.[65] Ms. Brigitte Nettesheim, CEO of Accountable Care Solutions at Aetna, testified that Northwestern Memo-

---

[61] Hr'g Tr. 1389:14-1390:9, 1395:5-20, 1418:21-1421:16, 1422:19-1423:1, Apr. 20, 2016 (Dr. Sacks, Advocate); PX04018-006.

[62] JX00017, M. Levin (Aon) Dep. Tr. 66:14-18, 76:7-13, 103:11-16, 145:9-25, Mar. 7, 2016; Hr'g Tr. 1434:10-1435:2, 1440:15-23, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 416:5-417:4, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 1178:25-1179:6, Apr. 18, 2016 (B. Nettesheim, Aetna); JX00019, P. Maxwell (Humana) Dep. Tr. 29:22-30:4, 30:15-31:7, Mar. 3, 2016; *see also* DX2009.0002; DX9112.0007; DX6011.0005; DX9126.0021; DX9117.0001.

[63] Hr'g Tr. 1440:15-23, 1452:8-12, 1434:10-1435:2, 1454:19-1455:11, 1483:1-17, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 373:19-374:18, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 1178:25-1179:6, Apr. 18, 2016 (B. Nettesheim, Aetna); JX00019, P. Maxwell (Humana) Dep. Tr. 29:22-30:4, 30:15-31:7, Mar. 3, 2016; JX00001, J. Abrams (Medline) Dep. Tr. 37:19-38:11, Feb. 28, 2016; DX9112.0007; DX9117.0001; *see* DX2009.0002.

[64] Hr'g Tr. 1435:15-1436:22, Apr. 20, 2016 (Dr. Sacks, Advocate).

[65] Hr'g Tr. 1432:19-1433:4, 1434:10-1435:2, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 1178:25-1179:6, 1181:2-1182:2, Apr. 18, 2016 (B. Nettesheim, Aetna); DX9111.0008; DX9112.0007; DX9120.0005; DX6010.0001.

rial and NorthShore were "interchangeable" for these purposes.[66]

48.     Advocate and Northwestern explored merging in 2014, but negotiations were fruitless.[67]

49.     Advocate cannot offer a group version of the HPN unless and until the merger with NorthShore is consummated due to its geographic gap east of Interstate 94.[68]

## 2.     NorthShore's Rationale for Merging with Advocate.

50.     NorthShore derives approximately 90% of its revenue from FFS contracts and only 10% from FFV contracts, with no full risk contracts.[69]

51.     NorthShore has not successfully managed its lone shared savings contract (even with 98% of revenues under it from FFS payments) and will *owe* $3-5 million under it for 2015.[70]

52.     NorthShore alone cannot engage in large-scale full risk contracting absent a merger, because it lacks: (1) sufficient geographic coverage; and (2) utilization management tools, care management tools, physician workflows and experience, all of which Advocate can provide.[71]

53.     NorthShore has been unsuccessful in implementing a NorthShore-only narrow network.[72]

54.     The clear message from meetings with area employers was that, despite being a high-quality provider, NorthShore alone was *not* an attractive option because of its limited geographic

---

[66] Hr'g Tr. 1183:21-25, Apr. 18, 2016 (B. Nettesheim, Aetna).

[67] Hr'g Tr. 417:5-19, Apr. 13, 2016 (J. Skogsbergh, Advocate).

[68] Hr'g Tr. 1438:9-14, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 418:3-21, Apr. 13, 2016 (J. Skogsbergh, Advocate).

[69] Hr'g Tr. 700:11-16, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 789:13-14, Apr. 14, 2016 (Dr. Golbus, NorthShore); JX00011, B. Fisk (NorthShore) Dep. Tr. 32:18-24, Feb. 18, 2016 (NorthShore received medical loss ratio data from United and Humana showing "that if [NorthShore] were to enter into a risk-based contract today we would lose money based upon our loss ratio trend compared to premium.").

[70] Hr'g Tr. 787:6-17, 787:18-25, 799:3-5, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 706:24-708:6, 799:3-5, Apr. 14, 2016 (M. Neaman, NorthShore); JX00011, B. Fisk (NorthShore) Dep. Tr. 107:21-24; 110:3-19, Feb. 18, 2016; DX1821.0001; DX7068.0002; ███████.

[71] Hr'g Tr. 796:19-24, Apr. 14, 2016 (Dr. Golbus, NorthShore); DDX10100.

[72] Hr'g Tr. 706:24-707:15, Apr. 14, 2016 (M. Neaman, NorthShore); JX00017, M. Levin (Aon) Dep. Tr. 145:16-19, Mar. 7, 2016.

coverage given that the respective employee bases are spread across Chicagoland.[73]

55.    A NorthShore-only product with ███████ failed, getting ███████████████
███████████████████████████████████████████.[74] ███████████████████
███████████████████████████████████████████[75]

56.    Another NorthShore-only narrow network with Land of Lincoln also failed due to its geographic coverage not satisfying Illinois regulatory requirements.[76]

57.    NorthShore efforts to change physician workflows or behaviors related to care management efforts focused on limited disease conditions have not been successful.[77]

58.    Advocate is a recognized national leader in PHM and risk-based contracting, whereas most Chicagoland providers primarily use a FFS model.[78]

59.    Over the last decade, Advocate has developed a set of proprietary clinical practices — "AdvocateCare®"—that has helped it emerge as a leader in PHM and value-based health care.[79]

60.    NorthShore seeks to merge with Advocate to expand its geographic footprint to partici-

---

[73] Hr'g Tr. 706:24-708:6, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 799:3-5, Apr. 14, 2016 (Dr. Golbus, NorthShore); JX00012, J. Gallagher (NorthShore) Dep. Tr. 184:17-186:3, Feb. 25, 2016; *see also* Hr'g Tr. 1184:21-24, Apr. 18, 2016 (B. Nettesheim, Aetna).

[74] Hr'g Tr. 798:7-11, Apr. 14, 2016 (Dr. Golbus, NorthShore); ███████████████████████
███████████████████

[75] ███████████████████████████████████

[76] Hr'g Tr. 707:7-15, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 798:23-799:2, Apr. 14, 2016 (Dr. Golbus,  NorthShore); ███████████████████████████████
DX1799.0001.

[77] Hr'g Tr. 800:17-801:8, Apr. 14, 2016 (Dr. Golbus, NorthShore).

[78] Hr'g Tr. 209:17-25, 211:6-12, 219:15-18, 237:5-8, 239:2-7, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1398:20-24, Apr. 20, 2016 (Dr. Sacks, Advocate);███████████████████████████
███████████; Hr'g Tr. 1195:6-12, Apr. 18, 2016 (B. Nettesheim, Aetna); Hr'g Tr. 415:8-416:4, Apr. 13, 2016 (J. Skogsbergh, Advocate); JX00019, P. Maxwell (Humana) Dep. Tr. 41:22-42:3, 42:5-24, 44:24-45:13, Mar. 3, 2016; DX7000, Dudley Report ¶¶ 13, 33, 101; DX7021.0003; DX0100.0005.

[79] Hr'g Tr. 1408:14-20 (Dr. Sacks, Advocate); JX00010, T. Esposito (Advocate) Dep. Tr. 33:25-34:04, Mar. 15, 2016; DX7000, Dudley Report ¶¶ 64-81, 101.

pate in marketable narrow networks, which Advocate's experience and tools will help.[80]

## II.  PLAINTIFFS HAVE NOT ESTABLISHED A *PRIMA FACIE* SHOWING THAT THE MERGER WILL CAUSE ANTICOMPETITIVE EFFECTS.

### A.  The Inpatient Services Product Market Is Constrained by Other Significant Competitive Factors.

61.  Due to technological advancements and other factors, outpatient services have significantly grown in recent years to become a large share of the services hospitals offer, while the volume of inpatient services has declined.[81] That trend is expected to continue.[82]

62.  Previous inpatient procedures that can now be performed on an outpatient basis include, for example, a host of laparoscopic surgeries—and "that list is growing greatly every day."[83]

63.  The patient, physician and payer influence the decision to proceed on inpatient or outpatient basis.[84]

64.  Inpatient services today are a "very rare or never event" because most people are not sick enough to require hospitalization, and the resulting current and projected "overbedding" in Chicagoland hospitals decreases hospital systems' bargaining power with payers.[85]

---

[80] Hr'g Tr. 805:21 -807:14, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 706:7-707:6, Apr. 14, 2016 (M. Neaman, NorthShore).

[81] Hr'g Tr. 767:2-9, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 659:19-23, Apr. 14, 2016 (M. Neaman, NorthShore); JX00019, P. Maxwell (Humana) Dep. Tr. 95:1-97:16, Mar. 3, 2016; ███████ ███████████; ███████████████; DX1425.0002; DX1434.0002; DX1553.0015; DX1865.0001.

[82] Hr'g Tr. 659:19-660:19, Apr. 14, 2016 (M. Neaman, NorthShore); JX00019, P. Maxwell (Humana) Dep. Tr. 96:23-97:16, Mar. 3, 2016; ███████████

[83] Hr'g Tr. 767:19-768:11, Apr. 14, 2016 (Dr. Golbus, NorthShore); █████████████████████ ████████████████████████.

[84] Hr'g Tr. 1117:16-1118:5, Apr. 18, 2016 (J. Beck, United); Hr'g Tr. 636:8-12, Apr. 14, 2016 (M. Neaman, NorthShore); DX1878, J. Montrie (LoL) Dep. 81:1-4, Mar. 10, 2016; ███████████████████ ████████████ *see* DX0011.0023.

[85] Hr'g Tr. 767:9-14, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 1267:3-4, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); ████████████████████████████████████

65.    As inpatient volume has declined, hospitals have responded by opening and expanding affiliated outpatient facilities and physician clinics in an effort to expand their geographic reach and draw more volume to their inpatient facilities.[86]

66.    These serve as "front doors" to a hospital, because a patient's physician influences a patient's hospital choice or ███████████████████████████████████████.[87]

67.    Payers consider outpatient and physician office locations in forming networks because those facilities show the "geographic breadth" of where that hospital can deliver services.[88]

68.    Payers negotiate inpatient and outpatient services "as one" in a single contract, focusing on the "total spend" due to price trade-offs between inpatient and outpatient services, which demonstrates that outpatient services can significantly impact inpatient pricing.[89]

### B.    The Plaintiffs Have Not Properly Defined a Relevant Geographic Market.

69.    Plaintiffs' expert economist, Dr. Steven Tenn, asserted that the relevant geographic market was either just six hospitals owned by the merging parties in the northern suburbs of Chicago (Condell, Lutheran General, NS Evanston, NS Glenbrook, NS Highland Park, and NS Skokie) or

---

████████████████████████████████████████████████ ; JX00025, J. Reilly Dep. Tr. 48:1-4, Feb. 25, 2016.

[86] Hr'g Tr. 346:3-10, Apr. 12, 2016 (J. Dechene, NWM); Apr. 14, 2016 Hearing Tr. 768:21-769:10 (Golbus); JX00019, P. Maxwell (Humana) Dep. Tr. 93:13-94:24, Mar. 3, 2016; JX00023, M. Primack (Advocate) Dep. Tr. 76:6-77:8, 151:4-152:14, Feb. 8, 2016; ████████████████████████████████ ; DX5001, McCarthy Report (corrected) ¶ 36; █████████████████ ; *see* DX1320.0001-0003, 0019-0020.

[87] Hr'g Tr. 346:3-10, Apr. 12, 2016 (J. Dechene, NWM); Hr'g Tr., 1116:14-18, Apr. 18, 2016 (B. Nettesheim, Aetna); JX00019, P. Maxwell (Humana) Dep. Tr. 94:9-24; ██████████████████████████████ ██████████████ ; DX1878, J. Montrie (LoL) Dep. 81:1-4, Mar. 10, 2016; *see also* DX1880, S. Pugh (FTC) Dep. Tr. 370:15-19, Mar. 21, 2016.

[88] JX00019, P. Maxwell (Humana) Dep. Tr. 93:13-24, Mar. 3, 2016.

[89] Hr'g Tr. 78:13-16, 79:24-80:5, Apr. 11, 2016 (T. Norton, Cigna); Hr'g Tr. 154:3-8, 155:9-12, 241:15-20, 242:5-7, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 635:16-636:1, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 1117:10-15, Apr. 18, 2016 (J. Beck, United); ████████████████████████ ██████████████████████ ; ████████████████████████████ ; DX1879, S. Pugh (FTC) Dep. Tr. 165:6-10, 166:10, Mar. 10, 2016; *see also* █████████████████████████ ████████████████████

those six party hospitals plus five non-party hospitals (Northwest Community ("Northwest") in Arlington Heights, Northwestern Lake Forest ("Lake Forest") in Lake Forest, Presence Resurrection ("Resurrection") in Chicago, Swedish Covenant ("Swedish Covenant") in Chicago, and Vista East ("Vista") in Waukegan) located in what Dr. Tenn calls the "North Shore Area."[90]

70. Dr. Tenn describes his geographic market (the "Tenn North Shore Area") as the area bounded by drawing a line between six hospitals—Condell, Lake Forest, NS Evanston, Swedish Covenant, Resurrection, and Northwest—and states that it "largely coincides with the 51 ZIP code system-wide service area" for NorthShore.[91]

71. Dr. Tenn, however, did not delineate NorthShore's service area as a relevant antitrust geographic market and agreed with Defendants' expert that a hospital's service area is generally not a relevant antitrust geographic market.[92]

### 1. Neither the "Tenn North Shore Area" Nor Merely the Six Party Hospitals in that Area Are a Relevant Geographic Market.

72. The six party hospitals are not a proper geographic market for antitrust purposes because there are many other hospitals within just a few miles of each that are alternatives to which patients can turn and will constrain the parties from imposing a significant post-merger price increase.[93]

73. The inclusion of just two of Advocate's hospitals in either of Plaintiffs' proposed geographic markets based on a hypothetical post-merger "small but significant non-transitory increase in price" (a "SSNIP")[94] just in the Tenn North Shore Area ignores the commercial reality

---

[90] Hr'g Tr. 253:8-13, 449:12-450:1, 451:9-16, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[91] Hr'g Tr. 450:14-451:3, 508:9-22, Apr. 13, 2016 (Tenn); PX06000, Tenn Report, ¶¶ 92, 105.

[92] Hr'g Tr. 591:12-22, 592:17-593:4, Apr. 14, 2016 (Dr. Tenn, Pls.' Expert); *see also* Hr'g Tr. 1216:19-1217:2, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[93] Hr'g Tr. 1216:19-1217:2, 1218:2-1219:5, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[94] U.S. Dep't of Justice & FTC Horizontal Merger Guidelines, § 4.1.1 (2010) ("Merger Guidelines").

that payers do not negotiate prices with Advocate for only a subset of its hospitals.

74.     Rates for multi-hospital systems are negotiated system-wide, rather than by individual hospital, and do not vary based on the location of the hospital or the patient using it.[95] A constraint on a price increase for any of Advocate's hospitals also constrains Lutheran General and Condell.[96]

75.     Although the Merger Guidelines ostensibly permit a geographic market based on supplier location, Defendants' expert economist, Dr. Thomas McCarthy, explained that Dr. Tenn artificially applies a perimeter boundary based on those hospital locations and therefore improperly excludes the portion of these hospitals' service areas that extends outside that boundary.[97]

76.     ███████████████████████████████████████████████████████████
███████████████████████████████████████████████[98] Therefore, numerous hospitals that compete in these surrounding areas also constrain prices within the Tenn North Shore Area, and Dr. Tenn's exclusion of these competitors creates an artificially narrow geographic market.[99]

> ### 2.     Patients in the Alleged Market Travel in Large Numbers to Hospitals Outside of the Alleged Market, and Patients Outside of the Alleged Market Travel in Larger Numbers to Hospitals in the Alleged Market.

77.     Payers consider providers in the Chicago MSA in forming provider networks.[100] With a

---

[95] Hr'g Tr. 240:6-241:1, Apr. 12, 2016 (S. Hamman, BCBSIL); *see also* Hr'g Tr. 412:19-413:6, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 1310:10-11, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[96] Hr'g Tr. 240:6-241:1, Apr. 12, 2016 (S. Hamman, BCBSIL), *see also* Hr'g Tr. 412:19-413:6, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 1310:10-11, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[97] Hr'g Tr. 1214:5-17, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also*, DX5001, McCarthy Report ¶ 66.

[98] ███████████████████████████████

[99] DX5001, McCarthy Report ¶ 66; DX5000, McCarthy Report App. B.

