IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | ) | |
| **and STATE OF ILLINOIS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | No. 15 C 11473 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| **ADVOCATE HEALTH CARE,** | ) | |
| **ADVOCATE HEALTH AND** | ) | |
| **HOSPITALS CORPORATION, and** | ) | |
| **NORTHSHORE UNIVERSITY** | ) | |
| **HEALTHSYSTEM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### AMENDED[1] MEMORANDUM OPINION AND ORDER

Plaintiffs have sued defendants to enjoin them from consummating their proposed merger pending completion of the FTC's administrative trial on the merits of plaintiffs' antitrust claims. For the reasons set forth below, the Court denies the motion.

### Background

**Parties**

Advocate Health Care Network, which is the parent of Advocate Health and Hospitals Corp., is a health care system that includes eleven hospitals: (1) BroMenn Medical Center; (2) Christ Medical Center; (3) Condell Medical Center; (4) Eureka Hospital; (5) Good Samaritan Hospital; (6) Good Shepherd Hospital; (7) Illinois Masonic Medical Center; (8) Lutheran General Hospital; (9) Sherman Hospital; (10) South Suburban Hospital; and (11) Trinity

---

[1] When the parties submitted their proposed redactions to the Court's sealed Memorandum Opinion and Order, they pointed out two citation errors, both on page 11, which the Court has corrected.

Hospital.  *See*  http://www.advocatehealth.com/hospital-locations (last visited May 31, 2016). NorthShore University HealthSystem is a health care system that includes four hospitals: (1) NorthShore Evanston Hospital; (2) NorthShore Glenbrook Hospital; (3) NorthShore Highland Park Hospital; and (4) NorthShore Skokie Hospital.  *See*  http://www.northshore.org/locations (last visited May 31, 2016).  In September 2014, Advocate and NorthShore signed an affiliation agreement to merge and create Advocate NorthShore Health Partners.  (*See* DX3118, Affiliation Agreement.)  "The combined entity would operate 15 GAC [general acute care] hospitals in Illinois and would generate approximately $7.0 billion in revenue."  (Pls.' Findings of Fact & Conclusions of Law ("PFFCL") ¶ 3.)

**Health Care Contracting**

Commercial health insurers (also called payers) try to create networks of health care providers that are attractive to potential members.  (*Id.* ¶ 12; Defs.' Findings of Fact & Conclusions of Law ("DFFCL") ¶ 21; Preliminary Injunction Hr'g Tr. ("Tr.") 75:11-16 [Norton-CIGNA]; *id.* at 148:12-18 [Hamman-Blue Cross Blue Shield of Illinois ("BCBSIL")].)  Among the factors insurers consider when determining whether to include a hospital in a network are "the attractiveness of that hospital, the quality, the reputation of that hospital, . . . its willingness to . . . meet certain price points," and its geographic coverage.  (Tr. at 149:3-11 [Hamman-BCBSIL]; *see id.* at 74:18-75:7 [Norton-CIGNA].)

Hospitals compete to be included in insurers' networks and negotiate reimbursement rates and services with the insurers.  (PFFCL ¶ 9; Tr. 76:8-19 [Norton-CIGNA]; *id.* at 149:12-20 [Hamman-BCBSIL]; JX 9, Englehart Investigative Hearing ("IH") Tr. at 142:2-9).)  A hospital has more bargaining leverage if there are fewer substitutes for it that can be included in the

2

insurer's network; the insurer has more leverage if there are more substitutes for the hospital. (███████████████████████; *id.* at 150:22-151:22 [Hamman-BCBSIL]; ███████████████.)

The Chicago market is dominated by one commercial payer, BCBSIL, which has about 4 million members in the Chicago area. (Tr. at 145:9-11 [Hamman-BCBSIL]; *id.* at 1121:3-8 [Beck-United]; *id.* at 1175:13-22 [Nettesheim-Aetna]; *id.* at 1412:18-25 [Sacks-Advocate].) The other payers include United Health Group, Aetna, CIGNA, and Humana, which have about 1.5 million, 389,000, 350,000, and 172,000 members, respectively, in the area. (Tr. 72:2-4 [Norton-CIGNA]; *id.* at 1115:4-6 [Beck-United]; DX1515.0002, Carrier Market Share Calculation; DX1862.0005, Advocate/Aetna Collaboration Discussion Guide.)