[100] DX0120.0002, 0005-0006; *see also* DX1853.0006; Hr'g Tr. 1168:25-1169:12, Apr. 18, 2016 (B. Nettesheim, Aetna).

high number of commuters in this area with relatively long commute times, patients here not only seek care near where they live but also frequently near where they work.[101] An analysis performed by Aetna found that that there may be "up to a 40-mile difference between where people lived and worked" and Chicago area patients "utilized services at both ends."[102]

78.     The drive times for patients residing in the Tenn North Shore Area to one or more of the hospitals Plaintiffs include in their proposed market can be longer than others not included.[103]

79.     Almost 50% of the patients treated at the eleven Tenn North Shore Area hospitals travel from *outside* that area for inpatient services.[104]

80.     More than 25% of the patients residing in the Tenn North Shore Area travel to other hospitals *outside* that area—often to hospitals near downtown Chicago—for inpatient services.[105]

81.     One measure of whether one hospital is a substitute for another hospital is its "diversion" ratio, which seeks to determine which hospital is "the next best alternative" for a consumer.[106]

82.     As measured by Dr. Tenn, more than half of the patients seeking inpatient services from

---

[101] Hr'g Tr. 83:25-84:8, Apr. 11, 2016 (T. Norton, Cigna); Hr'g Tr. 1116:6-13, Apr. 18, 2016 (J. Beck, United); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Hr'g Tr. 330:14-25, Apr. 12, 2016 (J. Dechene, NWM); JX00019, P. Maxwell (Humana) Dep. Tr. 93:9-11, Mar. 3, 2016; DX1449.0001, DX1428.0001; *see also* DX1880, S. Pugh (FTC) Dep. Tr. 371:19-23, Mar. 21, 2016; "10 U.S. Cities With the Longest Commute Times," ENTREPRENEUR (May 22, 2015), available at https://www.entrepreneur.com/article/246563 (last visited May 17, 2016).

[102] Hr'g Tr. 1169:13-1170:4, Apr. 18, 2016 (B. Nettesheim, Aetna); DX1853.0006. The perception of what is "close" to home or work is often in the eye of the beholder. *See, e.g.*, DX1878, J. Montrie (LoL) Dep Tr. 80:17-22, Mar. 10, 2016; JX00004, P. Butler (RUMC) Dep. Tr. 144:5-18, Mar. 24, 2016.

[103] Hr'g Tr. 519:8-23, 530:21-532:23, 533:3-15, April 13, 2016 (Dr. Tenn, Pls.' Expert); Hr'g Tr. 1377:11-16, Apr. 18, 2016 (Dr. McCarthy, Pls.' Expert); DX5001, McCarthy Report ¶¶ 44, 66.

[104] DX5001, McCarthy Report ¶ 70.

[105] Hearing Tr. 557:20-24, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report, ¶ 107; DX5001, McCarthy Report ¶ 70; *see also* Hr'g Tr. 1119:4-1119:9, Apr. 18, 2016 (J. Beck, United); JX00001, J. Abrams (Medline) Dep. 93:19-94:10, Feb. 28, 2016; JX00013, J. Hall (NorthShore) Dep. Tr. 153:12-15, 169:2-11, Feb. 5, 2016; JX00023, M. Primack (Advocate) Dep. Tr. 77:24-78:10, Feb. 8, 2016; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[106] Hr'g Tr. 559:23-560:1, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); *see also* Hr'g Tr. 1233:17-1234:12, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); PX06000, Tenn Report ¶ 96.

one of the eleven hospitals in the Tenn North Shore Area would "divert" to a hospital outside

that area if the patient's first choice hospital became unavailable—including nearly half of the

patients for Lutheran General and 68% of the patients for NS Evanston.[107]

### 3. Plaintiffs' Proposed Geographic Market Is Contrary to the FTC's Own Merger Guidelines.

83.    The Merger Guidelines direct the FTC to include in its proposed market all products that

are a closer substitute for any one of the products included in that proposed market, even when

the proposed smaller market might "satisfy the hypothetical monopolist test."[108]  The same prin-

ciple applies to identifying relevant competitors when defining a geographic market.[109]

84.    Plaintiffs and their expert admitted they did not even analyze who the close or closest

substitutes were for the hospitals they place in, or exclude from, their proposed market.[110]

85.    Several hospitals that are *not* included in Plaintiffs' proposed geographic market are clos-

er substitutes for hospitals that are included in their proposed market.[111]

86.    When defining a geographic market based on the location of suppliers, as Dr. Tenn pur-

ports to do, the Merger Guidelines also provide that competitors in the market should include all

firms "with relevant production, sales, or service facilities in that region."[112]

---

[107] Hr'g Tr. 557:25-558:12, 558:18-559:14, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report tbl.5.

[108] *See* Merger Guidelines, § 4.1.1 & ex. 6.

[109] Hr'g Tr. 1239:19-1241:09, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[110] DX1880, S. Pugh (FTC) Dep. Tr. 259:10-18, 263:20-24, 288:10-15, 293:20-294:2, 294:10-11, 295:15-18, 295:22-24, 301:17-21, 317:2-3, 317:20-22, 318:6-21, Mar. 21, 2016; Hr'g Tr. 549:9-550:12, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[111] *See infra* ¶¶ 88-161.

[112] Merger Guidelines, § 4.2.1; Apr. 18, 2016 Hearing Tr. 1213:3-18 (Dr. McCarthy, Defs.' Expert).  The Merger Guidelines further provide that market shares should be calculated "for all firms that currently produce products in the relevant market" and "for other market participants if this can be done to reliably reflect their competitive significance."  *Id.* § 5.2; *see also* Apr. 18, 2016 Hearing Tr. 1213:3-1218:5 (Dr. McCarthy, Defs.' Expert).

87.     Dr. Tenn's analysis, however, does not consider the locations of outpatient facilities and physician offices in that area that drive large inpatient volume to hospitals outside that area, causing these hospitals to have significant sales of inpatient services within the area.[113]

**C.      A Properly-Defined Relevant Geographic Market Includes at Least All Hospitals that Draw More Volume from the Tenn North Shore Area than One or More of the Six Party Hospitals Plaintiffs Include in Their Proposed Market.**

88.



[114] There is no sufficient factual evidence or economic rationale to conclude that any of these exclusions are consistent with actual market competitive conditions.[115]

**1.      There Is No Basis to Exclude the So-Called "Destination Hospitals."**

89.

[116]  He excluded "destination hospitals" even though they (a) have a higher average weighted share than other hospitals he included in his market and (b) are a common "second choice" to one or more of the party hospitals.[117]  Dr. Tenn could not identify any case law or literature that defines or endorses the term "destination hospital" or their exclusion from the market, and payers were un-

---

[113] *See supra* ¶¶ 61-68.

[114] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[115] Hr'g Tr. 1223:8-1224:23, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert). PX06000, Tenn Report ¶ 85 n.175.

[116] ▉▉▉▉▉▉▉▉▉▉▉▉▉

[117] Hr'g Tr. 453:19-23, 527:6-17, 610:15-21, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report, tbls.4 & 8.

familiar with the term.[118]

90.     Several party hospitals that Plaintiffs include in their proposed geographic market could also be termed "destination hospitals," as Dr. Tenn uses the term, because they also draw patients from various areas of Chicagoland or perform the most complex medical procedures, but Plaintiffs nevertheless included such party "destination hospitals" while excluding such non-parties.[119]

91.     The academic medical centers ("AMCs") delineated as "destination hospitals" by Dr. Tenn draw large numbers of patients from northern Cook County and southern Lake County.[120]

92.     Patients residing in the Tenn North Shore Area seek nearly identical inpatient services at these AMCs as are also available at the party hospitals closer to their homes.[121]

93.     Dr. Tenn's systematic exclusion of "destination hospitals" from his proposed market removes large, high-quality hospitals that significantly constrain the party hospitals in Plaintiffs' proposed market on the basis that they are highly desired by patients throughout Chicagoland.[122]

### a.     Northwestern Memorial Should Be Included in the Market.

94.     Northwestern Memorial Hospital, owned by Northwestern Memorial HealthCare ("Northwestern"), is an AMC in the Streeterville neighborhood of Chicago, with nearly 1,900

---

[118] Hr'g Tr. 515:24-516:8, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); Hr'g Tr. 1118:6-13, Apr. 18, 2016 (J. Beck, United); Hr'g Tr. 1170:15-22, Apr. 18, 2016 (B. Nettesheim, Aetna); *see also* Hr'g Tr. 1223:24-1224:3, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[119] Hr'g Tr. 691:1-20, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 517:7:-518:18, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[120] Hr'g Tr. 83:15-18, Apr. 11, 2016 (T. Norton, Cigna); Hr'g Tr. 157:15-20, 244:4-13, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 1119:4-1119:9, Apr. 18, 2016 (J. Beck, United); Hr'g Tr. 314:1-10, Apr. 12, 2016 (J. Dechene, NWM); JX00023, M. Primack (Advocate) Dep. Tr. 77:24-78:10, 81:11-82:1, 90:4-91:21, 215:16-217:25, Feb. 8, 2016; ███████████████████████████████████████████; DX5001, McCarthy Report ¶¶ 52, 59.

[121] Hr'g Tr. 243:20-244:3, Apr. 12, 2016 (S. Hamman, BCBSIL); Hr'g Tr. 766:5-9, Apr. 14, 2016 (Dr. Golbus, NorthShore); DX1878, J. Montrie (LoL) Dep. 80:11-16, Mar. 10, 2016; Hr'g Tr. 1226:1-25, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); ██6; DX5001, Corrected McCarthy Report ¶¶ 17, 52, 59; DX5000, McCarthy Report ex. 4.

[122] Hr'g Tr. 1214:22-1215-11, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also*, DX5001, McCarthy Report ¶ 51.

affiliated physicians representing nearly every medical specialty.[123]

95.  Northwestern is comprised of seven hospitals, a medical staff of more than 4,000 physicians and approximately 80 diagnostic and ambulatory sites across Chicago.[124]

96.  Northwestern also owns Lake Forest Hospital in Lake Forest, Central DuPage Hospital in Winfield, Delnor Hospital in Geneva, Kishwaukee Community Hospital in DeKalb, Valley West Hospital in Sandwich, and Marianjoy Rehabilitation Hospital in Wheaton.[125]  Northwestern just signed a letter of intent to affiliate with Centegra Health System, based in McHenry County.[126]

97.  Northwestern Memorial's legacy market area stretches from as far north as Wisconsin to as far south as Indiana.[127]

98.  It is located only 13 miles from NS Evanston and 18 miles from Lutheran General.[128]

99.  Northwestern uses its approximately 80 outpatient facilities and physician offices, as a "front door" to capture patients and feed them into its hospital system.[129] Northwestern's outpatient facilities and physician offices admit the majority of their patients to its hospitals.[130]

100.  Northwestern has significantly expanded "through . . . expanded / revitalized sites of

---

[123] About Northwestern Medicine, Northwestern Medicine, http://nmhc.nm.org/about-us.html (last visited May 17, 2016).

[124] Hr'g Tr. 288:20-289:5, Apr. 12, 2016 (J. Dechene, NWM); About Northwestern Medicine, Northwestern Medicine, http://nmhc.nm.org/about-us.html (last visited May 17, 2016).

[125] Hr'g Tr. 331:8-13, Apr. 12, 2016 (J. Dechene, NWM); *see also* About Northwestern Medicine, Northwestern Medicine, http://nmhc.nm.org/about-us.html (last visited May 17, 2016).

[126] Hr'g Tr. 343:2-5, Apr. 12, 2016 (J. Dechene, NWM); Northwestern Memorial Health Care and Centegra Health System Explore Affiliation," Northwestern Medicine, Press Release, http://news.nm.org/northwestern-memorial-healthcare-and-centegra-health-system-explore-affiliation.html (last visited May 18, 2016).

[127] Hr'g Tr. 349:23-350:3, 350:10-13, 351:11-352:8, Apr. 12, 2016(J. Dechene, NWM); DX1421.0012, 0017.

[128] Hr'g Tr. 332:19-333:6, Apr. 12, 2016 (J. Dechene, NWM).

[129] Hr'g Tr. 335:16-22, 342:6-25, 346:3-10, Apr. 12, 2016 (J. Dechene, NWM); Hr'g Tr. 675:8-11, Apr. 14, 2016 (M. Neaman, NorthShore); DX5001, McCarthy Report ¶¶ 54-56, 76.

[130] Hr'g Tr. 362:1-13, Apr. 12, 2016 (J. Dechene, NWM); *see* DX5001, McCarthy Report ¶¶ 54-55.

care," covering primary and immediate care facilities, outpatient clinics and physician offices across the northern suburbs since 2011.[131]  The locations are in Evanston, Glenview, Highland Park, Libertyville, Deerfield, Grayslake, Gurnee and Lindenhurst, all within close proximity to Advocate or NorthShore facilities.[132]

101.    Northwestern Memorial has consistently been NorthShore's "primary competitor," squaring off on a system-wide basis for patients, employees, and physicians.[133] Its rivalry with NorthShore is well documented in NorthShore's ordinary course documents, including describing Northwestern as an "Environmental Threat."[134]

102.    The press described the threat Northwestern poses to NorthShore as a "knife fight."[135]

103.    Northwestern Memorial and NS Evanston provide 97% to 99% of the same services.[136] Dr. Tenn also admitted Northwestern Memorial offers "essentially the same" services as Lutheran General and that it is a substitute for both NS Evanston and Lutheran General.[137]

104.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████[138]

105.    Dr. Tenn admitted that Northwestern Memorial has a higher weighted share using zip

---

[131] DX1425.0034; DX1427.0017.

[132] Hr'g Tr. 336:4-340:13, Apr. 12, 2016 (J. Dechene, NWM); DX1424.0004; DX1425.0006; DDX10032.0001; DX5005.0011; DX5006.0052-0053. *See generally* DX1426; DX1819.

[133] Hr'g Tr. 770:7-771:13, 774:15-775:7, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 667:22-25, Apr. 14, 2016 (M. Neaman, NorthShore); DX9151.0011.

[134] *See, e.g.*, DX9151.0011; DX9135.0002; DX9136.0001; DX5015.0001; DX1722.0001.  NorthShore has closely tracked Northwestern's expansion.  *See, e.g.*, DX1734.0008; DX1742.0001; DX1744.0028.

[135] Hr'g Tr. 774:15-775:7, Apr. 14, 2016 (Dr. Golbus, NorthShore); DX9151.0011; DX1743.0002-0004.

[136] Hr'g Tr. 766:5-9, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 684:25-685:21, Apr. 14, 2016 (M. Neaman, NorthShore).

[137] Hr'g Tr. 534:14-535:6, 536:18-25, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[138] ██████████████████████████████████

code admissions to all four NorthShore hospitals than any of the Advocate hospitals, as well as to the four Advocate hospitals he selected for analysis than any of the NorthShore hospitals.[139]

106.     █████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[140]

107.     Dr. Tenn's calculations for commercial insurance patients show Northwestern Memorial has the highest diversion—which has steadily grown since 2010—from both "All 4 Advocate" hospitals (12.2%) and "All 4 NorthShore" hospitals (21.3%), making Northwestern Memorial the top alternative for both sets.[141]

108.     These ratios confirm Northwestern Memorial as NorthShore's "top competitor."[142]

109.     █████████████████████████████████████████████████████████████████

████████████████████████████████████████████[143]

110.     █████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████.[144]

111.     Northwestern views the Advocate-NorthShore merger as a "competitive threat."[145]

112.     Northwestern opposes the merger and advised NorthShore that it would like NorthShore

---

[139] Hr'g Tr. 525:4-16, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report, tbl.4, DDX12046.001.

[140] ██████████████████████████

[141] Hr'g Tr. 540:8-14, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); Hr'g Tr. 615:7-19, Apr. 14, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report, tbl.9; Hr'g Tr. 1230:15-1231:19, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); DX5001, McCarthy Report, ¶ 75; DX5000, McCarthy Report, ex. 14.

[142] Hr'g Tr. 690:18-25, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 1118:20-1119:3, Apr. 18, 2016 (J. Beck, United); DX9136.0001; DX9134.0003; DX9138.0001; DX9140.0001.

[143] ████████████████████████

[144] ███████████████████████████████████

[145] Hr'g Tr. 322:22-323:3, 324:2-326:2, Apr. 12, 2016 (J. Dechene, NWM); DX1419.0005-0006; DX1420.0027; PX7075-015-016, -027.

to merge with Northwestern instead of with Advocate.[146]

113.    Although he lacks any expertise in economics and has no business personnel reporting to him, Northwestern's General Counsel, James Dechene, repeatedly met with the FTC to discuss the merger, provided market concentration calculations to the FTC, signed a declaration drafted by the FTC offering unqualified opinion testimony about the merger, and testified for the FTC.[147]

### b.    RUMC Should Be Included in the Market.

114.    Rush University Medical Center ("RUMC") is an AMC with 800 physicians, located on the west side of Chicago that is a part of Rush Health ("Rush").[148]

115.    Rush is comprised of RUMC, Rush Oak Park Hospital in Oak Park, Rush-Copley Medical Center in Aurora, Riverside Medical Center in Kankakee, and over 1,000 physicians and 250 non-physician network clinicians.[149]

116.    RUMC, alone, has the ▮ largest share of any provider in the Chicagoland area ▮



117.    Like Northwestern, ▮

118.    ▮

---

[146] Hr'g Tr. 691:24-694:16, 695:18-699:9, Apr. 14, 2016 (M. Neaman, NorthShore); *see also* Hr'g Tr. 692:10-699:16.