Insurers pay health care providers under fee-for-service ("FFS") or risk-based contracts. Under FFS contracts, the payer pays a set fee for every service the provider gives to a patient. (Tr. 85:16-18 [Norton-CIGNA].) Risk-based contracts "[are] a set of payment arrangements in which providers hold some degree of financial risk." (PX 6001, Jha Report ¶ 10.) These arrangements include, from the lowest to the highest level of risk: shared savings, bundled payments, partial capitation, and full capitation/global risk. (*Id.* ¶ 24.) "Under shared savings agreements, [a ]payer[] and [a] provider[] agree to a target or benchmark level of spending that they believe a certain population is likely to incur," and if the provider spends less than the target amount, it will split with the payer the difference between the target and the actual amount spent. (*Id.*) "Under bundled payment contracts, providers are given a lump sum of money to finance all of the care needed for a patient's single episode [of care]." (*Id.*) Under a partial capitation arrangement, the provider is paid a set amount per patient for a negotiated set of health care services. (*Id.*) The services that are not subject to capitation are paid on an FFS basis. (*Id.*)

3

Under a full capitation arrangement, a provider is paid a set amount per patient per month for all of that patient's health care services. (*Id.*) Ninety percent of NorthShore's commercial revenues come from FFS contracts; less than a third of Advocate's commercial revenues come from FFS contracts. (DFFCL ¶ 50; Tr. at 785:10-13 [Golbus-NorthShore]; *id.* at 1410:18-20 [Sacks-Advocate].)

**Rationale for the Merger**

Advocate's alleged rationale for the merger is "to create a new, low-cost, high performing network ("HPN") insurance product that can be sold . . . throughout Chicagoland," which it claims it cannot do "unless and until the merger with NorthShore is consummated due to [Advocate's] geographic gap east of Interstate 94." (DFFCL ¶¶ 38, 49.) Northshore's alleged rationale for the merger is "[to] engage in large-scale full risk contracting," which it says it cannot do "absent a merger, because it lacks: (1) sufficient geographic coverage; and (2) utilization management tools, care management tools, physician workflows and experience, . . . which Advocate can provide." (*Id.* ¶ 52.)

**Discussion**

Section 7 of the Clayton Act prohibits a merger "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of [which] may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18. The Court may preliminarily enjoin a violation of § 7 "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). "Therefore, 'in determining whether to grant a preliminary

injunction . . . , a district court must (1) determine the likelihood that the FTC will ultimately succeed on the merits and (2) balance the equities.'" *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1073 (N.D. Ill. 2012) (quoting *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991)). "[T]o demonstrate such a likelihood of ultimate success, the FTC must raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999) (quotations omitted). "A showing of a fair or tenable chance of success on the merits will not suffice . . . ; Section 7 deals in probabilities not ephemeral possibilities." *Id.* However, "the statute requires a prediction, and doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

"Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (quoting *United States v. E. I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593 (1957)); *see Tenet Health Care*, 186 F.3d at 1051 ("It is . . . essential that the FTC identify a credible relevant market before a preliminary injunction may properly issue."); *OSF Healthcare*, 852 F. Supp. 2d at 1075 (quoting *Tenet Health Care*, 186 F.3d at 1052) ("'[A] monopolization claim often succeeds or fails strictly on the definition of the product or geographic market.'").

The parties agree that the relevant product market in this case is inpatient general acute care services sold to commercial payers and their insured members ("GAC services"). (PFFCL ¶ 15; Tr. at 1270:3-6 (defense expert McCarthy conceding that the relevant product market is GAC services).) GAC services are a cluster of medical services that require a patient to be admitted to

a hospital at least overnight. (PFFCL ¶ 16; Tr. at 78:18-19 [Norton-CIGNA]); *see OSF Healthcare*, 852 F. Supp. 2d at 1075 ("This is a 'cluster market' of services that courts have consistently found in hospital merger cases, even though the different types of inpatient services are not strict substitutes for one another. *See FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *54 (N.D. Ohio Mar. 29, 2011) (collecting cases); *see also United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990) (upholding a similar GAC product market).").