[147] Hr'g Tr. 301:8-14, 327:20-22, 328:7-23, 354:8-11, 354:16-355:5, Apr. 12, 2016 (J. Dechene, NWM); DX1415.0001-0002; DX1408.0001.

[148] About Us, Rush Health, https://www.rush-health.com/RHA/AboutUs/ (last visited May 18, 2016).

[149] About Us, Rush Health, https://www.rush-health.com/RHA/AboutUs/ (last visited May 18, 2016).

[150] JX00004, P. Butler (RUMC) Dep. Tr. 15:19-16:21, 21:7-22:11, 52:6-53:8, 67:1-67:3, Mar. 24, 2016; DX3909.0028; *see also* Hr'g Tr. 667:22-25, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 770:7-22, Apr. 14, 2016 (Dr. Golbus, NorthShore).  *See generally* DX3917.

[151] JX00004, P. Butler (RUMC) Dep. Tr. 25:20-26:9, 29:4-30:2, Mar. 24, 2016; DX1639.0066, 0082; DX3905.0096.

[152]

119. 
[153]

120.    According to Dr. Tenn, there are more commercial inpatient admissions to RUMC from NorthShore's 51-zip code service area than other hospitals in Plaintiffs' proposed market.[154]

121.    Dr. Tenn admits that RUMC is also a substitute for Lutheran General.[155]

### c.    UCMC Should Be Included in the Market.

122.    The University of Chicago Medical Center ("UCMC") is an AMC in Chicago, with 800 attending physicians, 900 residents and fellows, and physician offices across Chicagoland.[156]

123. 
[157]

124. [158]

125.    NorthShore considers UCMC to be a "key" competitor, like Northwestern.[159]

126. 
[160].

---

[152]  JX00004, P. Butler (RUMC) Dep. Tr. 32:24-34:10, 56:1-57:1, 58:12-59:15, Mar. 24, 2016; DX3909.0036.

[153]  JX00004, P. Butler (RUMC) Dep. Tr. 94:8-95:1, 96:5-97:9, 97:14-98:2, Mar. 24, 2016; DX3915.0012-13, 20-21, 30-31, 32-33, 42-43, 48-49.

[154]  PX06000, Tenn Report tbl.8; Apr. 13, 2016 Hearing Tr. 527:18-23 (Dr. Tenn, Pls.' Expert).

[155]  Hr'g Tr. 536:24-537:2, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[156]  About Us, The University of Chicago Medicine, http://www.uchospitals.edu/about/fact/hospitals-sheet.html (last visited May 17, 2016).

[157]

[158]

[159]  DX1745.0002.

[160]

#### d. Lurie Should Be Included in the Market.

127.    Ann & Robert H. Lurie Children's Hospital ("Lurie") is a renowned hospital located in the Streeterville neighborhood of Chicago specializing in pediatric care, with outpatient centers in many Chicago suburbs, including Arlington Heights, Glenview and Lake Forest.[161]

128.    NorthShore identifies Lurie as a strong and growing competitor, competing for patients, employees, and physicians.[162]



132.    Lurie is the largest children's hospital in Illinois, much larger than Advocate's children's hospital facility in Park Ridge, and one of Park Ridge's significant competitors.[166]

#### 2. There Is No Basis to Exclude Hospitals that Constrain Only One Set of Party Hospitals but not Both Sets of Party Hospitals.

133.    Dr. Tenn excluded all hospitals from Plaintiffs' proposed geographic market that had overlapping service areas with either Advocate hospitals or NorthShore hospitals but not both.[167]

---

[161]    Important Facts, Lurie's Children, https://www.luriechildrens.org/en-us/about-us/Documents/important-facts.pdf (last visited May 17, 2016).

[162]    Hr'g Tr. 770:7-22, Apr. 14, 2016 (Dr. Golbus, NorthShore).

[163]    ████████████████

[164]    ████████████████

[165]    ████████████████

[166]    Important Facts, Lurie's Children, https://www.luriechildrens.org/en-us/about-us/Documents/important-facts.pdf (last visited May 17, 2016).

[167]    Hr'g Tr. 552:18-553:11, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report ¶¶ 80-81.

134.    A hospital that constrains either an Advocate or a NorthShore hospital pre-merger will impose that same constraint on the entire post-merger Advocate and NorthShore system.[168]

### a.    St. Francis Should Be Included in the Market.

135.    Presence St. Francis Hospital ("St. Francis") is a full-service hospital in Evanston, less than three miles south of NS Evanston (and in the same suburb), and recognized by U.S. News and World Report as one of the best hospitals in metropolitan Chicago.[169]

136.    St. Francis is part of the Presence Health system ("Presence"). Presence also owns Resurrection Hospital on the northwest side of Chicago, St. Joseph Hospital in the Lakeview neighborhood of Chicago, Saints Mary and Elizabeth Hospital on the west side of Chicago, St. Joseph Hospital in Elgin, Mercy Medical Center in Aurora, and other Illinois hospitals.[170]

137.    Presence has acquired several physician practices in Chicago and its northern and northwest suburbs since the 2011 merger that created Presence.[171]

138.    NorthShore and Presence, including St. Francis, compete for patients, employees, and physicians.[172]  NorthShore considers St. Francis to be a significant competitor, █████████████ ████████████████████████████████████████████.[173]

139.    Over 90% of patients in NS Evanston's primary service area are also in the service area

---

[168]  Hr'g Tr. 1224:04-08, 1236:23-1237:23 (Dr. McCarthy, Defs.' Expert), Apr. 18, 2016; DX5000, McCarthy Report ¶ 61.

[169]  Presence Saint Francis Hospital, Presence Health, http://www.presencehealth.org/presence-saint-francis-hospital-evanston (last visited May 1, 2016); Internal Medicine Residency at Presence Saint Francis Hospital, Presence Health, http://www.presencehealth.org/residency-programs-internal-medicine-presence-saint-francis-hospital (last visited May 18, 2016).

[170]  DX1206.0002; ████████████.

[171]  DX9114.0022.

[172]  Hr'g Tr. 667:22-25, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 770:7-22, Apr. 14, 2016 (Dr. Golbus, NorthShore).

[173]  Hr'g Tr. 668:22-669:10, Apr. 14, 2016 (M. Neaman, NorthShore); ████████████████████████ █████████████████████████████████████████

of St. Francis.[174] About 70% of patients in Lutheran General's service area are also located in the service area of St. Francis.[175]

140.    With the same "Level 1" trauma center designation, St. Francis is an alternative to NS Evanston, Condell, and Lutheran General.[176]

141.    
.[177]

### b.    ABMC and St. Alexius Should Be Included in the Market.

142.    Alexian Brothers Health System ("ABHS"), now a part of AMITA Health, is a five-hospital system headquartered in the northwest suburbs of Chicago and includes Alexian Brothers Medical Center ("ABMC") and St. Alexius Hospital ("St. Alexius").[178]

143.    ABMC is located in Elk Grove Village, with more than 900 physicians.[179] St. Alexius is located in Hoffman Estates with a staff of more than 1,200 physicians.[180]

144.    ABHS has 22 primary care facilities and immediate care centers, serving five counties.[181]

145.    ███████████████████████████████████████████

---

[174] Hr'g Tr. 1242:21-1243:06, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[175] Hr'g Tr. 1243:21-25, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[176] Hr'g Tr. 82:17-83:14, Apr. 11, 2016 (T. Norton, Cigna); Illinois Department of Public Health—Trauma Centers by Region, http://www.dph.illinois.gov/topics-services/emergency-preparedness-response/ems/trauma-program/centersByReg (last visited May 18, 2016); *see also* Apr. 13, 2016 Hearing Tr. 537:3-6 (Tenn) (admitting that St. Francis is a "substitute" for Lutheran General).

[177] ███████████████████

[178] DX1304.0003; About Us, AMITA Health, http://www.alexianbrothershealth.org/about (last visited May 18, 2016).

[179] Alexian Brothers Medical Center, AMITA Health, http://www.alexianbrothershealth.org/abmc (last visited May 18, 2016).

[180] St. Alexius Medical Center, AMITA Health, http://www.alexianbrothershealth.org/stalexius (last visited May 18, 2016).

[181] DX1304.0003; About Us, AMITA Health, http://www.alexianbrothershealth.org/stalexius (last visited May 18, 2016).

██████████████████████████████████████████████████████████ .[182]

146.    Lutheran General has noted "aggressive moves" by ABHS in pediatrics, including con-

struction of a new children's hospital in direct competition with Advocate Children's Hospital.[183]

147.    ████████████████████████████████████████████ .[184]

### c.    Centegra–McHenry Should Be Included in the Market.

148.    Centegra Health System ("Centegra") consists of two hospitals located in McHenry

("Centegra-McHenry") and Woodstock and many outpatient facilities, with more than 200 phy-

sicians and allied health professionals.[185]

149.    Centegra is currently constructing a new hospital in Huntley, Illinois, following the issu-

ance of a certificate of need by the Illinois Health Facilities and Services Review Board.[186]

150.    Centegra has recently recruited physicians from Condell, Lake Forest, and Vista.[187]

151.    █████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████ .[188]

### d.    Advocate Illinois Masonic Should Be Included in the Market.

152.    Advocate's Illinois Masonic Medical Center should also be included in the relevant geo-

---

[182] ████████████████████████████████████████

[183] DX9114.0045; DX5033.0002.

[184] ████████████████████████

[185] Apr. 12, 2016 Hearing Tr. 344:01-17 (J. Dechene, NWM); Northwestern Memorial HealthCare and Centegra Health System Explore Affiliation, http://news.nm.org/northwestern-memorial-healthcare-and-centegra-health-system-explore-affiliation.html (last visited May 18, 2016).

[186] JX00023, M. Primack (Advocate) Dep. Tr. 183:20-184:21, Feb. 8, 2016; ████████ ; Northwestern Memorial HealthCare and Centegra Health System Explore Affiliation, http://news.nm.org/northwestern-memorial-healthcare-and-centegra-health-system-explore-affiliation.html (last visited May 18, 2016); .

[187] JX00023, M. Primack (Advocate) Dep. Tr. 222:10-224:8, Feb. 8, 2016.

[188] ████████████████████

graphic market, for similar reasons discussed for the other hospitals above.[189]

### 3. There Is No Basis to Exclude Hospitals that Have a Higher Share in the North Shore Area than a Hospital that Plaintiffs Include in Their Proposed Geographic Market.

153.    Even if a third-party hospital was found to compete with both the Advocate hospitals and the NorthShore hospitals, Dr. Tenn still excluded any such hospital that did not have at least 2% of the commercial inpatient volume in the service areas of both the NorthShore and selected Advocate hospitals.[190] Some of the hospitals that Dr. Tenn labeled as "destination hospitals" exceeded the 2% threshold, but he still excluded them as a "destination hospital," while other hospitals that met the 2% threshold for one system but not the other were also excluded.[191]

154.    Dr. Tenn admitted that he could not identify any case law or published economic literature that employed his 2% threshold.[192]

155.    Plaintiffs include NS Skokie and Resurrection in their proposed geographic market even though their market shares are only 1.5% and 1.4%, respectively; if that same threshold were applied to all hospitals attracting patients from the Tenn North Shore Area, the relevant geographic market would include a total of 20 hospitals in 12 different systems.[193]

156.    Dr. McCarthy testified that Dr. Tenn's restrictions have no basis in economic theory or market reality, yield a gerrymandered market definition that assumes away key competitors, and overstates market shares and market concentration metrics by omitting important competitors.[194]

157.    In addition to analyzing adjustments to Dr. Tenn's criteria based on market shares, Dr.

---

[189] Hr'g Tr. 1236:7-21, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[190] Hr'g Tr. 550:13-17, 552:6-553:11, 524:17-20, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[191] Hr'g Tr. 552:6-25, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[192] Apr. 13, 2016 Hearing Tr. 553:8-23, 554:20-555:13 (Dr. Tenn, Pls.' Expert).

[193] DX5001, McCarthy Report ¶ 62; DX5000, McCarthy Report ex. 10.

[194] Hr'g Tr. 1223:17-1224:14, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also*, DX5001, McCarthy Report ¶¶ 16-17.

McCarthy also identified competitors that impose a significant constraint on the Advocate and NorthShore hospitals through an analysis of diversion.[195]

158.   Beyond these two methods, additional evidence corroborates that the true set of relevant competitors in the Tenn North Shore Area have overlapping service areas and conduct outreach activities through non-hospital facilities in order to attract patients to their hospitals.[196]

159.   The hospital market in the Chicagoland area remains hyper-competitive and very fragmented.[197]

160.   Lutheran General actively monitors the competitive activities of numerous area hospitals, including Northwestern Memorial, Alexian Brothers, and the Presence hospitals.[198]

161.   NorthShore identifies many hospital competitors that Plaintiffs exclude from their proposed market, including Rush, UCMC, Loyola, and Cancer Treatment Centers of America.[199]

### D.   In a Properly Defined Market, the Merger Does Not Result in Market Concentration Levels that Create a Presumption of Anticompetitive Harm.

162.   Dr. Tenn purports to construct his proposed geographic market using the hypothetical monopolist test in the Merger Guidelines, but uses an effects model that is ill-suited for the hospital industry because it does not estimate hospitals' actual bargaining power.[200] This leads Dr. Tenn to violate governing law and the Merger Guidelines by excluding several significant competitors to which patients could practically turn in the event of a price increase and thereby over-

---

[195] Hr'g Tr. 1218:6-1219:2, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[196] Hr'g Tr. 1219:2-5, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[197] Hr'g Tr. 769:25-770:6, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 1167:23-1168:8, Apr. 18, 2016 (B. Nettesheim, Aetna); ███████████████████████

[198] DX9123.0005; DX9114.0022, .0029, DX9122.0003-0004.

[199] DX9136.0001; DX9134.0003; DX9144.0001; DX1741.0001-0003.

[200] *See infra,* ¶¶ 235-47.

stating the Defendants' market shares and market concentration measures.[201]

163.     The Merger Guidelines state that the Agencies (including the FTC) calculate market con-
centration for a merger using the Herfindahl-Hirschman Index ("HHI"), which calculates market
concentration by summing the squares of the relevant firms' market shares; they set an HHI
market concentration threshold figure of greater than 2500 for highly concentrated markets.[202]

164.     If only St. Francis, Northwestern Memorial, and RUMC were added to the Tenn North
Shore Area for inpatient services, the HHI figure would be well-below the 2500 threshold.[203]

165.     If those three hospitals were added to the Tenn North Shore Area with four to six other
area hospitals (Advocate Illinois Masonic, ABMC, St. Alexius, UCMC, Lurie and Centegra-
McHenry) that attract significant inpatient volume from the area, the combined post-merger
share of the Defendants for commercial discharges ranges from 28.1 to 29.9% of that market,
and the transaction is predicted to lead to a post-merger concentration level (as measured by
HHI) between 1,747 and 1,762, well-below the threshold in the Merger Guidelines.[204]

## III.     THERE IS NO OTHER EVIDENCE THAT INDICATES ANTICOMPETITIVE EFFECTS FROM THIS MERGER ARE LIKELY.

### A.     Advocate and NorthShore Are not Each Other's Closest Competitors.

#### 1.     Northwestern, not Advocate, Is NorthShore's Closest Competitor.

166.     Northwestern has long been, and will continue to be, NorthShore's closest competitor.[205]

167.     Northwestern's competitive significance has grown with its acquisition of Lake Forest

---

[201] Hr'g Tr. 1210:2-10, 1217:3-18, 1249:10-16, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also* DX5001, McCarthy Report ¶ 104.

[202] Merger Guidelines, § 5.3.

[203] Hr'g Tr. 1212:4-8, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also* Merger Guidelines, § 5.3.

[204] Hr'g Tr. 1248:17-1249:8, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also* DX5001, McCarthy Report ¶¶ 18, 85.

[205] Hr'g Tr. 1118:20-1119:3, Apr. 18, 2016 (J. Beck, United); Hr'g Tr. 774:15-24, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 690:10-25, Apr. 14, 2016 (M. Neaman, NorthShore); DX1722.0001; DX1750.0050; DX1820.0001.