The parties do not agree, however, on the relevant geographic market, *i.e.*, "[the] area in which the seller operates, and to which the purchaser can practicably turn for supplies." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (quotation omitted). There is no formula for determining the geographic market; rather, it should be identified in "a pragmatic [and] factual" way and should "correspond to the commercial realities of the industry." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37, (1962) (quotation omitted). The geographic market "need not . . . be defined with scientific precision," *United States v. Connecticut National Bank*, 418 U.S. 656, 669 (1974), but "must be sufficiently defined so that the Court understands in which part of the country competition is threatened," *Federal Trade Commission v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998). "The FTC's failure to sufficiently define the relevant geographic market can be grounds to deny the requested injunction." *Id.*

Plaintiffs contend that the relevant geographic market, which their expert Steven Tenn refers to as the "North Shore Area," includes six of the merging hospitals – Advocate Lutheran General Hospital, Advocate Condell Medical Center, NorthShore Evanston Hospital, NorthShore Skokie Hospital, Glenbrook Hospital, and Highland Park Hospital – as well as Vista East Hospital, Northwest Community Hospital, Presence Resurrection Hospital, Northwestern Lake

6

Forest Hospital, and Swedish Covenant Hospital, all of which are located in northern Cook or southern Lake Counties. (PX 6000, Tenn Report ¶¶ 9-11, 14-15, 18, 72.)[2] Tenn constructed this market based on the location of the hospitals and by including: (1) local hospitals and excluding what he called destination hospitals, *i.e.*, Northwestern Memorial Hospital, Rush University Hospital, University of Chicago Hospital, Loyola University Hospital, Cancer Treatment Centers of America, and Lurie Children's Hospital; (2) hospitals "with at least a two percent share in the area from which the relevant Advocate and NorthShore hospitals attract patients"; and (3) hospitals "that overlap with [, *i.e.*, draw patients from the same area as] both Advocate and NorthShore" rather than those that overlap with just one. (*Id.* at n.175; Tr. at 453:22-23, 463:2-465:12.)

>Tenn's rationale for the first criterion was that:
>
>[T]he purpose of the geographic market definition is to illuminate the competitive impact of the proposed transaction.
>
>Here the competitive concern is that Advocate and NorthShore are substitutes for commercial payers when they're putting together provider networks in the northern Chicago suburbs. The destination hospitals do not -- are not located in the northern Chicago suburbs and, therefore, do not fulfill this role for commercial payers.
>
>And, therefore, I include local hospitals which do fulfill this role.

(*Id.* at 454:1-11.) His rationale for the second criterion was that "competing hospitals that attract a greater number of admissions from the same areas as the relevant Advocate and NorthShore hospitals are likely to be more significant competitors to Advocate and NorthShore," and two

---

[2]Tenn also opined that the four NorthShore hospitals as well as Advocate's Lutheran General and Condell Hospitals constitute a relevant geographic market. (*See* PX 6000, Tenn Report ¶ 76.) However, he "focus[ed] [his] analysis on . . . the North Shore Area." (*Id.* ¶ 79.)

percent was a reasonable and conservative threshold. (*Id.* at 463:10-464:14.) His rationale for the third criterion was:

> [T]he concern is that a significant fraction of patients view Advocate and NorthShore as their first and second choices. And, therefore, it's natural to look at, for that set of patients, what alternative hospitals would be the next best alternative. And those competing hospitals are likely to be in the areas which overlap with both Advocate and NorthShore.

(*Id.* at 465:6-12.)

After identifying the market, Tenn tested whether it passed the hypothetical monopolist test; that is, whether a hypothetical monopolist that owned all of the hospitals in the market could raise prices by a small but significant amount ("SSNIP") at one or more of the merging hospitals. FTC Horizontal Merger Guidelines § 4.1.1. A market passes the test if the hospitals in it "are sufficiently close substitutes that the internalization of substitution by a hypothetical monopolist would make it profitable to [impose a SSNIP]." (PX 6000, Tenn Report ¶ 57.) Tenn measured the level of substitution by calculating diversion ratios, that is, the fraction of patients who use one hospital for GAC services that would switch to another hospital, if their first-choice hospital were no longer available. (*Id.* ¶¶ 95-98.) He determined that 48% of the patients admitted to one of the eleven hospitals in the North Shore Area would substitute to one of the other hospitals in the North Shore Area, if their chosen hospital were no longer available. (*Id.* ¶ 99.) This "level of intra-market diversion," Tenn opined, "is sufficiently high . . . to pass the hypothetical monopolist test." (*Id.* ¶ 100.)