Hospital in 2010, construction of a new $400 million hospital there, and the significant expansion of outpatient facilities and physician offices placed in NorthShore's geography.[206]

168.    Northwestern uses a "push-pull" strategy to persuade patients who live in Chicago's northern suburbs to travel downtown to receive inpatient services at Northwestern Memorial.[207]

169.    Northwestern's "push" strategy is reflected in Northwestern's opening of outpatient facilities and physician offices in the northern Chicago suburbs—roughly 15 such facilities in the last few years, with many located in close proximity to one of NorthShore's four hospitals.[208]

170.    The "pull" strategy involves Northwestern investing resources in the quality of its hospital facilities and reputation, which then persuades—or "pulls"—patients from the northern Chicago suburbs to its downtown Northwestern Memorial.[209]

171.    Northwestern Memorial has particularly high market shares in zip codes along the lake, coinciding with Northwestern's outpatient facilities and physician locations, including several with shares over 15%, and more than a 20% share in a zip code just south of Highland Park.[210]

172.    Advocate's shares of the same zip codes along the lake are generally less than 10%.[211]

173.    NorthShore's close competition with Northwestern extends into the physician realm.[212]

---

[206] Hr'g Tr. 771:8-13, Apr. 14, 2016 (Dr. Golbus, NorthShore); ▮▮▮▮▮▮▮

[207] Hr'g Tr. 362:1-13, Apr. 12, 2016 (J. Dechene, NWM); Hr'g Tr. 685:22-686:25, Apr. 14, 2016 (M. Neaman, NorthShore).

[208] Hr'g Tr. 688:12-689:8, Apr. 14, 2016 (M. Neaman); Hr'g Tr. 773:24-774:3, Apr. 14, 2016 (Dr. Golbus, NorthShore); DX1427.0017; DX1738.0015-16; DX1740.0002; DX1738.0015-16.

[209] Hr'g Tr. 333:21-334:4, Apr. 12, 2016 (J. Dechene, NWM); Hr'g Tr. 686:18-25, Apr. 14, 2016 (M. Neaman, NorthShore); ▮▮▮▮▮▮; DX1427.0002.

[210] DX5000, McCarthy Report ex. 9; Apr. 18, 2016 Hearing Tr. 1229:8-24 (McCarthy).

[211] Hr'g Tr. 1228:23-1229:03, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); see infra ¶¶ 297-98 (Advocate lacks outpatient and physician offices east of Interstate 94).

[212] Hr'g Tr. 776:15-21, Apr. 14, 2016 (Dr. Golbus, NorthShore); DX1727.0002; DX9139.0001; DX1736.0001; DX1756.0001.

Such physician competition is absent with Advocate.[213]

174. ███████████████████████████████████████████.[214] Advocate's service area maps, which only reflect overlapping zip codes where both systems may have only a few inpatient discharges, do not indicate the intensity of competition in that area either.[215]

175. Consistent with the actual market evidence, in *In re Evanston Northwestern Healthcare Corp.*, the FTC itself found, in a unanimous opinion, that neither Lutheran General nor Condell could constrain NorthShore with respect to prices charged to managed care organizations.[216]

### 2. NorthShore Is not Advocate's Closest Competitor.

176. Lutheran General's closest competitor is Northwest Community, as evidenced by documents and testimony showing that Lutheran General's service area is generally located north and west of it.[217] Condell's closest competitors are Lake Forest and Vista East.[218]

177. None of Advocate's major current or proposed future capital investments have occurred

---

[213] JX00023, M. Primack (Advocate) Dep. Tr. 97:3-6, Feb. 8, 2016.

[214] *Compare* ██████████, *with* ███████████████████████████████ *and id*. 778:24-779:23 (NorthShore looking for comparison of providers other than Northwestern). *Compare* PX05057.0012, *with* ███████████████████████████████████.

[215] *Compare* PX4032.0009, *with* Hr'g Tr. 394:9-16, Apr. 13, 2016, (J. Skogsbergh, Advocate) (The map "doesn't talk about the degree of strength of the competition"), *and* Hr'g Tr. 1298:17-1299:10, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert) ("[A]s is true of looking at service areas, it still doesn't tell you how intense that overlap is.").

[216] *In re Evanston Nw. Healthcare Corp.*, FTC Docket No. 9315, 2007 WL 22861958, at *48-49 (Aug. 6, 2007).

[217] Hr'g Tr. 1437:16-23, Apr. 20, 2016 (Dr. Sacks, Advocate); DX3060.0010; *see, e.g.*, DX5000, McCarthy Report Ex. 18; *see infra* ¶ 186 (Lutheran General natural experiment); ¶ 187 (Condell natural experiment).

[218] JX00023, M. Primack (Advocate) Dep. Tr. 72:22-73:3, Feb. 8, 2016. For example, Condell is planning to spend $60 million to renovate its campus in order to compete with the Lake Forest renovation. DX5029.0006-7, 12-14.

or will occur in the core NorthShore service area east of Interstate 94.[219]

178.    Patients who leave the Advocate system to receive care elsewhere (*i.e.*, "leakage") predominantly seek such treatment at downtown AMCs, not NorthShore.[220]

### 3.    Payer Testimony Confirms that Advocate and NorthShore Are not Each Other's Next Best Network Alternative.

179.    Aetna considers Northwestern to be "interchangeable" with NorthShore, not Advocate.[221]

180.    [222]

181.    Land of Lincoln believes that Presence and Northwestern would be important providers to maintain in-network if NorthShore was not.[223]   Land of Lincoln views Advocate as a "complement" to NorthShore, not a substitute, in forming a network.[224]

182.    BCBSIL's proposed "Project Remedy" network, which excluded both systems, confirms that the merged firm is *not* a "must have" for coverage adequacy purposes to payers.[225]

183.    Blue Choice, BCBSIL's fastest-growing PPO product in the employer and individual segments, also excludes both Advocate and NorthShore.[226]

---

[219] DX3033.0009; DX3108.0003-0005; DX3113.0006-0007.  The only major capital projects Advocate has planned are occurring in Des Plaines and Arlington Heights, which are in Northwest Community's primary service area, not NorthShore's.   DX3032.0004; DX3033.0010-0011; DX3034.0002-0003; JX00015, D. Havill (Advocate) Investigational Hr'g Tr. 106:7-16, Aug. 28, 2015; JX00023, M. Primack (Advocate) Dep. Tr. 228:13-229:19, Feb. 8, 2016.

[220] Hr'g Tr. 1433:15-1434:9, Apr. 20, 2016 (Dr. Sacks, Advocate).

[221] Hr'g Tr. 1181:10-15, 1183:16-25, Apr. 18, 2016 (B. Nettesheim, Aetna); DX9112.0008.

[222] JX00019, P. Maxwell (Humana) Dep. Tr. 30:15-32:1, Mar. 3, 2016; DX1802.0001.

[223] DX1878, J. Montrie (LoL) Dep. Tr. 83:6-84:11, Mar. 10, 2016; *see also* Hr'g Tr. 1183:18-25, Apr. 18, 2016 (B. Nettesheim, Aetna); ███.

[224] DX1878, J. Montrie (LoL) Dep. Tr. 117:3-16, Mar. 7, 2016.

[225] Hr'g Tr. 234:1-19, Apr. 12, 2016 (S. Hamman, BCBSIL); *see* ████████ 0011, 0014.

[226] Hr'g Tr. 168:21-23, 244:21-23, Apr. 12, 2016 (S. Hamman, BCBSIL).

184.    In negotiating contracts, neither BCBSIL nor Land of Lincoln has ever tried to receive lower rates from Advocate based on competition with NorthShore, and vice-versa.[227]

185.    Testimony from Tyler Norton of Cigna that Condell, rather than Lake Forest, is the primary alternative to NS Highland Park was not credible. Ms. Norton sought to compare the services between Condell and NS Highland Park, but then cited the fact that *NS Evanston* and Condell are designated Level I trauma centers (which NS Highland Park is not).[228] ██████

██████████████████████████████████████████████████████████████

████████████████████████████████████.[229]

### 4.    Real-World "Natural Experiments" Establish that Advocate and NorthShore Are not Each Other's Next Best Substitutes.

186.    When the Advocate system went "out of network" with United in 2004, few patients at Lutheran General with United insurance diverted to NorthShore. Northwest, Condell (before it was a part of Advocate), and ABMC received the largest diverted United volumes.[230]

187.    When Condell went "out of network" with BCBSIL in 2006,[231] patients with BCBSIL insurance largely diverted to hospitals other than NorthShore. Substantially all of Condell's lost BCBSIL volume went to Lake Forest (and not to NS Highland Park).[232]

---

[227] Hr'g Tr. 207:1-12, Apr. 12, 2016 (S. Hamman, BCBSIL); DX1878, J. Montrie (LoL) Dep. Tr. 86:13-20, Mar. 7, 2016.

[228] Hr'g Tr. 82:17-83:9, Apr. 11, 2016 (T. Norton, Cigna). Lutheran General, Condell, NS Evanston, Presence St. Francis, and Northwestern Memorial are Level I trauma centers, whereas NS Highland Park and other hospitals are Level II trauma centers. *See* Illinois Department of Public Health—Trauma Centers by Region, *available at* http://www.dph.illinois.gov/topics-services/emergency-preparedness-response/ems/trauma-program/centersByReg (last visited May 18, 2016).

[229] ████████████████████████████████████████

[230] Hr'g Tr. 422:17-25, 423:6-10, Apr. 13, 2016 (J. Skogsbergh, Advocate); PX04156.0014-0016.

[231] Hr'g Tr. 423:1-10, Apr. 13, 2016 (J. Skogsbergh, Advocate).

[232] DX1425.0003. Lake Forest's share of BCBSIL discharges from the Condell service area increased from 22.0% to 41.4%, while NS Highland Park's already-minor share increased from only 0.1% to 0.4%. Hr'g Tr. 423:1-5, Apr. 13, 2016 (J. Skogsbergh, Advocate); DX1425.0003; PX04156.0015-16 (NS High-

188.    Advocate's efforts to open facilities in the core NorthShore service area east of Interstate 94 only resulted in significant financial losses.[233] Advocate concluded that such failure "was ultimately based on the inability to grow volumes due to a lack of a significant AMG physician base and in a market that is highly dominated by NorthShore University HealthSystem."[234]

### 5.    Plaintiffs' Alleged Examples of Close Substitution Are Misplaced.

#### a.    Cigna LocalPlus

189.    

190.    [238] As of February 2016, NorthShore had only treated approximately 200 LocalPlus members—out of approximately 400,000 total patients

---

land Park received only 100 of these diverted Condell patients, while Lake Forest Hospital received over 2,000 diverted patients).

[233] Hr'g Tr. 1435:7-14, Apr. 20, 2016 (Dr. Sacks, Advocate); DX3112.0002, 0005.

[234] DX3112.0002; *see also* DX3112.0005.



[235]

[236]

DX1263.0002.

[237]

[238]

NorthShore treats per year.[239]

191. ████████████████████████████████████████████████████

████████████████████████████████████.[240]

### b. BCBSIL's Blue Choice Product

192. The removal of 17-20 hospitals from the Blue Choice product—including NorthShore, Northwestern Memorial, and UCMC—was a concern of Albertsons, but loss of NorthShore "was not the reason [Albertsons] determined the 2014 Blue Choice network to be inadequate."[241]

193. Albertsons was willing to pay higher rates to BCBSIL to regain in-network access to all of the 17-20 departing hospitals, not just access to NorthShore.[242]

### c. Plaintiffs' Other Purported Examples of Competition Between NorthShore and Advocate Do not Make Them Substitutes.

194. In 2012, NorthShore began developing plans for a large-scale modernization of NS Highland Park, in response to the plans of Northwestern—its "primary competitor"—for a new hospital on its Lake Forest campus.[243] The President of NS Highland Park confirmed that the modernization was in response to Lake Forest, and neither Condell nor any other competitor was considered in the modernization plan.[244]

195. In 2012, NorthShore also began modernization of NS Skokie to "defend our turf against

---

[239] JX00011, B. Fisk (NorthShore) Dep. Tr. 151:1-3, Feb. 18, 2016; DX1793.0001.

[240] ████████████████████████████████████████████████

[241] JX00016, M. Hodge (Albertsons) Dep. Tr. 63:9-11, 138:20-139:5, 139:12-19, 140:7-11, 147:25-148:4, 150:9-19, 152:21-153:3, 197:10-17, Feb. 26, 2016; DX1363.0002; DX1366.0001; DX1362.0001; *see also generally* DX1357; DX1712.

[242] JX00016, M. Hodge (Albertsons) Dep. Tr. 168:1-7, Feb. 26, 2016.

[243] JX00013, J. Hall Dep. Tr. (NorthShore) 164:19-165:16, Feb. 5, 2016.

[244] JX00013, J. Hall Dep. Tr. (NorthShore) 163:13-165:16, Feb. 5, 2016.

Northwestern's incursions."[245]

196. 

197.     Contrary to Plaintiffs' claim, citing a September 2013 presentation, that NorthShore decided to participate in BCBSIL's HMOI-Illinois product in part due to competition from Advocate, NorthShore's employed physicians decided to participate in HMO-Illinois more than a decade ago, was seeking to grow NorthShore's independent physician group, and the key risk listed was "*Northwestern* elect[ing] to participate" in the product—not Advocate.[247]

198.     NorthShore created the Care Transformation Team "in response to a changing . . . reimbursement environment," not due to Advocate's risk-based contracting, as Plaintiffs contend.[248] Contrary to Plaintiffs' contention, the Care Transformation Team's strategic roadmap is not evidence that NorthShore is engaging in advanced risk-based contracting or PHM. The current strategic roadmap assumed that the ANHP merger had *already closed*, and because it has not, the goals set forth are "too aggressive and not consistent with where [NorthShore is] today." [249]

---

[245] Hr'g Tr. 775:14-776:1, Apr. 14, 2016 (Dr. Golbus, NorthShore).

[246] [redacted]

[247] JX00029, B. Washa (NorthShore) Dep. Tr. 129:19-25, Feb. 11, 2016; PX05116.007.

[248] JX00013, J. Hall (NorthShore) Dep. Tr. 161:8-162:14, Feb. 5, 2016; *see also id.* 163:1-12 ; JX00012, J. Gallagher (NorthShore) Dep. Tr. 64:1-4, Aug. 25, 2015; JX00029, B. Washa (NorthShore) Dep. Tr. 25:15-23, Feb. 11, 2016.

[249] JX00012, J. Gallagher (NorthShore) Dep. Tr. 72:14-23; 73:19-74:7, Feb. 25, 2016; *see also id.* at 77:4-78:2 (testifying that that even when NorthShore employees explained to him that NorthShore was not close to reaching the objectives, he would instruct the employees to keep the goals in place "based on [the] belief that the merger would help and that we still needed to work aggressively towards these goals").

### B.    Payers Support the Merger as Procompetitive and a Benefit to Consumers.

199.    United supports the merger and believes it will lead to a decrease in the "total cost of care" for its members, while improving the quality of that care, by accelerating NorthShore's adoption of Advocate's PHM expertise and clinical integration quality measures.[250]

200.    ██████████████████████████████████████████████████████████
████████████████████████████████[251]

201.    ██████████████████████████████████████████████████████████
████████████████████████████████[252]

202.    United believes that if the merger is blocked, United's members will be harmed.[253]

203.    Aetna similarly believes the merger could lead to better coordination of care, "clinical efficiencies," and "lower total medical costs," all of which would benefit Aetna members.[254]

204.    Aetna's experience with single integrated systems, including those with similar metropolitan-wide market shares as the merged firm would have, has been that the system was able to join Aetna's Accountable Care Solutions ("ACS") product and create a seamless experience for Aetna's members at a lower price point, with reduced utilization and positive customer feedback.[255]

205.    ██████████████████████████████████████████████████████████

---

[250] Hr'g Tr. 1114:7-24, ████████████████████, Apr. 18, 2016 (J. Beck, United); DX0003.0001.

[251] Hr'g Tr. 1124:17-1124:23, ██████████, Apr. 18, 2016 (J. Beck, United); DX0003.0001; ████████; *see also* DX0006.0001 (United expects that the merger will be budget neutral).

[252] ████████████████████████████████████████████

[253] Hr'g Tr. 1114:25-1115:3, Apr. 18, 2016 (J. Beck, United).

[254] Hr'g Tr. 1189:6-11, 1190:10-1191:15, Apr. 18, 2016 (B. Nettesheim, Aetna) ("[T]he potential of one governance structure and one management approach of population health management could help bring this product differentiation to the consumers").