Defendants contend that plaintiffs' proposed market is too narrow because it arbitrarily excludes so-called destination hospitals and other "firms 'with relevant production, sales, or service facilities in that region.'" (DFFCL ¶ 86 (quoting Merger Guidelines § 4.2.1); *see* Merger Guidelines § 4.2.1 ("Geographic markets based on the locations of suppliers encompass the

region from which sales are made. . . . Competitors in the market are firms with relevant production, sales, or service facilities in that region."). In defendants' view, the market should include hospitals that are outside of Tenn's North Shore Area but are associated with outpatient facilities or doctor's offices within the Area that drive significant inpatient volume to, *i.e.*, sell GAC services of, those outside hospitals. (DFFCL ¶ 87.) As support, defendants point to Tenn's diversion ratios, which show that Northwestern Memorial Hospital is the second or third choice for patients who use five of the six party hospitals in the North Shore Area – Advocate Lutheran General, NorthShore Evanston, NorthShore Skokie, NorthShore Highland Park, and NorthShore Glenbrook.[3] (*See* PX 6000, Tenn Report, Table 9.)

The Court agrees with defendants that the criteria Tenn used to identify the geographic market are flawed. Tenn offers no economic basis for the "destination hospital" designation in his first criterion. (*See id.* at n.175 (defining "destination hospitals" as those "that attract patients from throughout the Chicago metropolitan area, at long distances"); Tr. at 515:24-517:20.) Even if he had, his rationale for excluding such hospitals – that they are not substitutes for Advocate and NorthShore – assumes the answer to the very question the geographic market exercise is designed to elicit; that is, are the destination hospitals substitutes for the merging parties?[4] *See Phila. Nat'l Bank*, 374 U.S. at 359 (the geographic market is "[the] area in which

---

[3]Moreover, despite the considerable distance between the two, Northwestern Memorial is the fifth choice for Condell patients, while NorthShore Evanston, Northwest Community, and Northshore Glenbrook are the sixth, seven, and ninth choices, respectively, for those patients. (*See* PX 6000, Table 9.)

[4]Tenn says that is an appropriate assumption, given payers' testimony that they could not successfully market a health plan that did not include Advocate or Northshore to employers with employees who live in the northern suburbs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, that testimony – from parties opposed to the merger – is undermined by the diversion ratios that Tenn

9

the seller operates, and to which the purchaser can practicably turn for supplies"). Moreover, his assumption that the destination hospitals are not substitutes is based on the notion that patients prefer to receive GAC services near their homes (*see* Tr. at 454:15-457:4), a point on which the evidence is equivocal. (*Compare id.* at 330:9-11 (Dechene of Northwestern testifying that "people prefer to receive inpatient hospital care near to where they live"); JX 27 Steele Dep. at 25:15-17 (defense expert testifying that "patients tend to go to nearby or local hospitals"), PX 2008, Hall [NorthShore] IH Tr. at 187:9-18 (testifying that "[f]or more ordinary in-patient procedures, . . . patients prefer to receive care closer to home"), *with* Tr. at 158:1-2, 246:12-23 (Hamman of BCBSIL testifying that "people get most routine care," which is largely outpatient, "close to where they live"); *id.* at 330:14-16 (Dechene testifying that Northwestern "seeks to provide care where patients live and work"), *id.* at 1130:8-11 (Beck of United Healthcare testifying that "some patients prefer to receive care near their homes," but where a patient receives care is "really a personal decision of each member"); *id.* at 83:15-84:8 (Norton of CIGNA testifying that CIGNA's members in northern Cook and Southern Lake Counties "[t]ypically . . . seek care in their own communities, but some . . . travel to where they work or for a higher level of care"); *id.* at 1169:15-22 (Nettesheim of Aetna testifying that in Chicago, people "live[] in one place and work[] in another and often receive[] [medical] services at both locations," and that "there was up to a 40-mile difference between where people lived and worked, . . . utiliz[ing] services at both ends"); ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ; JX 28,

---

calculated.