[255] Hr'g Tr. 1192:14-1193:4, 1196:9-17, Apr. 18, 2016 (B. Nettesheim, Aetna); *see also*, *Banner Health closes on merger*, Banner Health News Release, Mar. 5, 2016, https://www.bannerhealth.com/About+Us/News+Center/Press+Releases/Press+Archive/2015/Banner+Health+closes+on+merger.htm (last visited May 17, 2016).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ [256]

206.    Land of Lincoln supports the merger because it "would result in the opportunity to advance the delivery of high quality affordable health care in the Illinois marketplace, and would provide additional opportunities for innovation and competition in this marketplace which ultimately benefits all consumers."[257] It believes that ANHP will be the kind of ████████████ ████████████████████████████████████████ and sees no evidence that prices would increase following the merger.[258]

207.    Cigna, per its President of the Midwest Region, Michael Phillips, informed Advocate that the "announcement of the merger . . . came as good news to us here at Cigna"[259] and "affirm[ed] you [Advocate and NorthShore] have our [Cigna's] support and would be happy to share our [Cigna's] position with the FTC or other entities as appropriate."[260]

208.    Cigna supports the merger because (1) it finds the combination of Advocate's strength in clinical integration, which "has markedly and measurably improved the quality of care delivered to our customers" and NorthShore's "multi-year history of physician integration and clinical excellence . . . to be exciting and market changing," and (2) the merger "will promote a move from

---

[256] ████████████████████████████████████████████
████████████████

[257] DX1878, J. Montrie (LoL) Dep. Tr. 12:23-13:20, Mar. 7, 2016; DX1582.0001 (explaining "NorthShore and Advocate have both demonstrated market leadership in the areas of clinical integration, EMR, ACO activities, and the potential of this merger could result in further transformation of a new health system delivering on the Triple Aim" which would benefit its members).

[258] DX1878, J. Montrie (LoL) Dep. Tr. ██████████, 85:23-86:6, Mar. 7, 2016; DX1582.0001.

[259] Hr'g Tr. 126:6-9, Apr. 11, 2016 (T. Norton, Cigna); DX1276.0001.

[260] Hr'g Tr. 130:19-131:7, Apr. 11, 2016 (T. Norton, Cigna); DX1276.0002.

'volume' to providing value for the limited health care dollars available today."[261]

209.     Ms. Norton, who works for Mr. Phillips, never expressed to anyone at Cigna that she disagreed with the contents of Mr. Phillips' letter and the reasons Cigna supports the merger.[262]

210.     Upon learning that Advocate elected to offer an Advocate-only insurance product on the Public Exchange with BCBSIL,[263] Ms. Norton submitted a declaration that she did not draft, does not know who at the FTC did, had to correct for the first time at her deposition, and did not receive authorization from Cigna to sign.[264]

### C.     BCBSIL Opposes the Merger as a Threat to its Own Market Dominance.

211.     BCBSIL has opposed this merger from the outset—before the FTC even contacted it.[265]

212.     Upon learning of the merger, Karen Atwood, then head of BCBSIL, told her BCBSIL leadership, including Mr. Steve Hamman, that she "thinks Advocate is ready to compete directly with insurance companies."[266] ████████████████████████████████
██ .[267] ████████████████████████████████████████████████████[268]

213.     Although BCBSIL partnered with Advocate to create the Blue Care Direct ("BCD") product to be sold on the Public Exchange, it only did so to protect its dominant market position and to "box out" other competitors who had been discussing a similar product with Advocate.[269]

---

[261] Hr'g Tr. 126:11-127:11, 129:9-12, Apr. 11, 2016 (T. Norton, Cigna); DX1276.0001.

[262] Hr'g Tr. 125:1-131:7, Apr. 11, 2016 (T. Norton, Cigna).

[263] Hr'g Tr. 132:25-133:6, 135:6-10, 132:6-133:6, Apr. 11, 2016 (T. Norton, Cigna); DX1286.0001-0002.

[264] Hr'g Tr. 88:25-89:3, 90:6-9, 135:20-136:9, 138:4-15, Apr. 11, 2016 (T. Norton, Cigna); DX1286.0001-0002.

[265] Hr'g Tr. 196:15-197:12, Apr. 12, 2016 (S. Hamman, BCBSIL).

[266] See ████████████████████████████████ see also DX0045.0001; DX0043.0001-0002.

[267] See ████████████████████████ DX0043.0001; DX0044.0001.

[268] ████████████████████████

[269] Hr'g Tr. 220:21-221:14, 221:22-222:6 Apr. 12, 2016 (S. Hamman, BCBSIL); JX00002, R. Allegretti (BCBSIL) Dep. Tr. 44:20-45:20, Feb. 22, 2016; DX0072.0001; DX0050.0001; DX1106.0001.

214.    BCBSIL's outside lawyers, not Mr. Hamman, drafted his declaration for the FTC.[270]

215.    █████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████—BCBSIL's own internal documents are replete with concerns of this

very sort.[271] Mr. Hamman himself admitted that it would be better for BCBSIL if Advocate did

not obtain an insurance license.[272]

216.    █████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[273]

217.    Mr. Hamman's hearing testimony is not credible on several other points, including that:

    (a)    providers are capable of using their market share as leverage in negotiations
           with BCBSIL—even though Advocate, NorthShore and other providers testi-
           fied that they could never go out of network with BCBSIL given its market
           dominance and large membership;[274] and

    (b)    BCD, in its current configuration without NorthShore, could be successfully
           marketed to employers—after BCBSIL had informed Advocate that an Advo-
           cate-only product would not be commercially successful in the sale to Chicago-
           land employers, and it made no projections for such an ANHP product.[275]

    **D.    There Is No Evidence that the Merger Will Lead to Higher Prices.**

218.    BCBSIL leverages its dominant position by explicitly or implicitly threatening to exclude

providers from its networks to obtain lower prices. It has threatened to cut Alexian Brothers,

---

[270] Hr'g Tr. 159:5-8, Apr. 12, 2016 (S. Hamman, BCBSIL).

[271] DX0034.0005; DX106.0009; ████████████; DX0045.0001.

[272] Apr. 12, 2016 Hearing Tr. 191:7-21 (S. Hamman, BCBSIL).

[273] Hr'g Tr. ██████, 203:4-20, ████████████████████████████ Apr. 12, 2016 (S. Hamman, BCBSIL); *see also* DX0034.0005; DX0106.0009; ████████████; DX0045.0001.

[274] *Compare* Hr'g Tr. 150:22-151:11, Apr. 12, 2016 (S. Hamman, BCBSIL), *with* Hr'g Tr. 1414:13-1415:5, April 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 709:15-710:20, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 413:2-12, 419:13-21, Apr. 13, 2016 (J. Skogsbergh, Advocate), *and* ████████████ ████████████████████████; *see also* ████████████; DX1794.0001.

[275] *Compare* ████████████████████████████ *with* Hr'g Tr. 250:4-251:17, Apr. 12, 2016 (S. Hamman, BCBSIL), *and* ████████████████████████████ ████████████████████.

Ingalls Memorial, Loyola, HSHS Health Systems, and Springfield Memorial out of network, and in fact did exclude Condell before it became part of the Advocate hospital system.[276]

219.    Providers in Chicago are "price takers."[277] BCBSIL, in particular, is able to obtain the lowest rates from providers because it is a "must have" for providers.[278]

220.    Due to BCBSIL's size and large membership, Advocate and NorthShore cannot just walk away from BCBSIL in negotiations.[279] BCBSIL alone accounts for 72% of Advocate's commercial revenue, and there is "absolutely no way" NorthShore "can live without a Blue Cross contract" because "[o]ther networks would grab [its] patients, and [it would] be out of business."[280]

221.    Even payers with lower market share than BCBSIL have pricing leverage over Chicago providers. For example, United believes it has leverage to push back against providers demanding unreasonable rates.[281] ████████████████████████████████████████

████████████████████████████████████████████████████████[282]

222.    Advocate has lowered its rates to payers over the past five years.[283] Advocate and NorthShore have also committed to Plaintiffs not to raise the merged firm's reimbursement rates more than the greater of the Consumer Price Index or 1.0% for at least seven years.[284]

---

[276] Hr'g Tr. 151:12-152:19, 205:7-12, 205:18-23, Apr. 12, 2016 (S. Hamman, BCBSIL).

[277] Hr'g Tr. 1414:13-1415:5, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 709:15-710:20, 722:17-25, 723:9-14, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 413:2-12, 419:13-21, Apr. 13, 2016 (J. Skogsbergh, Advocate).

[278] Hr'g Tr. 709:15-710:20, Apr. 14, 2016 (M. Neaman, NorthShore); ████████████████████████ ████████████████

[279] Hr'g Tr. 206:8-15, Apr. 12, 2016 (S. Hamman, BCBSIL).

[280] Hr'g Tr. 1412:21-23, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 709:15-710:20, Apr. 14, 2016 (M. Neaman, NorthShore); *see also* ████████████████████████████████████

[281] ██ ████████████████████████████████████

[282] ████████████████████████████████████████████████

[283] Hr'g Tr. 1437:24-1438:8, Apr. 20, 2016 (Dr. Sacks, Advocate).

[284] *See* DX1640.0002.

1. **The Hospital Merger Simulation Model Endorsed by the FTC Indicates that There Is No Basis to Predict a Statistically Significant Post-Merger Price Increase.**

223. Even with a larger combined system, there is little evidence that the merging parties have the ability to raise prices following the merger, and Advocate's CEO testified that the merging parties do not intend to do so.[285] Since there are many provider alternatives available for network formation and hospitals are overbedded, health systems have little leverage with insurers.[286]

224. FTC economists developed a model—the Hospital Merger Simulation Model ("HMS")—to predict the level of any potential price increase following the proposed merger of hospitals, and the FTC has used that model in prior litigation to challenge impending mergers.[287]

225. "Stage 2" of HMS measures the relationship between actual prices negotiated between hospital systems and payers and purchasers' "willingness to pay" ("WTP") to keep that system available, which is a measure of the system's bargaining leverage in negotiations with payers.[288]

226. The key outcome of the negotiation between a hospital system and a payer is how the "bargaining surplus" from the transaction—meaning the spread between the most that the buyer is willing to pay and the least that the seller is willing to accept—is split between the entities.[289]

227. Hospital systems bargain with payers on an "all or nothing" basis, meaning that the payer

---

[285] Hr'g Tr. 413:2-12, 419:13-21, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 709:15-710:20, Apr. 14, 2016 (M. Neaman, NorthShore).

[286] Hr'g Tr. 1266:17-1267:10, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also*, DX5001, McCarthy Report ¶ 83.

[287] Hr'g Tr. 1508:22-1509:12, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX5001, McCarthy Report, ¶ 21; DX6000, Eisenstadt Report ¶¶ 72-74; Op. of the Comm'n, *In the Matter of Promedica Health Sys., Inc.*, Docket No. 9346, at 50 (June 25, 2012) (relying on a regression analysis conducted by the FTC's expert to conclude that the merger was likely to result in a price increase), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2012/06/120625promedicaopinion.pdf.

[288] DX6000, Eisenstadt Report ¶ 73.

[289] Hr'g Tr. 1251:17-1252:9, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

will include either all of that system's hospitals in the payer's network or none of them.[290]

228.    Although a merger may increase WTP for the merged firm, the effect of a merger on price depends not just on the increase in WTP but also on how that bargaining surplus is split between the payer and the hospital system (*i.e.*, the hospital system's actual bargaining power), in addition to efficiencies, competitor repositioning, and other factors.[291]

229.    Dr. McCarthy and Dr. Eisenstadt properly used medical claims data from Chicagoland payers to perform a regression analysis according to the FTC's approved methodology and found that the merger would have no statistically-significant effect on price.[292]

230.    Dr. McCarthy analyzed the price impact of the merger by estimating the historical relationship between a hospital system's WTP and inpatient hospital prices here, using a patient choice model and constructing hospital system prices using claims data from insurers.[293]

231.    Based on several regressions estimating the relationship between WTP and price in the Chicago area, Dr. McCarthy concluded that the merger will not lead to a significant price increase. For example, by one measure, he estimated that the merger will lead to a statistically significant price decrease of approximately 3.3 percent. Ascribing statistical significance to a longitudinal analysis, he estimated that the merger will lead to a price increase of approximately 0.6 percent.[294] Other regressions by Dr. McCarthy indicate the merger is unlikely to raise price.[295]

232.    Dr. Eisenstadt's worst-case analysis of a potential price increase for inpatient hospital

---

[290] Hr'g Tr. 240:6-241:1, Apr. 12, 2016 (S. Hamman, BCBSIL); *see* Hr'g Tr. 412:19-413:6, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 1310:10-11, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); DDX11002.0029.

[291] Hr'g Tr. 1252:9-17, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); Hr'g Tr. 1509:19-1510:19, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert).

[292] *See* DX5001, McCarthy Report ¶¶ 89-92, 98-101, 105; DX6000, Eisenstadt Report ¶¶ 72-74.

[293] Hr'g Tr. 1261:23-1263:20, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert).

[294] DX5001, McCarthy Report ¶ 22.

[295] DX5001, McCarthy Report ¶ 22.

services using Stage 2—if there is any price increase at all—is approximately $11 million.[296]

233.    Empirical evidence indicates that hospital mergers predicted to increase WTP often result in a post-merger price decrease, as Dr. McCarthy predicts in this case.[297]

234.    Dr. Tenn did not conduct any empirical testing of Dr. McCarthy's model to determine whether the results are affected by endogeneity bias or measurement error.[298]

### 2. Dr. Tenn Relied on a Screening Test that Is Unsuited for, and Has Never Been Used to, Predict a Price Increase in a Hospital Merger Case.

235.    Although Dr. Tenn predicts that there will be a price increase following the merger, Dr. Tenn did not analyze any potential price increase using the HMS model endorsed by the FTC.[299]

236.    Unlike Dr. McCarthy and Dr. Eisenstadt, Dr. Tenn did not use actual negotiated prices from the medical claims data the FTC subpoenaed, nor did he estimate the actual empirical relationship between merger-induced increases in WTP and pricing, as a Stage 2 analysis directs.[300]

237.    Instead, Dr. Tenn uses a "differentiated Bertrand" model to predict a post-merger price increase, using "simplifying assumptions" based only on diversion ratios, pre-merger price and margin data, and an untested theoretical formula. He uses the same model to establish proof of the relevant geographic market (whether a hypothetical monopolist could impose a "SSNIP").[301]

238.    Contrary to the findings of the Stage 2 analysis, Dr. Tenn's model predicts a post-merger

---

[296] DX6000, Eisenstadt Report ¶ 76.

[297] Hr'g Tr. 1259:7-15, Apr. 18, 2016 (Dr. McCarthy, Defs.' Experts); Hr'g Tr. 589:11-25, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[298] Hr'g Tr. 1694:23-1695:13, 1695:19-1696:08, May 6, 2016 (Dr. Tenn, Pls.' Expert).

[299] DX6000, Eisenstadt Report ¶ 72; DX5001, McCarthy Report ¶ 103. Based on the teaching in the economic literature, both of Defendants' economists relied on the FTC's HMS model to analyze potential price increases following the merger. DX6000, Eisenstadt Report ¶ 72; DX5001, McCarthy Report ¶ 103.

[300] Hr'g Tr. 1256:7-1257:3, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); DX5001, McCarthy Report ¶ 21; Hr'g Tr. 1510:25-10, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶¶ 73-75.

[301] Hr'g Tr. 567:13:-568:23, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); Hr'g Tr. 1212:25-1213:16, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); PX06020, Tenn Rebuttal Report ¶ 18.

price increase of approximately 8%, amounting to $45 million annually.[302]

239.   Dr. Tenn's model predicts that a post-merger price increase will always occur if the contribution margins and diversion ratios for the merging parties are positive.[303]

240.   Dr. Tenn claims that high contribution margins reflect hospital bargaining power—the only parameter in his model that purportedly does so—but high contribution margins for hospitals are driven by high fixed costs, and are not necessarily indicative of bargaining power.[304] Moreover, Dr. Tenn did not even have contribution margin data for any of the 11 hospitals in his geographic market other than for Advocate and simply used extrapolated assumptions.[305]

241.   Dr. Tenn could not identify a single case that had ever accepted his model, any prior litigated hospital merger case where any litigant had attempted to use it, or any such case where a party had even tried to use the equation in his model.[306]

242.   There is also no published peer-reviewed literature demonstrating that Dr. Tenn's model has ever accurately predicted a post-merger hospital price increase. The sole article cited by Dr. Tenn using anything like his model to assess a post-merger price increase did not even include any price increase model in its final published peer-reviewed version.[307]

243.   The academic article on which Dr. Tenn's model is based specifically recommends *against* using that method to estimate such post-merger price increases because "these models are very simple and cannot alone form the basis of any conclusions regarding competitive effects

---

[302] DX6000, Eisenstadt Report ¶ 75; Hr'g Tr. 490:9-13, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[303] Hr'g Tr. 1253:9-11, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); Hr'g Tr. 589:11-25, Apr. 14, 2016 (Dr. Tenn, Pls.' Expert).

[304] Hr'g Tr. 1250:17-25, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); Hr'g Tr. 584:1-3, Apr. 14, 2016 (Dr. Tenn, Pls.' Expert).

[305] Hr'g Tr. 588:3-10, Apr. 14, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report ¶ 195.

[306] Hr'g Tr. 1210:11-15, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); Hr'g Tr. 494:1-14, 544:4-10, 574:4-575:8, 575:25-576:14, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[307] Hr'g Tr. 575:9-24, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

in any specific proposed merger."[308] The article that Dr. Tenn cites in his expert report as the basis for his model expressly states that it should not be used to predict post-merger prices.[309]

### 3. Dr. Tenn's Model Is Unreliable Because, Among Other Things, It Fails to Provide any Estimate of the Relevant Bargaining Strengths.