Tallarico [Advocate] Dep. 272:20-23 ("[W]hen . . . something is considered routine, [patients] expect to be able to stay within their local health community").) Finally, Tenn's exclusion of destination hospitals ignores "the commercial realities of th[is] industry," *Brown Shoe*, 370 U.S. at 336 (quotation and footnote omitted), specifically that: (1) payers negotiate a single contract with a hospital system for both inpatient and outpatient services (*see* Tr. at 241:15-20 [Hamman-BCBSIL]; *id.* at 76:20-77:1, 78:13-16, 79:24-80:5 [Norton-CIGNA]; *id.* at 1117:10-15 [Beck-United]); JX 19, Maxwell Dep. [Humana] at 98:16-99:1; DX 1878 Montrie Dep. [Land of Lincoln] at 98:11-20); (2) outpatient services are on the rise and inpatient services on the decline (*see* Tr. at 767:4-11 (Golbus of NorthShore testifying that "[t]here's been tremendous growth [in outpatient services] over the last five years as technology and advances in medical care have made it much more easy to do these procedures outside the inpatient environment," inpatient services are "[c]ontinually" declining, and "for most patients today, an inpatient admission is a very rare or never event"); *id.* at 659:16-18 (Neaman of NorthShore testifying that two-thirds of NorthShore's revenues come from outpatient services); JX 19, Maxwell Dep. at 95:1-97:16 (testifying on behalf of Humana that inpatient volume is "trending down" and expected to continue to decline) ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; and (3) outpatient services are a key driver of hospital admissions (*see* Tr. at 345:19-346:10 (Dechene testifying that outpatient facilities and doctor's offices are "front doors" to the hospital); *id.* at 1116:14-18 (Beck testifying that "a member's physician relationship influence[s] where they seek hospital care"); JX 24, Reilly Dep. at 45:7-12 (testifying on behalf of Presence

that "physicians . . . have a very significant effect on patient's [sic] choice of hospitals for inpatient services"); JX 3, Bagnall Dep. at 37:2-8 (testifying on behalf of University of Chicago Medical Center that "patients don't shop for inpatient providers, they shop for physicians" and "it's the physician who makes the decision of what inpatient facility that patient goes to"); ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; JX 19, Maxwell Dep. at 94:1-24 (testifying on behalf of Humana that hospitals "extend their geographic breadth" by opening outpatient centers and doctor's offices further from the hospital, and the doctor "plays a significant role [in determining] where [a] patient goes to seek care"); JX 23, Primack [Advocate] Dep. at 76:6-14 ("[O]rganizations' satellite facilities . . . are funnels to an organizational partnership of patient referrals"); DX 1878, Montrie Dep. at 81:1-4 (testifying on behalf of Land of Lincoln that "a patient's physician plays a significant role in where the patient goes to seek care"); DX 1880 Pugh [FTC] Dep. at 370:15-19 (testifying that "referring physicians play a role in their patients' choices for inpatient services")).

The third criterion Tenn used to construct the market, including hospitals that overlap with both Advocate and NorthShore rather than just one of them, is also problematic. Tenn states that this criterion is designed to determine which hospitals "would be the next best alternative" for the patients whose first and second hospital choices are the merging parties. (Tr. at 465:6-12.) However, instead of analyzing data to make this determination, Tenn simply assumes the answer – that "those . . . hospitals are likely to be in the areas which overlap with both Advocate and NorthShore." (*Id.* at 465:10-12.) But, as defense expert McCarthy pointed

12

out, "you can constrain the postmerger system by constraining any [one] of its hospitals" (*id.* at 1224:7-8), so requiring a hospital to constrain both parties to be included in the geographic market makes little sense. In short, plaintiffs have not shouldered their burden of proving a relevant geographic market. Absent that showing, they have not demonstrated that they have a likelihood of succeeding on their Clayton Act claim. Therefore, the Court denies plaintiffs' motion for a preliminary injunction [152].

**SO ORDERED.**  ENTERED: **June 20, 2016**

_____
**HON. JORGE L. ALONSO**
**United States District Judge**