244. In Dr. Tenn's differentiated product framework, the underlying assumption is that all of the bargaining strength resides with the seller—in this case, the hospital system.[310]

245. Dr. Tenn admits that his model is a "posted price" model, but he contends that his model is still mathematically equivalent to the formula derived from a bargaining model.[311] However, the bargaining model that Dr. Tenn uses to claim mathematical equivalence uses a significantly different assumption: that model does not assume "all-or-nothing" bargaining between the hospital system and payer, unlike what Dr. Tenn assumes about the market elsewhere in his report.[312]

246. His model also fails to account for cost savings, efficiencies, or the repositioning responses of providers—and Dr. Tenn conducted no such analysis of those factors.[313]

247. Other FTC economists have acknowledged this flaw in Dr. Tenn's model, stating that these hospital merger simulation methods cannot explicitly evaluate competitor repositioning.[314]

### E. Significant Repositioning by Payers and Competitors Further Reduces any Likelihood of Anticompetitive Effects.

#### 1. There Is Dynamic and Persistent Provider Competition in Chicagoland.

248. As Dr. McCarthy explained, other providers' "repositioning" activities—where a market

---

[308] Hr'g Tr. 1254:8-1254:16, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); *see also*, DX5001, McCarthy Report ¶ 104.

[309] Hr'g Tr. 573:7-574:3, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); PX06000, Tenn Report ¶ 96 n.190.

[310] Hr'g Tr. 1512:3-20, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶ 87.

[311] PX06020, Tenn Rebuttal Report ¶¶ 15-17.

[312] Hr'g Tr. 1512:21-1513:19, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); PX06000, Tenn Report ¶ 40, n.108.

[313] DX5001, McCarthy Report ¶ 106; Hr'g Tr. 502:1-7, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[314] DX5001, McCarthy Report ¶¶ 20-21.

opportunity is seen, and the provider repositions its offerings to take advantage of it—further show that there may be little impact on prices following the merger.[315]

249.     Northwestern and NorthShore place physician and outpatient facilities close to one another's locations, in an effort to draw patients away from one another.[316] Northwestern has opened at least a dozen outpatient facilities or physician offices close to NorthShore locations.[317]

250.     Northwestern is building a replacement hospital for Lake Forest, around a man-made waterfall, to attract patients—and those plans expressly leave room for "future expansion."[318]

251.     Northwestern prepared a presentation to analyze the Advocate-NorthShore merger less than a week after it was announced, labeled it as a "competitive threat," and identified specific concerns about the strengths its competitors possessed.[319]

252.     Northwestern then identified opportunities, strategies and a "tactical response" to the Advocate-NorthShore merger.[320] ███████████████████████████████████████

██████████████████████████████████████████████████[321]

253.     As noted above, Northwestern just signed a letter of intent to affiliate with Centegra.[322]

254.     ██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[315] Hr'g Tr. 1267:15-25, 1341:20-1342:8, 1344:17-1345:4, Apr. 18, 2016 (Dr. McCarthy, Defs.' Expert); DX5001, McCarthy Report, app. A, at 63-95 (Nearly every provider in Chicagoland is engaged in repositioning as a "direct response to the market dynamics").

[316] Hr'g Tr. 675:2-15, Apr. 14, 2016 (M. Neaman, NorthShore); Hr'g Tr. 773:16-774:3, Apr. 14, 2016 (Dr. Golbus, NorthShore); DX9151.008.

[317] Hr'g Tr. 688:23-689:5, Apr. 14, 2016 (M. Neaman, NorthShore).

[318] Hr'g Tr. 333:21-334:4, 348:4-20, Apr. 12, 2016 (J. Dechene, NWM); DX1427.0035, 0043.

[319] Hr'g Tr. 322:22-325:7, 325:11-16, Apr. 12, 2016 (J. Dechene, NWM); DX1420.0027; DX1419.0005; PX07075.0015.

[320] Hr'g Tr. 325:24-326:2, Apr. 12, 2016 (J. Dechene, NWM); PX07075.0016; DX1419.0005, ████.

[321] ████; DX1420.0008; DX1424.0015.

[322] See supra ¶ 96.



[323]

255. ████████████████████████████████████████████

[324]

256. ████████████████████████████████████████████

[325]

257. ████████████████████████████████████████████

[326]

258. Other hospitals and hospital systems, including ████, ██████████, ████, ████ and ████ have also assessed opportunities to recruit physicians directly from Advocate and/or NorthShore following the merger announcement and continue plans to open new outpatient facilities and physician offices, as well as explore mergers and alliances.[327]

### 2. "Project Remedy" Represents a Coordinated Health Plan/Provider Competitive Response to the Merger.

259. BCBSIL has worked with competitors of Advocate and NorthShore on a "Project Remedy" plan, ████████████████████████████.[328]

260. ████████████████████████████████████████████





[329] Northwestern had facilities in Chicago's lakefront suburbs that the others did not.[330]

261. [redacted] [331]

[redacted]

[redacted].[332]

262. [redacted]

[redacted]

[redacted] [333]

## IV. THE MERGER WILL GENERATE SUBSTANTIAL SAVINGS FOR CHICAGO CONSUMERS, PRICE EFFICIENCIES, AND COST EFFICIENCIES, ALL OF WHICH OUTWEIGH ANY POTENTIAL HARM ESTIMATED BY PLAINTIFFS.

263. The Advocate-NorthShore merger will generate substantial consumer savings in the form of both price efficiencies and cost efficiencies as described below. Unlike cost efficiencies, which must be converted to a price savings to consumers, "[p]rice savings represent dollar-for-dollar benefits to consumers because they are just that, lower prices."[334]

### A. HPN Pricing Efficiencies.

#### 1. Overview of the High Performing Network.

264. As of January 2016, Advocate offers a version of its low-cost, high-quality HPN to indi-



[329] [redacted]; [redacted]

[330] *See* DX9131.0001.

[331] [redacted]
DX1416A.0001; DX1420A.0001; [redacted]; DX0119.0001.

[332] [redacted]; DX1416A.0010;
DX1420A.0001.

[333] [redacted]
DX1444.0001.

[334] Hr'g Tr. 1489:3-90:2, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert).

viduals and qualified small groups on the Public Exchange in collaboration with BCBSIL as an Advocate-only network product—BCD with Advocate.[335] The majority of enrollment in BCD, however, has been individuals, not small employers—and BCD is not offered to large employer groups because of Advocate's geographic gap in the northern suburbs east of Interstate 94.[336]

265.    The current BCD version and the planned ANHP version have a benefit plan design distinguishing them from other insurance products. Unlike traditional HMOs, it does not have "gatekeeper" requirements for primary-care referrals to specialists and the network includes all Advocate physicians and hospitals, and all BCBSIL-contracted hospitals for its HMO.[337]

266.    According to BCBSIL, BCD is "a unique health plan that promotes high quality at a low cost," with the "lowest price retail offering," and has the potential for better health outcomes.[338]

267.    Like BCD, the ANHP HPN product will not require selection of a primary care physician or referral to specialists (a "gatekeeper") and affords patients open access to all Advocate and NorthShore hospitals and physicians.[339] In these respects, the HPN is more like a PPO than a traditional HMO given its open access and no gatekeeper requirement.[340]

268.    ████████████████████████████████████████████████████

███████████[341] For most benefit design levels, BCD is the lowest-priced product by a signifi-

---

[335] ██████████████████, 183:12-15, 216:4-13, Apr. 12, 2016 (S. Hamman, BCBSIL; DX0115.0003;
████████████

[336] Hr'g Tr. 416:5-417:4, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 1434:10-1435:2, Apr. 20, 2016 (Dr. Sacks, Advocate); DX9146.0001; DX6000, Eisenstadt Report ¶¶ 32 & n.42.

[337] Hr'g Tr. 1449:8-1450:3, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 231:4-12, Apr. 12, 2016 (S. Hamman, BCBSIL); *see also* DX0100.0008-0009.

[338] Hr'g Tr. 189:19-190:5, 216:19-22, Apr. 12, 2016 (S. Hamman, BCBSIL); DX4025.0002; DX0059.0001.

[339] Hr'g Tr. 1421:7-10; 1422:6-18, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 72:20-73:3, Apr. 11, 2016 (T. Norton, Cigna); Hr'g Tr. 146:2-16, Apr. 12, 2016 (S. Hamman, BCBSIL).

[340] Hr'g Tr. 1418:21-1421:16, Apr. 20, 2016 (Dr. Sacks, Advocate); DX3102.0010; ████████.

[341] ██████████

cant amount offering either Advocate or NorthShore or both, including Aetna's AWH product.[342]

269.    ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ [343]

270.    Consistent with that, Payers have stated that the price for a narrow network product must be 8-15% below the next-best alternative product to be attractive to employer groups.[344]

271.    Upon merging with Advocate, NorthShore, including all of its hospitals and physicians, will participate in BCD (and similar ANHP HPN products) at the same price point of 10% below Blue Precision or similar reference product, such as Blue Advantage, which is the group version of Blue Precision.[345] Large employers and their employees will gain access to NorthShore at the same low price individual members pay now for an Advocate-only network.[346]

272.    As of February 2016, enrollment in BCD among individuals and qualified small groups on the Public Exchange reached 66,000 enrollees, vastly exceeding BCBSIL's projections.[347]

273.    BCBSIL expects that sales of BCD will increase if NorthShore is added to the product and the premium pricing remains at the necessary price point—which it will.[348]

### 2.    Consumers Will Each Save Hundreds of Dollars Per Year in Price Reductions from Switching to the HPN.

274.    The merged firm will sell the ANHP HPN to employer groups throughout the Chicago-

---

[342] Hr'g Tr. 1426:21-1427:4, Apr. 20, 2016 (Dr. Sacks, Advocate); DX6000, Eisenstadt Report ¶¶ 32, 48; DX5001, McCarthy Report, ¶ 26; ███████; DX6020.0001-0003; DX6021.0001-0003; DX6022.0001-0003; DX6023.0001-0003; DX6024.0001-0003.

[343] ██████████████████████████████████████████████.

[344] Hr'g Tr. 1176:3-1177:12, Apr. 18, 2016 (B. Nettesheim, Aetna); *see also* DX9111.0003; DX9112.0003;

[345] Hr'g Tr. 1423:23-1425:3, Apr. 20, 2016 (Dr. Sacks, Advocate); ████████

[346] Hr'g Tr. 1423:23-1424:9; 1426:21-1427:4, Apr. 20, 2016 (Dr. Sacks, Advocate); ████████ DX0054.0001; *see also* DX5022.0005-0006.

[347] Hr'g Tr. 1428:24-1429:22, Apr. 20, 2016 (Dr. Sacks, Advocate); ████████████████████ ████████████████████; DX9146.0001.

[348] JX00002, R. Allegretti (BCBSIL) Dep. Tr. 22:20-24:3, ████, Feb. 22, 2016.

land area at the same low price point (10% below the next closest comparable product) as BCD is sold today.[349] As such, consumers who purchase their health insurance through their employer in Chicago (89% of the total commercial health insurance market) stand to save hundreds of dollars, per year, by switching to the HPN from other higher-priced products.[350]

275. Depending on the consumer's demographic group and prior insurance product, Dr. Eisenstadt estimated that a consumer could save $284 to $1,426, per year, purchasing the HPN.[351]

276. Dr. Tenn estimated the potential harm, or inpatient price increase, that may result from this merger to be $45 million.[352] HPN enrollment in the employer group market of only 32,000 to 159,000 people would offset *all* estimated potential harm, dollar-for-dollar.[353] This equates to HPN enrollment of only 0.7% to 3.6% of the 4.8 million people in the employer group market.[354]

277. Advocate itself estimates that $210 million—and potentially as much as $500 million—could be saved by consumers in the large group insurance market purchasing the low-priced HPN, just by assuming Advocate's and NorthShore's historical rates of market penetration.[355]

278. Correcting for Dr. Tenn's errors discussed above, the maximum potential economic harm

---

[349] Hr'g Tr. 1420:20-1421:16, Apr. 20, 2016 (Dr. Sacks, Advocate).

[350] Hr'g Tr. 1423:23-1424:9, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 1492:10-14, 1500:3-8, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); ▮▮▮▮▮▮▮.

[351] Hr'g Tr. 1503:10-19, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report tbls. 1A-1F; *id.* ¶ 58, tbl.4; DDX11002.0021. Dr. Eisenstadt compared "gold" versions of these products, which most closely approximate the richer benefits in employer group products. DX6000, Eisenstadt Report ¶¶ 32 n.28, 39.

[352] Hr'g Tr. 490:9-13, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert).

[353] Hr'g Tr. 1505:1-1507:15, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶¶ 8; 58 tbl.4; DDX11002.0023, 0036.

[354] Hr'g Tr. 1489:13-18, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report tbls.1A-1F; *id.* ¶ 58, tbl.4.

[355] Hr'g Tr. 1427:5-1428:10; 1429:23-1430:14; 1431:13-18, Apr. 20, 2016 (Dr. Sacks, Advocate).

from this merger is $11 million,[356] an amount which requires HPN enrollment in the employer group market of only 8,000 to 39,000 people to offset any potential harm.[357] This equates to the HPN achieving only 0.2% to 0.9% of the 4.8 million people in the employer group market.[358]

### 3. The Offsetting HPN Enrollment Necessary for the Consumer Savings to Outweigh Plaintiffs' Estimated Potential Harm Is Achievable.

279. There is consumer demand for low-priced health insurance products.[359]

280. Demand for the HPN will be driven by its aggressively low price point, the substantial savings it will create, the geographic scope of the product, and the exceptional reputation for quality of both Advocate and NorthShore.[360]

281. Very few current BCD enrollees came from qualified small groups.[361] Adding NorthShore to the HPN, however, allows Advocate to sell the HPN not only to more small groups but notably to the 4 million people in the large employer segment that it cannot reach today without NorthShore.[362]

282. Several payers and brokers are already prepared to offer the HPN to Chicagoland em-

---

[356] *See supra* ¶¶ 235-47; Hr'g Tr. 1507:21-1508:14, 1514:1-22, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶¶ 8, 72-119; DDX11002.0036.

[357] Hr'g Tr. 1514:23-1515:4, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶ 117; DDX11002.0037.

[358] Hr'g Tr. 1514:1-1515:4 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶¶ 76, 117 tbl.6.

[359] Hr'g Tr. 1187:5-17, Apr. 18, 2016 (B. Nettesheim, Aetna); JX00019, P. Maxwell (Humana) Dep. Tr. 25:12-24, Mar. 3, 2016; JX00017, M. Levin (Aon) Dep. Tr. 28:15-21, Mar. 7, 2016; DX9112.0003; DX0003.0001.

[360] JX00017, M. Levin (Aon) Dep. Tr. 102:25-105:5; 141:20-142:18; 145:20-146:1-13; 150:18-151:12, Mar. 7, 2016; DX8000, Steele Report ¶ 17.

[361] Hr'g Tr. 1429:1-17, 1451:22-14:52:4, Apr. 20, 2016 (Dr. Sacks, Advocate). *See generally* DX6004.

[362] Hr'g Tr. 1417:9-14, 1440:15-22, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 1491:22-1492:9, Apr. 20, 2016 (D. Eisenstadt, Defs.' Expert); ██████████████████████; DX1704.0001; DX6010.001.

ployers, including BCBSIL, United, █████, Aetna, Land of Lincoln, and Aon.[363]

283.    Aetna believes that the ANHP HPN product would be marketable across the Chicagoland area to all three consumer segments—individual, small group, and large group—in a way that other products, such as Aetna's current Advocate-Rush AWH offering, are not successful.[364]

284.    █████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████ [365]

285.    █████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████ [366]

286.    Land of Lincoln believes ANHP would ███████████████████████

████████████████████████████████████████████████████

██████████████. [367]

███████████████████████████████████████████████████. [368]

287.    Aon plc ("Aon"), the largest broker in Illinois, offers a private insurance exchange, the "Aon Private Exchange," under which Aon allows large employers to make health insurance options available to their employees.[369] Aon supports the merger because ANHP would possess three critical attributes necessary "to successfully offer a product on the Aon Private Exchange":

_____

[363] DX6000, Eisenstadt Report ¶¶ 19, 34-36, 49, 34 n.39-42; JX00017, M. Levin (Aon) Dep. Tr. 153:22-154:4, Mar. 7, 2016; ██████████████████████████████; JX00001, J. Abrams (Medline) Dep. Tr. 37:7-11; 38:9-11, Feb. 28, 2016.

[364] Hr'g Tr. 1188:1-9, 1193:5-14, Apr. 18, 2016 (B. Nettesheim, Aetna).

[365] █████████████████████████████████████████████

[366] ████████████████████████████████████

[367] ████████████████████████████████████████

[368] ████████████████████████████████

[369] Hr'g Tr. 1416:8-23, Apr. 20, 2016 (Dr. Sacks, Advocate).

"sufficient geographic reach," "price competitiveness," and "brand awareness."[370]

288.    Aon's head of strategy, Mr. Matt Levin, explained that, "[w]hile Advocate, standing-alone, is a terrific system, as is NorthShore, it is only, *when combined*, we feel the above criteria [sufficient geographic reach, price competitiveness, and brand awareness] are really met." Aon believes that the ANHP HPN product would be an "attractive and marketable product for our [private employer] exchange, assuming it is similarly priced [to BCD]."[371]

289.    Even BCBSIL, which opposes this merger, believes that the ANHP HPN will be more attractive once NorthShore is added to it at the same low price.[372]

290.    The payer interest in offering the low-priced HPN is consistent with significant employer interest in the ANHP HPN.[373]

291.    Dr. Kent Van Liere designed and conducted a survey of a representative sample of 130 Chicago-area employers with knowledge of their companies' health insurance decision making "to measure or gauge Chicago area employers' interests" in the ANHP HPN.[374]

292.    86% of the survey respondents answered that their employers would be very or somewhat interested in offering the plan; 82% said their employers would be very likely or somewhat likely to offer it as one of two or more options; 25% said their employers would be very likely to offer tit as the only health insurance plan option for employees; and of those providing an estimate,

---

[370] Hr'g Tr. 1417:16-22, Apr. 20, 2016 (Dr. Sacks, Advocate); DX2009.002.

[371] DX2009.0002.

[372] JX00002, R. Allegretti (BCBSIL) Dep. Tr. 22:20-24:3, 75:8-21, Feb. 22, 2016; Hr'g Tr. 217:18-218:4, Apr. 12, 2016 (S. Hamman, BCBSIL).

[373] ███████████████████████████████████████ Hr'g Tr. 1192:14-1193:14, Apr. 18, 2016 (B. Nettesheim, Aetna); ██████████ DX1517.0001; DX1276.0001-0002; *see* DX8100, Van Liere Report ¶¶ 9, 25, 28, 31, 33; Hr'g Tr. 1042:19-1043:8, 1048:1-9, 1051:17-1052:14, 1055:3-19, Apr. 15, 2016 (Dr. Van Liere, Defs.' Expert).

[374] DX8100, Van Liere Report ¶¶ 9, 11-18; Hr'g Tr. 1026:6-17, Apr. 15, 2016 (Dr. Van Liere, Defs.' Expert).

48% said more than half of their companies' benefit-eligible employees would select the plan.[375]

293.    The employer respondents identified the benefit plan design and substantial cost savings as among the reasons the HPN would be attractive. One verbatim response from someone very interested in offering the HPN option stated that the HPN offered: "great health service providers - North Shore & Advocate; substantial cost savings; emergencies still covered; no hassle--no referral necessary for specialist; benefit to both company and employee."[376]

294.    The results of Dr. Van Liere's survey demonstrate that there would be considerable interest among Chicagoland-area employers in the Advocate NorthShore HPN product.[377]

295.    Dr. Gary Ford's criticisms of Dr. Van Liere's methodology do not undermine its validity.[378] For example, Dr. Ford's criticism that the survey's product description lacks information about deductibles, and used insurance jargon, disregards the fact that survey participants were prequalified as familiar with their company's health plan offerings.[379] Dr. Ford's criticism that the survey lacked a control reflected a basic misunderstanding of the survey's purpose, which was to gauge employer interest, not to determine the cause of that interest.[380]

###    4.    The HPN Price Savings Consumers Will Receive Cannot, and Will Not, Occur Without this Merger.

296.    To sell a commercially-successful HPN, payers, employers, and brokers informed Advocate that the product would need two essential elements: broad geographic scope in the Chicago-

---

[375] DX8100, Van Liere Report ¶¶ 9, 25, 28, 31, 33; Hr'g Tr. 1042:19-1043:9, 1048:1-9, 1051:17-1052:14, 1055:3-19, Apr. 15, 2016 (Dr. Van Liere, Defs.' Expert).

[376] DX8100, Van Liere Report Ex. D at 447 (Respondent 217).

[377] DX8100, Van Liere Report ¶ 34; Hr'g Tr. 1054:16-1055:2, Apr. 15, 2016 (Dr. Van Liere, Defs.' Expert).

[378] DX8100, Van Liere Report ¶ 34; Hr'g Tr. 1038:12-1039:5, 1046:20-1047:19, 1052:15-1054:8, 1055:20-22, 1067:15-20, Apr. 15, 2016 (Dr. Van Liere, Defs.' Expert).

[379] Hr'g Tr. 1038:12-1039:21, 1046:20-1047:19, Apr. 15, 2016 (Dr. Van Liere, Defs.' Expert).

[380] Hr'g Tr. 1052:15-1053:16, Apr. 15, 2016 (Dr. Van Liere, Defs.' Expert).

land area and a sufficiently low price point.[381]

297.    Advocate lacks geographic coverage east of Interstate 94 and, as a result, Advocate cannot sell an Advocate-centered product to Chicago employers without merging with a provider that has that geographic access.[382]

298.    Advocate's attempts to close this gap by opening physician offices and outpatient clinics east of Interstate 94 have been unsuccessful to attain sufficient coverage.[383]

299.    Payers, including BCBSIL, are unwilling to recognize joint ventures, such as Advocate's clinical affiliation agreement with Silver Cross Hospital, for purposes of negotiating managed care contracts.[384] A merger is the only viable option to achieve the necessary scale and pricing.[385]

300.    Likewise, NorthShore has insufficient geographic coverage across Chicagoland to offer a successful NorthShore-only network to large employers.[386]

301.    In addition to geography, a merger is necessary to achieve the low price point necessary to sell a commercially successful HPN product to employer groups in the Chicagoland area.[387] Notably, NorthShore does not and cannot participate in narrow networks that reach the necessary

---

[381] Hr'g Tr. 1417:15-22, 1434:10-1435:2, Apr. 20, 2016 (Dr. Sacks, Advocate); DX2009.0002; DX9112.0007; DX6011.0005; DX9126.0021; *see also* JX00017, M. Levin (Aon) Dep. Tr. 66:14-18, 76:7-13, 103:11-16, 145:9-25, Mar. 7, 2016; DX9117.0001; DX9113.0001; DX9111.0008; DX9112.0007; DX9120.0004-0005, 0011; DX9129.0002.

[382] ████████████████████████████████████; JX00017, M. Levin (Aon) Dep. Tr. 66:14-18, 70:7-12, Mar. 7, 2016.

[383] Hr'g Tr. 1435:7-14, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 417:20-418:2, Apr. 13, 2016 (J. Skogsbergh, Advocate); DX3112.0007.

[384] Hr'g Tr. 418:22-419:5, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 245:13-246:11, Apr. 12, 2016 (S. Hamman, BCBSIL); DX0066.0001.

[385] Hr'g Tr. 418:22-419:5, Apr. 13, 2016 (J. Skogsbergh, Advocate); Hr'g Tr. 245:13-246:11, Apr. 12, 2016 (S. Hamman, BCBSIL); DX0066.0001.

[386] ████████████████████████████████ Hr'g Tr. 1184:21-24, Apr. 18, 2016 (B. Nettesheim, Aetna); JX00017, M. Levin (Aon) Dep. Tr. 145:16-19.

[387] *See supra* ¶¶ 268-71.

low pricing of 10% below Blue Precision or similar reference products.[388]

302.  ███████████████████████████████████████████████████
███ ██████████████████████████████████████████████████[389]

303.  By contrast, NorthShore has *no* full capitation arrangements with any payer, let alone an arrangement where it has agreed to such a low level of payment.[390]

304.  NorthShore would not participate in a group version of the HPN priced at or about the same level as BCD *unless* it was merged with Advocate.[391]

305.  Pursuant to standard economic principles, two sellers of complementary inputs in the production or creation of a final product will set a lower combined price when they are financially integrated compared to when they each price independently.[392]

306.  A "pricing externality" occurs when two complementary but independent systems set prices independently at levels too high, causing the downstream buyer (here, the insurer) to purchase a lower combined quantity of the two inputs.[393]

307.  Real world examples demonstrate that NorthShore cannot and will not offer the low prices necessary for a commercially successful narrow network sold to employers. First, Aetna approached NorthShore in October 2014 to discuss an ACS narrow network contract as part of Aetna's strategic efforts to obtain a greater market share.[394]

308.  Based on experience in other markets, Aetna believes that for the ACS employer group

---

[388] JX00011, B. Fisk (NorthShore) Dep. Tr. 130:11-24, ███████████, Feb. 18, 2016.

[389] ████████

[390] JX00012, J. Gallagher (NorthShore) Dep. Tr. 35:1-3, Feb. 25, 2016.

[391] Hr'g Tr. 790:6-22, Apr. 14, 2016 (Dr. Golbus, NorthShore); JX00012, J. Gallagher (NorthShore) Dep. Tr. 201:4-13, Feb. 25, 2016; JX00011, B. Fisk Dep. Tr. 253:18-254:10; DX1801.0005-0008.

[392] DX6000, Eisenstadt Report ¶ 41.

[393] DX6000, Eisenstadt Report ¶ 42.

[394] Hr'g Tr. 789:18-790:16, Apr. 14, 2016 (Dr. Golbus, NorthShore); DX6011.0003-0005; DX7096.0001, 0007.

product to be successful in Chicago, the "price should be targeted to be 8 to 15% below BCBS Precision [/Advantage] products[,]"—33-40% below Aetna's broad PPO network pricing.[395]

309.    In December 2014, NorthShore rejected Aetna's suggested wholesale pricing for the ACS product because NorthShore's reimbursement would have been less than its costs.[396]

310.    Second, Aetna later proposed that NorthShore participate in its AWH product in 2015. NorthShore only agreed to participate because the proposed rate reductions for AWH "were no-where near as substantial or drastic" as those Aetna required for participation in ACS in 2014.[397]

311.    Aetna explained that AWH has failed to achieve Aetna's goals for ACS because AWH is not priced at "8-15% below competing products" across all targeted market segments, and AWH is not marketable to large employer groups.[398]

312.    Aetna's goal with ACS products was to create seamless experience for consumers, which is not easily achieved under the current AWH model where Aetna is "separately managing two populations under that one product"—one for Advocate, one for NorthShore.[399]

313.    Similarly, market evidence in the Chicagoland area related to BCBSIL's failed "Project Remedy" demonstrates that the required low pricing cannot be achieved by a payer contracting

---

[395] Hr'g Tr. 1184:10-14, Apr. 18, 2016 (B. Nettesheim, Aetna); see also DX1801.0005-0008; DX7096.0008, 0012.

[396] Hr'g Tr. 790:6-12, 790:17-22, Apr. 14, 2016 (Dr. Golbus, NorthShore); Hr'g Tr. 1184:8-20, Apr. 18, 2016 (B. Nettesheim, Aetna); DX6000, Eisenstadt Report ¶ 37; PX7002.0003; DX1801.0007.

[397] Hr'g Tr. 790:23-791:4, 791:13-18, Apr. 14, 2016 (Dr. Golbus, NorthShore); *see also* ███████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████ Hr'g Tr. 1498:14-1499:22, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶ 39; DX7096.008.

[398] Hr'g Tr. 1186:19-1887:17, Apr. 18, 2016 (B. Nettesheim, Aetna).

[399] Hr'g Tr. 1191:17-1192:13, Apr. 18, 2016 (B. Nettesheim, Aetna).

individually with each participating provider.[400]

314.    A contractual arrangement of this sort would not provide the necessary incentives to reach the required low price point. For example, Advocate would incur the financial risk for services provided by other contracted providers (*e.g.*, NorthShore) that are outside of its control.[401]

315.    Since NorthShore is unable and unwilling to participate in the pricing necessary to offer the joint ANHP HPN as an independent entity, and Advocate cannot sell the HPN to groups without gaining the geography NorthShore provides,[402] the consumer savings from the merged entity's offering of the HPN is a merger-specific efficiency.[403]

316.    Payers, brokers, and employers acknowledge that ANHP would have the capability to create a successful HPN product for employer groups in the Chicagoland area.[404]

### B.    Price Savings from Reductions in NorthShore Physicians' Rates

317.    Advocate provides physician services at a lower unit price than Northshore does.[405]

318.    Following the merger, Advocate will move the NorthShore employed physicians under Advocate's contracts, which reimburse physicians at lower prices. Consistent with Advocate's plan, payers have the right, post-merger, to select the contract of the pre-merger firms it wishes to utilize going forward; logically, payers will choose the lower priced option.[406]

319.    ████████████████████████████████████████████████████

---

[400] See DX6000, Eisenstadt Report, ¶ 46; *see also* ████████████████████████ ████████ ; DX0119.0001; DX1416A.0001; DX1420A.0001.

[401] Hr'g Tr. 1462:10-18, 1463:2-9, Apr. 20, 2016 (Dr. Sacks, Advocate).

[402] Hr'g Tr. 1438:9-14, Apr. 20, 2016 (Dr. Sacks, Advocate).

[403] DX6000, Eisenstadt Report ¶ 49.

[404] *See supra* notes 199-210.

[405] DX6000, Eisenstadt Report ¶ 71.

[406] Hr'g Tr. 1424:10-1425:3, Apr. 20, 2016 (Dr. Sacks, Advocate).



320. The price savings from moving NorthShore to Advocate contracts is $30.2 million.[409]

321. Decreasing Dr. Tenn's $45 million estimate of potential harm by $30.2 million, the maximum potential harm is $14.8 million.[410] Using the same HPN savings estimates discussed above, this $14.8 million would require HPN enrollment of only 11,000 to 53,000 (or 0.2% to 1.2% of the 4.8 million people in the employer group market) to offset total potential harm.[411]

### C. Clinical Efficiencies Resulting in Reductions of Total Cost of Care

322. The merger has additional opportunities for consumer benefits, since Advocate is lower cost than NorthShore and the two systems expect NorthShore's costs to decrease with access to Advocate's proprietary tools and experience to manage the total cost of care of a population.[412]

323. Payers do not focus solely on providers' reimbursement rates; rather, payers focus on total cost of care, which refers to the total amount a payer will spend for a patient's care accounting for both the unit price for services and utilization rates, *i.e.*, the quantity of care performed.[413]

324. NorthShore is higher cost than Advocate comparing unit costs between the two.[414]

325. Using Medicare Cost Reports for both systems, at the system-wide level, Advocate's av-

---

[409] Hr'g Tr. 1519:15-1520:13, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DDX11002.044 (the $30.2 million in price savings is derived by subtracting the maximum potential harm of $14.8 million from Dr. Tenn's estimated $45 million in harm).

[410] Hr'g Tr. 1519:15-1520:13, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert).

[411] Hr'g Tr. 1519:15-1520:13, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert).

[412] Hr'g Tr. 1490:13-23, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); DX6000, Eisenstadt Report ¶¶ 8, 29, 71.

[413] Hr'g Tr. 1177:13-20, Apr. 18, 2016 (B. Nettesheim, Aetna); Hr'g Tr. 424:20-421:3, Apr. 13, 2016 (J. Skogsbergh, Advocate); JX00019, P. Maxwell (Humana) Dep. Tr. 34:19-21, Mar. 3, 2016.

[414] DX6000, Eisenstadt Report ¶ 60.

erage variable costs per inpatient discharge are 7 to 14% lower than NorthShore's.[415] When comparing Lutheran General and Condell to NorthShore's four hospitals, the average variable cost per discharge for the two Advocate hospitals is 14 to 22% lower than Northshore's.[416]

326.  Payers and employers recognize that Advocate has lower unit prices than NorthShore.[417]

327.  In addition to differences in unit costs, Advocate also performs better than NorthShore at managing utilization and therefore the total cost of care. An analysis of the systems' BCBSIL PPO ACO claims data demonstrates that NorthShore's total cost of care or utilization rate—*i.e.*, usage of inpatient, outpatient, and professional services to manage the health of an attributed population—is ███ higher than Advocate's after accounting for price differences.[418]

328.  Payers, employers, and other providers recognize that Advocate has performed well in lowering the total cost of care.[419]

329.  ████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████ [420]

330.  NorthShore acknowledges that it lacks the organizational capabilities to control utilization and "optimize the cost-effectiveness of care" when managing the total cost of care of populations.[421] Through this merger, NorthShore will gain access to the experience and proprietary

---

[415] DX6000, Eisenstadt Report ¶ 61, tbl.2.

[416] DX6000, Eisenstadt Report ¶ 61, tbl.2.

[417] ████████████████████████████████████ JX0017, M. Levin (Aon) Dep Tr. 77:22-78:8; 83:17-23, Mar. 7, 2016; ████████ DX2005.0002;

[418] DX6000, Eisenstadt Report ¶ 62.

[419] Hr'g Tr. 212:17-21, Apr. 12, 2016 (S. Hamman, BCBSIL); JX00017, M. Levin (Aon) Dep. Tr. 83:17-23, Mar. 7, 2016; JX00019, P. Maxwell (Humana) Dep. Tr. 34:14-24, 35:18-21 Mar. 3, 2016; ████████ ██████████████████████████████

[420] █████████████████████████

[421] Hr'g Tr. 799:6-800:16, Apr. 14, 2016 (Dr. Golbus, NorthShore).

tools that will enable it to perform better on utilization management.[422]

331.    The merger creates an opportunity for ANHP to reduce NorthShore's clinical costs and improve utilization and the total of care, benefiting payers and consumers after the merger.[423]

332.    Advocate's belief in its ability to help lower utilization at NorthShore is not inconsistent with NorthShore's belief that it is not providing unnecessary care; Advocate's focus "is more longitudinal and population-based" with the added focus of preventing patients from needing in-patient hospital care in the first place.[424]

333.    Advocate's successful integration of hospitals following previous acquisitions demonstrates that it can merge with entities while still reducing cost.[425]

334.    Advocate has recently integrated three hospitals into its system, with great success on cost and quality measures.[426] For example, Condell "went from being financially distressed [when Advocate acquired it in 2008] to being recognized by Truven the last two years as a top 100 hospital in 2014 and '15."[427] Similarly, two recently integrated hospitals, Bromenn Medical Center and Sherman Hospital, currently score well on quality and outcome metrics.[428]

335.    Advocate has prepared and is ready to execute on a detailed NorthShore Integration Plan, building off its prior integration efforts discussed above, with the goal of seamlessly integrating

---

[422] Hr'g Tr. 799:6-800:16; 807:15-808:5, Apr. 14, 2016 (Dr. Golbus, NorthShore).

[423] Hr'g Tr. 1515:6-22, Apr. 20, 2016 (Dr. Eisenstadt, Defs.' Expert); *see also* JX00017, M. Levin (Aon) Dep. Tr. 83:17-23, Mar. 7, 2016.

[424] Hr'g Tr. 1465:21-1466:7, 1466:12-17, Apr. 20, 2016 (Dr. Sacks, Advocate); Hr'g Tr. 1578:25-1580:10, Apr. 20, 2016 (R. Dudley, Defs.' Expert).

[425] Hr'g Tr. 1598:15-20, Apr. 20, 2016 (R. Dudley, Defs.' Expert).

[426] Hr'g Tr. 1409:12-21; 1437:2-15, April 20, 2016 (Dr. Sacks, Advocate); DX3062.0006-0007; DX3063.0006.

[427] Hr'g Tr. 1437:2-7, Apr. 20, 2016 (Dr. Sacks, Advocate); DX3063.0001.

[428] Hr'g Tr. 1437:8-15, Apr. 20, 2016 (Dr. Sacks, Advocate); DX3062.0006.

NorthShore into the Advocate system.[429]

336.    The clinical leaders at both organizations, who will lead this integration effort, are confident at the merged firm's ability to integrate the NorthShore employed and independent physicians into Advocate's clinical integration and PHM framework.[430]

    **D.    Cost Efficiencies**

337.    In addition to the pricing efficiencies and the clinical cost savings discussed above, the merger will also result in additional cost savings from the Advocate and NorthShore combining their operations into one integrated health system.[431]

338.    In June or July of 2015, NorthShore's Chief Financial Offer, Mr. Gary Weiss, conducted an analysis of the cost savings and additional revenue from new business that could be achieved from the merger between Advocate and NorthShore.[432]

339.    Mr. Weiss prepared this analysis after the parties' Chief Operating Officers requested a financial roadmap in order to move forward with strategic planning for the merger.[433]

340.    Using the combined historical financial results of Advocate and NorthShore, Mr. Weiss identified two main categories of net improvements that the merged entity could achieve over an approximately five-year period post-merger: (1) cost savings totaling approximately $309 million;[434] and (2) net revenue from new business of approximately $175 million.[435]

341.    After accounting for approximately $95 million in operating investments that the merged

---

[429]  Hr'g Tr. 1409:12-21 Apr. 20, 2016 (Dr. Sacks, Advocate); *see also* DX3041.0001-00067; DX3044.0001-0004; DX3045.0001-0005; DX3042.0001-0006; DX3271.0001-00017.

[430]  Hr'g Tr. 1433:5-10, Apr. 20, 2016 (Dr. Sacks, Advocate); JX00007, Dr. Dan (Advocate) Dep. Tr. 100:10-22; 151:6-16, Feb. 17, 2016.

[431]  DX1632, G. Weiss (NorthShore) Decl. ¶¶ 6-21.

[432]  DX1631.0002-0006; DX1632, G. Weiss (NorthShore) Decl. ¶ 6.

[433]  DX1632, G. Weiss (NorthShore) Decl. ¶ 3.

[434]  DX1632, G. Weiss (NorthShore) Decl. ¶¶ 6-16; DX1631.0002.

[435]  DX1632, G. Weiss (NorthShore) Decl. ¶¶ 6, 17-18, 20; DX1631.0002, 0005.

organization would need to spend in order to support its new business, Mr. Weiss concluded that the combined ANHP could achieve approximately $390 million in net financial improvements within five years post-merger.[436]

342.    These savings include, *inter alia*, supply chain savings opportunities, employee health costs, and fees for redundant maintenance agreements.[437]  The pricing of medical supplies sold to hospitals reflects volume: the larger the volume, the lower the prices will generally be.[438]

343.    Neither Advocate nor NorthShore could achieve this magnitude of cost savings and additional revenue from new business absent the proposed merger because only the merged entity would have the broad reach and scale necessary to achieve these efficiencies.[439]

344.    Additionally, Mr. Weiss' cost savings and revenue improvement projections are verifiable and not speculative because they are based on Advocate's and NorthShore's actual historical finances, NorthShore's past experience in reducing costs and increasing revenue as part of past mergers, and sound financial theory.[440]

## CONCLUSIONS OF LAW

## I.    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION MUST BE DENIED BECAUSE THEY HAVE FAILED TO PROVE THEY ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Plaintiffs Carry the Burden of Proof.

1.      Section 7 of the Clayton Act prohibits mergers and acquisitions the effect of which "may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.

2.      Under § 13(b) of the FTC Act, the FTC bears the burden of persuasion that a requested

---

[436] DX1632, G. Weiss (NorthShore) Decl. ¶ 6; DX1631.0002.

[437] DX1632, G. Weiss (NorthShore) Decl. ¶¶ 8-10.

[438] *See* JX00001, J. Abrams (Medline) Dep. Tr. 20:23-21:07, Feb. 28, 2016.

[439] DX1632, G. Weiss (NorthShore) Decl. ¶¶ 18, 20.

[440] DX1632, G. Weiss (NorthShore) Decl. ¶¶ 6, 8, 13, 21, 24; DX1631.0002-.0006.

injunction is "in the public interest" after "weighing the equities and considering the Commission's likelihood of ultimate success" in proving a violation of Section 7. 15 U.S.C. § 53(b).

### B. Plaintiffs Must Demonstrate a Likelihood of Success on the Merits.

3.      To establish likelihood of success, the FTC must show that "there is reasonable probability that the merger will substantially lessen competition." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). This means a "substantial lessening of competition" that is "probable and imminent." *FTC v. Arch Coal, Inc*., 329 F. Supp. 2d 109, 115 (D.D.C. 2007) (citations omitted).

4.      To satisfy their burden, Plaintiffs had to prove "(1) the relevant product market in which to assess the transaction, (2) the geographic market in which to assess the transaction, and (3) the transaction's probable effect on competition in the relevant product and geographic markets." *Arch Coal*, 329 F. Supp. 2d at 117 (citations omitted).

5.      Only if the FTC establishes a relevant market and demonstrates undue concentration in that market is it entitled to a presumption that the merger is illegal. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001). Where it fails this presumption the FTC still bears the burden of proof and persuasion that the merger will substantially lessen competition. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 938 (D.C. Cir. 1990).

6.      Defendants can rebut a presumption in the FTC's favor by showing that anticompetitive effects are unlikely. *See United States v. Gen. Dynamics Corp*., 415 U.S. 486, 497-98 (1974).

7.      Plaintiffs failed to meet their burden of establishing a likelihood of proving each of the elements of a Section 7 claim, and thus their motion for a preliminary injunction fails.

### C. Plaintiffs Failed to Prove a Relevant Market.

8.      Failure to prove the relevant market is fatal. *See, e.g.*, *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995); *FTC v. Penn State Hershey Medical Center et al.*, Civ. Action No. 1:15-cv-2362, 2016 WL 2622372, at *2-4 (M.D. Pa. May 9, 2016).

9.      In this case Plaintiffs' failure to meet their burden was particularly severe with regard to their assertion of the "North Shore Area" as their candidate for the relevant geographic market.

10.      To establish a geographic market, "the FTC must present evidence on the critical question of where consumers of hospital services could practicably turn for alternative services should the merger be consummated and prices become anticompetitive." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999); *see also Arch Coal*, 329 F. Supp. 2d at 116.

11.      The Tenn North Shore Area fails as the relevant geographic market because it arbitrarily excludes several hospitals to which patients of the Defendants "can practicably turn" for service, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963); it does not include "potential suppliers who can readily offer consumers a suitable alternative to the [Defendants'] services"; and it thus fails to include all hospitals "where consumers could practicably go, not [only] where they actually go." *Tenet Health Care*, 186 F.3d at 1052; *see also*, *FTC v. Penn State Hershey Med. Ctr. et al.*, No. 1:15-cv-2362, 2016 WL 2622372, at *3-5 (M.D. Pa. May 9, 2016).

12.      Plaintiffs also failed to meet their burden regarding the relevant product market in light of their improper exclusion of outpatient services from the proposed "GAC Services" market.  Inpatient and outpatient services are increasingly linked in contract negotiations and are also increasingly substitutable. *See, e.g.*, *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995).

13.      Plaintiffs' failure to meet their burdens on both the relevant product and geographic markets precludes their use of market share statistics to establish a presumption of anticompetitive effects.  *See Phila. Nat'l Bank*, 374 U.S. at 363-66.

### D.      Plaintiffs Have Not Established that Anticompetitive Effects Are Likely.

14.      The main anticompetitive effect that Plaintiffs assert is that the merged hospitals will "unilaterally" raise their inpatient prices after the merger occurs.  Plaintiffs' economic analysis in

support of an alleged price increase is flawed and unreliable.

15. Additionally, to prevail on this kind of unilateral effects theory, Plaintiffs would need to prove all of the following: (1) "the products controlled by the merging firms must be differentiated"; (2) "the products controlled by the merging firms must be close substitutes"; (3) "other products must be sufficiently different from the products controlled by the merging firms that a merger would make a small . . . price increase profitable for the merging firms"; and (4) "repositioning by the non-merging firms must be unlikely." *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1117-18 (N.D. Cal. 2004).

16. Defendants have presented evidence showing that the second element of a unilateral effects theory cannot be established since payer testimony, Plaintiffs' own testimony, and documentary evidence demonstrate that Advocate and NorthShore are not each other's closest competitors nor next best substitutes for each other. *See, e.g.*, *Oracle Corp.*, 331 F. Supp. 2d at 1172.

17. Additionally, Defendants have presented evidence showing that the third and fourth elements cannot be established, particularly since several major hospital systems are already repositioning to compete more robustly against the Defendants and are thereby positioned to defeat any attempted post-merger price increase. *See, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 502 F. Supp. 2d 1, 42 (D.D.C. 2007), *rev'd on other grounds*, 548 F.3d 1028 (D.C. Cir. 2008).

### E. Substantial Consumer Benefits Will Result from this Merger and Outweigh Plaintiffs' Estimate of Potential Harm.

18. Further weighing against Plaintiffs' claim of anticompetitive effects is Defendants' strong showing of procompetitive effects that can be expected from powerful efficiencies that the merger will generate. These efficiencies will emerge from the offering of a highly innovative, high quality, low-cost insurance product—the High Performing Network—that will be offered to employers and their employees throughout Chicagoland. It is "merger-specific" in that the HPN

70

cannot successfully be sold to employers in the absence of the merger.

19.     Particularly in the context of hospital mergers, courts have required consideration of these kinds of procompetitive efficiencies as part of the analysis of a merger's effects. *See*, *e.g.*, *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015) ("[A] defendant can rebut a prima facie case with evidence that the proposed merger will create a more efficient combined entity and thus increase competition"); *Tenet Health Care*, 186 F.3d at 1054 ("the district court should . . . have considered evidence of enhanced efficiency in the context of the competitive effects of the merger"); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991) ("whether an acquisition would yield significant efficiencies in the relevant market is an important consideration in predicting whether the acquisition would sub-stantially lessen competition" and "evidence that a proposed acquisition would create significant efficiencies benefiting consumers is useful in evaluating the ultimate issue—the acquisition's overall effect on competition"); *Hershey Med. Ctr.*, 2016 WL 2622372, at *5-6.[441]

## II.    THE BALANCE OF EQUITIES FAVORS THE MERGER.

20.     Even if Plaintiffs had been able to establish a likelihood of success, they would not be entitled to a preliminary injunction because the balance of equities favors the merger.

21.     "[T]he 'likelihood of success' analysis and the 'public equities' analysis are legally dif-ferent points and the latter should be analyzed separately, no matter how strong the agency's case on the former." *FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 75 (D.D.C. 2009).

22.     Public equities militating against a preliminary injunction include "the potential benefits, both public and private, that may be lost by enjoining" the proposed merger at issue. *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 172 (D.D.C. 2000). "Public equities include improved

---

[441] *See also United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 137 (E.D.N.Y. 1997); *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1301 (W.D. Mich. 1996), *aff'd*, 121 F.3d 708 (6th Cir. 1997).

quality, lower prices, increased efficiency, realization of economies of scale, consolidation of operations, and elimination of duplication." *FTC v. Lab. Corp. of Am.*, No. SAV 10-1873 AG, 2011 WL 3100372, at *22 (C.D. Cal. Mar. 11, 2011) (citations omitted). "[P]articularly strong equities [that] favor the merging parties bar" an injunction. *Whole Foods Mkt.*, 548 F.3d at 1035.

23.     The consumer benefits that will arise from Defendants' introduction and sale of the High Performing Network are "merger-specific" in that these benefits will not occur and cannot emerge in the absence of the merger at issue. The merger will "create significant efficiencies" that will "benefit competition and, hence, consumers." *Univ. Health*, 938 F.2d at 1222-23; *see also FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1301-02 (W.D. Mich. 1996).

24.     Defendants' offer to commit for a seven-year period to limit the annual increase in payment rates for all acute care inpatient services to the rate of increase in the CPI-U enhances the expected consumer benefits over the years following consummation of their merger. *See Hershey Med. Ctr.*, 2016 WL 2622372, at *4; *see also Butterworth Health*, 946 F. Supp. at 1302-04.

25.      A preliminary injunction would almost surely kill the merger and thereby kill the prospect of all of the expected consumer benefits described hereinabove. These benefits would come in the form of hundreds of dollars of savings per year per person, for patients throughout Chicagoland. In this light, the balance of equities favors the merger and disfavors—indeed precludes—issuance of the requested preliminary injunction that Plaintiffs seek.

26.     Over 40 years ago, the Supreme Court highlighted the importance of a close look at the changing dynamics and "probable future" of the market in which a merger takes place. *Gen. Dynamics Corp.*, 415 U.S. at 498, 502, 510-11. Doing so is at least as important in our Chicago hospital merger case as it was in the recent central Pennsylvania hospital merger case. *Hershey Med. Ctr.*, 2016 WL 2622372, at *9.

Dated: May 18, 2016

/s/ David E. Dahlquist          .
Dan K. Webb, Esq.
David E. Dahlquist, Esq.
Michael S. Pullos, Esq.
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
Phone: (312) 558-5660
Fax: (312) 558-5700
Email: DDahlquist@winston.com

**Counsel for Defendant NorthShore University HealthSystem**

Respectfully submitted,

/s/ Robert W. McCann          .
Robert W. McCann, Esq.
Kenneth M. Vorrasi, Esq.
John L. Roach, IV, Esq.
Jonathan Todt, Esq.
Drinker Biddle & Reath LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005
Phone: (202) 230-5149
Fax: (202) 842-8465
Email: Robert.McCann@dbr.com

J. Robert Robertson, Esq.
Leigh Oliver, Esq.
Robert F. Leibenluft, Esq.
Hogan Lovells US LLP
555 13th Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5774
Email: robby.robertson@hoganlovells.com

**Counsel for Defendants Advocate Health Care Network and Advocate Health and Hospitals Corp.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2016 I caused a copy of the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law to be filed and served on all counsel of record for Plaintiffs via electronic mail.

/s/ Robert W. McCann

Robert W. McCann